UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
FORTESA QORROLLI,

        Plaintiff,

v.                                                            18 Civ. 6836 (DLC)

METROPOLITAN DENTAL ASSOCIATES,
D.D.S. – 225 BROADWAY, P.C., et al.

        Defendants.
-------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS UNDER RULES 50/59**


Derek Smith, Esq.
Zachery I. Holzberg, Esq.
Derek Smith Law Group
1 Penn Plaza
New York, N.Y. 10119
(201) 925-2540

Stephen Bergstein, Esq.
Bergstein & Ullrich
5 Paradies Lane
New Paltz, N.Y. 12561
(845) 469-1277

Counsel for Plaintiff

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1. Plaintiff's employment with Metropolitan Dental Associates. . . . . . . . . . . . . . . . . . . 1

    2. Mario Orantes sexually harasses Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    3. Orantes sexually harasses Plaintiff's female coworkers . . . . . . . . . . . . . . . . . . . . . . . 4

    4. Dr. Cohen ignores Plaintiff's complaints about the sexual harassment . . . . . . . . . . . . 5

    5. Plaintiff resigns from MDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Point I: Defendants are not entitled to judgment as a matter of law. . . . . . . . . . . . . . . . . . . . . 8

    A. The standard of review is manifest injustice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B. Orantes subjected Plaintiff to a hostile work environment . . . . . . . . . . . . . . . . . . . . . 9

        1. Legal standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            a. Federal and state law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            b. New York City Human Rights Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2. The sexual harassment verdict is a not a manifest injustice . . . . . . . . . . . . . . . . . 12

Point II: The damages awards are not excessive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A. Defendants waived the argument that Plaintiff cannot recover
       compensatory or punitive damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B. The jury properly awarded Plaintiff $575,000 for pain and suffering . . . . . . . . . . . . 16

    C. The jury properly awarded Plaintiff $2 million in punitive damages. . . . . . . . . . . . . 20

        1. MDA's failure to remedy the hostile work environment was
           reprehensible and in conscious disregard of Plaintiff's rights . . . . . . . . . . . . . . . 21

2. The ratio of punitive to compensatory damages comports
with constitutional limits and awards in comparable cases . . . . . . . . . . . . . . . . . . 23

3. The $2 million punitive damages award is not a manifest injustice . . . . . . . . . . . 23

Point III: Defendants are not entitled to a new trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A.  The trial was not tainted by inadmissible hearsay. . . . . . . . . . . . . . . . . . . . . . . . . 25

B. Defendants' credibility arguments are no basis for a new trial . . . . . . . . . . . . . . . . 27

C. Defendants' remaining new trial issues are meritless. . . . . . . . . . . . . . . . . . . . . . . 28

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## Table of Authorities

**Cases**

BMW of North Am., Inc. v. Gore,
    517 U.S. 559 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 23

Chauca v. Abraham,
    30 N.Y.3d 325 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Chopra v. General Elec. Co.,
    527 F. Supp. 2d 230 (D. Conn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cross v. N.Y.C. Transit Auth.,
    417 F.3d 241 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Cruz v. Loc. Union No. 3,
    34 F.3d 1148 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Duarte v. St. Barnabas Hosp.,
    341 F. Supp. 3d 306 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,
    136 F.3d 276 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Gallagher v. Delaney,
    139 F.3d 338 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Gallegos v. Elite Model Mgmt. Corp.,
    Index No. 120577/10, 2004 WL 51604 (Sup. Ct. N.Y. Co. Jan 6, 2004)24

Greenbaum v. Handelsbanken,
    67 F .Supp. 2d 228 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Greenway v. Buffalo Hilton Hotel,
    143 F.3d 47 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Gutierrez v. Taxi Club Mgt., Inc.,
    17 CIV 532 (AMD) (VMS), 2018 WL 3432786 (E.D.N.Y. June 25, 2018) . . . . . . . . . 22

Ismail v. Cohen,
    899 F.2d 183 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Kirsch v. Fleet St., Ltd.,
    148 F.3d 149 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

Lee v. Edwards,
    101 F.3d 805 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Liebovitz v. N.Y.C. Transit Auth.,
    252 F.3d 179 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 26

Lore v. City of Syracuse,
    670 F.3d 127 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15

Madrigal v. Montefiore Med. Ctr.,
    191 A.D.3d 407 (1st Dept. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Malmsteen v. Berdon, LLP,
    595 F. Supp. 2d 299 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Manganiello v. City of New York,
    612 F.3d 149 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Marcic v. Reinauer Transp. Cos.,
    397 F.3d 120 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Matusick v. Erie Cty. Water Auth.,
    739 F.3d 51, 72 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

National R.R. Passenger Corp. v. Morgan,
    536 U.S. 101 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Olsen v. Cty. of Nassau,
    615 F. Supp. 2d 35 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Patterson v. Balsamico,
    440 F.3d 104 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

PBA v. City of New York,
    310 F.3d 43 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Piesco v. Koch,
    12 F.3d 332 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 24

Pucino v. Verizon Wireless,
618 F.3d 112 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Raedle v. Credit Agricole Indosuez,
670 F.3d 411 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rasmy v. Marriott Int'l, Inc.,
952 F.3d 379 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Redd v. New York Div. of Parole,
678 F.3d 166 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Reed v. A.W. Lawrence & Co., Inc.,
95 F.3d 1170 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rivera v. Rochester Genesee Reg'l Transp. Auth.,
702 F.3d 685 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Sharkey v. JP Morgan Chase,
10 Civ. 3824 (DLC), 2018 WL 1229831 (S.D.N.Y. March 5, 2018) . . . . . . . . . . . . . . . 20

Smith v. Lightning Bolt Products., Inc.,
861 F.2d 363 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sooroojballie v. Port Auth.,
816 Fed. Appx. 536 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Stampf v. Long Island R. Co.,
761 F.3d 192 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

State Farm Mut. Auto. Ins. Co. v. Campbell,
538 U.S. 408 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

Summa v. Hofstra Univ.,
708 F.3d 115 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Suri v. Grey Global Group, Inc.,
164 A.D.3d 108 (1st Dept. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Terry v. Ashcroft,
336 F.3d 128 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Tolbert v. Queens Coll.,
    242 F.3d 58 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Torres v. Pisano,
    116 F.3d 625 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Trivedi v. Cooper,
    95 CIV. 2075 (DLC), 1996 WL 724743 (S.D.N.Y. Dec. 17, 1996) . . . . . . . . . . . . . 24, 25

Tulino v. City of New York,
    15-CV-7106 (JSR), 2019 WL 3810975 (S.D.N.Y. Aug. 1, 2019) . . . . . . . . . . . . . . . . . . 19

Turley v. ISG Lackawanna, Inc.,
    774 F.3d 140 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 23

Uni-Rty Corp. v. Guangdong Bldg., Inc.,
    571 Fed. Appx. 62 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. v. Agrawal,
    726 F.3d 235 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. v. Becker,
    502 F.3d 122 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. v. Downing,
    297 F.3d 52 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. v. Snype,
    441 F.3d 119 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Villalta v. JS Barkats, P.L.L.C.,
    16 CV 2772 (RAR), 2021 WL 2458699 (S.D.N.Y. Apr. 16, 2021) . . . . . . . . . . . . . . . . 16

