UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                       :
 FORTESA QORROLLI,                     :
                                       :
                            Plaintiff, :
                                       :        18cv6836 (DLC)
              -v-                      :
                                       :        OPINION AND ORDER
 METROPOLITAN DENTAL ASSOCIATES, D.D.S. :
 - 225 BROADWAY, P.C. et al.,          :
                                       :
                           Defendants. :
                                       :
--------------------------------------- X

APPEARANCES:

For plaintiff:
Zachary Ian Holzberg
Alexander Gabriel Cabaceiras
Derek Smith Law Group, PLLC
One Penn Plaza
New York, NY 10119

Stephen Bergstein
Bergstein & Ullrich, LLP
5 Paradies Lane
New Paltz, NY 12561

For defendants:
David Christopher Wims
David Wims, Law Offices
1430 Pitkin Avenue
2nd Floor
Brooklyn, NY 11233

DENISE COTE, District Judge:

    On October 27, 2022, at the end of a four-day trial, a jury

found the defendants liable for violations of Title VII of the

Civil Rights Act of 1964 ("Title VII"), the New York State Human

Rights Law ("NYSHRL"), and the New York City Human Rights Law

("NYCHRL"), awarding plaintiff Fortesa Qorrolli $575,000 in compensatory damages and $2,000,000 in punitive damages.  The defendants have moved for judgment as a matter of law, a new trial, and remittitur.  For the following reasons, the defendants' request for a new trial is granted.

## Background

I.  Procedural History

Qorrolli filed this action on July 30, 2018, alleging that her supervisor Mario Orantes regularly sexually harassed her at work, and that the proprietor of her workplace, Dr. Paul I. Cohen, did nothing to stop the harassment, in violation of Title VII, the NYSHRL, and the NYCHRL.  On June 10, 2021, the defendants filed a motion for summary judgment.  The motion became fully submitted on July 30, 2021.  The case was transferred to this Court on September 9, 2021.

On December 22, 2021, this Court granted the defendants' motion for summary judgment with respect to the plaintiff's retaliation claims, but otherwise denied it.  Qorrolli v. Metro. Dental Assocs., D.D.S – 225 Broadway, P.C., 18CV06836 (DLC), 2021 WL 6064520, at *5 (S.D.N.Y. Dec. 22, 2021).  The Opinion denied the motion with respect to the plaintiff's hostile work environment claims because Qorrolli's deposition testimony was "sufficient to raise a genuine dispute of material fact about

2

the existence and pervasiveness of Orantes' harassment." Id. at *3.  The Opinion disregarded other evidence offered by the plaintiff to support sexual harassment, however, as inadmissible hearsay. Id. at *3 n.3.  In particular, the Opinion declined to consider screenshots of text messages from coworkers discussing Orantes's relationships with other coworkers, as well as an anonymous letter faxed to the parties' workplace alleging that Orantes had sexual relationships with employees.  Id.

The Opinion granted the defendants' motion for summary judgment with respect to the plaintiff's retaliation claims because the plaintiff had failed to point to any instances of protected activity. Id. at *4.  The Opinion found that, in telling Orantes to "back off," the plaintiff had not "communicat[ed], with sufficient clarity, her opposition to sex discrimination or sexual harassment." Id.  And the Opinion also found that the plaintiff had not engaged in protected activity when she provided Dr. Cohen with a letter containing complaints about her employment conditions, because the letter could not be reasonably understood as describing conduct prohibited by Title VII.[1] Id.

On January 7, 2022, the plaintiff moved to reconsider the grant of summary judgment against her retaliation claims,

---

[1] The letter complained about oppressive working conditions such as excessive hours and the use of abusive language.

arguing that she'd testified in her deposition that she complained about sexual harassment to Dr. Cohen multiple times. Qorrolli v. Metro. Dental Assocs., D.D.S. – 225 Broadway, P.C., 18V06836, 2022 WL 125823 (DLC), at *1 (S.D.N.Y. Jan. 13, 2022). An Opinion of January 13, however, denied the plaintiff's motion, holding that the plaintiff's deposition testimony provided "no detail or explanation about the content" of her complaints to Dr. Cohen.  Id. at *2.

On January 20, the parties were advised that the trial would take place in April.  On February 8, the parties requested an adjournment of the trial until August.  Their request was granted, and the trial was placed on the September trial-ready calendar.  On August 25, at the parties' request, the trial was again adjourned until October.  The parties submitted their joint pretrial order on August 26, 2022.

II.  Trial

Trial began on October 24.  As her first witness, the plaintiff called Dr. Cohen.  The plaintiff testified next and then called Orantes.  The plaintiff's mother was her final witness.  The parties had agreed that each witness would testify only once during the trial, and therefore the "cross examination" of Dr. Cohen and Orantes included their direct testimony.  The case was submitted to the jury on October 26. This Opinion summarizes the facts adduced at trial that are

4

necessary to the disposition of the defendants' November 18
motion.  The facts are generally taken in the light most
favorable to the plaintiff, as the verdict winner, but where
indicated, the Court has made its own evaluation of the evidence
pursuant to its powers under Rule 59, Fed. R. Civ. P.

