```
N1QBQORC
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

FORTESA QORROLLI,

                    Plaintiff,

          v.                                 18 Civ. 6836 (DLC)

METROPOLITAN DENTAL
ASSOCIATES, D.D.S. – 225
BROADWAY, P.C., *et al*,

                    Defendants.
                                             Conference
------------------------------x
                                             New York, N.Y.
                                             January 26, 2023
                                             3:00 p.m.

Before:

                         HON. DENISE COTE,

                                             District Judge

                              APPEARANCES

DEREK SMITH LAW GROUP, PLLC
        Attorneys for Plaintiff
BY:  ZACHARY I. HOLZBERG

DAVID WIMS, LAW OFFICES
        Attorneys for Defendants
BY:  DAVID C. WIMS

N1QBQORC

1        (Case called; appearances noted)

2        THE COURT:  Good afternoon, everyone.

3        As you know, I have granted a new trial in this case.

4    I understand the parties have not settled the action and so

5    we'll be proceeding to trial next month.  This is our final

6    pretrial conference for this trial.  I have received your final

7    pretrial order, and let's go through it in terms of witnesses.

8        The plaintiff is planning to call the plaintiff and

9    her mother and the two individual defendants Mr. Orantes and

10   Dr. Cohen.  The plaintiff has also listed three additional

11   witnesses, Astrid Morales, Toya Howard and Mercedes Vila.

12   We'll address whether any of those three witnesses have

13   admissible evidence to offer that ties in with the *motion in*

14   *limine* that the defendant filed just the other day.  And I'll

15   go through each of those issues too which have to do with

16   exhibits.

17       I'm also planning to do what I can to prevent the

18   kinds of problems that arose in the first trial that caused the

19   grant of the new trial.  And so I'm prepared to go through the

20   trial transcript of the direct of the plaintiff to try to

21   identify issues that can be corrected and not infect the new

22   trial with inadmissible hearsay that is prejudicial and

23   unfairly prejudicial.  And we'll talk about the time limits

24   that should apply once we have a better understanding of what

25   is going to come in at this trial.  So perhaps before we get to

N1QBQORC

1    the three witnesses, it would be more helpful to address the

2    *motions in limine* since they are going to impact, I expect, who

3    the plaintiff can and wishes to call.

4         I should mention that the defendant does not intend to

5    call any witnesses, apart from those the plaintiff has

6    identified, so that's why I haven't listed additional names.

7    So the defendant made a motion on January 25th, yesterday,

8    addressing exhibits listed in the, as I understand it, the

9    pretrial order that the plaintiff intends to offer at trial.

10   And the first of these is the anonymous letter that we're all

11   very familiar with.  This did come in as an exhibit at trial,

12   and the defendant had objected to its admission at the trial,

13   so this faxed document is anonymous.  It's unsigned.  It was

14   faxed to the plaintiff's place of business in October of 2015,

15   so roughly a half a year before she left employment there.  And

16   it does not discuss the plaintiff by name.  It has a variety of

17   allegations about the defendant Orantes's conduct, and the

18   conduct that it describes is not the conduct that the plaintiff

19   has testified she was personally subject to.

20        The conduct described in the anonymous letter is of a

21   far more serious nature.  It accuses Orantes, who was the

22   office manager, of engaging in sex with staff at the office and

23   elsewhere.  And in that connection threatening employees with

24   cutting their hours, giving other employees benefits of raises

25   and free dental services.  It says he was assisted in his

N1QBQORC

1    conduct of sexual affairs in the workplace by an older woman

2    employee, and it describes the defendant or Mr. Orantes as

3    sending inappropriate texts to women employees.  The plaintiff

4    at the trial testified that she saw this at the time that it

5    came in, in October of 2015.  It's relevance to the plaintiff's

6    allegations are not because it describes conduct similar to

7    that she experienced, but it's relevance is that these were

8    allegations against Mr. Orantes.  And the counsel at the trial

9    explored whether or not Dr. Cohen himself saw this letter, and

10   whether any investigation was conducted by Dr. Cohen or those

11   he authorized in response to this letter.  The plaintiff is

12   offering this document for the truth, that is that it

13   accurately describes the conduct that Mr. Orantes engaged in.

         So you're shaking your head Mr. Holzberg, no.  You're

15   not offering it for the truth.

16       MR. HOLZBERG:  Correct, your Honor.  We're not

17   offering it for the truth of the matter asserted as we

18   indicated at trial.  Initially it was being offered for notice

19   and the effect that it had upon Ms. Qorrolli, upon seeing it,

20   and the impact within the office.  She had testified that she

21   saw Mr. Orantes running around trying to grab the letter so

22   that Dr. Cohen would not see the letter.

23       THE COURT:  So explain to me again -- because you've

24   said I think at least two and perhaps three different things

25   there in terms of the reason for receiving the letter.  So

N1QBQORC

| | |
|---|---|
| 1 | could you again just outline why you want the letter to come |
| 2 | in? |
| 3 | MR. HOLZBERG:  Sure.  Thank you.  First and foremost, |
| 4 | we want the letter to come in on the basis of notice. |
| 5 | THE COURT:  Notice? |
| 6 | MR. HOLZBERG:  Correct. |
| 7 | THE COURT:  To whom? |
| 8 | MR. HOLZBERG:  To Dr. Cohen. |
| 9 | Mr. Orantes testified that he discussed the letter |
| 10 | with Dr. Cohen, and so did the plaintiff. |
| 11 | THE COURT:  And what is the relevance of the notice of |
| 12 | this letter to Dr. Cohen to your case? |
| 13 | MR. HOLZBERG:  Dr. Cohen testified that he never |
| 14 | received any allegations of sexual harassment against Mario by |
| 15 | the plaintiff or anyone for that matter.  So it goes to the |
| 16 | issue of his credibility.  Plaintiff testified that she herself |
| 17 | made complaints of sexual harassment to Dr. Cohen, and that she |
| 18 | discussed this letter specifically with Dr. Cohen, and that it |
| 19 | echoed her complaints. |
| 20 | THE COURT:  I don't think she necessarily testified to |
| 21 | that, but I understand you're saying one is -- |
| 22 | MR. HOLZBERG:  I noted that she did.  I read the |
| 23 | transcript last night. |
| 24 | THE COURT:  I know she testified that she discussed it |
| 25 | with Dr. Cohen.  I don't know that she used the phrasing that |

N1QBQORC

1    you just used.

2              MR. HOLZBERG:  I believe it was on page 110 of the

3    transcript, your Honor.

4              THE COURT:  Great.  Let me turn to that.  So where

5    does it say that she told him that the letter echoed what she

6    was experiencing?

7              MR. HOLZBERG:  I don't have the transcript in front of

8    me, your Honor, to cite to a specific line.  But in my notes I

9    have that it was on page 110.  I can provide a more specific

10   citation to your Honor if you'd like after the fact; but

11   unfortunately I don't have the entire transcript in front of

12   me.

13             THE COURT:  OK. So I have the transcript.  And again,

14   as I said, she testified that she discussed it with Dr. Cohen.

15   The transcript says what it says, but I don't believe your

16   characterization captures what it says, but the transcript

17   speaks for itself.  But let's return to the issue --

18             MR. HOLZBERG:  Correct.

19             THE COURT:  -- of trying to understand why you are

20   offering the letter.  One, that it provided notice to Dr. Cohen

21   of complaints against Mr. Orantes.

22             MR. HOLZBERG:  Correct.

23             THE COURT:  And why is that relevant to your client's

24   case?

25             MR. HOLZBERG:  It's relevant to our case, your Honor,

N1QBQORC

1   because the plaintiff complained to Dr. Cohen that she was

2   being sexually harassed, together with other women in the

3   office.  If Dr. Cohen had notice of the fact that Mr. Orantes

4   was sexually harassing women in the office, and an

5   investigation was conducted, presumably then he would have

6   talked to the plaintiff in response to her complaints, and he

7   would have taken action to prevent it from occurring.

8           As plaintiff testified that never occurred, so

9   therefore it's relevant for purposes of impeaching Dr. Cohen's

10  credibility.

11          THE COURT:  What impeaches Dr. Cohen's credibility?

12  What?  I'm sorry.  I'm not quite sure.  How does receipt of

13  this letter impeach his credibility?

14          MR. HOLZBERG:  Sure.  So he testified on, I guess it

15  would be direct examination when Mr. Wims was questioning

16  Dr. Cohen that he had never received any complaints of sexual

17  harassment against Mario, and that is directly contradicted by

18  Mr. Orantes himself who said, yes, I recall receiving this

19  letter at the time that it was sent, and I spoke to Dr. Cohen

20  about it.  And then plaintiff corroborates that as well by

21  saying she spoke to Dr. Cohen specifically about this letter.

22          THE COURT:  And is there anything else that makes this

23  document, receipt of this document relevant?

24          MR. HOLZBERG:  I think it also goes to the effect on

25  the plaintiff in knowing that there were other women that were

N1QBQORC

1   also experiencing sexual harassment as well.  I think one of

2   the major points that was raised during the initial trial was

3   that plaintiff felt that Mr. Orantes was attempting to sexually

4   harass her.  Obviously plaintiff had testified that she

5   observed Mr. Orantes take other women, other employees into

6   examination rooms by the hand, close the door, and that there

7   was a reputation within the office that Mr. Orantes was

8   sexually harassing these women.

9           So then the effect that it has on Ms. Qorrolli is that

10  when then Mr. Orantes goes to take Ms. Qorrolli into a room and

11  closes the door, she now is concerned that he is going to be

12  doing the same thing to her.  And, in fact, she testified that

13  he did make sexual advances to her while they were in

14  examination rooms together.  It creates a general hostile work

15  environment in the sense that it has the effect of unreasonably

16  interfering with the workplace environment.