Watson v. E.S. Sutton, Inc.,
    02 CIV. 2739 (KMW), 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005) . . . . . . . . . . . . . . . 23

Wiercinski v. Mangia 57, Inc.,
    787 F.3d 106 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Williams New York City Hous. Auth.,
    61 A.D.3d 62 (1st Dept. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Zakre v. Norddeutsche Landesbank Girozentrale,
    541 F. Supp. 2d 555 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statutes**

Fed. R. Civ. P. 50(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 9, 15

Fed. R. Civ. P 59. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

### Introduction

The jury found that Plaintiff's supervisor, Mario Orantes, subjected her to extensive, almost daily sexual harassment during her six-year employment with Metropolitan Dental Associates (MDA) in the form of attempted sexual liaisons, physical touching, offensive comments, and retaliation for resisting his advances. Dr. Paul I. Cohen, who owned the practice, ignored Plaintiff's repeated complaints about her work environment. Plaintiff also personally saw Orantes harass four other female coworkers; he pursued them as he did Plaintiff: grabbing and summoning them into empty offices for sexual activity. Plaintiff also testified about the extensive pain and suffering occasioned by the harassment. Even had Defendants not waived many of their arguments under Rule 50(a)(2), the record supports the verdict.

Nor are Defendants entitled to a new trial. This Court issued limiting and curative instructions when the jury heard second-hand accounts about Orantes' office-wide sexual harassment. The law presumes the jury will follow those instructions. Defendants' other trial-related objections on this motion are not enough to warrant a new trial. Defendants got a fair trial and the jury believed Plaintiff over their witnesses. While Defendants challenge the damages as excessive, the record supports the pain and suffering and punitive damages, as Plaintiff testified extensively about the long-term emotional harm caused by the hostile work environment, and her mother corroborated this testimony. Dr. Cohen's callous failure to remedy the work environment supports the punitive damages award.

### Statement of Facts

#### 1. Plaintiff's employment with Metropolitan Dental Associates.

Fortesa Qorrolli, a 32-year-old dental hygienist, began working for MDA in December 2009. (Tr. 71-72). Plaintiff was supervised by Mario Orantes, the office manager who controlled

1

her schedule and made personnel decisions; and Dr. Paul I. Cohen, who owned the practice and placed "an extreme amount of trust" in Orantes, his second-in-command. (Tr. 31, 35-38, 55, 75-78, 231). While Orantes and Dr. Cohen "consulted about a hundred things a day," Dr. Cohen was responsible for Orantes' actions. (Tr. 36, 55, 227). This case centers on the hostile work environment created by Orantes and condoned by Dr. Cohen.

### 2. Mario Orantes sexually harasses Plaintiff.

The sexual harassment began three months after Plaintiff began working at MDA (Tr. 160-61), and it occurred "many, many times," and "was a daily thing." (Tr. 217). During their daily professional contact (Tr. 78), Orantes would touch Plaintiff, usher her into an unoccupied room, pronounce his love for her, angle for kisses, and comment on her body. (Tr. 91-92, 164-65). For six years, Orantes sexually harassed Plaintiff at least "every other day." (Tr. 137); *see also* Tr. 182 (describing this as "constant"). Plaintiff told Orantes "to back off many times" (Tr. 92), making it clear she had no sexual interest in him. (Tr. 165-66).

Orantes touched Plaintiff's body "many times," or a few times per week. (Tr. 93). In addition to kissing Plaintiff and putting his arms around her, Orantes "grabbed my thigh and butt area." (*Id.*) He grabbed her arms and shut the door "[e]very time that he called me into a room with him." (Tr. 93-94). Once, when Plaintiff was in the elevator upon returning from the gym, he "touched my leg, my butt area, and said, oh wow, that's very firm." (Tr. 93, 162 [Orantes grabbed her thigh]). He added, "if you worked out your brain as much as you work out ass, you would be better off in life." (Tr. 93). Once, when Orantes kissed her in the periodontal department, Plaintiff got "scared" and "started to experience anxiety and panic attacks." (Tr. 92).

For six years, Orantes also "very often" made unwanted sexual comments, telling Plaintiff that "you're beautiful and you could easily sell treatment because you are a woman. He

has told me that he loved me. He told me that I had a nice, firm body." (Tr. 95). Orantes said this "a few times a week, sometimes it would go a week and then he will make it the next week but continuously it would happen." (*Id.*) These comments never stopped. (Tr. 96).

Plaintiff's mother, Nexhmije Qorrolli, who worked in the office, testified that, every day for six years, she saw Orantes grab and touch Plaintiff, pull her into a room and call her disparaging names, like "retard," "stupid," and "worthless." (Tr. 276). Nexhmije "saw Mario putting hands on Tesa, pulling her from the hand, pulling her inside the room, closing the door." (Tr. 280). Orantes also grabbed Plaintiff by the arm. (Tr. 291-92). "I saw him many times putting hands around her, putting on the shoulder, on the butt area and down, grabbing her, pulling her on her hand, holding her in the room." (Tr. 320-21). To keep an eye on Orantes, Nexhmije often showed up when Orantes called Plaintiff into a private room, only to have Orantes throw her out of the room. (Tr. 99-100). Once, when Nexhmije saw Orantes position himself "very close to Tesa," he slammed the door on her and called her "Hitler" because "you want to see what's going on and you should just go do your work and mind your business." (Tr. 100).

After she rejected his advances, Orantes cut Plaintiff's hours and sent her home early (Tr. 98-99), once denying that he had granted Plaintiff an accommodation to see her ailing father, threatening and cursing her in the process. (Tr. 212-13). Orantes also tried to get Plaintiff fired, repeatedly telling Dr. Cohen in her presence that she was incompetent and "doesn't do anything around here" (Tr. 92, 97), even blaming Plaintiff for office problems over which she had no control. (Tr. 146-47). During these meetings, Nexhmije recalled, Plaintiff was "shaking" and her arteries were "popping like to explode" when Orantes raised his voice and lied about Plaintiff. (Tr. 277-78). When Plaintiff tried to defend herself, Orantes would cut her off and get Dr. Cohen so "worked up" that "he didn't want to hear it anymore. . . . There [were] times [Dr. Cohen] told

me to get out and go home and don't come back for the day." (Tr. 98). Under his *modus operandi,* after Plaintiff resisted Orantes' advances, the harassment would briefly "cool[] off" but start up again, creating "a vicious, vicious cycle" and a continuous "mind game." (Tr. 96, 195). Orantes would pretend nothing had happened and avoided Plaintiff for a few days "until he started acting aggressive towards me again" and falsely disparaged her job performance to Dr. Cohen. (Tr. 97); *see also* Tr. 92 (same).