Immediately after she obtained her associate degree in
dental hygiene, Qorrolli began her employment as a dental
hygienist at Metropolitan Dental Associates, D.D.S. - 225
Broadway, P.C. and Metropolitan Dental Associates, D.D.S., P.C.
(together "MDA").  She worked there from December of 2009 until
May of 2016, when she left her job.  During Qorrolli's
employment, Orantes worked as MDA's office manager, supervising
Qorrolli as well as most other MDA employees.  Dr. Paul I. Cohen
owned MDA, which had four locations at the time of Qorrolli's
employment.  Qorrolli worked at MDA's main office at 225
Broadway.

A.   The Plaintiff's Testimony

Three months after the start of her employment, Qorrolli
received a pay increase.  Around that time, Qorrolli testified
that Orantes's conduct toward her became much more hostile.
Orantes began to assign her to excessive numbers of patients.
Orantes would also regularly take Qorrolli to Dr. Cohen's office
and berate her about her job performance in front of Dr. Cohen.
Although some of Orantes's criticism was related to her work,

some was not -- for example, Orantes would sometimes complain about broken air conditioners or other office conditions.

Qorrolli also testified that Orantes sexually harassed her. She admitted that he never asked her out or explicitly propositioned her, but described with specificity two instances in which he touched her.  In one incident, Orantes met Qorrolli in an elevator as she was returning from the gym.  He touched her butt and commented on its firmness.  In another incident, after reprimanding Qorrolli in front of Dr. Cohen, Orantes took Qorrolli into a private room.  He hugged her, wiped her tears, and kissed her cheek.  Qorrolli testified that Orantes would frequently engage in this kind of conduct after reprimanding her in front of Dr. Cohen.  She also testified that Orantes would frequently make comments about her appearance or her body. Qorrolli testified that she felt pressured to accept his conduct.  The plaintiff's mother, who also worked at MDA, testified that she saw Orantes touching and grabbing the plaintiff.

Qorrolli testified that she told Dr. Cohen multiple times that Orantes was sexually harassing her, but that Dr. Cohen refused to do anything about the harassment.  On one occasion, Dr. Cohen responded to Qorrolli's complaints by telling her that she was "fucking crazy."  At the time of Qorrolli's employment,

MDA did not have any written sexual harassment policy or
employee handbook.

Qorrolli also witnessed events around the office that
caused her to believe that Orantes was sexually harassing or
otherwise sexually involved with other employees.  Qorrolli
would often see Orantes pull a female employee into a room and
close the door behind them, from which she inferred that Orantes
was sexually harassing or having sex with the employee.
Qorrolli also saw Orantes rub himself against another employee
with his groin and make crude comments about her appearance.
And one occasion, Qorrolli walked in on Orantes and another
employee holding each other close, with the employee's jacket
down around her shoulders and lipstick smudged on her face.

B.   Letter to Dr. Cohen

During cross-examination, defense counsel asked the
plaintiff about a letter she had personally delivered to Dr.
Cohen complaining about her working conditions.  The plaintiff
acknowledged that she did not mention any sexual harassment in
the letter.  When asked why, the plaintiff explained that her
lawyers had told her not to mention it because it could expose
her to a defamation lawsuit.

During a conference held before the following day of trial,
counsel explained that there had been no notice of any waiver of
the attorney-client privilege.  The Court noted that the

plaintiff had relied on the letter in opposing the defendants'
motion for summary judgment, and that there had been no
discussion at that time of any attorney-client waiver.  The
plaintiff's counsel explained that, although their firm
represented the plaintiff at the time the letter was drafted,
that they were not aware that anyone had advised the plaintiff
not to mention sexual harassment.  The plaintiff's counsel
consented to striking from the record the plaintiff's testimony
regarding the reasons for her failure to include sexual
harassment in the letter.

    C.   Emotional Distress

    The plaintiff testified that she began seeing a
psychiatrist in June of 2015 due to the stress she was
experiencing at work.  She testified that she used to be
consistently happy, but that she continues to suffer from
anxiety and depression that began during her job at MDA.  The
plaintiff was prescribed medication to treat her anxiety and
depression.  She stopped seeing a psychiatrist after she left
her job at MDA in 2016.

    The plaintiff's mother, Nexhmije Qorrolli, also testified
regarding the plaintiff's emotional distress.  Nexhmije returned
to work at MDA shortly after her daughter began her employment
there.  She testified that the plaintiff's demeanor changed
significantly after she began working at MDA, that she would

experience panic attacks, and that she began rubbing her nose in distress so frequently that it perforated the cartilage in her nose.  Nexhmije testified that witnessing these behaviors caused her distress as well.  The Court instructed the jury, both during Nexhmije's testimony and upon charging them, that they could only award damages for the plaintiff's emotional distress, not for Nexhmije's.