17          THE COURT:  The receipt of the fax?

18          MR. HOLZBERG:  Yes.

19          THE COURT:  The receipt of the fax created a hostile

20  work environment for her?

21          MR. HOLZBERG:  No.  It goes to her state of mind that

22  Mr. Orantes's actions were with the intent to cause a hostile

23  work environment.

24          THE COURT:  Well, that only means if -- OK. Thank you.

25          MR. HOLZBERG:  Your Honor, if I may actually.  I was

N1QBQORC

1   meaning to raise this, and I think it may be relevant before we

2   kind of get into all of the other items with respect to the

3   *motions in limine*.  So to depart from the discussion with

4   respect to *the motions in limine*.  I was actually going to make

5   a request to your Honor whether or not we would limit the trial

6   specifically to the issue of plaintiff's damages as oppose to

7   liability as well.  I think that your Honor's order made very

8   clear.  You said that plaintiff's testimony is sufficient as a

9   matter of law to permit the jury to find Orantes liable under

10  Title 7 in New York State Human Rights Law and New York City

11  Human Rights Law.  A jury crediting the plaintiff's testimony

12  could find that the harassment she experienced pervaded her

13  employment and took place within the limitations period.

14          THE COURT:  So if you're going to read something,

15  counsel, you have to slow down so that the court reporter can

16  capture everything you're saying if it's important.

17          MR. HOLZBERG:  Understood.  I apologize.

18          THE COURT:  Now, your time for a motion for

19  reconsideration I think has expired.  Am I right?

20          MR. HOLZBERG:  Your Honor's order is dated December

21  15th, so most likely.  It's been six weeks.

22          THE COURT:  And so have you discussed your proposal

23  with the defendant?

24          MR. HOLZBERG:  Just prior to this conference I did.

25          THE COURT:  So do you have agreement with the

N1QBQORC

1    defendant?

2              MR. HOLZBERG:  I don't know that he had an opportunity

3    to speak with his client about it, but he initially said he did

4    not consent.

5              THE COURT:  So we're going to assume that if you have

6    consent from the defendant, let me know.  But otherwise, I

7    found that inadmissible evidence tainted not just the issue of

8    damages, but also the issue of liability, so let's continue

9    then.

10             Do you have anything else that would be an overarching

11   issue that should disrupt me from going through the *motions in*

12   *limine*?

13             MR. HOLZBERG:  No, your Honor.

14             But just to that point, I mean, your Honor did state

15   that the plaintiff put forward evidence that if credited by the

16   jury, established the elements of her claims.  So I think it

17   was clear from your Honor's decision that there was a

18   sufficient basis to support liability in favor of the

19   plaintiff.  As your Honor is aware, the jury found liability

20   against the defendants on all counts.  So I understand that

21   your Honor stated that the hearsay may have tainted the jury's

22   award of damages --

23             THE COURT:  And the verdict as a whole, including a

24   verdict on liability.  So, counsel, this is an untimely

25   application.  If you wish to make a motion, you can make it on

N1QBQORC

1  papers.  Of course you can consult with the defendant at any

2  time and seek agreement, consent from the defendant.  And if

3  you have such consent, just let me know immediately.  We might

4  have to have another conference in order to talk about the

5  scope of the trial because it would change the trial.

6              MR. HOLZBERG:  Sure.

7              THE COURT:  Thanks so much.

8              MR. HOLZBERG:  Thank you.

9              THE COURT:  Yes. So the defendant is not offering the

10  anonymous letter for its truth, and it can't be received for

11  its truth.  It's pure hearsay.  To the extent that the

12  defendant is offering this as simply the fact that these were

13  statements that were made and for the effect on others, that

14  has to be carefully analyzed under Rule 403 because it has very

15  limited probative value since the allegations that are

16  described in the anonymous letter do not include allegations of

17  misconduct towards the plaintiff and do not describe the kind

18  of conduct that the plaintiff herself says she suffered at the

19  hands of Mr. Orantes.

20              So one more point here.  I am not going to allow

21  plaintiff's counsel to elicit at trial from the plaintiff or

22  any other witness what she understood or had discussed with

23  others was the reputation of Mr. Orantes in the workplace.  If

24  the plaintiff believes that such testimony is admissible, he

25  should first discuss it with his adversary.  If there's

N1QBQORC

1    consent, that's one thing.  If there isn't consent, I'll take a

2    letter by next Tuesday to support the admissibility of any such

3    evidence, and the defendant can respond by next Thursday with

4    respect to the admission of reputation evidence in that way.

5    So I will allow the following facts to come in with respect to

6    the anonymous letter:

7             That there was an anonymous fax received at the

8    workplace on the date it was received and that the plaintiff

9    saw it, and that the plaintiff discussed it with one of the

10   defendants Dr. Cohen or –– I think it was Dr. Cohen she said

11   she discussed it with.  I don't remember her saying she

12   discussed it with Mr. Orantes too.  But if she did discuss it

13   with Mr. Orantes, she can testify to that, and she can testify

14   to the conversation.

15             MR. HOLZBERG:  Excuse me, your Honor.  She also

16   testified that she spoke to Dr. Cohen's sister Bonnie Cohen

17   about that letter.

18             THE COURT:  Any objection to that testimony coming in,

19   Mr. Wims?

20             MR. WIMS:  Judge, you said an anonymous fax, evidence

21   here maybe referenced regarding the receipt of the fax, the

22   date on which it was received, that plaintiff saw it, discussed

23   it with one or both of the individual defendants; but it is

24   inadmissible as an exhibit.  I'm unclear as to ––

25             THE COURT:  Yes, it's not coming in, so the contents.

N1QBQORC

The jury is not going to see the anonymous letter.  They're not going to have anybody describe it to them, but the plaintiff may describe the conversations she had about the anonymous letter with Dr. Cohen or Mr. Orantes.  And if she had a conversation with one or both of them, she may testify to what she said and what the defendant said to her about the anonymous letter.

        MR. HOLZBERG:  Your Honor, I just want to preserve the record.  Why is it that the jury won't be able to see the letter despite the fact that they were able to in the first trial?

        THE COURT:  I should not have admitted it in the first trial.

        MR. HOLZBERG:  And why is that?

        THE COURT:  I'm not done ruling, counsel.

        MR. HOLZBERG:  OK. I'm just curious.

        THE COURT:  Well, I'm very glad you're curious because I want to used today's conference to really go through a number of evidentiary issues, so hopefully the second trial will run more smoothly and with fewer surprises.

        I'm going to require Mr. Wims, you to be making objections when you should.  You objected to this letter, but otherwise not complaining if you don't make an objection when something comes in.  As I had before the first trial, Mr. Holzberg, and is my practice in all trials to ask counsel

N1QBQORC

1    if they plan to offer testimony that they think will draw

2    objections and require evidentiary rulings, to discuss it with

3    their adversary before the trial so that I don't have to

4    interrupt jury proceedings in order to deal with legal

5    arguments, so I'm going to ask you again to do that.

6            But we're at the beginning of a long conference, so

7    I'll ask you to be seated and I'll continue ruling on the

8    anonymous letter issue.

9            MR. HOLZBERG:  Sure.  If I may, your Honor.  I just

10   want to touch on that.  As discussed previously in our initial

11   joint pretrial order, as well as the current joint pretrial

12   order, we listed this exhibit and defendants' counsel made no

13   objection then or now.  Your Honor's individual rules

14   specifically state --

15           THE COURT:  One minute.

16           MR. HOLZBERG:  Sure.

17           THE COURT:  Let me get the pretrial order.  Counsel,

18   let me continue ruling.  This is going to be a long conference.

19   I'll get the pretrial order from the first time.

20           MR. HOLZBERG:  Sure.

21           THE COURT:  Thank you.

22           First of all, the substance of the anonymous letter

23   does not have to come in to support any of the reasons

24   articulated by plaintiff's counsel for the relevance of the

25   receipt of the fact or the jury hearing the fact that an

N1QBQORC

1   anonymous letter was received in the office.  I'm going to let

2   him develop through admissible testimony that it was received;

3   and therefore, put Dr. Cohen on notice that it was received.

4   I'm going to let him have the plaintiff describe her

5   conversations with Dr. Cohen about -- please be seated,

6   counsel.

7           MR. HOLZBERG:  I just have a question.

8           THE COURT:  Please be seated.  We can't finish this

9   conference if you're going to interrupt me every time I'm

10  speaking.  I'll give you a chance to be heard at the end of my

11  ruling with respect to the anonymous letter.

12          MR. HOLZBERG:  I just want clarity as to whether or

13  not she's able to discuss the content of the letter.  They're

14  just going to know that there was an anonymous letter, but

15  she's not going to discuss what the letter was about.  I just

16  want to clarify that.

17          THE COURT:  Will you please be seated, counsel.

18          MR. HOLZBERG:  Sure.

19          THE COURT:  Next time when I ask you to be seated, I

20  want you to be seated.  I've already said that the plaintiff

21  will be able to testify to her conversations about the letter

22  with Dr. Cohen and Mr. Orantes.

23          The question that Mr. Holzberg asked for clarification

24  was, Could she also describe in her testimony the conversations

25  about the letter that she had with Dr. Cohen's sister.  And I

N1QBQORC

1    had asked Mr. Wims do you have any objection to the plaintiff

2    repeating her testimony in which she described to the jury her

3    conversation with Dr. Cohen's sister about the anonymous

4    letter.  Any objection, Mr. Wims?

5            MR. WIMS:  Yes, Judge.  I think that doing so makes it

6    more likely that specific contents of the letter will in fact

7    be testified to or discussed in front of the jury, thereby

8    impeding your stated intent that its content not be disclosed

9    to the jury.