After Orantes humiliated Plaintiff this way, she would return to work in tears "and then Mario would come after me, call me inside a room, close the door behind him and tell me that this wasn't him, that it was Dr. Cohen who was doing this and that he loves me, he would hug me." (Tr. 117). Orantes would wipe the tears from Plaintiff's face and kiss her, hinting at another kiss while she pushed him away "and he just stormed out and then that cycle waited two days, maybe, and it happened all over again." (Tr. 117-18). This manipulative cycle began in 2010. It "would just never end and I didn't know what to do. I wanted to end my life. The pain was really unbearable." (Tr. 97, 161). Corroborating Plaintiff's account, Nexhmije saw Orantes kiss Plaintiff, invade her personal space, and hug Plaintiff "all the time" right after berating her in Dr. Cohen's office. (Tr. 290).

### 3. Orantes sexually harasses Plaintiff's female coworkers.

Plaintiff witnessed Orantes' inappropriate sexual activity toward other women firsthand, which affected her because it created a sexually harassing environment and allowed these women to slack off and leave early, increasing Plaintiff's workload. (Tr. 223-24). Plaintiff saw Orantes and another female employee, Faten, enter unoccupied rooms, close the door, and disappear for over an hour. (Tr. 83-84, 171). Plaintiff also saw Orantes "many times" push Fiona into an office, where they spent a half-hour alone. (Tr. 85). In addition, Plaintiff testified,

Orantes routinely pulled another dental hygienist, Marina, off the floor in between patients and brought her into a room, from which she would emerge 20 minutes later with her lipstick smudged. (Tr. 87-88). Plaintiff saw Orantes and Marina with their bodies touching in the lunchroom in 2014 or 2015, when Marina had lipstick all over her face "and her lab coat is halfway down her shoulders." (Tr. 88, 171-73). It was "very obvious that they were kissing and there is a lot more going on than just kissing." (Tr. 173). Plaintiff also saw Orantes rub his groin against Mercedes, a receptionist, and comment on her "nice, sexy legs," her clothing, and her rear-end. (Tr. 90, 188, 202-03).

### 4. Dr. Cohen ignores Plaintiff's complaints about the sexual harassment.

Although MDA employed more than 100 people at the time (Tr. 31-32), the office had no written sexual harassment policy or employee handbook. (Tr. 102, 231). Dr. Cohen's testimony on this point was inconsistent. (Tr. 33-35). Nor did MDA have an HR office. (Tr. 102). Dr. Cohen knew sexual harassment in the workplace is illegal and that management should try to prevent a hostile work environment. (Tr. 32).

As soon as Orantes began sexually harassing her, and throughout her employment, Plaintiff "many times" complained to Dr. Cohen about it. (Tr. 96, 136-37, 180-81). Plaintiff said "he makes unwelcome sexual comments to me. I told Dr. Cohen that he brings me into rooms and he hugs me and that he touches me and he puts his arms around me, he pulls me next to him and he tells me that he loves me and he likes me and that he thinks I'm beautiful." (Tr. 182). "Begg[ing] him to believe me," Plaintiff said Orantes was falsely telling Dr. Cohen that she was incompetent "because I'm not letting him sexually harass me." (Tr. 96). Plaintiff complained to Dr. Cohen "right after Mario threatened to fire me, right after Mario told Dr. Cohen, you need to fire her, you need to get rid of her, she's a fucking moron, she doesn't know anything, she's an

idiot." (*Id.*); *see also* Tr. 205 (same). Plaintiff told Dr. Cohen that, after he tried to get her fired, Orantes would pretend to be the good guy and disparage Dr. Cohen. (Tr. 181). Dr. Cohen "did nothing about it." (Tr. 96). Nexhmije also complained to Dr. Cohen about the hostile work environment, noting how Orantes treated her daughter. (Tr. 283). But Dr. Cohen was in denial: "he never wanted to believe that," and the harassment continued "for all these years." (*Id.*)

In January 2015, while complaining about the sexual harassment, Plaintiff told Dr. Cohen that patients were walking out over the long waits (Tr. 82) for which Orantes blamed Plaintiff and her mother. (Tr. 141). In fact, Plaintiff told Dr. Cohen, Orantes was having sex with the hygienists, putting "all this workload . . . on me and I can't do it myself because I cannot see 20, 30 patients." (Tr. 83, 100). She added, "the reason why you have these patients complaining and why they wait so long is because Marina, your hygienist . . . disappears with Mario for about half a day." (Tr. 141). Orantes was blaming Plaintiff "for all the wrongdoings and everything that was going wrong in the office because I wasn't allowing him to sexually harass me." (Tr. 83). An unreceptive Dr. Cohen told Plaintiff "[she] was fucking crazy." (Tr. 83, 100). Dr. Cohen's indifference to Plaintiff's complaint was humiliating. (Tr. 83).

When Plaintiff told Dr. Cohen that Orantes was sexually harassing Marina, he replied, "Who the fuck is Marina?" (Tr. 100). Plaintiff said Marina was the other hygienist. (Tr. 100). Dr. Cohen "said I don't want to hear it, Tesa, just go downstairs[.]" (*Id.*) It did not appear that Dr. Cohen discussed Plaintiff's complaints with Orantes, as "nothing was changing." (*Id.*) When Orantes somehow learned that Plaintiff told Dr. Cohen that Orantes was harassing a female coworker, Faten, Orantes "told me to mind my fucking business and do as he says or else he was going to throw me the fuck out." (Tr. 100-01).

Apart from her verbal complaints about the harassment, Plaintiff also gave a complaint letter to Dr. Cohen. (Tr. 112-15). This Court instructed the jury to disregard Plaintiff's testimony about the advice of counsel in omitting any reference to sexual harassment in the letter. (Tr. 132, 134). Dr. Cohen never got back to Plaintiff about the letter, which made Plaintiff feel "that I didn't matter, that what I was going through made no difference, and that I just had to deal with it if I wanted to work there." (Tr. 135-36).

In October 2015, a coworker faxed the office a letter detailing Orantes' sexual harassment. (Exhibit 1 to Bergstein Aff.; Tr. 57, 102-04, 109). While he tried to intercept the fax (Tr. 103, 109), Orantes recalled reviewing it with Dr. Cohen. (Tr. 233-37). While Orantes testified that Dr. Cohen investigated the allegations in the fax and that a tape recording memorializing this inquiry proved the allegations false (Tr. 249-252), Defendants introduced no evidence to corroborate this testimony, and the jury heard no such recording.

Plaintiff told Dr. Cohen that the fax "confirm[s] what I am telling you" (Tr. 110, 139, 141-42), "how he sexually harasses women and what he puts them through if you don't give in to his sexual advances." (Tr. 110). While Plaintiff vowed not "to put myself in a position where I have to be sexually involved with Mario to get away with not working here" (Tr. 139), Dr. Cohen told Plaintiff she was "fucking crazy." (Tr. 110, 139). Without intervention from Dr. Cohen, the harassment continued, and Orantes, who was furious about the fax, "continued to do what he was doing and he was not scared of anything." (Tr. 105). Defendants put on no evidence refuting Plaintiff's testimony that Orantes was never disciplined over this fax. (Tr. 106).