D.   Out-of-Court Statements

At trial, the plaintiff testified to numerous conversations she had with others to show that Orantes harassed other women. She frequently testified that coworkers told her that Orantes was sexually involved with other employees.  The plaintiff asserted that one employee, Faten, was in a sexual relationship with Orantes.  The plaintiff admitted that she had never seen Faten and Orantes engage in sexual activity first-hand. Nevertheless, she asserted that Faten was fired because she had used her relationship with Orantes to avoid work assignments. The plaintiff also testified that Toya, a coworker, told her that yet another coworker, Doreen, was in an unwanted sexual relationship with Orantes.  And the plaintiff testified to a conversation she had with Fiona, a head floor assistant, in which Fiona stated that Orantes had instructed her to agree with anything negative that Orantes said about the plaintiff, and suggested that Orantes was angry with the plaintiff for failing

to let him use his "power" over the plaintiff "like he does with the other women" at MDA.  Although the Court instructed the jury not to consider these conversations for the truth of the matters asserted, the plaintiff frequently asserted as fact that Orantes regularly harassed other women in the office.

Nexhmije also referenced these allegations during her testimony.  When asked to explain how she observed the plaintiff being treated, Nexhmije frequently referenced Orantes's treatment of other women that she had not personally observed, and relayed the plaintiff's recounts of what had happened between her and Orantes.  The Court sustained several objections to this testimony, striking from the record references to matters that the witness had not personally observed.

The plaintiff also introduced an anonymous letter, faxed to the office in October of 2015, which alleged that Orantes had been sexually harassing female employees, and was providing free dental work in exchange for sex.  The plaintiff testified Toya had told her that she was the author of the fax, even though Toya had not herself experienced the misconduct alleged in the fax.

On cross-examination, the plaintiff was asked why she did not call many of these coworkers to testify.  The plaintiff stated that she did not have the contact information of some of

them, that she did not have an ongoing relationship with them, or that they were still employed at MDA.  The plaintiff asserted that one witness, however, refused to testify on the ground that it would be too painful for her to appear at trial and confront Orantes.

The Court frequently interjected to clarify to the jury that the out-of-court statements repeated by the plaintiff could be considered only for their effect on the plaintiff, and not for the truth of the matter asserted.  Some of these statements were stricken from the record.  And although the October 2015 fax was admitted into evidence and published to the jury, the Court gave a limiting instruction clarifying that the letter could be considered only for its effect on the plaintiff, and for the evidence that it provided, if any, of notice to the defendants.

Despite these limiting instructions, however, the plaintiff persisted in relying on out-of-court declarations.  And in summation, the plaintiff's counsel told the jury that they had heard testimony that Orantes sexually harassed three of the plaintiff's co-workers, and that the defendants failed to call even one of them to deny it.  Again, the Court was required to interject multiple times, informing the jury that neither the

out-of-court statements nor statements of counsel constituted evidence of the matter asserted.

E.   Verdict

The case was submitted to the jury on October 26.  The jury returned a verdict for the plaintiff that same day.  The jury found all defendants liable under Title VII, the NYSHRL, and the NYCHRL, awarding the plaintiff $575,000 in compensatory damages for her emotional distress.[2]  The jury also found MDA liable for punitive damages under the NYCHRL.[3]  The jury returned to deliberate on October 27 regarding the amount of punitive damages.  After a brief deliberation, the jury returned a punitive damages award of $2,000,000.

## Discussion

The defendants have moved for judgment as a matter of law, a new trial, and remittitur.  For the reasons given below, the motion for judgment as a matter of law is denied, and the motion for a new trial is granted without remittitur.

---

[2] The plaintiff was employed elsewhere after she stopped working for the defendants.  The plaintiff therefore did not seek back pay, front pay, or any form of compensatory damages other than emotional distress damages.

[3] The jury was not instructed with respect to punitive damages under Title VII or the NYSHRL.

I.   Forfeiture

The plaintiff argues that the defendants forfeited certain arguments in their motion by failing to sufficiently articulate the grounds on which they seek judgment as a matter of law and a new trial before the case was submitted to a jury.  The Federal Rules of Civil Procedure allow a party to request judgment as a matter of law or a new trial.  First, a party can move for judgment as a matter of law "at any time before the case is submitted to the jury."  Fed. R. Civ. P. 50(a)(2).  "The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment."  Id.  If the court reserves a decision on the matter, and the jury returns a verdict, the party may then "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial."  Fed. R. Civ. P. 50(b).

"Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."  MacDermid Printing Solutions LLC v. Cortron Corp., 833 F.3d 172, 180-81 (2d Cir. 2016) (citation omitted).  "The principal purpose of the requirement that any such motion be made before the case is submitted to the jury is to assure the responding party an opportunity to cure any deficiency in that party's proof."  Lore v. City of Syracuse, 670 F.3d 127, 152 (2d Cir. 2012) (citation omitted).  "A

district court may grant a Rule 50(b) motion based on a ground
not advanced in a Rule 50(a) motion only if necessary to prevent
manifest injustice." <u>MacDermid Printing Solutions LLC</u>, 833 F.3d
at 181 (citation omitted).