10           THE COURT:  So to the extent that she had a

11   conversation, that is the plaintiff had a conversation about

12   the letter with one of the defendants, I'm going to let her

13   describe that conversation.  The jury's not going to see the

14   actual letter.

15           So the question for you, Mr. Wims, is do you have an

16   objection to the plaintiff describing her conversation about

17   the letter with Dr. Cohen's sister other than what you've

18   already just said?

19           MR. WIMS:  Not as long as there's no disclosure with

20   respect to the letter's contents, Judge.

21           THE COURT:  Well, we have the prior testimony.  You

22   know what she said before, so I'm assuming for purposes of

23   these rulings that her testimony is going to be consistent, or

24   largely so, with what she testified before.  So I'll let you

25   discuss that with Mr. Holzberg.  But I'm assuming here,

N1QBQORC

1    counsel, that the issue is what is the sister's, that is

2    Dr. Cohen's sister's, relationship with the corporation, such

3    that a conversation would be a conversation with a party

4    opponent; and therefore, an admission.  That's the relevance I

5    think of whether or not there's an objection with respect to

6    the conversation with the sister, such that the corporation is

7    put on notice as well of the existence of the letter.

8          MR. WIMS:  She is not a manager or principal of either

9    the corporate defendants, Judge, strictly a bookkeeper, and not

10   full-time at the time these events transpired.  So I think our

11   initial objection would be as to relevance on those grounds.

12         THE COURT:  It would be objectionable as hearsay?

13         MR. WIMS:  Right.  I was going to say, Judge, if she's

14   saying what Bonnie told her, that would be hearsay, and we'd

15   object on that grounds.  Especially since plaintiff listed

16   Ms. Cohen in its initial disclosures and could have had her

17   testify.

18         THE COURT:  So, Mr. Holzberg, what's your evidentiary

19   basis for having a conversation with the sister come in?

20         MR. HOLZBERG:  It's exactly what your Honor said.

21         THE COURT:  I'm sorry.  Is she a party opponent in

22   your view?

23         MR. HOLZBERG:  Yes, she is.

24         THE COURT:  On what ground do you find her a party

25   opponent?

N1QBQORC

1    MR. HOLZBERG:  She's an employee of the defendants.

2    She's employed by the defendants as a bookkeeper as Mr. Wims

3    stated, and plaintiff testified that she asked Dr. Cohen's

4    sister whether she had seen the letter and discussed it with

5    Dr. Cohen, and whether she would then discuss the letter with

6    Dr. Cohen.  Again, it goes to the issue of notice.

7    THE COURT:  So, I am not going to have any discussion

8    between the plaintiff and any employee of the dental office

9    considered admissible simply as a statement offered against a

10   party opponent.  There are rules, legal rules with respect to

11   who is a party opponent when a corporation has been named as a

12   party.  And this is governed by Rule 801(d)(2), and I assume

13   the plaintiff is relying on (d)(2).  It's a statement made by a

14   parties' agent or employee on a matter within the scope of that

15   relationship and while it existed.  But I don't know if that's

16   what you're relying on, Mr. Holzberg.

17   So with respect to your Tuesday submission, if you

18   believe the plaintiff's discussion of the anonymous letter with

19   Dr. Cohen's sister is admissible, you should include that, a

20   description of why that is so.  and if Mr. Wims objects still,

21   he can respond next Thursday.  Let me just see a document I've

22   been handed from the pretrial order from the first trial.  So

23   I'm looking at the exhibit list, and I actually don't know

24   which exhibit this is.  Do you know, counsel?

25   MR. HOLZBERG:  I don't recall the Bates number

N1QBQORC

offhand, your Honor.  I assume that it would have been either

in section one or two, could have even been three.  Those are

the plaintiff's production.  But regardless --

THE COURT:  OK.  So, counsel, what I have here is

Exhibit 1 is a 60-page document, Exhibit 2 is 11 pages, Exhibit

3 is several hundred pages.  So that cannot be an

identification of the two-page document which is the anonymous

letter.

MR. HOLZBERG:  Sure.  Your Honor, I think that the

anonymous letter was contained in section two.

THE COURT:  Okay.  So, counsel, that is not listing

the trial exhibits.  To list a bulk exhibit, it gives no notice

to the other side of what you're actually planning to offer at

trial.  Okay.  So that's fine.

So the fact that there was no objection is, I think,

irrelevant because the plaintiff did not separately itemize

their trial exhibit such that there could effectively be notice

as to which documents would be offered at trial; and therefore

give the defendant an opportunity to object.

MR. HOLZBERG:  Understood, your Honor.  However, we

also did specifically itemize a list of our trial exhibits and

discuss that with counsel prior to the trial.  The morning of

the trial your Honor asked if there was any objection, and

counsel stated that there was not.  That was why as your Honor

said we were trying to avoid any surprises once the jury was

N1QBQORC

present.  And I was very surprised to hear that counsel was

objecting to our introduction of these exhibits, given the fact

that at the very onset of the trial he indicated that there was

no objection to the more specific list that he was provided

with.

THE COURT:  OK.

MR. HOLZBERG:  I was unaware that there was going to

be any objection to any of plaintiff's exhibits at all

throughout the course of the first trial.  So it was only for

the first time in my line of questioning with the witnesses

that I was learning that there was an objection.  And as your

Honor may recall, and as the record reflects, there was no

basis typically stated for the objection.  So I wasn't even

really aware of the basis of defendant's objection at that

time.

THE COURT:  OK. Thank you.

So the receipt of the actual document with its

descriptions of conduct with respect to other employees of a

far different nature than the plaintiff described herself being

subjected to would result in substantial and unfair prejudice

to the defendant.  As plaintiff has admitted, this document

cannot come in for the truth of any of the statements within

it.  There is a very substantial risk if the document itself

came in.  The jury would be unable to distinguish the purpose

for which it's offered and it's being received when it's not

N1QBQORC

1    being offered or received for the truth.

2           The plaintiff has described the reasons for wanting

3    mention of the receipt of the anonymous letter that Dr. Cohen

4    failed to conduct any investigation despite hearing a complaint

5    against Mr. Orantes of sexual harassment in the workplace.  The

6    plaintiff will testify that she made her own complaint directly

7    to Dr. Cohen of sexual misconduct as to her in the workplace,

8    and that she discussed the fact that Dr. Cohen had received

9    this anonymous letter making separate complaints of sexual

10   misconduct in the workplace; and that Dr. Cohen did nothing in

11   response to receipt of those complaints.  So I'll receive it to

12   the limited extent I've described.

13          The jury will not see the anonymous letter.  The

14   plaintiff will be able to describe as she did at the first

15   trial the conversations that she had about the letter with

16   Dr. Cohen and if she did with Mr. Orantes.  The plaintiff will

17   brief whether or not she can also repeat the conversation that

18   she had with Dr. Cohen's sister.  The plaintiff may also

19   inquire of witnesses whether any investigation was done.  I

20   believe he discussed that with both Dr. Cohen and Mr. Orantes

21   at the first trial and he may do so there again.  But, unless

22   there is a conversation directly with one of the defendants,

23   the jury will not hear the contents of the letter.

24          MR. HOLZBERG:  Your Honor, thank you.

25          What if the plaintiff in describing her conversation

N1QBQORC

1    with the defendants discuss the content of the letter.  Is that

2    something that the jury would hear?

3              THE COURT:  I have not kept it out.  I've told you

4    again and again in the last few minutes that she may repeat her

5    conversations with both Dr. Cohen and Mr. Orantes if she had it

6    about the letter.  We'll go through the testimony hopefully

7    sometime today, but she's not going to be able to give more

8    detail than she actually discussed with them in their

9    conversations.

10             MR. HOLZBERG:  Understood.  I'm just clarifying that

11   if she said to Dr. Cohen, Dr. Cohen, did you see this letter

12   that came in today.  It says that's Mario was doing X, Y and Z.

13             THE COURT:  Well, she did not give much detail last

14   time.

15             MR. HOLZBERG:  I don't recall what specific details

16   she did or didn't give last time, but this time I'm inquiring

17   as to how much detail she may give.

18             THE COURT:  Well, counsel, there was a problem with --

19   let me put it this way.  If she plans to give more detail than

20   she gave last time, she may not.

21             MR. HOLZBERG:  Okay.  On what basis?

22             THE COURT:  Because under Rule 403, she's using my

23   rulings here to create a conversation to get in through the

24   backdoor what she's not permitted to get in through the front

25   door.

N1QBQORC

1          MR. HOLZBERG:  Well --

2          THE COURT:  So, Mr. Holzberg, I have many more motions

3     to rule on.  You have my ruling.  Thanks you.  You may be

4     seated.

5          MR. HOLZBERG:  Sure.

6          THE COURT:  The next *motion in limine* has to do with

7     the defendant's psychiatric records.  As I remember last time,

8     these weren't certified.  Are they certified yet?

9          MR. HOLZBERG:  Your Honor, they were certified last

10    time, and they were actually stipulated to by counsel.

11         THE COURT:  OK.  So they came in last time?

12         MR. HOLZBERG:  No.

13         THE COURT:  Because?

14         MR. HOLZBERG:  I wish you could tell me the answer to

15    that, your Honor, I don't know.

16         THE COURT:  OK.  I do not.  I haven't researched

17    everything here.  But from the last trial, do you a page

18    reference?