In the end, Dr. Cohen did "absolutely nothing" about Plaintiff's complaints and undertook no investigation. (Tr. 101). Nor did he intervene on her behalf. (*Id.*) No one interviewed Plaintiff or the staff about her complaints. (Tr. 102). Orantes "saw that nothing was

7

getting done and he then just continued to get worse and worse because he knew he could get away with it." (Tr. 101). Dr. Cohen could not recall investigating any sexual harassment claims against Orantes. (Tr. 58). While the office has surveillance cameras, Dr. Cohen did not check to see if Orantes created a hostile work environment, testifying, "[i]t's a pain in the ass for me to go to my IT guy and say dial up the camera into the endo room at 6:30 this morning I haven't got time in my life to do that[.]" (Tr. 59).

### 5. Plaintiff resigns from MDA.

Despite the sexual harassment, Plaintiff kept working because she needed to pay her mortgage. (Tr. 94, 154, 184-85, 207). But the work environment became so unbearable that Plaintiff resigned in May 2016 (Tr. 116-17), as "Mario's vicious cycles were only getting worse and harsher and he made it clear that he wanted me out of there." (*Id.*) Once Orantes knew that Plaintiff had complained about him, he made her life a "a miserable hell until I got to the point where I couldn't take it and I had to quit." (Tr. 117). "Nothing was changing." (Tr. 135).

### Point I

### Defendants are not entitled to judgment as a matter of law

### A. The standard of review is manifest injustice.

"A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Rule 50(a)(2). "The principal purpose of the requirement that any such motion be made before the case is submitted to the jury is 'to assure the responding party an opportunity to cure any deficiency in that party's proof.' To ensure that that opportunity is a 'fair' one, Rule 50(a) also provides that '[t]he motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.' '[T]he specificity requirement is obligatory.'" *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012). As such, a defendant

must "identify the specific element that the defendant contends is insufficiently supported." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 286 (2d Cir. 1998).

At trial, counsel for Defendants sought relief under Rule 50(a)(2), stating, "we would like to make a motion for directed verdict on the basis that the plaintiff has not met its burden of proof, not made out a *prima facie* case." (Tr. 336-37).[1] This motion did not articulate the precise grounds that Defendants now raise post-trial. *Compare Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993) (defendants' cursory statement that they "move for a directed verdict" was not "sufficiently informative to preserve their right to move for judgment as a matter of law after trial"); *Smith v. Lightning Bolt Products., Inc.*, 861 F.2d 363, 368 (2d Cir. 1988) (where defendant's "first motion stated simplistically that 'plaintiff has failed to make out a *prima faci[e]* case'; and its attorney renewed this motion with only the statement, 'I don't believe there is any evidence before this Jury of any fraud,' these motions were not 'sufficiently specific to alert [the plaintiff] to [the defendants' Rule 50(b)] contentions that there was simply no proof' to support a specific element of the claim"). As their Rule 50(a)(2) motion failed to comply with the specificity requirements or detail the deficiencies in Plaintiff's proof, the standard of review is manifest injustice. *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998).

### B. Orantes subjected Plaintiff to a hostile work environment.

"[A] Rule 50 motion must be denied unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Matusick v. Erie Cty. Water Auth.*, 739 F.3d 51, 72 (2d Cir. 2014). "[T]he trial court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to

---

[1] Defendants argue that they made their directed verdict motion "at the close of Plaintiff's case in chief" at page 212. (Def. Mem. at 5). No such motion was made at that portion of the trial.

give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. In making its evaluation, the court should 'review all of the evidence in the record,' but it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001). "A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).

Juries are in the best position to determine whether a plaintiff has suffered a hostile work environment. *See Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998) ("An Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury"); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1179 (2d Cir. 1996) ("It cannot be denied that we live in a time of significant cultural change, in which varieties of coarse conduct once taken for granted in the American workplace appear to be subject to punishment under the law").

### 1. Legal standards.

#### a. Federal and state law.

"To prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013). "[T]he kinds of workplace conduct that may be actionable under Title VII . . . include '[u]nwelcome sexual advances, requests for sexual favors,

and other verbal or physical conduct of a sexual nature.'" *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012).

Rather than review individual incidents in isolation, *id.* at 176, courts should view the evidence "cumulatively in order to obtain a realistic view of the work environment . . . and to determine whether they alter[ed] the conditions of [plaintiff's] employment and create[d] an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 695 (2d Cir. 2012). "[A] plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd*, 678 F.3d at 175. "Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant." (*Id.*) The ultimate question is whether the harassment altered the plaintiff's work environment "for the worse." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).

### b. New York City Human Rights Law.

Under the City HRL, '[t]here is no '[unlawful] harassment provision' of the law to interpret; there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment" based on sex. *Williams New York City Hous. Auth.*, 61 A.D.3d 62, 75 (1st Dept. 2009). While federal law requires "severe or pervasive" harassment (*id.*), the City HRL rejects this "middle ground" approach, "a test that had sanctioned a significant spectrum of conduct demeaning to women. With this broad remedial purpose in mind, we conclude that questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Id.* at 76.

Under the City law, "the primary issue for a trier of fact in harassment cases, as in other terms and conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender." *Id.* at 78. The only affirmative defense is whether the plaintiff suffered a "petty slight" or "trivial inconvenience." *Suri v. Grey Global Group, Inc.*, 164 A.D.3d 108, 114 (1st Dept. 2018).

### 2. The sexual harassment verdict is a not a manifest injustice.

The trial record supports the verdict. At a minimum, the sexual harassment was not a "petty slight" or "trivial inconvenience" under the City HRL. At least every other day for six years (Tr. 137, 160-61, 217), Orantes made persistent, unwanted sexual advances by (1) physically maneuvering her into a vacant office for a sexual liaison (Tr. 92); (2) touching her body "many times," at least a few times per week (Tr. 93, 217); (3) kissing Plaintiff, touching her rear-end, and grabbing her thigh (Tr. 92-93, 162); and (4) regularly commenting on her body in sexual terms and stating he loved her. (Tr. 91, 95-96). This was not "non-sexual touching." (Def. Mem. at 8). While Defendants claim that Plaintiff identified no "explicit sexual overtures" (*id.* at 6), the jury understood that Orantes made it clear that he wanted to have sex with Plaintiff.

Defendants further argue that Plaintiff only identified "[t]wo alleged incidents" and that the harassment was "episodic" because she failed to specify the "number of times [the alleged harassment] allegedly occurred. *Id.* at 6, 8. But Plaintiff recalled that Orantes' sexual advances and physical contact happened almost daily for six years. Plaintiffs are not required to "recount each and every instance of abuse to show pervasiveness." *Pucino v. Verizon Wireless*, 618 F.3d 112, 119-120 (2d Cir. 2010) (citing *inter alia Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997) ("If a jury were to credit [the plaintiff's] general allegations of constant abuse, which were confirmed by her coworkers, it could reasonably find pervasive harassment, even in the absence

of specific details about each incident")). On a similar record, in denying Defendants' summary judgment motion, this Court stated, "Qorrolli's testimony is sufficient to raise a genuine dispute of material fact about the existence and pervasiveness of Orantes' harassment. To the extent that the defendants contend that Qorrolli's testimony should not be believed, her credibility must be tested at trial." (Dkt. 64, at 8); *see also id.* at 8-9 ("Qorrolli's testimony, taken in the light most favorable to her, is sufficient to raise triable issues about whether Orantes' sexualized remarks and touching were so pervasive and abusive that they altered her working conditions").