The plaintiff argues that the defendants forfeited certain
arguments for judgment as a matter of law or a new trial by
failing to raise them before the case was submitted to a jury.
The plaintiff acknowledges that the defendant moved for a
directed verdict before the case was submitted on the ground
that the plaintiff had failed to provide sufficient evidence to
establish a prima facie case.  But the plaintiff argues that
this motion did not preserve the arguments the defendants make
in the present motion, because it did not identify any specific
deficient elements of the plaintiff's case, or raise any of the
defendants' current objections to the jury's damages award.

It need not be decided whether the defendants forfeited
their motion for judgment as a matter of law because, for the
reasons given below, judgment as a matter of law may not be
awarded regardless.  But the plaintiff's arguments do not show
that the defendants waived their motion for new trial or
remittitur.  The defendants request a new trial or remittitur
primarily on the grounds that the jury's damages award was
excessive, and that its verdict and its award were tainted by

14

inadmissible evidence at trial.  A motion for remittitur or new trial based on the amount of the jury's damages award, of course, cannot be raised until the jury has returned a damages award.[4]  Nevertheless, the defendants alluded to their concerns about punitive damages before the jury was charged, and the Court informed the defendants that they could raise any issues regarding punitive damages in post-trial motions.

Additionally, the defendants frequently raised objections to the plaintiff's repeated reliance on and reference to hearsay, and the Court frequently interjected to provide a limiting instruction or strike such testimony when it was offered.  The plaintiff therefore cannot claim that she received insufficient opportunity to "cure any deficiency" in the presentation of her case.  Lore, 670 F.3d at 142.  Accordingly, the defendants did not forfeit their arguments for remittitur or a new trial.

II.  Judgment as a Matter of Law

Under Rule 50, Fed. R. Civ. P., a court may grant a party judgment as a matter of law if the "party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient basis to

---

[4] Additionally, a court can grant a new trial sua sponte, so long as it provides notice and an opportunity to be heard.  Fed. R. Civ. P. 59(d).

find for the party on that issue."  To grant judgment as a matter of law, there must be either "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or "such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded persons could not arrive at a verdict against it."  Millea v. Metro-North R.R. Co., 658 F.3d 154, 161 (2d Cir. 2011) (citation omitted).

The defendants argue that the plaintiff failed to introduce credible evidence that she had been sexually harassed within the statute of limitations period, which the defendant calculates as beginning on September 28, 2015, or that this harassment was severe and pervasive.  The plaintiff testified to two specific incidents of sexual harassment.  First, the plaintiff testified that, on one occasion, Orantes touched her thigh in the elevator.  Second, the plaintiff testified that Orantes took her into a room after complaining about her work in front of Dr. Cohen, brushed away her tears, and kissed her cheek.  Although the plaintiff could not identify a specific date that this behavior took place, she testified that Orantes disciplined her in front of Dr. Cohen multiple times per week, and that he would regularly afterwards take her into a private room.

A plaintiff bringing a hostile work environment claim under Title VII "must establish that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Legg v. Ulster Count, 979 F.3d 101, 114 (2d Cir. 2020) (citation omitted).  Claims under the NYSHRL are subject to the same standard.  Summa v. Hofstra Univ., 708 F.3d 115, 123-24 (2d Cir. 2013).  By contrast, a plaintiff bringing a hostile work environment claim under the NYHCRL need not show that any discrimination was severe or pervasive.  See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 113 (2d Cir. 2013).

The plaintiff's testimony is sufficient as a matter of law to permit the jury to find Orantes liable under Title VII, the NYSHRL, and the NYCHRL.  A jury, crediting the plaintiff's testimony, could find that the harassment she experienced pervaded her employment and took place within the limitations period.[5]  See Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d

---

[5] Because the statute of limitations for a hostile work environment claim begins to run only when the last act has occurred, any of the behaviors constituting a hostile work environment fall within the statute of limitations so long as the last discriminatory act was within the statute of limitations.  See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75-76 (2d Cir. 2010).  Additionally, the defendant produced no evidence to show that the alleged conduct fell outside of the

112, 119-20 (2d Cir. 2010).  Finally, because uncontroverted
evidence showed that Orantes acted as the plaintiff's
supervisor, and that the other defendants acted as the
plaintiff's employer, the jury could find the other defendants
liable as well.  See Bentley v. AutoZoners, LLC, 935 F.3d 76, 91
(2d Cir. 2019) (strict employer liability for a supervisor's
misconduct under Title VII); Griffin v. Serva, 835 F.3d 283, 291
(2d Cir. 2016) (NYSHRL); Doe v. Bloomberg, 36 N.Y.3d 450, 459-60
(2021) (NYCHRL).

The defendants also argue that the plaintiff's testimony
regarding the details of her sexual harassment was not credible.
In reviewing a motion for judgment as a matter of law, however,
"all credibility determinations and reasonable inferences of the
jury are given deference," and the court "may not weigh the
credibility of witnesses."  Vangas v. Montefiore Med. Ctr., 823
F.3d 174, 180 (2d Cir. 2016).  The plaintiff put forward
evidence that, if credited by the jury, established the elements
of her claims.  Accordingly, the defendants' motion for judgment
as a matter of law is denied.