19         MR. HOLZBERG:  I don't have the transcript in front of

20    me, your Honor.  What I can tell you is, is that prior to the

21    first trial, defendants had raised a *motion in limine* with

22    respect to those records.  I don't recall the exact docket

23    numbers offhand, but your Honor indicated that parties were to

24    meet and confer regarding those records.  I was to send counsel

25    the specific pages that I intended to introduce at trial.  I

N1QBQORC

did so together with the certification that is dated October 6,

2002 from the plaintiff's Dr. Sung Ho Lee.  In response to that

letter, I received an email in Mr. Wims in accordance with your

Honor's order that says -- this is October 20, 2022, at 12:17

p.m. Zach, hope all is well.  Having consulted the rules, I

believe that records you had certified and seek to have

admitted into evidence at trial are in fact admissible,

therefore, I think we agree.  I'll see you at the conference in

a couple of hours.  Thanks.

     So by all indications, those records were to be

admitted at trial.  And for whatever reason, I couldn't tell

you why they weren't.

     THE COURT:  OK.  Mr. Wims -- first of all, the

documents I have, I think, do not have the indicated passages

that you wanted admitted.  I have instead a complete set of the

records, and they're labeled Plaintiff's Exhibit 2.  I don't

think anything has been deleted or redacted.

     MR. HOLZBERG:  Correct.

     THE COURT:  I just want to let counsel know that I may

not be ruling on what you're intending to offer.

     MR. HOLZBERG:  To my recollection, your Honor, I think

it was maybe a 26 or 28-page document.  I don't recall offhand.

But in essence, whatever we had disclosed to defendants'

counsel, it was the entire record was the portion that we

intended to use at trial.  There was no specific page or

N1QBQORC

 1   paragraph that we intended to use.  It was the entire record

 2   which I believe was 26 or 28 pages.

 3           THE COURT:  Mr. Wims, can you shed light on what

 4   happened here.

 5           MR. WIMS:  Sure, Judge.  We objected at trial based on

 6   relevance, and that the admission of those records would be

 7   highly prejudicial to the defendants, and likely confuse the

 8   jury because they contain no statement from Dr. Lee as to

 9   causation.  So there are diagnoses contained in those records

10   with respect to depression, anxiety, post-traumatic stress

11   disorder, but there's no statement that any of those things

12   were caused by the alleged harassment plaintiff complains

13   about.  So we thought they weren't relevant, and admitting them

14   is essentially inviting the jury to form its own conclusion

15   with respect to causation.

16           Assuming they're not physicians, that would seem to be

17   likely to lead to confusion.  It would be highly prejudicial to

18   defendants.  Jurors may assume we're here, the judge is here,

19   these records say she had all this distress, maybe we should

20   conclude therefore that it was caused by defendants.  And were

21   they to make that leap, you believe the plaintiff, the

22   plaintiff's obligation on that burden of proof on that and all

23   other issues.

24           THE COURT:  Thank you very much, counsel.

25           So let me just describe the document that I have.

N1QBQORC

It's marked page 358 to 380.  It reflects notes from meetings

with a patient on 11 separate occasions between June 10, 2015

and August 31, 2016.  It refers to a past traumatic event from

which she suffered PTSD.

MR. HOLZBERG:  I'm sorry, your Honor.  What past

traumatic event?

THE COURT:  Well, it doesn't explain.  It just refers

to the plaintiff suffering a past traumatic event from which

she got PTSD.

MR. HOLZBERG:  And which date is this?

THE COURT:  It's on the first page, and perhaps

repeated since many of these records seem to just repeat what

was said on earlier occasions, June 10, 2015.

MR. HOLZBERG:  Just to clarify, plaintiff testified

she never sought treatment before in her life, and this was the

first time she ever received psychiatric treatment.  And my

recollection -- I don't have the record in front of me, the

document that your Honor is holding, but that was specifically

pertaining to what she discussed with Dr. Lee regarding her

working in Metropolitan Dental Associates.  There was no record

of prior psychiatric treatment, no record of prior mental

disorder, anything of that nature.

And just to touch upon what Mr. Wims had said.  First

of all, they're objecting claiming that it's prejudicial.

Anything that the plaintiff has offered they're obviously

N1QBQORC

1    claiming is prejudicial because it cuts against their defense.

2    That's not a basis to say that it's prejudicial to the jury.

3    The plaintiff testified specifically that she had never treated

4    before in her entire life.

5              Due specifically to the conduct by Mr. Orantes, she

6    sought psychiatric treatment with Dr. Lee.  That is referenced

7    in Dr. Lee's records.  Dr. Lee indicates throughout his records

8    that plaintiff is discussing that she experienced issues at

9    work, that she was having issues with Mr. Orantes, that he was

10   being manipulative and abusive.  There is no mention of any

11   other extraneous factors that nay have caused her stress.  And

12   Dr. Lee indicates specifically that his diagnoses are based on

13   the information as plaintiff presented it to him during his

14   meetings, which is very obviously the issues that she's having

15   with defendant Orantes.

16             So there's no mental gymnastics or leap that the jury

17   will need to make to infer caution.  I think it's absurd to say

18   that. Plaintiff testified she never had any other prior issues

19   with her mental health.  She had never sought psychiatric

20   treatment related to mental health issues.  For the first time

21   in her life, she needed to seek psychiatric treatment

22   specifically as a result of defendant Orantes's sexual

23   misconduct, and that is reflected in those records, and the

24   basis also of Dr. Lee's diagnoses.

25             Also just to touch on that, your Honor.  To the extent

N1QBQORC

1    that defendant is claiming that there's no specific mention of

2    sexual harassment within those records, that goes to the weight

3    of the evidence, not the admissibility of the evidence.

4           Obviously as we've already discussed, there was a

5    certification with respect to the records.  And on that basis

6    alone, they would be admissible. They're also admissible under

7    803(4), that is a statement made for medical diagnosis or

8    treatment.  It's our position that the records are admissible.

9    Obviously previously counsel stipulated to the fact that they

10   are admissible.  And if he wishes to cross-examine the

11   plaintiff with respect to those records, that goes to the

12   weight of the evidence, not it's admissible, and they have

13   every right to do so.

14          THE COURT:  So counsel, I was in the process of

15   describing the records.  On the very first page there is a

16   description as follows:

17          Ms. Qorrolli described symptoms of PTSD.  She

18   experienced a traumatic event, feelings of intense fear and

19   helplessness were experienced.  Now I don't know what that

20   refers to.  I don't know if it's her childhood experience of

21   leaving Kosovo.  I'm just telling you, counsel, those words

22   appear on the first page.

23          MR. HOLZBERG:  Sure.  That's specifically pertaining

24   to her employment at Metropolitan Dental Associates.

25          THE COURT:  I have no idea.  I'm just describing the

N1QBQORC

records.

1

2          MR. HOLZBERG:  Sure.

3          THE COURT:  Thank you.  She describes in the first

4  appointment of having problems in the workplace.  A generic

5  reference without more specificity, and she describes symptoms

6  principally of difficulty sleeping.

7          The first time there is a reference to the defendant

8  Orantes is on June 22, and it reports that she said she is

9  continuous to be stressful at work.  Mario is very manipulative

10  and verbally abusive.  That same kind of phrasing as if it's

11  sort of a cut and paste appears in most of the records.

12  There's no description of a specific event or no use of the

13  term "sexual harassment."

14          In the June -- I'm sorry, in the May 22, 2016 entry,

15  she refers to the letter of the complaint, the letter of

16  complaint that she herself prepared and gave to the doctor, her

17  employer.  And she describes in these psychiatric records that

18  that letter described all the things that she had experienced.

19  And as we know, that letter to Dr. Cohen which was perhaps

20  written on or about April 5th has no reference to any sexual

21  harassment.  So there's agreement that these are admissible

22  generally as medical records.  They've been certified.  The

23  argument is an argument with respect to perhaps relevance, but

24  also Rule 430.  I'll reserve on this.

25          I have to say though that I'm inclined to have them

N1QBQORC

come in, but without that reference to the traumatic event and

PTSD.  I want counsel to discuss that with each other.  Reading

the records -- and I know you were surprised to hear me

referring to that as something that's in the record, so I ask

both counsel, please, to read these records again.  It doesn't

seem to me to be a reference to what she's then experiencing in

the workplace, which is separately described.  But it seems to

me to be referring to something completely different.

        But in any event, I think, counsel, you need to look

at these again and just refresh your recollection about what

they actually contain, and I'll reflect on the objection and

try to let you know next week.

        MR. HOLZBERG:  Your Honor, if I may just with respect

to the relevance.  Obviously it's our contention that they're

highly relevant to the issue of plaintiff's emotional distress.

That's a significant portion of her damages.  She testified at

the first trial that she sought treatment as a direct result of

Mario's unwelcome sexual advances and the impact that it was

having on her, so these are directly relevant to her emotional

distress as a result of the hostile work environment to which

she was subjected.

        THE COURT:  Yes, and I'm inclined to let them in.  The

issue was with respect to that one phrase, and I'd ask counsel

to look at the entirety of the records again.  I just want to

reflect further on that one phrase, and I would appreciate

N1QBQORC

1   counsel looking at the records again too.

2           MR. HOLZBERG:  Absolutely.  Thank you.

3           THE COURT:  The next motion is with respect to the

4   plaintiff's diary.

5           As I understand this document, it's something the

6   plaintiff extracted from her phone.  It reflects notes she made

7   on her telephone while at work.  The dates she extracted run

8   from it appears December 23, 2014 through May 2, 2016.  There

9   are many entries.  Many of the entries are long and fill a

10   third of a page when printed out in small print as they are in

11   this document.  Most are labeled by the plaintiff as being

12   about overtime complaints.  Most complain that the plaintiff

13   has been wrongfully accused of poor work performance.  She is

14   aggrieved by being threatened with firing for that poor work

15   performance.  She's recording abusive language used to her or

16   used with her when confronting her about her alleged poor work

17   performance.