While Defendants minimize Plaintiff's testimony in claiming she only called "one first-hand witness" (Def. Mem. at 8), Plaintiff's mother corroborated this testimony, recalling that Orantes inappropriately hugged and touched Plaintiff "many times," touched her "on the butt area and down," and ushered Plaintiff into a room and closed the door. (Tr. 276, 280, 290-92, 320-21). In addition, whenever Plaintiff objected to these advances and complained to Dr. Cohen, Orantes (1) tried to get Plaintiff fired (Tr. 92, 97-98, 146-47), (2) sent her home for the day (Tr. 98-99), (3) manipulated her schedule (Tr. 99), and (4) threatened to deny her any days off, even for medical reasons. (Tr. 212-13). Following their meetings with Dr. Cohen, Orantes would blame it all on Dr. Cohen and said he loved her while hugging and kissing her again. (Tr. 97, 117-18, 161).

In addition, Plaintiff observed that Orantes and other female coworkers disappeared into an empty office for extended periods of time (Tr., 83-85, 87-88, 171), although some incidents took place openly, as one woman had lipstick smudged on her face and "her lab coat [was] halfway down her shoulders" (Tr. 88, 171-73), and she saw Orantes rub his groin against another woman and comment on her "sexy legs." (Tr. 90, 188, 202-03). *See Liebovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) ("evidence of harassment directed at other co-workers

can be relevant to an employee's own claim of hostile work environment discrimination"). Plaintiff's firsthand knowledge of Orantes' office-wide harassment undercuts Defendants' claim that she did not know what he "allegedly did with the others because she did not hear or see it." (Def. Mem. at 7). The jury could infer that Orantes took women into these empty offices during business hours for sexual liaisons while patients were awaiting treatment, particularly since Orantes tried this tactic with Plaintiff. As Dr. Cohen brushed off Plaintiff's repeated verbal complaints, the jury could find that Plaintiff understood, in watching Orantes treat women this way with impunity, that she would have to tolerate this harassment if she wanted to keep her job.

Defendants also minimize Plaintiff's evidence about the facially-neutral harassment and verbal abuse. The jury could factor Orantes' non-sexual conduct into the hostile work environment analysis. As noted above, Plaintiff testified that, when she rejected his advances, Orantes disparaged her job performance in trying to have Dr. Cohen terminate her employment. This "vicious cycle" made the work environment more unbearable for Plaintiff, as her refusal to have sex with Orantes caused constant worry that she would lose her job and be unable to support her family. (Tr. 94, 139, 154, 184-85, 207). *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020) ("when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim"). The jury charge reflects this standard. (Tr. 381). While Defendants cite Plaintiff's testimony for the proposition that Orantes was simply commenting on her job performance (Def. Mem. at 7), the jury could disagree, as she testified that he called her a "fucking moron" because she resisted his sexual advances. (Tr. 205).

Finally, Defendants' argument that Plaintiff identified no sexual harassment within the 300-day limitations period (Def. Mem. 7) ignores the three-year statute of limitation under state

and city law, as well as Plaintiff's testimony that the harassment continued throughout her employment, up until her resignation, as "Mario's vicious cycles were only getting worse and harsher[.]" (Tr. 116-17). While Defendants argue that "only alleged misconduct occurring on or after September 28, 2015 would fall within the 300-day limitations period" under Title VII (Def. Mem. at 7 n. 3), under the continuing violations rule, all sexual harassment is actionable if it continues into the 300-day window. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-18 (2002).

### Point II

### The damages awards are not excessive

"The 'calculation of damages is the province of the jury,' and 'we will not vacate or reduce a jury award merely because we would have granted a lesser amount of damages.' . . . We have observed repeatedly that juries have wide latitude in setting compensation for damages." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014). Since the compensatory damages award issued under federal and city law, this Court should review the propriety of the damages award under the more lenient federal standard, which upholds the amount unless it "is so high as to shock the judicial conscience and constitute a denial of justice." *Manganiello v. City of New York*, 612 F.3d 149, 168 (2d Cir. 2010).

### A. Defendants waived any argument that Plaintiff cannot recover compensatory or punitive damages.

"A Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter." *Uni-Rty Corp. v. Guangdong Bldg., Inc.*, 571 Fed. Appx. 62, 64 (2d Cir. 2014) (summary order). This rule applies when the defendant challenges the plaintiff's entitlement to any damages. *See Lore*, 670 F.3d at 153 (defendant waived challenge to plaintiff's entitlement to reputational damages in failing to

raise it under Rule 50(a)(2)); *Cruz v. Loc. Union No. 3*, 34 F.3d 1148, 1155 (2d Cir. 1994) ("Although Local Union No. 3 claims that it could not have raised the issue of damages previously because they were an unknown quantity, it could have challenged the sufficiency of the evidence for a damage award").

Defendants claim "Plaintiff did not prove emotional distress in any amount." (Def. Mem. at 8). They further claim "there was no testimony and/or medical record from [Plaintiff] or anyone else on causation." *Id.* at 9. They also challenge her entitlement to punitive damages. *Id.* at 17. As Defendants did not assert these arguments under Rule 50(a)(2) (Tr. 336-37), the test is manifest injustice. *Kirsch*, 143 F.3d at 164.

### B. The jury properly awarded Plaintiff $575,000 for pain and suffering.

Plaintiff's pain and suffering falls within the significant to egregious category. "Significant emotional distress claims are based on more substantial harm or offensive conduct and may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses. Egregious emotional distress claims yield the highest awards and are warranted only where the employer's conduct was outrageous and shocking or affected the physical health of the plaintiff." *Sooroojballie v. Port Auth.*, 816 Fed. Appx. 536, 546 (2d Cir. 2020) (summary order). "In 'significant' or 'egregious' cases, where there is typically evidence of 'debilitating and permanent alterations in lifestyle,' larger damage awards may be warranted." *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 47 (E.D.N.Y. 2009)..

"Important factors in assessing an appropriate amount to award for emotional suffering include 'the amount, duration, and consequences of [the claimant's] emotional distress.'" *Villalta v. JS Barkats*, 16 CV 2772 (RAR), 2021 WL 2458699, at *15 (S.D.N.Y. Apr. 16, 2021), *report and recommendation adopted*, 2021 WL 2458023 (S.D.N.Y. June 16, 2021). Prolonged, or

"lasting" psychological damage from the hostile work environment can support damages in the neighborhood of $500,000. *Sooroojballie*, 816 Fed. Appx. at 547-48. Plaintiff satisfies this test.

While Defendants claim Plaintiff "did not prove emotional distress in any amount" and she did not produce medical testimony or records to prove causation (Def. Mem. at 8-9), the record shows extensive pain and suffering caused by the sexual harassment, particularly since the work environment darkened Plaintiff's sunny personality. Moreover, Plaintiff's pain and suffering was corroborated by her mother (who noted the emotional distress had physical manifestations), her treatment for anxiety and depression, and "the objective circumstances of the violation itself." *PBA v. City of New York*, 310 F.3d 43, 45 (2d Cir. 2002).