---

statute of limitations, and "the statute of limitations is an
affirmative defense."  Id. at 76 (declining to dismiss a hostile
work environment claim pursuant to a statute of limitations even
when the plaintiff did not date the incident giving rise to the
claim).  Accordingly, the statute of limitations does not
provide a basis for judgment as a matter of law.

III. New Trial

The standard for granting Rule 59 relief, Fed. R. Civ. P.,
confers more discretion to the judge than the standard for
judgment as a matter of law.  "It is the judge's right, and
indeed duty, to order a new trial if it is deemed in the
interest of justice to do so."  Charles Alan Wright & Arthur R.
Miller, Fed. Prac. & Proc. § 2803 (3d ed. 2017).  A district
court may grant a new trial if the jury's verdict was "against
the weight of the evidence."  Raedle v. Credit Aricole Indosuez,
670 F.3d 411, 417 (2d Cir. 2012).  A verdict may be against the
weight of the evidence when it is based on "irrelevant and
prejudicial testimony," even if the court has given a limiting
instruction.  Arlio v. Lively, 474 F.3d 46, 48, 50 (2d Cir.
2007).  A court should grant a motion for a new trial only if
"the trial court is convinced that the jury has reached a
seriously erroneous result or that the verdict is a miscarriage
of justice."  ABKCO Music, Inc. v. Sagan, 50 F.4th 309, 324 (2d
Cir. 2022) (citation omitted).

A special case of the general power to order relief under
Rule 59 arises in the context of excessive verdicts.  A trial
judge has "'discretion to grant a new trial if the verdict
appears to the judge to be against the weight of the evidence .
. . includ[ing] overturning verdicts for excessiveness and
ordering a new trial without qualification, or conditioned on

the verdict winner's refusal to agree to a reduction
(remittitur).'" <u>Lore v. City of Syracuse</u>, 670 F.3d 127, 176–77
(2d Cir. 2012) (quoting <u>Gasperini v. Center for Humanities,</u>
<u>Inc.</u>, 518 U.S. 415, 433 (1996)).  The "calculation of damages is
the province of the jury," and a court may "not vacate or reduce
a jury award merely because [it] would have granted a lesser
amount of damages." <u>Turley v. ISG Lackawanna, Inc.</u>, 774 F.3d
140, 162 (2d Cir. 2014) (citation omitted).  Review of a jury's
verdict consists of determining "whether the award is so high as
to shock the judicial conscience and constitute a denial of
justice."[6] <u>Dancy v. McGinley</u>, 843 F.3d 93, 113 (2d Cir. 2016)
(citation omitted).

> But, when juries grant large compensatory awards for
> intangible and unquantifiable injuries, such as
> emotional distress, pain, and suffering, we are
> required to subject the trial court's discretion to
> substantial constraints.  Awards for mental and
> emotional distress are inherently speculative.  There
> is no objective way to assign any particular dollar
> value to distress.  Nonetheless, as we explained in
> discussing a claim of excessive punitive damages . . .
> a legal system has an obligation to ensure that such
> awards for intangibles be fair, reasonable,
> predictable, and proportionate.
>
> We must ensure proportionality, to control for the
> inherent randomness of jury decisions concerning
> appropriate compensation for intangible harm, and to
> reduce the burdensome costs on society of over-

---

[6] To the extent that the plaintiff was found to have recovered
under the NYSHRL and NYCHRL, "an award is deemed excessive"
under New York law "if it deviates materially from what would
have been reasonable compensation." <u>Lore</u>, 670 F.3d at 177
(quoting N.Y. C.P.L.R. § 5501(c)).

extensive damages awards.  Stampf v. Long Island R.R.
Co., 761 F.3d 192, 205 (2d Cir. 2014) (noting that, if
appellate courts regularly affirm large damages awards
in the name of deference to the jury, the "baseline of
reasonableness will be constantly forced upward").

Turley, 774 F.3d at 162 (citation omitted).  Determination of

what is fair, reasonable, predictable, and proportionate can

rely upon a survey of damages awards in comparable cases.  See

Stampf, 761 F.3d at 207.

A.   Hearsay

A significant portion of the plaintiff's case was based on

inadmissible and prejudicial hearsay.  The plaintiff testified

repeatedly that Orantes harassed other women, even though she

did not witness this harassment herself.  She repeatedly

asserted that Orantes wanted her to give in to sexual advances,

and that he retaliated against her for refusing to do so, even

though she testified to no statement in which this was made an

explicit condition of Orantes' treatment of her.  She shared

with the jury, and frequently referenced, an anonymous fax to

MDA offices accusing Orantes of sexual misconduct, among other

forms of impropriety.  She testified to a conversation with a

coworker in which the coworker suggested that Orantes wanted the

plaintiff to give in to his advances.  And both the plaintiff

and her mother asserted, without foundation, that another

employee was fired because Orantes was in a sexual relationship

with her, and therefore allowed her to work lax hours.