18           They convey that she feels she's being unfairly

19   criticized principally by Dr. Cohen.  There are some entries

20   here though that are relevant to the sexual harassment

21   complaints that are the subject of this trial.  There are

22   entries of some relevance that bear the dates January 2015,

23   three entries of relevance in February of 2015, one in July of

24   2015.  There is a March 2016 entry about the anonymous letter,

25   and there are entries on April 5th and 6th of 2016, concerning

N1QBQORC

the plaintiff's letter to Dr. Cohen.  This diary is pure

hearsay.  I don't know the basis under which it could be

received.  Mr. Holzberg, do you want to argue for its receipt?

        MR. HOLZBERG:  Yes, your Honor.  Thank you.

        Primarily and as discussed previously, we argue that

it would come in under 803(1) as well as 803(3).  It's both a

present sense impression as well as a then exiting emotional

condition.  As your Honor may recall at trial we laid a

foundation with respect to the diary.  Plaintiff indicated that

she made the entries immediately after the events occurred,

that she had no time to reflect on the events that had

occurred.  She even testified that there were various typos

throughout the notes because of the fact that she was typing so

quickly after the events had occurred.  She indicated that she

was also under the same mental condition that she was when

typing these notes as when the event had occurred.  So on that

basis, we believe it comes in under both 803(1) as well as

803(3).

        THE COURT:  Thank you.  I'm going to exclude it again

for the reasons I gave at the first trial.  And if I want to

supplement them, I'll look at that ruling and give you a

further ruling.

        MR. HOLZBERG:  Your Honor, there are also cases that

we cited during the first trial in support of the contention

that the diary is admissible.  I'm not sure if your Honor had a

N1QBQORC

1   chance to review the citations that we provided last time, but

2   obviously we would echo those cases as well.

3        THE COURT:  So, counsel, just as sort of a practice

4   pointer here.  I gave you an opportunity to be heard.  When you

5   finished, I ruled.  That's over.  We don't reargue.  We're

6   going to move on to the next point.  Thank you.

7        With respect to this diary, I mean, I could see that

8   the defendant would actually want it in, but the defendant has

9   objected, and that's just fine.  The defendant has a right to

10  object.

11       MR. HOLZBERG:  Your Honor, if I may?

12       THE COURT:  Mr. Holzberg, I'm in the middle of

13  speaking again and you're rising to interrupt me.

14  Mr. Holzberg, that's not how an attorney is supposed to act.  I

15  did not interrupt you.  You do not interrupt the Court.  Please

16  be seated.

17       MR. HOLZBERG:  Understood.

18       THE COURT:  There are also significant Rule 403 issues

19  here.  I don't think these entries are terribly reliable given

20  the fact that the entries made after she had obtained an

21  attorney in the spring of 2006, and before the latter entries I

22  described, and just before she quit.  Her motivation for making

23  these entries, those entries in particular undermines their

24  reliability.  But, again, I'll review my ruling and tell you

25  whether or not I want to make further findings in this regard.

N1QBQORC

1   That takes us to the recording, and I think this is a recording

2   that the plaintiff made with a woman co-worker named Fiona who

3   the plaintiff does not plan to call as a witness as I

4   understand it.  This recording was made in December of 2015,

5   and I'll take an argument from you, Mr. Holzberg, for the

6   admissibility of this recording.

7           MR. HOLZBERG:  Your Honor, the basis to its

8   admissibility would be again under 801(d)(2)(D) as a statement

9   offered against the party opponent.

10          THE COURT:  Fiona is a party opponent?

11          MR. HOLZBERG:  Correct, she's an employee of the

12   defendants.

13          THE COURT:  OK.  So I'm going to exclude it on that

14   ground, and the plaintiff cannot offer her conversations with

15   her co-workers.

16          MR. HOLZBERG:  Well, your Honor, you're saying

17   co-workers, or just specific to Fiona?

18          THE COURT:  Well, Fiona fits within that category.  I

19   was trying to cut through what appears to be a larger issue

20   here which is, the plaintiff cannot offer as admissions against

21   a party opponent her conversations with co-workers.

22          MR. HOLZBERG:  Is plaintiff entitled to testify to

23   conversations that she had with co-workers, as to what she told

24   co-workers?

25          THE COURT:  No.

N1QBQORC

1          MR. HOLZBERG:  OK.

2          THE COURT:  If you think any particular conversation

3     with a co-worker is admissible, you should identify that to

4     Mr. Wims and the basis for the admissibility of that

5     conversation.  And if there is an agreement, then you should

6     address it in Tuesday's letter why that conversation is

7     admissible under the federal rules of evidence.  Now there is,

8     I think, in the pretrial order a reference to six recordings,

9     but I only saw reference to one.  Is there more than one

10    recording at issue here?

11         MR. HOLZBERG:  No, your Honor.

12         THE COURT:  The next *motion in limine* deals with the

13    plaintiff's text message or messages.  I only have one

14    document, one page, which reflects a text with Mercedes, and I

15    think is Mercedes Vila who the plaintiff has put on the witness

16    list as someone he wishes to call.  So are there more text at

17    issues, or is this one page that I've received, the only text

18    at issue, Mr. Holzberg?

19         MR. HOLZBERG:  I believe that's a question for the

20    defendant, your Honor.

21         THE COURT:  Well, are you offering other texts?

22         MR. HOLZBERG:  No.

23         THE COURT:  OK.  He's only made a *motion in limine*

24    addressed to the plaintiff's exhibits, so this is the only text

25    you're offering?

N1QBQORC

1          MR. HOLZBERG:  Correct.

2          THE COURT:  Thank you.  I don't see a date on this

3     text.  It's marked as Plaintiff's Exhibit 4.  It bears a time

4     4:45, and I don't have one person's conversation in the text

5     that begins with a phrase, Will ya, that's what he use to do to

6     me.  Is that a statement by Ms. Vila, Mr. Holzberg, or a

7     statement by the plaintiff?

8          MR. HOLZBERG:  That's from Ms. Vila, your Honor.

9          THE COURT:  Please stand.

10          MR. HOLZBERG:  My apologies.  Yes, that's from

11     Ms. Vila.

12          THE COURT:  And the whole text is just, that you are

13     seeking to offer, is this one statement from Ms. Vila on this

14     one page?

15          MR. HOLZBERG:  That's correct.

16          THE COURT:  Thank you.  And the basis for this being

17     admissible?

18          MR. HOLZBERG:  It would be the effect on the

19     plaintiff, your Honor.

20          THE COURT:  What was the date?

21          MR. HOLZBERG:  I don't know offhand, your Honor.

22          THE COURT:  There's a reference in here to telling

23     Mr. Orantes's off.  I assume this is suppose to be a reference

24     to Mr. Orantes, though it doesn't identify him.  And the text

25     ends with a statement, Till the point he framed me.  What's

N1QBQORC

1    that a reference to?

2            MR. HOLZBERG:  I'd have to go back to Ms. Vila's

3    deposition transcript.  I don't want to misquote what she had

4    said.  But to the best of my recollection, she had complained

5    to Dr. Cohen that Mario was sexually harassing her, and then

6    Mario had her arrested.

7            THE COURT:  Arrested?

8            MR. HOLZBERG:  Correct.

9            THE COURT:  On what charge?

10           MR. HOLZBERG:  I don't recall, your Honor.  I'd need

11   to refer to her transcript.  I can include it in the letter on

12   Tuesday if your Honor would like.

13           THE COURT:  Have you subpoenaed Ms. Vila?

14           MR. HOLZBERG:  We have, your Honor.

15           THE COURT:  Is she intending to appear?

16           MR. HOLZBERG:  It's my understanding that she will.

17           THE COURT:  Can you give me a proffer as to what her

18   testimony will be?

19           MR. HOLZBERG:  Generally, your Honor, Ms. Vila will

20   testify to the fact that she witnessed defendant Orantes

21   sexually harassing the plaintiff and that she complained with

22   the plaintiff to Dr. Cohen pertaining to Mario's unwelcome

23   sexual advances both to the plaintiff, as well as her

24   individually.  If your Honor would permit it as well, she also

25   would testify to the fact that Mario sexually harassed her.

N1QBQORC

And the reason for that relevance is with respect to punitive damages.  As your Honor may recall, initially in the first trial your Honor charged the jury with respect to punitive damages under the New York City standard, and under the New York City standard the *Chukka* case.  I don't recall the exact citation offhand, but I know that we did cite it during the first trial, the relevant standard with respect to punitive damages under the city law is not only whether there was a conscious disregard to the rights of the aggrieved individual, but also whether there was a conscious disregard to the rights of others.  And that is evidence of the fact that not only was plaintiff's rights disregarded, but also the rights of the other employees as well.

THE COURT:  How did Mr. Orantes harass Vila?  What did he do?

MR. HOLZBERG:  He made sexual comments to Ms. Vila. He rubbed his body against hers. He touched her body on different occasions.  I recall a specific quote something to the effect that he complimented her handbag and said that she would look great wearing the handbag and nothing else.  There was also testimony -- and again I am not directly quoting from the transcript because I don't have it in front of me -- that Mr. Orantes made comments about how sexy Ms. Vila looked, as well as the fact that she had nice legs or sexy legs.  And if your Honor may recall, plaintiff also testified that she

N1QBQORC

1   witnessed that as well.

2              THE COURT:  Thank you.  So certainly Ms. Vila can

3   testify to -- you know, I don't think that the plaintiff

4   described any physical interaction with Mr. Orantes that could

5   have been witnessed by another person?

6              MR. HOLZBERG:  Your Honor, she did.

7              THE COURT:  Wait one minute.  There were only two

8   incidents that she described with any specificity.  One was in

9   an elevator, and the other was in a room with a closed door.