The sexual harassment over "six long years" had a "horrible" impact on Plaintiff's mental state. (Tr. 142-43). Plaintiff recalled that if women refused Orantes' sexual advances, "he made your life a miserable hell." (Tr. 203). After each sexual harassment incident, Orantes tried to get Plaintiff fired then tried "to play the good guy with me." (Tr. 145-46). She woke up "every morning and thinking today would be my last day at work for no reason just because I wasn't giving in to Mario, or today would be the day that I would finally have to give in to Mario because I needed to keep my job." (Tr. 143). "I became someone I'm not. I hated life. I didn't want to wake up in the morning to go to work. I no longer enjoyed my profession, I no longer enjoyed my job. . . . I would go home and I would just sometimes go to bed without showering or even taking off my scrubs because the next morning it was very hard for me to wake up and get myself to get to work, so it was just easier to get up from bed and just walk into the car and get driven to work." (*Id.*) She slept to escape the pain and did not want to live. (Tr. 153).

For the first time in her life (Tr. 156), Plaintiff began suffering anxiety "all the time, very dizzy in the mornings, very weak. I wasn't eating. It was six long years every day, every day in

this fearful state of mind going to work." (Tr. 143). The panic attacks that Plaintiff suffered "every single day" as she approached the building caused her to feel "jittery, I would feel like I was losing my breath, like I couldn't breathe. I would literally forget that I have to walk into the building and go inside." (Tr. 144). The panic attacks also made her feel "very nauseous, I felt very weak. I felt like the doors would close in on me." (*Id*.) Plaintiff had to "breathe in and breathe out and try to calm myself and walk into the office." (*Id*.) Everyone at work saw that Plaintiff was "constantly crying" and "constantly anxious waiting for something to happen [with Orantes] and I was never calm." (Tr. 144-45). Plaintiff still avoids that neighborhood because "those panic attacks just kick in." (Tr. 144).

In June 2015, Plaintiff began seeing a psychiatrist twice a month, tapering off over time. (Tr. 148-49). Plaintiff told Dr. Lee about the "sexual harassment, mental abuse, verbal abuse," and what "Dr. Cohen had put me through." (Tr. 150). Dr. Lee prescribed Zoloft for the PTSD and depression and Klonopin for the panic attacks/anxiety, which Plaintiff took for the duration of her employment with MDA (Tr. 156-57), as "I couldn't go on with life the way it was, not in its current state at least." (Tr. 158). When the medication did not improve Plaintiff's mood, Dr. Lee increased the dosage. (*Id*.) Ultimately, her treatment with Dr. Lee did not help. (Tr. 158-59).

Plaintiff still suffers anxiety and depression. (Tr. 151, 159). While she was previously happy and always smiling, today she is "constantly scared, constantly worried. It is very hard for me to enjoy life" after six years of daily verbal and mental abuse. (Tr. 151). "I get angry a lot. I don't have patience. I am just not the person that I was prior to Metropolitan Dental." (*Id*.) She does not want to interact with people or even be around her friends and family, losing friends in the process. (Tr. 152). Plaintiff's experience at MDA "changed me forever." (Tr. 159).

Plaintiff's mother corroborated her pain and suffering, testifying that she went from being a "very happy girl, was full of life, full of energy" to a complete personality change after she began working for MDA, as her mood changes easily and she starts crying, frequently doing so at work. (Tr. 283, 287-88). This personality change occurred after Orantes began summoning Plaintiff to Dr. Cohen's office upstairs, where she was berated. (Tr. 289-290). Plaintiff is now a chronic nail-biter who perforated her nose cartilage out of stress, and "[s]he's not anymore who she used to be." (Tr. 284-85). Plaintiff would go straight to bed still wearing her scrubs after coming home from work out of exhaustion. (Tr. 285-86). Nexhmije also corroborated Plaintiff's testimony about the panic attacks. (Tr. 287).

Plaintiff's case compares favorably to those in which hostile work environment plaintiffs recovered even higher damages awards. In *Turley,* the court sustained $1.32 million in damages, most of it for racial harassment. 774 F.3d at 146, 151-52, 162-63. Turley suffered three years of racial harassment, including physical threats (*id.* at 148), causing "serious panic attacks," "other abnormal behavior," weight loss, sleeplessness, strained relations with his children and a lack of socialization. *Id.* at 150-51. Turley was also diagnosed with "short-term adjustment disorder, depression, and a panic disorder" as well as PTSD. (*Id.*) While Turley "had possessed a colorful and animated personality," the harassment left him "broken and dispirited." *Id.* at 151; *see also Tulino v. City of New York*, No. 15-CV-7106 (JSR), 2019 WL 3810975, at *6 (S.D.N.Y. Aug. 1, 2019) (plaintiff in a multi-year sexual harassment case was entitled to $1 million where she suffered PTSD, major depression, and panic attacks). While Defendants cite *Villalta* in claiming the sexual assaults in that case only yielded $350,000 in compensatory damages (Def. Mem. at 11-12), courts should not "balance the number of high and low awards and reject the verdict in

the instant case if the number of lower awards is greater. Rather, we inquire whether the . . . verdict is within reasonable range." *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990).

While Defendants cite *Sharkey v. JP Morgan Chase*, 10 Civ. 3824 (DLC), 2018 WL 1229831 (S.D.N.Y. March 5, 2018), in moving to set aside the verdict because of the amount of compensatory damages (Def. Mem. at 13), that case is distinguishable. The *Sharkey* plaintiff's minimal pain and suffering evidence (and other possible causes for her depression and anxiety) could not support the $563,000 damages award, 2018 WL 1229831, at *5, 12, the jury curiously awarded the plaintiff the same amount for back pay despite her limited job search efforts (*id.* at *10-12), and the plaintiff's evidence barely supported the liability verdict (*id.* at *10), such that the result could only have resulted from "passion or prejudice" to warrant a new trial on all issues without any option for remittitur. *Id.* at *12. *Sharkey* is distinguishable because Plaintiff put on extensive evidence of the sexual harassment and her pain and suffering, Defendants put on no independent witnesses to refute Plaintiff's testimony, and the jury's evidence-based questions during deliberations (Tr. 412-16) and split verdict on punitive damages (Tr. 420) demonstrates it carefully reviewed the evidence. Should this Court find the compensatory damages are too high, the proper remedy is a remittitur, not a new trial on liability.

**C. The jury properly awarded Plaintiff $2 million in punitive damages.**

Punitive damages are available under the City HRL when the employer "has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017).

In determining whether the punitive damages are excessive, courts consider the "guideposts" under *BMW of North Am., Inc. v. Gore*, 517 U.S. 559 (1996), including "(1) the

degree of reprehensibility of the tortious conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996). "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. Courts examine reprehensibility by considering *inter alia* whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm v. Campbell*, 538 U.S. 408, 419 (2003).

"Separate and apart from constitutional concerns, 'a federal court in a case governed by state law must apply the state law standard for appropriateness of remittitur.'" *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 329 (S.D.N.Y. 2018). Since the jury only awarded punitive damages under the City HRL, "this Court must apply relevant New York precedents and CPLR § 5501(c), which . . . 'provides generally that damages awards are excessive or inadequate if they 'deviate[ ] materially from what would be reasonable compensation.'" (*Id.*)

### 1. MDA's failure to remedy the hostile work environment was reprehensible and in conscious disregard of Plaintiff's rights.