These remarks were not merely stray comments during otherwise relevant testimony; they comprised the core of the plaintiff's case.  The plaintiff prepared blown-up copies of the fax to show to the jury.  Her attorney frequently posed questions about Orantes's harassment of other women or about his state of mind, which the plaintiff could only answer with speculation or hearsay.  And he relied on these statements in his closing argument, telling the jury -- multiple times, and despite repeated interjections from the Court -- that the jury had heard testimony of Orantes's sexual harassment of several other women.

By contrast, the plaintiff's testimony regarding her own harassment was, in comparison, minimal.  She identified two specific incidents: one in which Orantes brushed against or touched her thigh in an elevator, and another in which he kissed her cheek in a private room.  The plaintiff also stated that Orantes frequently took her to a room, shut the door behind them, and harassed her in this manner.  But the plaintiff failed to describe any other incident with particularity, and could not identify the dates or even the years on which the two specifically described incidents took place.  In total, the plaintiff provided minimal direct evidence from which the jury could infer that she was sexually harassed, but large volumes of

inadmissible hearsay accusing Orantes of sexually harassing other women.  As the plaintiff's trial strategy became apparent, the Court explained its concern to the parties about the integrity of the trial and whether the limiting instructions provided to the jury would be sufficient "to capture and correct the misuse of evidence."

B.   Emotional Distress Damages

Courts in this Circuit frequently group emotional distress damages into three categories: "garden-variety, significant, and egregious." United States v. Asare, 476 F. Supp. 3d 20 , 37 (S.D.N.Y. 2020) (citation omitted).  In "garden variety" cases, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or the consequences of the injury." Id. (citation omitted). "Garden variety emotional distress claims generally merit $30,000.00 to $125,000.00 awards." Id. (citation omitted).  A claim of "significant emotional distress," by contrast, "is based on more substantial harm or more offensive conduct, is sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." Lewis v. Am. Sugar Refining, Inc., 325 F. Supp. 3d 321, 364-65 (S.D.N.Y. 2018) (citation omitted).  "'Significant' claims typically

support damages awards ranging from $50,000 to $200,000,"
although awards of up to $500,000 may also be upheld under some
circumstances.  Villalta v. JS Barkats, P.L.L.C., 16CV02772,
2021 WL 2458699, at *14 (S.D.N.Y. Apr. 16, 2021); Lewis, 325 F.
Supp. 3d at 365 (plaintiff required hospitalization).

The jury's damages award illustrates that its verdict was
not based on the admissible evidence introduced at trial of
Orantes's treatment of the plaintiff.  The plaintiff's testimony
indicates that her emotional distress straddles the line between
"garden variety" and "significant."  On the one hand, she
introduced evidence that her job caused her anxiety and
depression, that she saw a psychiatrist for a period of time and
took medication in order to treat her symptoms, and that she
experienced physical manifestations of the distress in the form
of panic attacks and damage to her nose.  On the other hand, the
plaintiff presented no evidence from medical experts or a
treating physician, and presented limited evidence regarding the
severity of the conduct that produced such distress.  The
plaintiff also testified that she stopped taking medication or
seeing her psychiatrist after she left her job.

Nevertheless, the jury awarded $575,000 in emotional
distress damages -- above even some of the highest amounts
approved in cases involving "significant" emotional distress.

See, e.g., Olsen v. County of Nassau, 615 F. Supp. 2d 35, 49 (E.D.N.Y. 2009) (plaintiff's treating psychiatrist testified as to symptoms, medication, and causation; award of $500,000); Ramirez v. N.Y.C. Off-Track Betting Corp., 112 F.3d 38, 41 (2d Cir. 1997) (upholding the remittitur of a pain-and-suffering award to $500,000 where the plaintiff's physician testified that he had become "non-functional" and unemployable after the termination of his employment).  But damages awards have also been remitted to amounts well below $500,000 even in cases involving "egregious" misconduct.  See Villalta, 2021 WL 2458699, at *17 (recommending remittitur to $350,000 in emotional distress damages in an "egregious" case where the plaintiff was sexually assaulted twice).

By contrast, in cases where the plaintiff's testimony served as the primary basis for their emotional distress damages, and where the plaintiff's damages primarily consisted of harm to their emotional state, courts have upheld awards between $100,000 and $150,000.  See Lewis, 325 F. Supp. 3d at 367 (collecting cases).  Awards of this amount are typical in cases even where, as here, the plaintiff sought and received psychiatric treatment.  See id.  The plaintiff cites cases involving larger emotional distress awards; but those cases recognize that they represent the "upper end" of such damages

awards, and they involved "unique" circumstances not present
here.  Cf. Turley, 774 F.3d at 146, 163 (remitting a damages
award when the plaintiff was subject to "a pattern of extreme
racial harassment"); Tulino v. City of New York, 15CV07106
(JSR), 2019 WL 3810975, at *6 (S.D.N.Y. Aug. 1, 2019) (citing
Turley, 774 F.3d at 163).  The jury's award of $575,000 in
emotional distress damages in this case is therefore severely
out of proportion to the conduct demonstrated at trial.