10             MR. HOLZBERG:  I have to disagree with that

11  characterization, your Honor.

12             THE COURT:  OK.  Good.  Remind me, please.

13             MR. HOLZBERG:  Sure.  Again, without looking at the

14  transcript, plaintiff testified that there were numerous

15  instances in which Mr. Orantes touched her arms, attempted to

16  hug her.  She mentioned a specific instance in which she was in

17  a room with Mr. Orantes and he kissed her on the cheek.

18             THE COURT:  Yes.  Yes.  I remember in the room.  Are

19  you saying that there was another person present in that room?

20  I thought the testimony was that Orantes took her in the room,

21  closed the door.

22             MR. HOLZBERG:  Correct.

23             THE COURT:  Are you saying that there was another

24  witness in the room?

25             MR. HOLZBERG:  In the room with plaintiff and Orantes?

N1QBQORC

1          THE COURT:  Yes.

2          MR. HOLZBERG:  In that specific instance?

3          THE COURT:  Yes.

4          MR. HOLZBERG:  No.

5          THE COURT:  So let's focus.

6          MR. HOLZBERG:  She's talking about other instances,

7    other touching within the office.  And plaintiff testified that

8    she -- this is now I believe on page 90 of the transcript --

9    that she observed Mario harassing Mercedes.  She had also

10   testified that she observed Mario harassing Marina.

11         THE COURT:  OK.  So, counsel, I'm not going to allow

12   either you or your client to use the term "harassing" in that

13   sort of generic general way when we don't know what you mean by

14   the term.  That is a term that many people can use to describe

15   a whole host of conduct.

16         So I'll let your client talk about what she observed,

17   but not in that kind of conclusory way.  Are you telling me

18   your client saw physical touching?

19         MR. HOLZBERG:  Yes, your Honor.

20         THE COURT:  She may describe that.

21         MR. WIMS:  Your Honor, may I address that?

22         THE COURT:  Yes.

23         MR. WIMS:  Ms. Vila's deposition testimony indicates

24   she never saw Mr. Orantes harass or in any way physically touch

25   plaintiff.  In addition, her testimony was that he at one,

N1QBQORC

1   time, Mr. Orantes, brushed into her in a narrow hallway.  So

2   she didn't witness the plaintiff's alleged victimization in any

3   way.  And her saying that Mario -- she'll use conclusory terms

4   like you just made reference to, Judge, saying, oh, he harassed

5   me too. It would be incredibly prejudicial, and it doesn't tend

6   to make any fact more or less likely that plaintiff has the

7   burden of proof on, because it's a different person.  And

8   plaintiff has already locked herself in to the two incidents of

9   touching that were described with specificity.  She said

10  generally at trial.  Oh, it was everyday.  It was everyday.

11  But there was no factual detail set forth in support of that.

12        And she repeatedly said, I don't remember the year.  I

13  can't tell you what month it is, so there wasn't a lot

14  specificity.  Ms. Vila unequivocally said she never saw

15  Mr. Orantes harassed or do anything that could be perceived as

16  harassment to the plaintiff.

17        THE COURT:  OK.  Well, I'll let counsel look at the

18  deposition again and point each other to the passages.

19  Mr. Holzberg believes that deposition from Ms. Vila indicates

20  that Ms. Vila witnessed Mr. Orantes's touching the plaintiff.

21  That's right, Mr. Holzberg?

22        MR. HOLZBERG:  Correct, your Honor.

23        Aside from her deposition testimony, we also just

24  discussed the fact that we intend to call her as a witness in

25  person.  So rather than her deposition, she would be able to

N1QBQORC

1    testify in the courtroom.

2            THE COURT:  Well, she's only going to be able to

3    testify in the courtroom, if at all.  The issue is, we're not

4    receiving her deposition.  The question is whether -- I asked

5    you for a proffer of what her courtroom testimony would be.

6    And defense counsel is saying that he thinks you're mistaken,

7    that in fact she denied ever witnessing Mr. Orantes harassing

8    the plaintiff in any way.  So I'm asking counsel to just look

9    at the deposition testimony again and discuss it with each

10   other.  One of you's right. One of you's wrong.  I don't know.

11           MR. HOLZBERG:  Your Honor, why is Ms. Vila's

12   deposition not going to be used at trial?

13           THE COURT:  It's inadmissible.

14           MR. HOLZBERG:  Why?

15           THE COURT:  Why would it be admissible?

16           MR. HOLZBERG:  Well --

17           THE COURT:  Does she live within 100 miles of the

18   courthouse?

19           MR. HOLZBERG:  Correct, if she's unavailable though.

20           THE COURT:  Why is she unavailable?

21           MR. HOLZBERG:  We discussed this with your Honor

22   previously.

23           THE COURT:  Well, she was available then.  She's

24   available now.  If she's unavailable, tell me why she's

25   unavailable.

N1QBQORC

1        MR. HOLZBERG:  Sure.  She was unavailable then based

2    on her doctor's letter that she was unable to attend in person.

3        THE COURT:  Actually, counsel, again we have a

4    transcript here.  I think what it came down to is she didn't

5    want to come to court.  She was going to trial everyday.  She

6    was under treatment for cancer.  There was no adequate doctors

7    note saying that she was physically unable to appear in a

8    courtroom.  What was conveyed to me is she did not want to come

9    to trial, and that's why I asked you if you subpoenaed her.

10        If you're going to bring her into court given her

11   reluctance, I think you need to subpoena her to make her appear

12   because she does not want to appear of her own volition.

13        MR. HOLZBERG:  Understood.

14        MR. WIMS:  If I may, Judge.

15        If you recall after Mr. Holzberg represented to the

16   Court that she was unavailable due to medical reasons, cancer

17   diagnosis, we deposed her virtually and she was at work, as

18   opposed to being home, and so thereby establishing that she was

19   available.

20        THE COURT:  So I need a better proffer from you,

21   Mr. Holzberg, to allow Ms. Vila to testify.  Obviously if she

22   witnessed Mr. Orantes's engaging in conduct that was sexual

23   harassment of the plaintiff -- and I need to understand what

24   she means by that since the only incidents of touching that the

25   plaintiff described were incidents in an elevator and a closed

N1QBQORC

1   room.  Mr. Holzberg, I understand your argument, but she only

2   described two incidents in any detail, and there was no witness

3   to those.

4            MR. HOLZBERG:  I disagree, your Honor.

5            THE COURT:  Thank you.  Now, are you saying that

6   Ms. Vila was with the plaintiff when both the plaintiff and

7   Ms. Vila complained to the doctor about the harassment?

8            MR. HOLZBERG:  That's correct, your Honor.

9            THE COURT:  They were together?

10           MR. HOLZBERG:  Correct.

11           THE COURT:  Well, that would be admissible testimony.

12   I don't remember that from the first trial, but that's fine.

13   If Ms. Vila chooses to come to trial this time or counsel

14   chooses to enforce a subpoenas to require her presence at

15   trial, I'll need a better proffer, a more specific proffer from

16   plaintiff's counsel with respect to what Ms. Vila would say was

17   her own sexual harassment by Mr. Orantes before I could rule on

18   whether or not it was admissible.  And of course, give that

19   description first to Mr. Wims.  He will object or consent.  I

20   don't know which, but we need a specific proffer in order to

21   make that assessment.

22           MR. HOLZBERG:  Your Honor, may I?

23           THE COURT:  Sure.

24           MR. HOLZBERG:  For clarity, when you say a more

25   specific proffer, how would you like me to make that proffer?

N1QBQORC

1    Do you want me to get a statement from Ms. Vila?

2              THE COURT:  No, it can an attorney's representation,

3    but it has to be made in good faith and be reliable as a

4    statement to the Court, but I don't need an affidavit or

5    declaration from the witness.

6              MR. HOLZBERG:  Thank you.

7              THE COURT:  Thank you.  Let me turn to Toya Howard.

8    You've listed her as a potential witness.  Have you subpoenaed

9    Ms. Howard, Mr. Holzberg?

10             MR. HOLZBERG:  Not yet, your Honor, but it's our

11   intention to do so.  Regardless of whether or not we subpoena

12   her, it's my understanding that she lives in Florida so I don't

13   anticipate that she'll be here.

14             THE COURT:  She will be here?

15             MR. HOLZBERG:  No, I'm saying I don't anticipate that

16   she will be here.

17             THE COURT:  So you're not calling Ms. Howard?

18             MR. HOLZBERG:  We'll send a subpoena, but she lives in

19   Florida, so I don't expect that she'll actually come.

20             THE COURT:  OK.  So I'm going to assume Ms. Howard is

21   not testifying.  If you expect her to testify, I'm going to

22   need a proffer as to what her testimony would be.

23             MR. HOLZBERG:  Sure.

24             THE COURT:  Before trial.

25             MR. HOLZBERG:  Sure.

N1QBQORC

1    THE COURT:  Thank you.  And Ms. Astrid Morales.  Is

2  she testifying at trial, Mr. Holzberg?

3    MR. HOLZBERG:  Same situation applies to Ms. Morales

4  as it does to Ms. Howard, your Honor.

5    THE COURT:  She's beyond the jurisdiction?

6    MR. HOLZBERG:  Correct.

7    THE COURT:  OK.  So I'm going to assume you aren't

8  calling Ms. Morales either.  And if you find that they are

9  coming voluntarily to trial, please give notice to Mr. Wims in

10 advance of trial with a specific proffer of what they'd be

11 testifying to, so if there's any objection, I can address it in

12 advance of trial.

13   MR. HOLZBERG:  Understood.

14   THE COURT:  Let's put some dates on that.  So let's

15 just use next Tuesday's date for that as well.  So if you're

16 going to call any of these three witnesses, you'll give a

17 detailed proffer next Tuesday, the 31st, and I'll get a

18 response from Mr. Wims on the 2nd.