Apart from not maintaining any sexual harassment complaint mechanism in the workplace, Dr. Cohen responded to Plaintiff's repeated complaints about Orantes' sexual harassment with callous indifference, telling Plaintiff she was "fucking crazy." Dr. Cohen allowed Orantes to abuse his supervisory authority in pressuring women for sex during business hours, and Dr. Cohen failed to investigate both Plaintiff's complaint and the allegations in Exhibit 1, the faxed letter. If, as Defendants argued at trial, Dr. Cohen investigated the

allegations in the fax, he did not produce the results at trial, permitting the inference that the findings confirmed the allegations. Dr. Cohen allowed this abusive work environment to continue for the duration of Plaintiff's six-year tenure with MDA. Dr. Cohen himself agreed that "[i]f I condoned anything like [the allegations in Exhibit 1] there would be something wrong with me." (Tr. 54-55). Every employer in New York knows it must take prompt and remedial action when employees complain about sexual harassment. There was no excuse for Dr. Cohen's inaction. While Defendants argue against punitive damages because Orantes contradicted Plaintiff's testimony about the harassment (Def. Mem. at 17), since the jury credited Plaintiff's account, there is no longer any dispute that Orantes created a hostile work environment. The jury's determination that Plaintiff was entitled to punitive damages was not a manifest injustice.

This case compares with other hostile work environment cases where the jury properly awarded punitive damages. *See Duarte*, 341 F. Supp. 3d at 330-31 (supervisor "repeatedly referred to [hearing-impaired] Plaintiff as 'deaf,' and . . . he did so in a manner that was calculated to be demeaning and humiliating to her," while hospital managers ignored her repeated complaints about the discriminatory misconduct); *Gutierrez v. Taxi Club Mgt., Inc.*, 17 CIV 532 (AMD) (VMS), 2018 WL 3432786, at *11 (E.D.N.Y. June 25, 2018), *report and recommendation adopted,* 2018 WL 3429903 (E.D.N.Y. July 16, 2018) ("Plaintiff testified that Mr. Freidman routinely harassed her in front of others, harassed her in front of her daughter, and would become angry when she rebuffed him. Plaintiff testified that she repeatedly asked Mr. Freidman to stop harassing her to no effect. She testified that she told him that she had written proof of his inappropriate behavior, and her employment was terminated within the week"); *Madrigal v. Montefiore Med. Ctr.*, 191 A.D.3d 407 (1st Dept. 2021) (remanding case for trial on punitive damages where "the evidence spoke to the presence of a sustained campaign of

malicious discrimination, as well as a painful and humiliating battery, which collectively amounted to a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard'").

### 2. The ratio of punitive to compensatory damages comports with constitutional limits and awards in comparable cases.

The second *Gore* factor is the ratio of the punitive damages to compensatory damages and back pay. While the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," it notes that "[o]ur jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 424-25. As the jury awarded $575,000 in compensatory damages, a nine-fold ratio of compensatory to punitive damages is approximately $5,175,000. The ratio is approximately 3.5:1 and comports with acceptable ratios. As for the third *Gore* guidepost, the City law places no limits on the maximum award. N.Y.C. Admin. Code § 8-502(a).

### 3. The $2 million punitive damages award is not a manifest injustice.

Defendants do not cite any cases in asserting the punitive damages award was excessive. Should this Court deem the punitive damages award excessive, it should not reduce it below $1 million. That amount would bring the award within the permissible 2:1 ratio under *Turley*, 774 F.3d at 167. Trial courts have sustained punitive damages awards in employment discrimination cases in the mid six-figure range. *Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 567 (S.D.N.Y. 2008), *clarified on reconsideration,* No. 03 CIV. 257, 2008 WL 2557420 (S.D.N.Y. June 26, 2008), *aff'd,* 344 Fed. Appx. 628 (2d Cir. 2009) ($600,000); *Watson v. E.S. Sutton, Inc.*, No. 02 CIV. 2739 (KMW), 2005 WL 2170659, at *19 (S.D.N.Y. Sept. 6, 2005),

*aff'd,* 225 Fed. Appx. 3 (2d Cir. 2006) ($717,000). Plaintiff also highlights the following cases: In *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 272 (S.D.N.Y. 1999), Judge Sotomayor upheld a 1997 punitive damages verdict of $1.25 million -- 2,341,389.06 adjusted for inflation to 2022. In *Gallegos v. Elite Model Mgmt. Corp.*, Index No. 120577/10, 2004 WL 51604, at *4 (Sup. Ct. N.Y. Co. Jan 6, 2004), *rev'd on other grounds*, 28 A.D.3d 50 (1st Dept. 2005), the court upheld a 2003 punitive damages verdict of $2.6 million -- $4,264,343.42 adjusted for inflation. In *Chopra v. General Elec. Co.*, 527 F. Supp. 2d 230, 246 (D. Conn. 2007), the court remitted a 2006 punitive damages verdict to $5 million -- $7,514,170.45 adjusted for inflation.

### Point III

### Defendants are not entitled to a new trial

"A district court may grant a motion for new trial under Rule 59 if 'the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice.' A new trial may be warranted 'if substantial errors were made in admitting or excluding evidence.'" *Stampf v. Long Island R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014). "Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Piesco*, 12 F.3d at 345.

Rejecting a verdict based on credibility and other trial-related issues is a tall order. *Compare Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 110-12 (2d Cir. 2015) (reinstating harassment verdict premised on credibility disputes even though (1) plaintiff invoked the Fifth Amendment 24 times during cross-examination; (2) plaintiff's witnesses were repeatedly impeached through prior inconsistent testimony; (3) plaintiff did not rebut testimony that he had offered to purchase a witness's testimony; and (4) the court was convinced plaintiff's witnesses offered "the glib testimony of school witnesses reciting a lesson"); *Trivedi v. Cooper*, No. 95

CIV. 2075 (DLC), 1996 WL 724743, at *5-6 (S.D.N.Y. Dec. 17, 1996) (while "[t]he evidence strongly suggested that the plaintiff suffered from mental illness and fabricated or imagined the discrimination," and the evidence "strongly supports the defendant's claim that the jury's verdict was against the weight of the evidence and a seriously erroneous result," this Court denied a new trial "[s]ince the resolution of whether the defendant created a hostile work environment for the plaintiff depended critically on the jury's assessment of the credibility of these two parties").

### A. The trial was not tainted by inadmissible hearsay.

Defendants argue that "[t]he jury was irreversibly poisoned by hearing an overabundance of hearsay and innuendo regarding Mr. Orantes' alleged and unproven sexual escapades at work," and that the Court's repeated curative instructions were not enough to salvage? the trial. (Def. Mem. 18). This is not the case, and this is no basis for a new trial.