C.   Punitive Damages

As with compensatory damages, a court may remit a punitive
damages award when the award "shocks the judicial conscience or
amounts to a miscarriage of justice."  Jennings v. Yurkiw, 18
F.4th 383, 389 (2d Cir. 2021) (citation omitted).  To determine
whether an award is excessive, a court may compare it to damages
awarded in similar cases.  See id. at 393-94.  Additionally,
review of a punitive damages award is informed by three
"guideposts": "(1) degree of reprehensibility of the defendant's
conduct, (2) relationship of the punitive damages to the
compensatory damages, and (3) criminal and civil penalties
imposed by the state's law for the misconduct in question."  Id.
at 390; see also BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-
84 (1996).

The jury's punitive damages award strongly indicates that
they disregarded the Court's multiple limiting instructions not

to consider the plaintiff's hearsay for the truth of the matter asserted.  The jury found the corporate defendants, but not Dr. Cohen or Orantes, liable for punitive damages under the NYHCRL in the amount of $2,000,000 -- approximately 3.5 times the amount of compensatory damages awarded, and dozens of times larger than a reasonable compensatory damages award.  Each of the three guideposts, as well as comparison to similar cases, shows that this award was severely out of proportion to the conduct described at trial.

First, the conduct at issue is not so reprehensible as to justify a $2,000,000 award.  Reprehensibility is "'perhaps the most important' consideration in assessing the reasonableness of an award of punitive damages."  Jennings, 18 F.4th at 390 (quoting BMW of N. Am., Inc., 517 U.S. at 575).  To determine the reprehensibility of conduct, courts look to whether:

> the harm caused was physical as opposed to economic;
> the tortious conduct evinced an indifference to or a
> reckless disregard of the health or safety of others;
> the target of the conduct had financial vulnerability;
> the conduct involved repeated actions or was an
> isolated incident; and the harm was the result of
> intentional malice, trickery, or deceit, or mere
> accident.

State Farm Mut. Auto Ins. Co. v. Cambpell, 538 U.S. 408, 419 (2003).  "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award."  Id.  Reprehensible conduct generally involves

"violence", "deceit", or "intentional malice." Jennings, 18
F.4th at 390.  Under the NYHCRL, punitive damages may be awarded
"where the wrongdoer's actions amount to willful or wanton
negligence, or recklessness, or where there is a conscious
disregard of the rights of others or conduct so reckless as to
amount to such disregard." Chauca v. Abraham, 30 N.Y.3d 325,
329 (2017) (citation omitted).

       The plaintiff argues that Dr. Cohen's response to the
plaintiff's complaints about Orantes constitutes reprehensible
conduct.[7]  But the jury did not award punitive damages against
Dr. Cohen.  The only negligent or reckless conduct attributable
to the corporate defendants -- as opposed to Dr. Cohen or
Orantes -- consists of the corporate defendants' failure to
maintain a sexual harassment policy.  Regardless, neither Dr.
Cohen's conduct, nor any other conduct attributable to the
corporate defendants, rises to the level of reprehensibility
needed to justify a large punitive damages award.  It did not
involve violence, trickery, or malice, and the plaintiff does
not argue that it threatened the health or safety of others, or
that it targeted someone with any more of a financial

---

[7] The plaintiff requests that any remittitur of the punitive
damages award leave in place an award of at least $1 million in
punitive damages.

vulnerability than any employee has in interactions with their
supervisor.

Second, the ratio between the compensatory and punitive
damages award is unreasonably high.  The jury awarded
approximately 3.5 times as much in punitive damages as in
compensatory damages.  Such ratios may be justified when there
is evidence demonstrating a "constellation of intentional
misbehavior" or "extensive misconduct directed at escaping
liability."  Jennings, 18 F.4th at 391-92.  But no such conduct
was demonstrated here.  Nor is this a case involving "a
particularly egregious act" that "has resulted in only a small
amount of economic damages."  Id. at 391 (citation omitted).
Moreover, the 1:3.5 ratio significantly understates the extent
to which the jury's punitive damages award is excessive, because
it uses as a baseline the jury's excessive award of emotional
distress damages.  Once that award is reduced to a reasonable
amount, the ratio between a $2,000,000 award and a reasonable
amount of compensatory damages climbs quickly into the double
digits -- a ratio that is not only excessive, but
constitutionally suspect.  State Farm Mut. Auto Ins. Co., 538
U.S. at 425.

Third, the "civil or criminal penalties that could be
imposed for comparable misconduct" do not justify a $2,000,000

punitive damages award.  <u>Jennings</u>, 18 F.4th at 392 (quoting <u>BMW</u>
<u>of N. Am., Inc.,</u> 517 U.S. at 583).  The plaintiff does not argue
that any of the conduct described could be charged criminally.
And the NYCHRL authorizes a maximum civil penalty of $250,000 --
eight times less than the punitive damages award given here.
N.Y.C. Admin. Code § 8-126(a).