19   Let me turn to the trial transcript, and this is

20 plaintiff's testimony on direct, and I just want to go through

21 some of the questions and answers on direct to give guidance to

22 counsel and hopefully simplify our task in the next trial of

23 keeping out inadmissible hearsay and getting the jury accurate

24 testimony from the plaintiff about the specific conditions that

25 she's experienced and is complaining of.  At page 75 --

N1QBQORC

1          MR. HOLZBERG:  Sorry, your Honor, if I may.  This is
2    all subject to our letter on Tuesday pertaining to whether or
3    not reputation evidence will be admissible, right?

4          THE COURT:  I don't know.  This is a separate task
5    that we're undertaking right now.  And that is, I'm going to
6    assume -- let me just march through this and see if this is
7    helpful to you.  OK.

8          MR. HOLZBERG:  Sure.

9          THE COURT:  On page 75, Mr. Holzberg, you asked.

10         Did there come a point in time that your mom then
11   started working at Metropolitan Dental associates.

12         The plaintiff answered yes.

13         That's fine, and she should have stopped there, but
14   she continued.  And she continued to relate what appeared to be
15   a conversation she had with her mother.

16         It said, Dr. Cohen called her and begged her to quit
17   her job, and continued from there.  The plaintiff cannot
18   testify to any conversation she had with her mother about any
19   subject without prior notice to the defendant and a chance for
20   the defendant to be heard and any objection to be ruled on by
21   me.  That's a hearsay conversation.

22         MR. HOLZBERG:  Your Honor, plaintiff's mother is going
23   to testify, so she's going to be subject to cross examination.

24         THE COURT:  That's fine.  So the plaintiff's mother
25   can testify to her own conversation with Dr. Cohen.  The

N1QBQORC

1  plaintiff cannot testify to the plaintiff's conversation with

2  her mother.

3          MR. HOLZBERG:  So just to be clear, plaintiff can't

4  testify to conversations that she had with her mother, but her

5  mother is able to testify to questions that she had with her

6  daughter?

7          THE COURT:  No.

8          MR. HOLZBERG:  Can you clarify, please, I'm not sure I

9  understand.

10         THE COURT:  The plaintiff's mother can testify to

11 conversations that the plaintiff's mother had with Dr. Cohen.

12         MR. HOLZBERG:  OK.  So why can't plaintiff testify to

13 conversations that she had with her mother?

14         THE COURT:  That's hearsay.

15         MR. HOLZBERG:  Why would conversations that her mother

16 is having with Dr. Cohen not be hearsay?

17         THE COURT:  Because there's an exception to the

18 hearsay rule since Dr. Cohen is a defendant, and it's a

19 conversation offered against the defendant.

20         MR. HOLZBERG:  OK.

21         THE COURT:  Rule 801.

22         At page 76 there's a question plaintiff's counsel

23 asked the plaintiff "Why did your schedule change at that

24 point?"

25         And then the plaintiff went on for ten or more lines

N1QBQORC

1    to answer a question.  And in answering it, included a lot of

2    hearsay, things that she assumed, things she heard others

3    discuss with others, lots of inadmissible testimony.  So you

4    are certainly allowed, counsel, to inquire on the topic of a

5    schedule change, but please do it in a way that will control

6    the witness so that the plaintiff is responsive and does not

7    begin testifying about conversations that she was not part of

8    or conversations she did not have with the defendants or things

9    she was thinking at that time.

10           Then there is a line of questions about Mr. Orantes's

11   reputation on page 79.  There was a question.  "What was the

12   general feedback that you received regarding Mario's

13   reputation?

14           And the answer referred to Mario has sex with anyone

15   and everyone and continued from there. As far as I know, that

16   is all hearsay, and you will address it on the Tuesday

17   submission if you believe that is admissible.  Page 79.

18           MR. HOLZBERG:  Yes, your Honor.  Under rule 803(21),

19   reputation within the community is an exception to hearsay.

20   And there's case law that indicates that one's community

21   encompasses their workplace.

22           THE COURT:  OK.  Thank you.  We now have the basis

23   that you believe that that's admissible.  Mr. Wims, you'll have

24   an opportunity to be heard.

25           Starting on page 82, there were questions about

N1QBQORC

1   entries in the diary.  I allowed you to inquire about the

2   events, but not the entries.   And again, if the diaries not

3   coming in, that would also control the ability to ask your

4   client questions about what those entries were.

5       MR. HOLZBERG:  Your Honor, just to clarify.  We can

6   use the diary to refresh her recollection, correct?

7       THE COURT:  Yes, but first you have to exhaust her

8   recollection.

9       MR. HOLZBERG:  Understood.

10      THE COURT:  And if you are going to use it to refresh

11  her recollection, please educate your client ahead of time as

12  to the fact that she can't read from it aloud to the jury.  She

13  should just read it quietly, put it aside, and see whether or

14  not it actually refreshes her recollection.

15      MR. HOLZBERG:  Understood.

16      THE COURT:  Thank you.

17      On page 82, there was an absolutely perfect question

18  asked to the plaintiff it was "Do you recall what you told

19  Dr. Cohen in January of 2015 about Mario?"

20      Absolutely fine to have the plaintiff respond to that,

21  but she didn't respond to it.  Or more precisely, she didn't

22  only respond to it, she then began and added other material

23  outside of the conversation.  So I'd like you, Mr. Holzberg, to

24  work with your client.  When you ask her to recite a

25  conversation, she should just recite the conversation to the

N1QBQORC

best of her recollection.  What she said to Dr. Cohen, for
example, in January of 2015, and what he said to her in
response, and nothing more.

          Then there were questions that were put to the
plaintiff about how did you know, for instance, one of your
co-workers was being sexually harassed by Mario.  I don't want,
counsel, you to use the term "sexual harassment" unless it's
appropriate in the circumstances.  I don't want you to -- if
the term has appropriately been used in the answer that was
just given, of course you may inquire.  But I don't want you in
a conclusory way to tell the jury that something that has just
been described to them was sexual harassment.  That is for them
to assess.  But of course you can inquire as to the specific
conduct observed, or the specific conversation overheard if
that's appropriate in the circumstances.

          For instance, you inquired on page 84, Who did you see
Mario sexually harassing at MDA?  Well, that question should
have been objected to.  It's asking for a conclusion.

          At page 85 there's an inquiry made by plaintiff's
counsel of the plaintiff about what she and Fiona discussed
concerning Mario.  That's inadmissible.  I know that's subject
to your Tuesday filing about statements against a party
opponent.  But until I rule it's admissible, it is not. Here's
another example from a different kind of problem that arose.

          At page 92 plaintiff's counsel asked a perfectly

N1QBQORC

appropriate question.  How did Mario touch your body?  The

plaintiff in responding didn't just describe how Mario touched

her, she added, just like with most of the women he was

sexually harassing.  So, Mr. Holzberg I want your client to

respond to the question asked and not add other material.  It's

unfair to the defendant.  He doesn't get a chance to object.

Obviously if there had been an objection, I could strike it,

but that's not helpful to you, the plaintiff.  It's not helpful

to the jury or the trial process.

          Let's go to page 99.  There was a question asked, How

would you describe Mario's relationship with your mother?  The

plaintiff is a challenging witness, Ms. Holzberg, for you to

control.  I know that, and I sympathize.  But I think that

means that you have an extra burden here to make more pointed

direct questions and to guide your client so she can respond

directly to the question that you ask and the topic, as opposed

to giving her leeway to expand with a mini-essay which includes

hearsay and things she did not personally observe.  So you

could, for instance, inquire, Did you observe Mario and your

mother interacting in the workplace?  Yes.  Please describe

those interactions to us that you observed.

          I don't mean to limit the topic there, but I'm just

trying to give you helpful guidance as to how you can bring out

the relevant evidence that you want to in a way that won't draw

objections.

N1QBQORC

1    MR. HOLZBERG:  Thank you, your Honor.  I appreciate

2   it. My question I guess is, yeah, just struggling with sticking

3   to or avoiding I should say leading questions.  So my

4   understanding would be in terms of doing a direct examination,

5   I'm giving her open-ended questions.  So while I understand

6   what your Honor is saying in terms of asking more pointed

7   questions, saying describe Mario's relationship with your mom,

8   and describe the interactions that you observed between Mario

9   and your mom, it's more or less the same thing as far as I

10   understand it, no?

11    THE COURT:  Your client can only testify to what she

12   observed.

13    MR. HOLZBERG:  Sure.

14    THE COURT:  She can't testify to conversations she had

15   with her mother.  She can testify to conversations she had --

16   she, the plaintiff, had with Mr. Orantes's the defendant.  So

17   your client is someone -- as I'm sure when you review the

18   transcript, and it sounds like you've already reviewed it, she

19   was sort of what I would describe as a runaway witness.  So

20   you're going to have to both help educate her about what is

21   appropriate in testimony, to listen carefully to the question

22   asked and respond only to that question, to rely on counsel to

23   bring out the evidence that the jury needs to hear to support

24   the plaintiff's claims.

25    So you're going to have to phrase your questions in a

N1QBQORC

1    way that do not allow her or do not invite her to give

2    inadmissible testimony, including hearsay.

3              MR. HOLZBERG:  I'll try my best.

4              THE COURT:  Thank you.

5              Going to page 100, there was a question asked that

6    should have drawn an objection.  When you made these complaints

7    to Dr. Cohen, was Mario aware of the fact that you were making

8    these complaints?  And of course the answer was, I assume he

9    was.

10             So there's no foundation for that.  The answer should

11   have been stricken.  If there had been a request to strike it,

12   it would have been stricken.