Defendants ignore "the law's general assumption that juries follow the instructions they are given." *U.S. v. Agrawal*, 726 F.3d 235, 258 (2d Cir. 2013); *see also U.S. v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("the law recognizes a strong presumption that juries follow limiting instructions); *U.S. v. Downing,* 297 F.3d 52, 59 (2d Cir. 2002) (Rule 404(b) prejudice "can be cured with proper instructions, and juries are presumed to follow their instructions"). Courts follow this presumption unless "there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." *U.S. v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007).

In the context of Plaintiff's testimony about the hostile work environment, this Court issued limiting instructions on the following occasions: (1) Plaintiff testified without objection about what her coworkers said about Orantes' sexual activity in the office (Tr. 79-80); (2) Plaintiff testified without objection about her conversation with Toya about Orantes trapping

Doreen into an unwanted sexual relationship (Tr. 84-85); (3) Plaintiff testified without objection that Fiona told her about Orantes' efforts to manipulate Plaintiff for rebuffing her advances (Tr. 85-86); (4) Exhibit 1, a faxed letter detailing Orantes' office-wide sexual harassment (Tr. 104-05, 107-08); and (5) Plaintiff testified about what Orantes and her female coworkers were doing behind closed doors. (Tr. 146-47). These limiting instructions told the jury that testimony was not being received for the truth but for its impact on Plaintiff (Tr. 79-80, 84-86) or on her thought process. (Tr. 163). This Court instructed the jury to only consider Exhibit 1's impact on Plaintiff (Tr. 104-05) and "what happened as a result of it being received" (Tr. 107-08), the latter consideration a relevant factor under the jury charge on employer liability. (Tr. 382-84). One instruction struck testimony entirely, as to Orantes' private sexual escapades. (Tr. 147). In the jury charge, this Court reiterated that the jury can only consider second-hand accounts for the effect they had on Plaintiff when she heard them. (Tr. 390-91). This Court also instructed that Plaintiff is only suing for Orantes' sexual harassment against her, and "[y]ou may not return a verdict against the defendants for mistreatment of other employees, should you find any mistreatment of others occurred." (Tr. 391).

As courts presume the jury will follow the trial court's limiting and curative instructions, without citing any case law, Defendants only speculate that the hearsay testimony unfairly influenced the jury and that they ignored the limiting instructions. (Def. Mem. at 18). Nor do Defendants acknowledge Plaintiff's extensive testimony as to her first-hand observations about Orantes and Faten (Tr. 83-84, 171), Fiona (Tr. 85), Marina (Tr. 87-88, 171-73), and Mercedes (Tr. 90, 188, 202-03). This evidence was also relevant. *Liebovitz*, 252 F.3d 190. Plaintiff also detailed how Orantes subjected her to sexual harassment in the form of touching, verbal comments, and Orantes' retaliation when she rebuffed his advances.

(Statement of Facts § 2). The jury had ample basis to find in Plaintiff's favor. Notably, while Plaintiff's second-hand accounts implicated Orantes, the jury declined to award punitive damages against him (Tr. 420), demonstrating the jury carefully evaluated the evidence and parsed out the verdict, even as it found that Orantes had sexually harassed Plaintiff.

### B. Defendants' credibility arguments are no basis for a new trial.

"On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner. However, . . . trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge 'should rarely disturb a jury's evaluation of a witness's credibility,' and may not 'freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury.' Indeed, we have stated that '[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012); *id.* at 418-19 (when "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice").

Defendants argue that Plaintiff's credibility was irreparably damaged because "she testified that Plaintiff's counsel told her not to include the term sexual harassment in her letter that she claims she gave to Defendant Dr. Cohen," such that "either Plaintiff or her attorneys lied to the Court." (Def. Br. at 19). This is no basis for a new trial. This Court directed the jury to disregard Plaintiff's testimony "about why she did include or didn't include certain material in that letter she provided to Dr. Cohen. Specifically, you may not consider, in any way, whether

she was advised by an attorney about what to include or not include in the letter." (Tr. 134). This instruction sufficiently penalized Plaintiff and gave Defendants ammunition at trial since she could not justify this omission on the advice of counsel. While Defendants' attorney in summation highlighted that omission in challenging Plaintiff's credibility (Tr. 368), the jury still believed that Orantes had sexually harassed her.

Defendants claim Plaintiff "repeatedly contradict[ed] her own deposition testimony and even her earlier trial testimony," and she could not recall the first time she was harassed and contradicted her testimony about Orantes touching her buttocks. (Def. Mem. at 19). The examples in Defendants' brief are typical credibility attacks when a party deviates from deposition testimony. This Court instructed the jury that it may take those contradictions into account in assessing Plaintiff's credibility. (Tr. 389). The jury presumably followed that charge and determined that Plaintiff was still a credible witness.

### C. Defendants' remaining new trial issues are meritless.

Defendants never made a record of Plaintiff's "emotional displays" or asked this Court to instruct the jury to ignore them. Employment discrimination plaintiffs often cry and display emotion at trial. Defendants' argument acknowledges that Orantes caused Plaintiff significant emotional distress. To the contrary, if Plaintiff did not display her emotions or cry at trial, Defendants would argue that she did not endure any pain and suffering. Moreover, the order of witnesses could not have confused the jury, and Defendants' counsel was free to ask his clients any relevant questions to develop their side of the story. Defendants placed no objection to Plaintiff's trial strategy on the record, and it is common for plaintiffs to call adverse witnesses to the stand prior to the plaintiff's testimony. This Court told the jury that it was "highly appropriate" for Plaintiff to call Dr. Cohen as her first witness. (Tr. 61-62).

28

As for Defendants' post-trial objection to Plaintiff's summation, "[n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted." *Marcic v. Reinauer Transp. Cos*., 397 F.3d 120, 127 (2d Cir. 2005). "Rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006).

Plaintiff's counsel told the jury that, based on her testimony that Orantes sexually harassed her two to three times a week over the course of six years, "Mario subjected Tesa to approximately 780 unwelcome sexual advances in her place of employment." (Tr. 347-48). Not only did Plaintiff testify about the frequency of the harassment, but counsel gave the jury his mathematical calculations. Defendants placed no objection on the record or asked the Court to issue a corrective or limiting instruction. (Tr. 373), which would have allowed the Court "to deal with those remarks then and there." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998). Without an objection, a new trial is warranted if the "'error is so serious and flagrant that it goes to the very integrity of the trial.'" *Malmsteen v. Berdon*, LLP, 595 F. Supp. 2d 299, 309 (S.D.N.Y. 2009), *aff'd* 369 Fed. Appx. 248 (2d Cir. 2010). Not only did Plaintiff's counsel do nothing wrong in summation, but any purported misconduct was not plain error.

29

## Conclusion

As the record supports the verdict and the damages awards are not excessive, Defendants are not entitled to any relief under Rules 50/59.

Dated: December 2, 2022

Respectfully submitted,

| | |
|---|---|
| Stephen Bergstein, Esq.<br><br>Bergstein & Ullrich<br>5 Paradies Lane<br>New Paltz, N.Y. 12561<br>(845) 469-1277 | Derek Smith, Esq.<br>Zachery I. Holzberg, Esq.<br><br>Derek Smith Law Group<br>1 Penn Plaza<br>New York, N.Y. 10119<br>(201) 925-2540<br><br>*Counsel for Plaintiff* |