Finally, a comparison to similar cases shows that the
jury's punitive damages award was excessive.  In hostile work
environment cases involving no evidence of violence or deceit,
courts have frequently remitted punitive damages awards to
within a range of approximately $25,000 to $250,000.  <u>See</u> <u>Ravina</u>
<u>v. Columbia Univ.,</u> 16CV02137 (RA), 2019 WL 1450449, at *14
(S.D.N.Y. March 31, 2019) (collecting cases).  The $2,000,000
award here exceeds by roughly ten times the largest awards that
courts have otherwise approved in similar cases.[8]

D.   Remittitur or New Trial

If a damages verdict is deemed excessive, the Court must
determine whether the excessive amount is subject to remittitur,

---

[8] The plaintiff cites cases that involved comparable punitive
damage awards; but those cases also involved compensatory
damages higher than those awarded in this case, and far higher
than would be reasonable to award in this case.  <u>See, e.g.</u> <u>Chopa</u>
<u>v. Gen. Elec. Co.,</u> 527 F. Supp. 2d 230, 237, 246 (D. Conn. 2007)
(remitting to $5 million in punitive damages when the plaintiff
was awarded approximately $1 million in emotional distress
damages, back pay, and pay); <u>Gallegos v. Elite Model Mgmt.</u>
<u>Corp.,</u> 807 N.Y.S.2d 44, 53 (1st Dep't 2005).

or whether a new trial must be granted without remittitur. "A remittitur should be granted only where the trial has been free of prejudicial error." Ramirez 112 F.3d at 40. "[T]he size of a jury's verdict may be so excessive as to be 'inherently indicative of passion or prejudice' and to require a new trial," without remittitur. Id. (citing Auster Oil & Gas, Inc. v. Stream, 835 F.2d 597, 603 (5th Cir. 1988)). Prejudice may be found to exist where the appropriate amount of the remittitur "is totally out of proportion to the damages" awarded by the jury. Id. at 41.

The jury's damages award is so disproportionate to an award of reasonable damages that a new trial is required. The jury awarded compensatory damages several times greater than a reasonable amount, and punitive damages an order of magnitude greater than a reasonable amount. See id. (finding that a $4.35 million remittitur of a $5 million award, and a $1.65 million remittitur of a $1.9 million award suggested prejudice).

Additionally, the jury's excessive damages award -- and particularly its award of punitive damages -- can only be explained by the unfair prejudice to the defendants from the hearsay offered by the plaintiff. An award of $2,000,000 in punitive damages makes little sense if the only misconduct underlying the award is a failure to maintain a sexual

harassment policy.  It makes far more sense if the jury believed
that Orantes routinely harassed other women working for MDA, and
if the jury believed that he was retained despite this.  The
overwhelming majority of the evidence suggesting that Orantes
had harassed other women, however, came from hearsay
inadmissible for that purpose.  If the jury considered such
evidence as proof that Orantes harassed other women,
disregarding the limiting instructions, then this error infects
not just their damages award, but their finding of liability as
well.

      The plaintiff argues that the Court's limiting instructions
were sufficient to ensure the integrity of the trial, because of
"the law's general assumption that juries follow the
instructions they are given."  United States v. Agrawal, 726
F.3d 235, 258 (2d Cir. 2013).  But this presumption is "overcome
where there is an overwhelming probability that the jury will be
unable to follow the court's instructions," or where the
"instructions required jurors to perform 'mental acrobatics.'"
United States v. Becker, 502 F.3d 122, 130 (2d Cir. 2007).
Here, when evaluating whether Orantes harassed other women, the
jury cannot reasonably be expected to disregard the plaintiff's
frequent references to hearsay, and focus only on the few
incidents the plaintiff directly observed.  The "prejudicial

spillover" in this case was too severe for limiting instructions to suffice.  See id. at 131 (citation omitted).  The very fact that the limiting instructions had to be given so frequently, and even repeated in the Court's charge to the jury at the conclusion of the trial, may have undermined their effectiveness.  The jury could rightly ask, if the evidence could not be considered for its truth, why was it repeatedly presented?

Most of the out-of-court statements referenced by the plaintiff should never have been described to the jury.  The plaintiff's repeated references to conversations she had with coworkers about sexual harassment significantly prejudiced the defendants, and had limited probative value with respect to her state of mind.  Similarly, the fax contained a number of scandalous but irrelevant allegations against Orantes that the jury did not need to see in order to consider what notice the fax may have provided to the defendants about Orantes' conduct.  Accordingly, the defendants' liability must be determined at a new trial free of these errors.

## Conclusion

The defendants' November 18, 2022 motion for judgment as a matter of law is denied.  The defendants' motion for a new trial is granted, without remittitur.

Dated:   New York, New York
         December 15, 2022

                                  _____
                                  DENISE COTE
                                  United States District Judge