13             So at page 101 we get into the question of whether an

14   investigation was conducted by Dr. Cohen over complaints

15   against Mario.  And the question was, Was there any

16   investigation that took place, and that brought another

17   long-winded answer from the plaintiff, most of which was

18   inadmissible testimony.

19             Instead I think the question should have been

20   something along these lines.  To your knowledge, did any

21   investigation take place?

22             The beginning of the plaintiff's answer was just fine,

23   no investigation whatsoever.  She should have added to my

24   knowledge, period.

25             At page 104 there was a question as to who wrote the

N1QBQORC

anonymous letter.  That's inadmissible.  That's based on

hearsay, the conversation with Toya.

At page 105 there was questioning about the

plaintiff's reaction to reading the letter the anonymous

letter.  For a page and a half more there was an explanation of

why the plaintiff wasn't surprised.  All of this or most of it

was all based on hearsay and would be inadmissible and should

not have come in.

Page 109 there was a question about talking with the

co-workers about it.  I would let you ask, Did you talk with

your co-workers about it, yes or no.  And she could answer yes,

but no conversations.  It would all be hearsay.

Going to page 112.  There was a perfectly fine

question, So you also complained to Dr. Cohen then in writing,

correct?  And the answer was, Yes.  And it should have stopped

there, but it continued for lines, and it shouldn't have.  So

the plaintiff needs to listen to the question asked.  And if

she's unable to restrain herself, counsel, I'm going to ask you

to be more active in just getting her to answer yes or no when

the question just calls for a yes or no.  So I assume we

wouldn't have a problem again at this trail about the

plaintiff's testimony about her legal advice which appears at

page 114, but I'll let counsel address this with his client,

and if necessary with each other.

So those are just some examples.  I'm not trying to go

N1QBQORC

through the whole testimony, but just giving some examples of
how we could avoid hopefully some of the problems that occurred
at the first trial.

MR. HOLZBERG:  Your Honor --

THE COURT:  Yes.

MR. HOLZBERG:  I have a question for you.  With
respect to -- putting aside the direct examination of the
plaintiff, I had a question for you in terms of how your Honor
would like me to ask questions on cross-examination.  If your
Honor may recall the first witness that we called was
Dr. Cohen.  I was attempting to impeach Dr. Cohen on prior
inconsistent statements that he had given at his deposition.
Very frequently throughout the course of the examination your
Honor indicated that the manner in which I was asking the
question was improper, so I was curious if your Honor could
enlighten me as to how you would like to me properly impeach a
witness's testimony based on a prior inconsistent statement.

THE COURT:  Absolutely.  Thank you for asking.

You cannot impeach with a prior inconsistent statement
until you get testimony that opens the door to that
impeachment.  I don't remember the specific examples that might
be helpful to you, so let me just make one up.

Let us say that in his deposition Dr. Cohen said, I
conducted a full investigation of the issues raised in the
anonymous complaint.  This is our hypothetical.  But at

N1QBQORC

trial -- and at trial the doctor says, I conducted a full

investigation of the issues raised in the anonymous complaint.

Well, there's nothing to impeach him with then.  He's giving

the same testimony.  It's consistent.

        Let's say at trial you ask him, Did you conduct an

investigation of the issues raised in the anonymous complaint.

And he says, no, I didn't.  Then you can say, were you deposed

on March 2nd.  At that time were you asked these questions and

did you give these answers.  Question, did you conduct an

investigation.  Answer, yes, I conducted a full and complete

investigation.  Did you give that testimony at your deposition.

Yes, I did.

        And then you will have impeached his trial testimony,

but you can't go to the deposition first without setting up

what you expect the inconsistency to be.

        MR. HOLZBERG:  Thank you, your Honor.

        I think what may have caused confusion at the first

trial was, the way in which I was conducting the examination of

Dr. Cohen was that I had obviously looked at his deposition

transcript previously, and based my questions on his answers in

his deposition transcript.

        So, for example, I asked him a question, Did you do

something.  And at his deposition he said, No.  But then when

we were in court, I asked him, Did you do this; and he said,

Yes.  So at that point then I said, Well, I'd like to refer

N1QBQORC

1   your attention to the deposition transcript.  And at that point

2   your Honor said, No, that I needed to lay a foundation.  So I

3   was confused as to what your Honor meant by that given that my

4   understanding was that I was asking a question that had been

5   previously asked at the deposition.

6          THE COURT:  I will try to find an example.  What

7   you're saying does not suggest to me that there should have

8   been an objection.

9          MR. HOLZBERG:  I apologize, your Honor, because I wish

10  I had a specific example to provide you right now; but that was

11  more or less the entire examination that I had prepared was

12  based on his deposition transcript.  So I was just confused as

13  to the manner in which your Honor preferred me to go about

14  attempting to impeach his testimony.

15         Admittedly, I don't know that I asked the question

16  that your Honor just posed which was, Were you deposed on this

17  date.  I think I may have just assumed that rather than asking

18  him.  But after a certain point I had given Dr. Cohen a copy of

19  his deposition transcript, so I was going off of the assumption

20  that we were all aware that he had been deposed on a prior

21  date.

22         THE COURT:  The date of the deposition isn't

23  necessarily critical.  I think I've given you the guidance I

24  can, counsel.  It's getting late. It's after five.

25         MR. HOLZBERG:  I know that your Honor stopped the

N1QBQORC

1  questioning in around page 45, and at that point you started

2  giving instructions as to what you deem to be appropriate in

3  terms of the method of impeachment, so I imagine a good page

4  range would be around 35 or so.

5      THE COURT:  OK.  I'll do that and see if I can give

6  you more specific guidance.

7      MR. HOLZBERG:  Thank you.

8      THE COURT:  Counsel, let's talk about time limits this

9  time.  I'm going to suggest four hours a side.  Does that seem

10 reasonable, Mr. Holzberg?

11     MR. HOLZBERG:  Your Honor, respectfully last time we

12 had asked for five hours, and your Honor had granted that.  I

13 believe five hours will also be necessary this time around.

14     THE COURT:  Well, there was about half the trial spent

15 on inadmissible hearsay, so I'm hoping you could pare it down,

16 and we would not waste time this time.  Let's see how it goes,

17 but I'm expecting a much more focused trial with what the

18 witness herself experienced.

19     MR. HOLZBERG:  Understood.

20     THE COURT:  Mr. Wims, anything else to address from

21 your point of view?

22     MR. WIMS:  Yes, Judge.

23     The four hours I think is fine from defendants'

24 standpoint.  I just want to make sure.  The last time you had

25 issued an order at the final pretrial conversation indicating

N1QBQORC

1    the witnesses would take the stand one time only.  Is that

2    going to be the same thing here?

3            THE COURT:  Yes.

4            MR. WIMS:  Also, Judge, last time Mr. Holzberg was

5    gracious enough to work with us.  Mr. Orantes has a child

6    caring responsibilities with respect to a special needs child.

7    He leaves work at 3:30.  He'll need to leave here.  I provided

8    a letter from his doctor.  Mr. Holzberg worked with us so we

9    were able to shuffle and rearrange to accommodate that. I

10   assume the Court would be amendable to a similar arrangement.

11           THE COURT:  Absolutely.  In my experience, counsel are

12   very good at working with each other on these issues at trials.

13           MR. WIMS:  And my last issue, Judge, are we prohibited

14   in any way or do you wish to instruct us to regulate our

15   references during trial to the first trial?

16           THE COURT:  Good point.  Obviously, there can't be any

17   reference to the verdict or how a jury came out.  I think it

18   just should be at a prior proceeding. There shouldn't even be a

19   reference to a trial.

20           And, Mr. Holzberg, I'm going to ask you to make sure

21   that your client and her mother don't refer to a prior trial.

22   It can be a prior proceedings.  If someone is impeached with

23   their testimony, it's testimony you gave at a prior proceeding

24   that you're impeaching them with.  Does that make sense,

25   counsel?

N1QBQORC

        MR. WIMS:  That's fine from defendant, your Honor.

        MR. HOLZBERG:  Yes, your Honor, that makes sense.  I also have -- I was going to ask that as well -- a question with respect to punitive damages.  At the first trial your Honor indicated that we were to refrain from discussing punitive damages in our openings as you were going to decide whether or not punitive damage would be appropriate.

        Obviously ultimately your Honor did charge the jury with respect to punitive. I wanted to know what, if any -- how we should handle the discussion of punitive at this trial.

        THE COURT:  I think we should proceed with the same caution, and the parties shouldn't refer to punitive damages in the opening.  Obviously, I'll take motions at the end of the trial before we submit it to the jury as I did last time and decide if the jury should be given a charge on punitive damages.  And if they are, then plaintiff will be able to address that topic in their summations.

        MR. HOLZBERG:  Your Honor, if I may.  How is it that the jury would not be charged with punitives this time around when they were the first time around if it's on the same set of facts?

        THE COURT:  Well, hopefully it won't be on the same set of facts, will it?  I'm going to try to run a cleaner trial this time and focus on the plaintiff's own experiences and the bases for damages that would be appropriate for the jury to

N1QBQORC

1    consider.  So we'll just take it one step at a time.  I don't

2    think there's any prejudice to the plaintiff if I ultimately

3    decide that punitives should be charged.  They'll be charged,

4    and you can sum up on them.

5          MR. HOLZBERG:  OK.

6          THE COURT:  Counsel, I'm going to remind you that we

7    sit a full trial day.  You have to have your witnesses ready so

8    we fill the trial day till 5:00.  I know you're going to raise

9    lots of issues with me next week in writing. Plaintiff's

10   submission is due Tuesday.  Defendant's response Thursday, and

11   thank you.  Thanks, counsel.  Have a good night.

12          (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25