1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  FORTESA QORROLLI,

4              Plaintiff,               New York, N.Y.

5         v.                            18 Civ. 6836 (DLC)

6  METROPOLITAN DENTAL
   ASSOCIATES, D.D.S. – 225
7  BROADWAY, P.C., et al.

8              Defendants.

9  ------------------------------x

10                                      February 6, 2023
                                        9:30 a.m.
11
   Before:
12
                        HON. DENISE COTE,
13
                                        U.S. District Judge
14

15                         APPEARANCES

16

17
   DEREK SMITH LAW GROUP, PLLC
18      Attorneys for Plaintiff
   BY:  ZACHARY I. HOLZBERG
19          DEREK SMITH
            CONSTANCE MOLLICK
20
   LAW OFFICE OF DAVID C. WIMS
21      Attorneys for Defendants
   BY:  DAVID C. WIMS
22              and
   GILWITLAW
23      Attorneys for Defendants
   BY:  MARK D. GILWIT
24

25

1          THE DEPUTY CLERK:  Fortesa Qorrolli v. Metropolitan

2     Dental Associates, et al. 18 Civ. 6836.

3          Counsel for plaintiff, ready to proceed?

4          MR. HOLZBERG:  Yes, we are.

5          THE COURT:  Please state your appearance for the

6     record.

7          MR. HOLZBERG:  Zach Holzberg of the Derek Smith Law

8     Group.  Mr. Smith will be joining us shortly.  And we also have

9     from our office Ms. Constance Mollick.

10          THE DEPUTY CLERK:  For the defendant?

11          MR. WIMS:  David C. Wims, Law Office of David Wims.  I

12     have with me my co-counsel Mark Gilwit, and the two individual

13     defendants, Mario Orantes and Dr. Paul Cohen.

14          THE COURT:  Thank you.  And the record should reflect

15     that the plaintiff is with us as well.

16          Let me begin, counsel, by placing rulings on the

17     record to support the order that I issued late last week in

18     response to both our conference together and in response to the

19     letters that I received from counsel.

20          As you know, a number of items that the plaintiff

21     wishes to offer will not be admissible at this trial based on

22     my rulings, and I want to put the reasoning behind those

23     rulings on the record.

24          And Mr. Holzberg, I want to make sure that you have

25     properly instructed your client with respect to the scope of

 1     her testimony.

 2             Have you done so, sir?

 3             MR. HOLZBERG:  Yes, your Honor, I have.

 4             THE COURT:  Thank you so much.

 5             Let's address first the standard for Rule 403, which

 6     permeates a lot of these rulings.  Under Rule 403 -- I

 7     shouldn't say "permeates" it.  That's an alternative ground as

 8     I will articulate for some of the rulings.  I think most, if

 9     not all, of the evidence that I'm ruling upon is absolutely

10     inadmissible under clear application of the federal rules of

11     evidence.  But in addition, its receipt into evidence would be

12     in violation of Rule 403.

13             Under Rule 403, courts may exclude relevant evidence

14     if its probative value is substantially outweighed by the

15     danger of unfair prejudice, confusing the issues, misleading

16     the jury, undue delay, wasting time, or needlessly presenting

17     cumulative evidence.  A court must conscientiously balance the

18     proffered evidence's probative value with the risk for

19     prejudice.  United States v. Massino, 546 F.3d, 132.

20             Unfair prejudice speaks to the capacity of some

21     relevant evidence to lure the fact finder into rendering a

22     verdict on a different ground from proofs specific to the

23     claims brought.  Ibid.  For instance, the proffered evidence

24     may have a tendency to prove some adverse fact not properly in

25     issue or unfairly excite emotions against the opposing party.

1   Ibid at 133.

2           When conducting this balancing, a Court should

3   consider the possible effectiveness of a jury instruction and

4   the availability of other means of proof in making a Rule 403

5   determination.  United States v. Dupree, 706 F.3d at 138.

6           Let's turn to the ruling with respect to the diary.  I

7   adopt the prior statements I have made with respect to the

8   inadmissibility of the diary, and I add that Rule 403 concerns

9   also support its exclusion.  The diary reflects a calculated

10  narration of conversations, some of which had to be very

11  lengthy conversations.  These entries reflect what someone else

12  said in these conversations, not the plaintiff's then-existing

13  state of mind.  United States v. Lawal, 736 F.2d, 5, and

14  therefore are also excluded under this existing state of mind

15  exception that the plaintiff has most recently cited.

16          The probative value of the diary is exceedingly low.

17  The plaintiff can testify at trial to any conversations with

18  the defendants or events she participated in directly with the

19  defendants, and can use the diary to refresh her recollection

20  on the stand if necessary.  She can also, through her attorney,

21  examine the defendants about their interactions with the

22  plaintiff.

23          In contrast, the danger of unfair prejudice or

24  confusing the jury is high if the diary is admitted.  The bulk

25  of the diary entries describe activity that is irrelevant to

1  the issues at trial here, such as allegations of unpaid

2  overtime work.  While a few passages may have some relevance,

3  there was no proffer here of just relevant passages.  The

4  plaintiff seeks to admit the entire diary.

5      When considered in totality, the danger of unfair

6  prejudice, confusion, and waste of time significantly outweighs

7  any limited probative value a few entries in the diary may

8  have.

9      Let's turn to the issue of the employee statements.

10  The plaintiff seeks to testify to her conversation with other

11  employees of Dr. Cohen.  Many of these conversations were about

12  what others had told these fellow employees about their

13  relationships with defendant Orantes, therefore, double

14  hearsay.

15      The defendant relies on Rule 801(d)(2)(D) for the

16  admissibility of these conversations the plaintiff had with

17  co-workers.  Of course, there is no support through

18  801(d)(2)(D) of the double hearsay.  So the question is

19  whether, excluding the double hearsay, any of these

20  conversations would be admissible.

21      Under Rule 801(d)(2)(D), a statement by a party's

22  agent or employee is not hearsay if made on a matter within the

23  scope of that relationship and while it existed.  And that's a

24  quote from the rule.

25      But, under 801(d)(2)(D), a statement must concern

matters on which the employee had the authority to take action

to speak or to participate.  See, for example, on this issue,

United States v. Lauersen, 348 F.3d, 340; United States v.

Rioux, 97 F.3d, 660-661; and Pappas v. Middle Earth, 963 F.2d,

537-38.

There is no limitation within 801(d)(2)(D) on the

seniority or status of an employee, of course, but instead, it

considers the relationship between the statements and the

employee's duty or duties and the scope of those duties.

Statements concerning workplace harassment or

discrimination made by an employee who plays a role in

personnel decision making or human resources may be admissible,

depending on the statements and circumstances at issue.  Each

proffered statement must be analyzed individually, of course,

and the proponent of the statement has the burden of proving

that the statements are admissible non-hearsay.

The plaintiff has offered no evidence regarding the

scope of any potential employee declarant's employment, nor has

plaintiff's counsel identified specific statements for

admission under Rule 801(d)(2)(D).

Defendants object to the admission of the various

statements by co-workers.  Because the plaintiff has failed to

make sufficient proffer that the statements are admissible

non-hearsay, the statements will be excluded.

At the heart of this proffer, the plaintiff seeks to

1    use office gossip and conversations with co-workers after hours

2    to prove that Orantes treated others in a certain way.  The

3    plaintiff must call witnesses to these events who can present

4    competent evidence regarding them to the jury, and cannot rely

5    on hearsay.

6            Of course, if she called these witnesses, there would

7    be separate examination of whether or not the events to which

8    they would be able to testify based on competent evidence are

9    relevant to the plaintiff's claims, and can be admitted under

10   404(b) or some other theory.

11           Therefore, the plaintiff will not be able to describe

12   conversations with her co-workers.  She may, of course,

13   describe her conversations with either of the defendants,

14   defendant Orantes or Dr. Cohen.

15           Let me turn to the issue of reputation evidence.  The

16   plaintiff seeks to testify regarding defendant Orantes'

17   reputation at work.

18           At the prior trial at page 79, she described his

19   reputation as follows:  "He has sex with anyone and everyone,

20   whoever he lays his eyes on, and if you don't give into his

21   sexual desires, then he will make your life a living hell.  It

22   was widely known in the office that he was having sex with

23   multiple women in the office."

24           That testimony or anything like it is barred by the

25   federal rules of evidence.

1           Rule 404 provides that the evidence of a person's

2    character or a trait of character is not admissible for the

3    purpose of proving action in conformity therewith on a

4    particular occasion, and that evidence of other crimes, wrongs,

5    or acts is not admissible to prove the character of a person in

6    order to show action in conformity therewith.  That's Rule

7    404(b).

8           In contrast, where character itself is an element of

9    the crime, claim, or defense, Rule 404 does not apply, and the

10   relevant character evidence is admissible.

11          The circumstantial use of character evidence is

12   generally discouraged because it carries serious risks, serious

13   risks of prejudice, confusion, and delay.  Michelson v. The

14   United States, 335 U.S., 76.

15          Defendant Orantes' character is not an essential

16   element of any claim or defense at this trial.  The

17   prohibitions under Rule 404, therefore, apply.

18          If the plaintiff is offering the character evidence to

19   show that the defendant was engaged in numerous sexual

20   relationships within the office, it is doing exactly what it

21   cannot do, introducing evidence of a person's character to

22   prove that his behavior on one or more occasions was consistent

23   with that character.

24          Plaintiff asserts that the reputation evidence is

25   admissible hearsay under Rule 803(21).  Plaintiff is correct

1    that Rule 803(21) offers an exception for hearsay for testimony

2    concerning an individual's reputation among a person's

3    associates or in the community concerning the person's

4    character.  But Rule 803(21) also provides an exception where

5    character evidence is admissible to begin with, which is

6    governed by Rule 404(a).  And the advisory notes to Rule

7    803(21) make that explicit.  They say the exception deals only

8    with the hearsay aspect of this kind of evidence.  Limitations

9    upon admissibility based on other grounds will be found in

10   Rules 404, relevancy of character evidence generally, and Rule

11   608.

12           Let me turn to the plaintiff's psychiatric records.

13   At the first trial, the plaintiff decided not to offer the

14   records from the plaintiff's psychiatrist.  At this trial the

15   plaintiff seeks to offer them pursuant to Rule 803(4).  The

16   record from the plaintiff's psychiatrist is a 23-page printout.

17   The document reflects 11 meetings between plaintiff and her

18   psychiatrist from June 10, 2015, through August 31, 2016.  That

19   is some months after her employment ended.

20           Very few entries reflect any statements made by the

21   plaintiff to the doctor.  The records do contain, however,

22   descriptions of the plaintiff's mental well-being, including

23   that she was having problems in the workplace, having trouble

24   sleeping, and experiencing symptoms of depression.

25           As described at the final pretrial conference, there

1  are limited references to Orantes, and none of these describe

2  the specific instances at issue here.  For instance, the

3  incident in the elevator and the kiss on the cheek.  The

4  records also included diagnosis of panic disorder,

5  post-traumatic stress disorder, or PTSD, and major depressive

6  disorder.

7       With regards to the PTSD diagnosis, the records

8  reflect that plaintiff experienced a traumatic event and that

9  she experiences flashbacks and distressing dreams about this

10  event.  The PTSD diagnosis on several entries notes that it

11  includes PTSD for children six years and younger.  Nowhere in

12  the psychiatric records does Dr. Lee provide further context

13  for which event or events caused the PTSD diagnosis.

14       Finally, the records list the prescribed medications

15  and coping strategies.

16       The plaintiff seeks to admit the records under the

17  exception to the rule against hearsay.  Rule 803(4) allows a

18  statement made for medical diagnosis or treatment to be

19  admitted for the truth of the matter asserted, notwithstanding

20  the rule against hearsay.  A statement for medical diagnosis is

21  a statement that is made for, and is reasonably pertinent to,

22  medical diagnosis or treatment, and describes medical history,

23  past or present symptoms or sensations, their inception, and

24  their general cause.

25       The assumption underlying the exception is that the

1    desire for proper diagnosis or treatment outweighs any motive

2    to falsify.

3            Statements made by a medical professional to a patient

4    are not admissible under Rule 803(4).  See Field v. Trigg

5    County, 386 F 3d, 735-36.  The records partially, or in part,

6    qualify as medical records that are admissible under Rule

7    803(4).

8            The doctor's statements, including the diagnosis, are

9    inadmissible.  As noted, the plaintiff's statements are few in

10   number.  For instance, the statement in the first session that

11   she is very depressed and anxious.  There are few statements

12   that are repeated almost verbatim from appointment to

13   appointment and appear to be the doctor's summary of a

14   conversation with the plaintiff.  For example, "She is

15   continuous to be stressful at work.  Mario is very manipulative

16   and verbally abusive."

17           The psychiatric records are also subject to the

18   probative/prejudice balancing test under Rule 403.  I've

19   already described the standard that applies there.

20           Here the statements with regards to the plaintiff's

21   PTSD diagnosis are vague, include reference to potential

22   childhood trauma, and an unspecified traumatic event.  This

23   presents a high likelihood of misleading the jury and unfairly

24   prejudicing the defendants without further evidence

25   establishing that the PTSD diagnosis is solely based on events

1    that occurred at Metropolitan Dental Associates.

2         In addition, the probative value of the summaries of

3    plaintiff's statements is low, as plaintiff is able to testify

4    directly regarding what occurred in the workplace, and the

5    mental impact of the defendants' behavior on her.

6         Accordingly, the psychiatric records are inadmissible.

7         The parties may elicit from the plaintiff the dates of

8    her appointments and the medications prescribed, if they wish.

9    The plaintiff may not tell the jury what she told the

10   psychiatrist, or the diagnosis she received.

11        The plaintiff asserts that the PTSD diagnosis is based

12   entirely on plaintiff's employment, nothing else.  This fails

13   to address the substance of the records or the current concerns

14   that I have raised and that the defendants have raised.

15        The fact the plaintiff sought treatment as a result of

16   her employment with defendants does not mean that the treatment

17   was limited only to the topic of her experiences in the

18   workplace.  Without more, the risk of unfair prejudice and

19   confusion to the jury is too high.

20        Mr. Holzberg, will Ms. Vila be testifying at trial or

21   not?

22        MR. HOLZBERG:  I'm not sure yet, your Honor.

23        THE COURT:  Are you seeking to offer her deposition

24   testimony or not?

25        MR. HOLZBERG:  If she's unavailable, then, yes, we

1   will.

2           THE COURT:  If Ms. Vila is available to testify, I

3   want prior notice from counsel, and we will address the scope

4   of any testimony she may give.  I've reviewed her deposition

5   testimony, and am aware of what she testified to about the

6   defendants during that testimony.  She testified that she went

7   a few times with the plaintiff to Dr. Cohen to back her up with

8   respect to the issue of Mr. Orantes making inappropriate

9   comments.  She testified that she did not overhear any sexual

10  comments from Mr. Orantes to the plaintiff.  She testified that

11  she saw Mr. Orantes on one occasion touch the plaintiff's waist

12  and saw him bump into the plaintiff sometimes.

13          So let me just address the deposition testimony.  It's

14  inadmissible.  The plaintiff has made no proffer with respect

15  to the witness's unavailability, and it's inadmissible

16  therefore under the law.  Okay.

17          So, again, if she is going to testify, I'll separately

18  address, before she takes the stand -- so give me plenty of

19  notice, Mr. Holzberg -- the extent to which she's able to talk

20  about anything to the jury, including her own experiences with

21  the defendant.  And we'll conduct a 404(b) analysis to

22  determine what, if anything, is relevant about her own

23  experiences.

24          Let me turn to the anonymous letter.  I've already

25  ruled this is inadmissible, discussing at length the reasons

1   for that at our final pretrial conference on January 26.  And

2   it was during that conference that the plaintiff made its

3   proffer with respect to the admissibility of those statements.

4           The plaintiff submitted a letter after our conference,

5   and nothing in that letter suggests to me that this hearsay

6   document, anonymous fax received at the offices, should be

7   admitted at trial and seen by the jury.

8           The 403 analysis, besides it being inadmissible

9   hearsay, the Rule 403 analysis is prominent in my conclusion

10  here.  The risk of unfair prejudice, confusion of issues, waste

11  of jury time, is very substantial with respect to the fax.

12          So, counsel, let me describe to you how I am going to

13  describe the case to the jury.

14          MR. HOLZBERG:  Your Honor, if I may.

15          THE COURT:  So Mr. Holzberg, I'm going to proceed.

16  Please don't interrupt me.  I'll give you a chance to be heard

17  as soon as I'm finished.

18          MR. HOLZBERG:  Thank you.

19          THE COURT:  So please listen, counsel.

20          This is I believe the description that you approved

21  last time, but I just want to confirm that.  I'll read it

22  slowly.  Feel free to make any action objections or requests:

23          The plaintiff Fortesa Qorrolli is a licensed dental

24  hygienist.  She worked for dentist Dr. Paul Cohen at his dental

25  practice known as Metropolitan Dental Associates D.D.S. 225

1  Broadway, and Metropolitan Dental Associates D.D.S..  The main

2  office of the dental practice is at 225 Broadway in Manhattan.

3           The plaintiff worked full-time at the 225 Broadway

4  location from 2009 until she resigned in May of 2016.

5           Satellite offices for Metropolitan Dental Associates

6  exist at 447 Fulton Street and 327 Pennsylvania Avenue in

7  Brooklyn, and at 8801 Parsons Boulevard in Jamaica, Queens.

8           The plaintiff has sued Dr. Cohen and his dental

9  practices as well as the office manager Mario Orantes.  She

10  alleges that Mr. Orantes made sexual advances towards her and

11  harassed her, and that Dr. Cohen failed to stop that

12  harassment.  The defendants have denied these claims.

13           Mr. Holzberg, any requests for changes to that initial

14  description for the jury?

15           MR. HOLZBERG:  No, your Honor.

16           THE COURT:  Mr. Wims, any requests for changes to that

17  initial description?

18           MR. WIMS:  The only correction, Judge, is the Fulton

19  satellite office in Brooklyn is no longer open and operating.

20  It's been closed.

21           THE COURT:  Thank you.  I'm going to list each office,

22  because if a juror attended one of those offices, I think

23  that's relevant for the parties to know, but I'll change the

24  introductory phrase to reads as follows:  Satellite offices for

25  Metropolitan Dental Associates exist or existed at.  And then

1    I'll read the locations.

2            Any objection to that change?

3            MR. WIMS:  No objection from defendants, your Honor.

4            THE COURT:  Mr. Holzberg?

5            MR. HOLZBERG:  No objection from plaintiff, your

6    Honor.

7            THE COURT:  Thank you so much.

8            The voir dire has been provided to counsel and will be

9    marked as a court exhibit.

10           THE DEPUTY CLERK:  Court Exhibit No. 1.

11           THE COURT:  Now, we have at counsel table, and I'm

12   looking at paragraph 15, a new person I didn't have notice

13   until this moment would be at counsel table.  So I'm planning

14   to add orally during the voir dire process that the defendants

15   are represented by Mr. Wims as well as Mark Gilwit of

16   GilwitLaw.

17           Any other requests for additions or changes to the

18   voir dire, Mr. Holzberg?

19           MR. HOLZBERG:  No, your Honor.

20           THE COURT:  Mr. Wims?

21           MR. WIMS:  No, your Honor.

22           THE COURT:  Thank you.

23           So, Mr. Holzberg, you wish to be heard?

24           MR. HOLZBERG:  Yes, your Honor.  Thank you.

25           So first, with respect to the psychiatric records, I

1   just want to clarify, your Honor had said that at the prior

2   trial we did not seek to introduce those records, but I want to

3   note for the record that we did attempt to introduce those

4   records during the first trial.

5        With respect to those records, I understand what your

6   Honor is saying.  However, the records are very clear with

7   respect to prior psychiatric disorder, that there is no prior

8   history of a psychiatric disorder.  Simply because the code of

9   PTSD indicates its applicability doesn't -- there is no record

10  that would indicate that the plaintiff suffered any type of

11  childhood trauma or anything of the sort.  In fact, the records

12  specifically and clearly says there is no prior history of a

13  psychiatric disorder.  On that basis, I would say I think they

14  are relevant and should be admissible.

15       Even at the pretrial conference with your Honor, your

16  Honor said you were inclined to admit them.  That you were

17  curious with respect to the mention of the PTSD, but other than

18  that, I was under the assumption based on that conference that

19  your Honor was inclined to admit them.

20       I wanted to clarify that with respect to the PTSD

21  diagnosis.

22       THE COURT:  Thank you.  Anything else?

23       MR. HOLZBERG:  Yes, with respect to the anonymous

24  letter.  I understand your Honor ruled that that letter is

25  inadmissible.  I wanted to clarify as well at the pretrial

1   conference your Honor stated that we are able to discuss the

2   letter.  That plaintiff may describe her conversations with the

3   defendants pertaining to that letter.  And I wanted to confirm

4   that still holds true, despite the jury will not see the

5   letter.  I hope we are still able to make mention of the fact

6   that the letter existed on the basis, again, it put defendants

7   on notice that there were complaints of sexual harassment that

8   were made against defendant Orantes.

9        THE COURT:  The defendant testified to a very limited

10  conversation she had with Dr. Cohen about the letter.

11       MR. HOLZBERG:  Sure.

12       THE COURT:  She may absolutely discuss that very

13  limited conversation she had with Dr. Cohen about the letter at

14  this trial.

15       You're right, I ruled at the initial conference or our

16  final pretrial conference in this case that she may describe

17  her conversations with the defendants, and that would include a

18  conversation she had about the anonymous fax with the

19  defendants.  She testified also at the initial trial that she,

20  herself, saw the fax.

21       So, she may testify that a fax came in and that she

22  saw it.  But she may not read it to the jury or describe its

23  contents to the jury, other than to the extent that she

24  described it in her discussions with Dr. Cohen.

25       MR. HOLZBERG:  Thank you.  May she indicate that the

1    letter contained a complaint of sexual harassment against

2    defendant Orantes without providing specific detail?

3              THE COURT:  Yes.

4              MR. HOLZBERG:  Thank you.

5              THE COURT:  So with respect to your first point, you

6    did attempt at the first trial to introduce the documents that

7    is the psychiatric records.  But I think the record will

8    reflect that you withdrew that offer towards the end of the

9    trial.

10             And I don't think that the specific diagnoses that the

11   psychiatrist used are helpful to you to analyze, and Mr. Wims

12   made that point in his letter.

13             But wholly apart from that, there is no factual basis

14   to find discussions pertinent to the issues at this trial were

15   the basis of the specific psychiatric diagnoses that the doctor

16   used to prescribe medication.

17             But in any event, I think we've discussed the

18   psychiatric records enough.

19             Mr. Wims, anything that you would like to discuss?

20             MR. WIMS:  I don't believe so, your Honor.

21             THE COURT:  Great.

22             We'll pick a jury as soon as the jury clerk advises us

23   that one is ready for us.  We'll use the same procedure we used

24   last time.  Thank you, counsel, for your cooperation last time,

25   and I'm anticipating your cooperation again this time.  Jury

1   selection should go smoothly.  You are familiar with it.  You

2   each have three peremptories to exercise against the 14 jurors

3   or potential jurors who will qualify.  I expect then we'll have

4   opening statements.

5         Who is the first witness you're going to call,

6   Mr. Holzberg?

7         MR. HOLZBERG:  We intend to call Dr. Cohen, your

8   Honor.

9         THE COURT:  After Dr. Cohen who are you calling?

10        MR. HOLZBERG:  If at that point Mr. Orantes is still

11  here, we'd like to call Mr. Orantes.  I know he has to leave.

12  We discussed that with your Honor at the pretrial conference.

13  So if he's no longer here, then just as we did last time, we'll

14  call Ms. Qorrolli.

15        THE COURT:  Thank you.  When are you going to know

16  whether or not you have another witness?

17        MR. HOLZBERG:  I'm sorry?

18        THE COURT:  When are you going to know whether or not

19  you have another witness?

20        MR. HOLZBERG:  Ms. Vila?

21        THE COURT:  Yes.

22        MR. HOLZBERG:  I would anticipate by this afternoon,

23  your Honor.

24        THE COURT:  And please advise defense counsel as soon

25  as you know and so that we're able to discuss this no later

```
 1  || than 5 o'clock this afternoon with each other.
 2  ||          MR. HOLZBERG:  Sure.
 3  ||          THE COURT:  Thanks so much.
 4  ||          MR. HOLZBERG:  Thank you.
 5  ||          (Recess)
 6  ||          (Voir Dire off the record)
 7  ||          THE COURT:  We have a jury of eight people.  Thank you
 8  || for your cooperation during jury selection.
 9  ||          Are you intending to make an opening statement,
10  || Mr. Holzberg?
11  ||          MR. HOLZBERG:  Yes, I am, your Honor.
12  ||          THE COURT:  How long roughly will that take?
13  ||          MR. HOLZBERG:  I would say approximately 15 minutes,
14  || your Honor.
15  ||          THE COURT:  Thank you.  I don't want to have to
16  || interrupt it to break for lunch.
17  ||          MR. HOLZBERG:  Sure.
18  ||          THE COURT:  So, thank you for giving me that heads up.
19  ||          And Mr. Wims, roughly how long for yours?
20  ||          MR. WIMS:  Approximately 15 minutes, your Honor.
21  ||          THE COURT:  Great.  Good.  So, why don't you take a
22  || five-minute break.  Not long.  Just a very, very quick break so
23  || we'll accomplish as much as we can before our luncheon recess.
24  || Thanks so much.
25  ||          (Recess)
```

1            THE COURT:  Bring in the jury.

2            (Jury present)

3            THE COURT:  I'm going to ask each of our jurors please

4    to stand so that Mr. Whertvine can administer the oath.

5            (A jury of eight is impaneled and sworn)

6            THE COURT:  Please be seated.

7            Ladies and gentlemen, in our American system of

8    justice, the judge and jury have separate roles.  My role is to

9    instruct you as to the law that will govern and control this

10   case.  I will largely give you those instructions at the very

11   end of the trial.

12           Your job as jurors will be to determine the facts

13   based on the evidence presented at the trial.  You are the only

14   triers of fact, and your decisions will control the verdict

15   that is rendered in this case.

16           Please do not take anything I say or do as indicating

17   what I think your verdict should be.  I have no view of what

18   your verdict should be.  That is your decision.

19           Now, I know you will pay close attention to all the

20   evidence presented in this trial, and it is your obligation to

21   render a verdict based on that evidence.  So, what constitutes

22   the evidence?

23           The very first thing is the testimony of witnesses.

24   Witnesses will take the stand here, be sworn to tell the truth,

25   and give you their testimony about what they saw, what they

1   heard, what they observed.

2          There may also be documents received into evidence,

3   and if they are received into evidence, then you may consider

4   them as well.

5          On occasion, the parties enter into stipulations or

6   agreements as to a certain fact or facts.  If that happens,

7   that's also evidence.

8          That's it.  Just those three things.

9          I want to list for you some things that are not

10  evidence and cannot be the basis of your verdict.

11         First of all, any statement by a lawyer in this

12  courtroom is not evidence.  Any questions a lawyer puts to a

13  witness is not evidence.  It's the answer the witness gives

14  that is the evidence.  Of course, you'll listen closely to the

15  question, because that provides a context for the answer.  But

16  it is the answer that is the evidence.

17         During the course of the trial, the lawyers may object

18  to a question placed by another lawyer.  If that happens, they

19  are just doing their duty.  That's how this system works.  If

20  there is an objection made, and I sustain the objection, then

21  the witness may not answer.  Or if the witness has already

22  answered, that answer is stricken and cannot be considered by

23  you.  If an attorney makes an objection, however, and I

24  overrule it, I'm permitting the witness to give their answer.

25  And you may consider that, of course.

1              If at any time I strike testimony and say it's not

2    part of the record, then it can't be the basis for your verdict

3    and cannot be considered by you during your deliberations.

4              I think it goes without saying that anything you've

5    seen or heard outside this courtroom is not evidence.  The only

6    evidence is what comes in in this courtroom during trial under

7    my supervision.

8              Now, one of the important jobs you'll have is deciding

9    the credibility or believability of the witnesses who will

10   testify during this trial.  You're going to be thinking about

11   are they truthful, can I trust what they have to tell me?  You

12   can use the same tests you apply in your ordinary daily lives

13   to make that decision.  Do they appear to be truthful?  Do they

14   appear to know what they are talking about?  Do they have a

15   motive to testify falsely?  Do they have a reason to

16   exaggerate?  Were they in a good position to see or hear what

17   they're telling me they saw and heard?

18             Sometimes it's not what a witness says, but how a

19   witness says it, that can be important to you in deciding

20   whether a witness is credible or believable, so you can take

21   that into consideration as well.

22             As the trial proceeds, you may begin to develop

23   certain impressions about what occurred in the dental office in

24   which the plaintiff worked.  I'm going to ask you, though, to

25   keep an open mind.  The evidence can only come in one witness

1   at a time, one document at a time.  And therefore, until you

2   have all the evidence, you don't have a complete picture of

3   what happened.

4           Sometimes you may start to build an impression of what

5   happened when you're listening to the direct questioning of a

6   witness, and then cross-examination happens, and you have a

7   completely different impression of what happened.

8           So, again, keep an open mind so you can consider all

9   the evidence.

10          One of the strengths that jurors bring to a courtroom

11  and to a trial is their common sense.  I ask you to rely on

12  your common sense during the course of this trial.  It will be

13  of great assistance to you.

14          So there are a few rules that all jurors must follow

15  in civil trials.  Indeed, in criminal trials, too.

16          One.  Do not discuss this case with each other until

17  the time for deliberations.  Why do I say that?  It's a very

18  basic rule and it's hard to follow, but it's very important.

19  Because we know if you start to discuss the case before you

20  have it all, you are going to be expressing a point of view.

21  And then if someone disagrees with you, you are going to be

22  defending that point of view and become even more committed to

23  that point of view, and we don't want you to do that until you

24  have all the evidence.

25          At the time of deliberations, we are going to be

1    asking you to talk freely with each other.  But now, until the

2    case is submitted for deliberations, do not discuss the case

3    with each other.

4            The Super Bowl's coming up.  We've had some cold

5    weather.  There are lots of things to discuss.  A balloon I

6    think flew over this country recently.  Talk about other things

7    with each other.

8            Obviously, you are to do no research.  Depend on the

9    lawyers to bring out the evidence in this courtroom.  Don't

10   look up anything on ChatGPT or go to Google and look over the

11   internet for something.  Don't try to research a plaintiff or a

12   plaintiff's lawyer or defendant or a defendant's lawyer.  Don't

13   do any research.  Depend on the lawyers to bring out the

14   evidence you need in this courtroom under my supervision.

15           This is an open courtroom.  We don't have visitors

16   right now, but we may have visitors during the course of the

17   trial.  It is a public courtroom.  People can come in and watch

18   our proceedings.  That's one of the real gifts that the

19   American judicial system has.  Not secret proceedings.  If you

20   happen to know anybody who enters the courtroom, that's just

21   fine, but tell Mr. Whertvine, because I might give you an

22   additional instruction.

23           And, of course, if anyone comes up to you at any time

24   to discuss the case, just politely tell them that Judge Cote

25   has told you you cannot discuss the case, and again tell

1     Mr. Whertvine so that I can give you an additional instruction.

2          Now, the parties and the attorneys know they are

3     they're to have no contact with you outside this courtroom and

4     my supervision.  So don't think they're rude if you pass them

5     in the hallway and they don't say good morning or good evening.

6     They're to have no contact whatsoever.  So they are not being

7     rude; they are just following my instructions.

8          The bottom line of all of this is the plaintiff and

9     the defendants are entitled to have you render a verdict based

10    solely on the evidence received in this case and nothing else.

11    That's what all those rules are trying to support.

12         Let me just spend a few moments talking about trial

13    procedure.  This morning we picked a jury.  We picked you.  I'm

14    giving you my initial instructions.  The next step is for the

15    lawyers to give you their opening statements.  It's their

16    chance to tell you what they think the evidence will show as

17    the evidence comes in bit by bit.  What they say to you is not

18    evidence, but it's important and helpful, and I know you'll

19    give them your full attention.

20         Then the plaintiff has an opportunity to call

21    witnesses.  The plaintiff will call the first witness, and ask

22    questions.  That's called direct examination.  Then defense

23    counsel gets to put questions to that witness.  That's called

24    cross-examination.  Then we have redirect and recross, and at

25    some point all the questioning for that witness is done, and

1    then the plaintiff calls their next witness.

2          When the plaintiff is done calling their witnesses,

3    the defendants have an opportunity to call witnesses.

4          Let me mention one thing that's not uncommon in cases.

5    There are some witnesses that both the plaintiff and the

6    defendants want to call, but we're only going to have them on

7    the stand once.  Okay.  So, when that happens, I'll instruct

8    you that, of course, this is a witness that the defendant

9    wanted to call on their case, too.  And we're just trying to

10   ease the process for you and give you their testimony just

11   once.

12         After all the evidence is in, the attorneys will have

13   another opportunity to speak directly to you.  That's called

14   summation.  And I'll have more instructions for you at that

15   time.  It's their closing arguments or summations.  Then I will

16   give you my instructions as to the law, that's called the jury

17   charge, and then you must return and begin your deliberations

18   in the jury room with each other.

19         What's our schedule going to be from day to day?  Each

20   day our testimony or court session with you will begin at 9:30.

21   We begin 9:30 promptly.  I meet with the lawyers starting at

22   9 o'clock so we have a half an hour to work with each other to

23   make sure we're ready to begin promptly at 9:30.

24         So I'm going to ask you to be in the jury room before

25   9:30 so there is no delay.

1          As I've mentioned already, we take a lunch recess from

2     12:45 to 2 each day and we end promptly at 5.  So you can make

3     your plans that you will be able to leave for home at 5 o'clock

4     each day.  In addition, we have a midmorning and a midafternoon

5     recess.  I try to call those recesses at a time that fits with

6     the evidence.  But if at any time any of you need another

7     break, just raise your hand, we'll be happy to accommodate you.

8     Okay?

9          I think you've already given Mr. Whertvine your

10    contact information and received ours from him.  And because of

11    the importance of the internet these days, I have a special

12    charge for you and then I'm done.

13         As I've mentioned, you must decide this case solely on

14    the evidence presented in this courtroom over the next few

15    days.  You may not discuss this case with anyone, other than

16    your fellow jurors and only when all of you are gathered

17    together for deliberations, after I've given you my charge as

18    to the law.

19         So that means you can't discuss this case, even with

20    your family members or with whomever you live.  Just tell them

21    you've been chosen as a juror in a civil case, and you will

22    tell them all about it when the trial is over.  Okay?

23         You must not communicate with anyone, including your

24    fellow jurors, in any form, by telephone or through e-mail or

25    text messages or Twitter or Facebook or any other media.  You

1   may not update your status on any website to tell anyone that

2   you are a juror during this trial or give them any information

3   about this trial until the trial is over.  And then, of course,

4   you're free to tell anyone anything you'd like about the trial.

5   Okay?

6          So, I don't want to interrupt opening statements by

7   plaintiff's counsel, and we just have a few minutes before

8   luncheon recess, so I'm going to have you take a longer

9   luncheon recess or let you take a longer luncheon recess, and

10  we'll rejoin at 2 clock for opening statements and then

11  followed by our first witness.

12         Have a nice lunch.  Do not discuss the case with

13  anyone.  Thank you.

14         (Jury excused)

15         THE COURT:  So, I broke a few minutes early so I

16  wouldn't interrupt your opening statements.

17         Mr. Holzberg, before we break for lunch, is there

18  anything we need to discuss, Mr. Holzberg?

19         MR. HOLZBERG:  Thank you, your Honor.  No, there's

20  nothing to discuss from the plaintiff.

21         THE COURT:  Thank you.

22         Mr. Wims, anything to discuss before our luncheon

23  recess?

24         MR. WIMS:  Two things, Judge.  Your Honor previously

25  reserved ruling on our pending motion for sanctions against

1   plaintiff's counsel.  Is that ruling still reserved at this

2   point?

3           THE COURT:  Yes.

4           MR. WIMS:  Okay.  And the second thing is sort of

5   logistical.  My understanding is the cafeteria is closed and

6   will not be open this week.  Would you be able to provide us

7   with the closest location to eat so that we can stay within the

8   confines of the hour-and-15-minute lunch period?

9           THE COURT:  So I'll let you talk with Mr. Whertvine

10  about that, but we're very fortunate.  We're on the edge of

11  Chinatown there are lots of places.

12          Thanks, counsel.  Be back promptly at 2 o'clock.

13  We'll start promptly at 2.  Thank you.

14          MR. WIMS:  Thank you.

15          (Recess)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1                         AFTERNOON SESSION

 2                            2:00 p.m.

 3            THE COURT:  Counsel, we are going to start promptly at

 4    2.  The jury is ready.  I don't know where the doctor is.

 5            MR. WIMS:  He went to the restroom, your Honor.  He

 6    will be right back, your Honor, but we are ready to proceed.

 7            Are we going to have an opportunity to discuss the

 8    letter Mr. Whertvine handed us prior to the jury coming in?

 9            THE COURT:  I don't think so.

10            MR. WIMS:  No.

11            THE COURT:  No.

12            MR. WIMS:  Thank you, your Honor.

13            THE COURT:  Yup.

14            Counsel, there was at 1:20 a fax or an email to my

15    chambers with an attachment, a letter of February 2 from a

16    Dr. Sharma regarding Ms. Vila.  The jury is ready to proceed.

17    So nobody should mention Ms. Vila in their opening statements.

18    Thank you.  We will address this later.  Bring in the jury.

19            MR. SMITH:  Your Honor, may we please have five

20    minutes?

21            THE COURT:  No.

22            MR. SMITH:  I just don't know where Mr. Holzberg is.

23            THE COURT:  Hold on a minute, Mr. Whertvine.

24            Please go get Mr. Holzberg.  It's 2:00.

25            Bring in the jury.
```

1          Mr. Holzberg, no reference to Ms. Vila in your opening

2    statement.   None.

3          MR. HOLZBERG:   Sure.   Understood.

4          THE COURT:   In the future, please be on time.

5          MR. HOLZBERG:   Yes, your Honor.

6          (Jury present)

7          THE COURT:   Ladies and gentlemen, welcome back.

8          We are now at that stage of the case in which the

9    attorneys have a chance to make their opening statements to

10   you.   I remind you nothing that they say is evidence, but

11   nonetheless I know you will give them your careful attention.

12   It's their chance to tell you what they expect the evidence

13   will show.   They won't be making arguments to you but instead

14   just describing what they think the evidence will be.

15         Counsel, Mr. Holzberg, do you wish to make an opening

16   statement?

17         MR. HOLZBERG:   Yes, your Honor.

18         THE COURT:   Thank you.

19         MR. HOLZBERG:   Good afternoon.   The female associates

20   at Metropolitan Dental Associates are well-educated

21   professionals.   However, the evidence will show that the

22   defendants Metropolitan Dental Associates and defendant Mario

23   Orantes treated the female employees of Metropolitan Dental

24   Associates as sexual play toys for his sick own enjoyment.

25   Metropolitan Dental Associates is not a place where women

1    should be sexually harassed in their workplace.

2            Throughout the course of this trial you will be

3    hearing about defendant Paul Cohen, seated right over there.

4    Defendant Cohen is a dentist and is the owner of Metropolitan

5    Dental Associates.  He has been in practice for over 45 years.

6    The evidence will show the defendant Cohen was like an ostrich

7    who buried his head into the sand and refused to acknowledge

8    multiple complaints of sexual harassment against Metropolitan

9    Dental Associates office manager, Mario Orantes, seated right

10   over there.  You are going to hear testimony that the defendant

11   Orantes subjected the plaintiff to unwelcome sexual advances.

12           The plaintiff is seated right here.  Fortesa Qorrolli,

13   also known as Tessa.  Tessa worked at Metropolitan Dental

14   Associates for almost six and a half years.  You are going to

15   hear that Dr. Cohen had notice that his office manager was

16   subjecting Tessa to unwelcomed sexual advances throughout the

17   six and a half years that she was employed there.

18           Despite having knowledge that this was going on in his

19   office, you are going to hear testimony that Dr. Cohen did

20   absolutely nothing in response.  Why?  Because it would be

21   easier to ignore than to accept the truth.

22           Good afternoon.  My name is Zach Holzberg, and I have

23   the distinct privilege of representing plaintiff, Fortesa

24   Qorrolli, in this action against her prior employer,

25   Metropolitan Dental Associates, also known as MDA, Dr. Paul

1   Cohen, and Mario Orantes.  Tessa brought this action against

2   the defendants alleging that they subjected her to a hostile

3   work environment on the basis of her sex.

4          Let me tell you a story of what happened.  There came

5   a point in time that Tessa and her mother both became employed

6   as dental hygienists at MDA.  You will hear testimony that

7   shortly after they started working at MDA, Dr. Cohen said how

8   much he trusted them, how much he was impressed by them, that

9   he could see them handling the day-to-day operations of the

10  office.

11         You will also hear testimony that, as a result of

12  this, defendant Orantes, as the office manager, felt as though

13  his power and control was being threatened.  The evidence will

14  show that defendant Cohen had ultimate trust in defendant

15  Orantes.  You will hear testimony that defendant Orantes was

16  Dr. Cohen's right-hand man in operating the practice at MDA.

17  And defendant Orantes knew this.  Defendant Orantes knew that

18  if he told Dr. Cohen something, it would be accepted as the

19  truth, and he used that to his advantage.

20         You are going to hear testimony that defendant Orantes

21  abused his position of power and authority at MDA as the office

22  manager to sexually harass Fortesa Qorrolli.  Tessa is also

23  going to testify that she observed defendant Orantes harassing

24  other women at MDA.  You are going to hear that Tessa observed

25  Mario take other women by the hand, take them into an exam room

1    during the middle of the day, during working hours, sometimes

2    for 30 to 60 minutes, with the door closed.  You are going to

3    hear that sometimes women came out with lipstick smudged all

4    over their face.  On one occasion you are going to hear that

5    Tessa actually went looking for one of these women, opened the

6    door and behind the door is Mario, another woman with her

7    scrubs down past her shoulders, lipstick smudged all over her

8    face.  Now, Tessa is going to tell you that the women that were

9    involved with Mario received favorable treatment.  Those that

10   did not, he made their life a living hell.

11          Now, one of the things that we are going to talk about

12   is, for example, patient complaints.  As I just mentioned, you

13   are going to hear evidence that defendant Orantes was taking

14   women into these rooms.  Guess who the slack fell on.  Tessa

15   and her mother.  Tessa and her mother were seeing close to 20

16   to 30 patients per day while Mario was in these rooms with

17   these other women.  Then patients complained.  Who do you think

18   Mario blamed that on?  The women that he was involved with or

19   the women that rejected him, like Tessa?

20          You are going to hear testimony that Tessa then would

21   get called into Dr. Cohen's office with Mario and, again,

22   Dr. Cohen is accepting everything that Mario is telling him is

23   true.  So Mario says:  This is all Tessa's fault.  You are

24   going to hear testimony that Dr. Cohen would then look at Tessa

25   and say:  What, are you fucking retarded?  Are you a fucking

1   idiot, Tessa?  Don't you know how to do your job?  Go back

2   downstairs and do your job.  When in fact Tessa was the one in

3   fact doing her job.  Like I said, she was seeing 20 to 30

4   patients a day.

5          Now, you're also going to hear what defendant Orantes

6   did specifically to Tessa.  You are going to hear that through

7   the six and a half years that Tessa worked for MDA, defendant

8   Orantes made unwelcomed sexual comments about her body, that he

9   touched her body throughout the course of her employment.  Make

10  no mistake.  This was not a sporadic, once-in-a-while kind of

11  thing.  This was a continuous course of conduct that happened

12  throughout the six and a half years that Tessa was employed at

13  MDA.  You will hear testimony that it happened a couple of

14  times per week.  You are going to hear that Mario made sexual

15  comments about Tessa's body.  Nice butt.  You have a really

16  firm behind.  Tessa, you look beautiful.  I love you.

17         You are going to hear that defendant Orantes would

18  take Tessa by the hand as well, take her into an exam room,

19  close the door.  Often this was done after she had been berated

20  by Dr. Cohen.  Mario intentionally manipulated these situations

21  so that Tessa would become vulnerable and more likely to give

22  into these sexual advances.  You will hear testimony from Tessa

23  that while they were in the room, Mario would come put his arm

24  around her, hug her, tears coming down her face, wipe the tears

25  away, give her a kiss on the cheek.  Tessa, I love you.  I care

1   about you.  I want to protect you.  Now, Tessa never gave into

2   defendant Orantes' unwelcomed sexual advances throughout the

3   entire time that she worked there.

4          The defendants, they are going to deny all of this.

5   They are going to say none of this happened.  Defendant Orantes

6   never sexually harassed Tessa or anyone, for that matter.

7   Dr. Cohen never heard anything about this.  Has no clue.

8          But the evidence will show that multiple complaints

9   were made to Dr. Cohen.  You are going to hear that Tessa went

10  to Dr. Cohen on numerous occasions crying.  Dr. Cohen, please.

11  I don't want to have to be put in a position where I need to be

12  sexually involved with Mario in order to be able to keep my job

13  here.  Do you know what Dr. Cohen told Tessa in response?

14  You're fucking crazy.  You're delusional.  Completely dismissed

15  her.

16         Now, you are also going to hear about a letter that

17  was faxed to every fax machine in the entire office and this

18  letter was a complaint of sexual harassment against Mario.  You

19  will hear testimony that in response to seeing that letter,

20  Dr. Cohen testified:  This is abhorrent.  And if this is true,

21  I'm crazy to keep Mario here.  Remember, again, when Tessa

22  complained, she was the crazy one.  Dr. Cohen's conscious

23  disregard and refusal to take action to prevent Mario from

24  doing this only added fuel to the fire.

25         You will hear testimony that there was no recourse for

1    Mario.  Mario was never disciplined.  Mario was never written

2    up.  Mario was never suspended.  The evidence will show there

3    was no employee handbook in place, no antidiscrimination policy

4    in place.  And what this did was allow for a vicious cycle that

5    continued for the six and a half years that Tessa worked there.

6            Again, Mario makes an unwelcomed sexual advance

7    towards Tessa.  She rejects him.  Then he goes to Dr. Cohen,

8    complains, says Tessa is not doing her job.  Dr. Cohen says:

9    Tessa, you're a fucking idiot.  Tessa goes back downstairs

10   crying and, once again, Mario makes a move on her.  I love you.

11   I want to protect you, he said.

12           As I'm sure you can imagine, this started taking a

13   significant toll on Tessa's physical, mental, and emotional

14   well-being.

15           After we heard everything that happened to Tessa, I

16   want to talk to you about the damages that she sustained, the

17   harms that she suffered as a result of experiencing this

18   torture in the six and a half years that she worked at MDA.

19   You are going to be hearing from Tessa and you are also going

20   to be hearing from Tessa's mother, who, keep in mind, was also

21   employed during this time.  Tessa's mom is going to discuss the

22   impact that she witnessed firsthand that had on her daughter.

23           You're also going to hear that for the first time in

24   her life, as a result of what Mario was doing to her, Tessa

25   needed to seek treatment while she was still employed there.

1   Tessa met with the therapist and was prescribed various

2   medications to cope for what she was going through.  Tessa is

3   going to testify that as a result of what was happening to her

4   at MDA, she was suffering from panic attacks, almost daily,

5   anxiety attacks, and depression, so much so that there were

6   days that she couldn't even get out of bed.  You are going to

7   hear Tessa testify that she started to feel as though she was

8   losing herself.  You are going to hear Tessa testify that she

9   wanted to end her life because of what was going on at her job.

10  There was no other way out for her.

11          Now, you are also going to hear testimony that even

12  going to therapy and being prescribed these medications, her

13  work environment was so intolerable, nothing was changing, that

14  she had no choice but to resign.

15          At the end of this trial, I am going to ask you to

16  hold the defendants accountable for what they have done and to

17  ensure that this can never happen again.

18          Those are the only times that I can address you

19  directly.  It has been my honor speaking with you now, and I

20  look forward to talking with you at the end, after we have had

21  an opportunity to hear all of the evidence that we have

22  discussed.  Thank you for your time and your patience.

23          THE COURT:  Mr. Wims, do you wish to make an opening

24  statement?

25          MR. WIMS:  Yes, your Honor.

1            THE COURT:  Thank you.

2            MR. WIMS:  Good afternoon.  As many of you heard

3    earlier, I am the attorney for all of the defendants in this

4    case, so the two corporate defendants, Metropolitan Dental

5    Associates, the dental practice located in lower Manhattan on

6    Broadway, and my two individual clients, Dr. Paul Cohen and

7    Mr. Mario Orantes.

8            Now, you just heard plaintiff's counsel tell you about

9    what you are going to see and hear.  Some of you may have seen

10   the movie *My Cousin Vinny*.  There is a point where they are in

11   court and the guy stands up and says:  Everything that man just

12   said is bullshit.

13           MR. HOLZBERG:  Objection, your Honor.  Argumentative.

14           THE COURT:  Excuse me, counsel.  No reason to raise

15   your voice.

16           Sustained.

17           You can move on, Mr. Wims to your next point.

18           MR. WIMS:  Thank you.

19           That's essentially what the situation is here.  What

20   you will see as you watch the evidence come in in this case,

21   ladies and gentlemen, is that very little of what Mr. Holzberg

22   said will be borne out in proofs that are presented to you.

23           You heard the judge's instruction earlier.  She said,

24   opening statements, not evidence.  She said each of you

25   indicated to the judge that you could judge this case based on

1     the testimony you hear, the evidence presented, and the

2     witnesses who testify and nothing else, including Mr.

3     Holzberg's sensational opening statement.

4           Now, one other thing is, by virtue of being here and

5     having each of you seated as a juror, that doesn't make any

6     statement with respect to whether the Court believes

7     plaintiff's case or not.  That's what you are here for.  You

8     are the ultimate deciders of that.  Based on the evidence

9     presented to you, you will decide.

10          Now, as New Yorkers I'm confident that you will be

11    able to see that the proofs don't bear out what Mr. Holzberg

12    just described.  In fact, what we have here is a case where

13    there is an allegation of impropriety but there is no proof, no

14    evidence.  In fact, plaintiff's case is built upon hearsay and

15    office gossip and innuendo and supposition and very little

16    evidence.

17          You are also going to hear and see the varying factual

18    allegations plaintiffs make.  Plaintiff has made these

19    allegations now, not only in this lawsuit, but in a number of

20    proceedings, and you are going to see that the story changes

21    every time.

22          So we are asking you to listen very closely to

23    plaintiff's testimony because it will be inconsistent, it will

24    be contradictory, and, at the end of the day, the picture that

25    they are trying to paint does not make sense.

1              You are going to use your everyday powers of

2    discernment as the judge discussed with you, and ultimately we

3    are confident that you will arrive at the conclusion that

4    plaintiff cannot prove her case.  Much more difficult to prove

5    a case of alleged harassment than it is for the lawyer to stand

6    up here and tell you how they are going to do it.  Those are

7    two separate and distinct things.

8              I just want to be clear, obviously, my client and I,

9    we thank you for your service on the jury.  We are going to try

10   to get right to the point and not hold you any longer than

11   necessary.

12             I just want to address a couple of things Mr. Holzberg

13   said.  There were no unwelcome advances.  There was -- you are

14   going to hear testimony that there were two incidents in

15   particular where plaintiff alleges she was touched by defendant

16   Orantes.  And you will see that that story has changed over

17   time.  You will see that the allegations she makes about other

18   people in the workplace, she didn't witness.  So she is

19   reciting things that she heard a coworker say or the coworker

20   chose to conclude a particular way.

21             But this is a courthouse.  This is a courtroom.  We

22   are not on the corner.  We are not at home in front of the TV.

23   So plaintiff bears the burden of proof in this case.  Plaintiff

24   must prove her case by a preponderance of the evidence.  And

25   the judge will tell you at the appropriate time what that means

1   and how to apply that standard.

2           Just to be clear, although my clients deny plaintiff's

3   allegations, they are -- you can look at them.  Dr. Cohen and

4   Mr. Orantes, they are brothers, sons, cousins, nephews, that

5   sort of thing.  They have sisters, they have mothers.  And they

6   are opposed ideologically and specifically to sexual

7   harassment.  But that term is a legal term.  So it's similar to

8   someone saying, I was discriminated against.  You have to be

9   more specific on that.  That's a legal term and it can mean a

10  lot of things.

11          To be clear, this is not a situation where it's women

12  against men, for example, or a battle of the genders.  We are

13  all here for one reason, to determine that plaintiff can be

14  believed because she doesn't have any witnesses who will

15  corroborate her allegations, and she has no documents or

16  physical evidence, a recording, whether it be audio or video or

17  anything like that.  There is none of that.  So for her to

18  prevail you would have to take her word.  I think by the end of

19  this trial you will all agree with me that that's not an

20  attractive proposition in these circumstances.  There are too

21  many inconsistencies, too many conflicting statements.

22          At the end of this trial, when we come back and Mr.

23  Holzberg and I speak to you again in closing, I am going to

24  remind you about all the fantastic statements Mr. Holzberg made

25  in his opening and how they won't deliver on evidence in

1    support of those allegations.

2           Now, one of the important distinctions here is that

3    between illegal conduct, like sexual harassment, and legal

4    conduct, like managers and employers regulating their work

5    force, if I have an assistant who works for me or a paralegal,

6    it is my job to supervise him or her.

7           MR. HOLZBERG:  Objection, your Honor.

8           THE COURT:  Yes, counsel.  Please just forecast the

9    evidence you expect the trial to show.

10           MR. WIMS:  Thank you, your Honor.

11           What you will see in the testimony is that plaintiff

12    was subject to discipline.  She didn't like it.  Most people

13    don't.  That's not a reason to file a lawsuit.  That's not what

14    brings us here today.

15           Now, plaintiff essentially claims that there were two

16    incidents where she was touched by Mr. Orantes.  She is going

17    to describe those.  You will hear him answer questions

18    regarding those things.  But none of the allegations plaintiffs

19    make are that there was some explicit sexual contact or

20    conduct.  She doesn't allege that she was forcefully kissed or

21    that she was groped or anything like that.  When you see

22    everything and you have heard everything, it will be clear to

23    you, just like it is to me and my client, that plaintiff has a

24    tendency to embellish the alleged facts.

25           Finally, I just want to say, please keep in mind, even

1  though you are here with the judge and the lawyers, you're the

2  most important part of this system here because you're the fact

3  finders, the jury.  You're what makes the legal system work.  I

4  am confident that each of you, having taken that oath and

5  indicated you fairly hear this trial and decide it based on the

6  evidence, that you'll do exactly that.  We look forward to

7  showing you that there is no reason to hold my clients being

8  accountable for anything here because they have done nothing

9  wrong.

10          Finally, I just want to say, my clients and I are

11  sensitive to some of the difficulties that women face in the

12  workplace.  This case is not a referendum on that.

13          MR. HOLZBERG:  Objection.

14          MR. WIMS:  Please keep that in mind.  Listen to the

15  evidence, hear the evidence, decide the case fairly.  Do what

16  you know to be right after you have heard it.  Thank you very

17  much.

18          THE COURT:  Plaintiff may call its first witness.

19          MR. HOLZBERG:  Thank you, your Honor.  Our first

20  witness that we would like to call is Dr. Cohen.

21          THE COURT:  Dr. Cohen, if you could come up to the

22  witness stand.  Take the witness stand but remain standing.

23  Please face me.  Raise your right hand.

24  PAUL COHEN,

25      called as a witness by the Plaintiff,

```
 1          having been duly sworn, testified as follows:
 2               THE COURT:  Ladies and gentlemen, I want to remind you
 3      what I said earlier.  The plaintiff and the defendant seek to
 4      call some witnesses.  Both of them seek to call the same
 5      witnesses, some of them, and Dr. Cohen is one of those.  He
 6      will only be on the stand once, so you should consider him as
 7      called by both the plaintiff and the defendant.  Thank you.
 8               Dr. Cohen, if you could move that mic below your chin.
 9      Just keep your voice up.  I think it will be a little better.
10      Thank you.
11               THE COURT:  Mr. Holzberg.
12               MR. HOLZBERG:  Thank you, your Honor.
13      DIRECT EXAMINATION
14      BY MR. HOLZBERG:
15      Q.  Good afternoon, Dr. Cohen.
16      A.  Good afternoon.
17      Q.  Dr. Cohen, I am going to be asking you a number of
18      questions that call for a yes or no answer.
19               Do you understand that?
20      A.  Yes.
21      Q.  In answering my questions if you can, please try to answer
22      yes or no.  OK?
23      A.  OK.
24      Q.  Dr. Cohen, you are a dentist, right?
25      A.  Yes.
```

1   Q.  Aside from being a dentist, you are the sole owner of

2   Metropolitan Dental Associates, is that correct?

3   A.  Yes.

4   Q.  Your practice has been open for over 45 years, right?

5   A.  I graduated 50 years ago.  This practice has been opened

6   for 25 years.

7   Q.  You have three different locations, correct?

8   A.  Yes.

9   Q.  There is one office in Brooklyn, right?

10  A.  Yes.

11  Q.  One office in Queens?

12  A.  Yes.

13  Q.  And one office in Manhattan, right?

14  A.  Yes.

15  Q.  And you had a location that was in Brooklyn on Fulton

16  Street that closed, is that correct?

17  A.  Correct.  Several years ago.

18  Q.  And the office location in Manhattan is at 225 Broadway,

19  right?

20  A.  Yes.

21  Q.  And your office has been located at 225 Broadway for over

22  21 years, right?

23  A.  Yes.

24  Q.  You employ over 100 people just at the 225 Broadway

25  location, right?

 1   A.  No.

 2   Q.  Were there more than 100 people employed at that location

 3   prior to COVID?

 4   A.  Repeat the question, please.

 5   Q.  Were there more than 100 employees at the 225 location

 6   prior to COVID?

 7   A.  Several years earlier than COVID.

 8   Q.  You would agree that it's important to try to keep

 9   employees in an environment that is free from sexual

10   harassment, correct?

11            MR. WIMS:  Objection.

12            THE COURT:  Sustained.

13   Q.  Dr. Cohen, are you aware that it's illegal to sexually

14   harass someone in their place of employment?

15            MR. WIMS:  Objection.

16            THE COURT:  Sustained.

17            Counsel, I think the objection is and the concern is

18   about a term that may have different meanings to different

19   people and that doesn't shed much light on particular conduct.

20   But I'll let you inquire generally.  Thank you.

21            MR. HOLZBERG:  Thank you.

22   Q.  Dr. Cohen, are you aware that it's illegal for someone to

23   be groped in their workplace?

24            MR. WIMS:  Objection.  Calls for a legal conclusion,

25   Judge.

1              THE COURT:  Overruled.

2    A.  Can you repeat the question.

3    Q.  Sure.  You're aware of the fact that it's illegal for

4    someone to be groped in their place of employment?

5    A.  Yes.

6              THE COURT:  I am going to reverse myself here.  Strike

7    that answer.

8              Your next question, counsel.

9    Q.  Dr. Cohen, during the time that Tessa Qorrolli worked at

10   MDA, there was no employee handbook in place, is that correct?

11   A.  I am not sure when we developed the employee handbook.

12   Q.  Dr. Cohen, isn't it true that during the time that Tessa

13   Qorrolli was employed at MDA there was no antidiscrimination or

14   sexual harassment policy in writing at MDA?

15   A.  I don't know the answer to that.

16   Q.  Dr. Cohen, I want to ask you about your office manager,

17   Mario Orantes.  Mario is seated right over there, right, in the

18   gray suit?

19   A.  Yes.

20   Q.  And Mario is the overall manager at MDA, right?

21   A.  Correct.

22   Q.  When I say MDA, you understand that I'm referring to

23   Metropolitan Dental Associates, correct?

24   A.  Yes.

25   Q.  And Mario is your right arm in running MDA, right?

1    A.  He certainly is.

2    Q.  Mario is also in charge of the billing department, correct?

3    A.  Yes.

4    Q.  And Mario is also the primary manager of the downstairs

5    floor of MDA, is that correct?

6    A.  He's the senior person.

7    Q.  Did Mario manage the downstairs of your business?

8    A.  Mario has 33 years of my confidence.

9    Q.  And Mario has the authority to hire employees, right?

10   A.  Yes.

11   Q.  And in most instances Mario had the authority to fire

12   employees, correct?

13   A.  Yes.

14   Q.  Dr. Cohen, you have a lot of trust in Mario, true?

15   A.  Yes, I do.

16   Q.  And you have ultimate trust in Mario, right?

17   A.  I have a lot of trust in Mario.  I trust his judgment and

18   his reliability for over 33 years now.

19   Q.  You also have a lot of confidence in Mario, right?

20   A.  Yes.

21   Q.  And you believe Mario has your best interests as well as

22   the best interests of your office at heart, right?

23   A.  Yes.

24   Q.  And Mario handles just about everything in the office right

25   now, right?

 1   A.  He, along with several other people.

 2   Q.  Dr. Cohen, even though Mario is responsible for all the

 3   items you just mentioned, you are still ultimately responsible

 4   for everything that goes on in your business, MDA, right?

 5   A.  Correct.

 6   Q.  Now, I am going to ask you some questions about Tessa's

 7   employment at MDA.  There came a point in time that Tessa

 8   started working at MDA, right?

 9   A.  Yes.

10   Q.  Do you recall when that was?

11   A.  I think it was around 2009.

12   Q.  And Tessa's mother, Nexhmije, also began working for MDA,

13   right?

14   A.  Yes.

15   Q.  Do you recall when that was?

16   A.  She worked for us two separate times.  She worked, left.

17   Several years later, when we heard she was a hygienist, I asked

18   Tessa to get in touch with her and see if she was available to

19   work for us, and she did.

20   Q.  There was a point that Tessa's mother ended up then also

21   coming to work at MDA?

22   A.  Yes.

23   Q.  And while working for you at MDA, Tessa was a dental

24   hygienist, right?

25   A.  Correct.

1    Q.  In her capacity as a dental hygienist, you and Mario were

2    her supervisors, right?

3    A.  I was the owner, Mario was her chief supervisor.

4    Q.  And as her supervisor Mario had the authority to change

5    Tessa's schedule, right?

6    A.  Yes.  Like any supervisor.

7    Q.  Now, I want to talk to you about the allegations of sexual

8    harassment.

9            Dr. Cohen, Tessa worked for you at MDA for about six

10   years, right?

11   A.  Approximately.

12   Q.  She started around 2009, you said?

13   A.  I think so.

14   Q.  Do you recall when Tessa left?

15   A.  She left with 15 minutes' notice, dropped off a letter in

16   front of me, and walked out of the office very unprofessionally

17   along with her mother.

18   Q.  Do you recall approximately when that was?

19   A.  Around 2016, I think.

20   Q.  Dr. Cohen, do you have any reason to doubt Tessa's honesty?

21   A.  Yes.

22   Q.  Dr. Cohen, it's your testimony that you have reason to

23   doubt Tessa's honesty?

24            MR. WIMS:  Objection.  Asked and answered.

25            THE COURT:  Sustained.

1   Q.  Dr. Cohen, this isn't the first time that you've been asked

2   questions about this case, right?

3   A.  No, it's not the first time.

4   Q.  In fact, you gave two depositions in this case, right?

5   A.  I remember one.

6   Q.  You only remember one of your two depositions?

7   A.  It was several years ago.

8          THE COURT:  Counsel, you cannot testify.

9   Q.  Dr. Cohen, at your deposition, that was an opportunity for

10  me to ask you questions and for you to provide answers to those

11  questions, right?

12  A.  Yes.

13  Q.  When you answered those questions you were under oath,

14  right?

15  A.  Yes.

16  Q.  Similar to the oath that you took today, right?

17  A.  Yes.

18  Q.  An oath to tell the truth?

19  A.  I do tell the truth all the time.

20  Q.  I'm sorry.  That wasn't my question.

21         My question was, the oath you took today, is it the

22  same oath --

23  A.  I don't know if it was the same oath.  I took the oath with

24  the same sincerity and honesty that I would take any oath.

25  Q.  At your deposition, while you were under oath, is it your

 1   testimony that you told the truth at your deposition?

 2   A.   Yes.

 3   Q.   When you gave that deposition, it was closer in time to the

 4   events in question than today, correct?

 5   A.   Yes.

 6            MR. HOLZBERG:  Now, I invite the Court and counsel to

 7   please refer to page 147 of the deposition transcript of

 8   Dr. Paul Cohen.

 9            Your Honor, may I hand the witness a copy of the

10   deposition transcript?

11            THE COURT:  If you can hand me a copy too, please.

12            MR. HOLZBERG:  Absolutely.

13   A.   I left my glasses on my table there.

14   Q.   Would you like me to bring them to you?

15            THE COURT:  Mr. Whertvine will get the glasses.  I

16   know you're busy, Mr. Holzberg.

17            Mr. Holzberg, do you have a copy for me?

18            MR. HOLZBERG:  I'm sorry.

19            THE COURT:  Do you have a copy of the deposition?

20            MR. HOLZBERG:  For you, yes, of course.

21            THE COURT:  It appears that there they are having

22   trouble locating your glasses, Dr. Cohen.  I'll let you step

23   down and see if you can find them.

24            THE WITNESS:  I have it here, thank you.

25            THE COURT:  Dr. Cohen has found his glasses.

1              Counsel, thank you.

2    Q.  Dr. Cohen, at your deposition, dated February 11, 2020, you

3    were asked:

4    "Q.  OK.  During the time in which you worked with Tessa, did

5    you know her to be honest?

6    "A.  I didn't have any reason to doubt her honesty."

7              Did I read that correctly?

8    A.  I have not been following you.

9    Q.  We are on page 147, lines 22 -- it starts at line 22.

10   A.  At that time I had no question to question her honesty.

11   Q.  My question was:  "During the time in which you worked with

12   Tessa, did you know her to be honest?"

13   "A.  I didn't have any reason to doubt her honesty."

14             Did I read that correctly?

15   A.  I assume you read it correctly.  The question was at the

16   moment that you asked me the question did I have any reason to

17   question her honesty.  At that moment there was nothing.  I had

18   no reason to question her honesty.

19   Q.  During the time that Tessa was employed for you, you don't

20   recall Tessa complaining about Mario sexually harassing her,

21   right?

22   A.  No.

23   Q.  You have never witnessed Mario engage in any type of

24   inappropriate conduct with any employee at MDA, right?

25   A.  Correct.

1  Q.  Yet, you're also aware that Mario had a sexual relationship

2  with an employee at MDA, correct?

3  A.  I am not aware of anything.  I don't know what you're

4  talking about.

5  Q.  Dr. Cohen, please direct your attention to page 135, line

6  25.  Dr. Cohen, at your deposition on February 11, 2020, you

7  were asked --

8  A.  I am looking at what you just asked -- directed me to.

9  Q.  You were asked a question --

10         THE COURT:  Excuse me, counsel.

11         Are you ready, Doctor?

12  A.  I just got page to page 135.  You have directed my

13  attention to a certain line.

14  Q.  Line 25:

15  "Q.  So are you aware of Mario having a sexual relationship

16  with any employee at MDA?

17  "A.  Yes.  His third wife he married, and she was an employee."

18  A.  Yes.  He had a sexual relationship, I assume, with his

19  wife, who worked there as well.

20  Q.  Dr. Cohen, you have no idea whether they started dating

21  while Angela was employed at MDA, correct?

22         MR. WIMS:  Objection, your Honor.

23         THE COURT:  Sustained.

24  Q.  Dr. Cohen, please direct your attention to page 136 of your

25  deposition transcript, line 8.

 1          THE COURT:  Counsel, you can move on to your next

 2    topic.  Thank you.

 3          MR. HOLZBERG:  Your Honor, I am using a prior

 4    inconsistent statement.

 5          THE COURT:  You can move on to your next topic,

 6    counsel.

 7    Q.  Dr. Cohen, did there come a point in time that you became

 8    aware of an anonymous fax that was sent to your office

 9    containing allegations that Mario Orantes was sexually

10    harassing female employees?

11    A.  I was informed a long while ago about an anonymous fax,

12    unsigned, that was sent maliciously to different fax machines

13    within my business.  That's what I was aware of.

14          MR. HOLZBERG:  Your Honor, I move to strike the last

15    portion of that answer.

16          THE COURT:  Overruled.

17    Q.  Dr. Cohen, did anyone ever bring to your attention that

18    Mario was using his power and influence to sexually harass

19    young female employees at MDA?

20          MR. WIMS:  Objection.

21          THE COURT:  Sustained.

22          MR. HOLZBERG:  Your Honor, can we have a sidebar?

23          THE COURT:  No.

24    Q.  Dr. Cohen, you've witnessed Mario cut a female employee's

25    hours, correct?

 1   A.  Did I witness him do it?  No.

 2   Q.  Have you been made aware of it?

 3   A.  I know it's one of the accusations that you made before.  I

 4   have never witnessed it.

 5        MR. HOLZBERG:  I'll rephrase.

 6   Q.  To the best of your knowledge -- actually, never mind.

 7        Dr. Cohen, please direct your attention to page 116 of

 8   the deposition transcript, line 10.

 9   A.  Just one second.

10   Q.  Um-hum.

11        THE COURT:  Counsel, we have discussed this issue

12   before.  I am going to ask you to move on to another topic.

13        MR. HOLZBERG:  Your Honor, he testified --

14        THE COURT:  Thank you.  Thank you.  Thank you.

15   Q.  Dr. Cohen, to the best of your knowledge, have you ever

16   seen Mario send a female employee home?

17        THE COURT:  Counsel, if you'd like to ask this witness

18   about his interactions with your client, feel free.

19   Q.  Dr. Cohen, Mario still works for you today, correct?

20   A.  Yes.

21   Q.  Dr. Cohen, you're aware that you are held responsible for

22   the actions of your employees, correct?

23   A.  Yes.  All of my employees.

24   Q.  And that would include supervisory employees, correct?

25   A.  Yes.

 1  Q.  As you testified, Mario is a supervisor of the entire

 2  office, correct?

 3  A.  Yes.

 4  Q.  Meaning that you are responsible for Mario's conduct,

 5  right?

 6  A.  Ultimately, yes.  I am also responsible for the quality of

 7  work done by any licensed professional, their demeanor.  False

 8  accusations are looked into.

 9          MR. HOLZBERG:  Your Honor, I would move to strike the

10  addition.

11          THE COURT:  Yes.  It's stricken.

12          THE WITNESS:  I'm sorry, your Honor.

13  Q.  Dr. Cohen, I just asked you a few moment ago about an

14  anonymous fax that was sent to your office.

15          Do you recall testifying to that?

16  A.  Yes.

17  Q.  Do you recall speaking to defendant Orantes about this

18  letter?

19  A.  I asked Mario what's going on with this letter that I'm

20  hearing about, and he gave me an explanation.  He didn't accept

21  the letter.  It was an anonymous letter.

22  Q.  Dr. Cohen, do you recall whether or not there was ever an

23  investigation into any sexual harassment claims that were made

24  against Mario at MDA?

25  A.  Can you repeat the question.

1    Q.   Sure.  Do you recall whether there was any investigation

2    into sexual harassment claims against Mario at MDA?

3    A.   I approached Mario directly any time any accusation was

4    made and spoke to him.

5    Q.   Were there prior occasions of sexual harassment that were

6    made against Mario?

7    A.   Not that I know of.

8    Q.   Dr. Cohen, there are cameras set up in your office, right?

9    A.   Yes.

10   Q.   As the owner of Metropolitan Dental Associates, you have

11   the ability to check those cameras, right?

12   A.   Those cameras were put up 25 years ago and all of them, for

13   the last eight or ten years, don't work.

14   Q.   Did there come a point in time that you ever checked those

15   cameras in connection with allegations of sexual harassment

16   against Mario?

17   A.   They are nonfunctional.

18   Q.   Dr. Cohen, did you ever speak with an IT person at your

19   office and ask them to bring up a camera in the endodontic room

20   at 6:30 in the morning?

21   A.   I don't remember.

22              THE WITNESS:  May I say something?

23              THE COURT:  No.  I'm sorry, Doctor.  You have to wait

24   and respond to questions that are asked.

25   Q.   Dr. Cohen, I want to direct your attention to page 136 of

1   your deposition transcript.

2          THE COURT:  Counsel, is there an objection?

3          MR. WIMS:  I'm sorry, your Honor.  I was conferring

4   with cocounsel.

5          THE COURT:  Move on, Mr. Holzberg.

6   Q.  Dr. Cohen, do you recall giving the answer at your

7   deposition:  It's a pain in the ass?

8          THE COURT:  Mr. Holzberg, we can discuss this at the

9   afternoon break, but there is no question and answer given by

10  this witness that would make anything on page 136 relevant.

11         Mr. Holzberg, place your next question to the witness.

12  Q.  Dr. Cohen, did you just testify that you didn't check the

13  cameras at MDA?

14  A.  That's not what I testified.  I told you that they have

15  been inoperable for 12, 15 years now.  That's what I said.

16  Q.  Dr. Cohen, did you ever go to your IT guy and say:  Dial up

17  the camera in endo room at 6:30 this morning?

18  A.  You asked me that question.

19         MR. WIMS:  Objection.  Asked and answered.

20         THE COURT:  Counsel, I am going to ask you to move on

21  past the cameras issue.

22  Q.  Dr. Cohen, isn't it true that in and around 2019 your

23  practice grossed approximately $18 to $20 million?

24         MR. WIMS:  Objection.

25  A.  I don't recall.

 1   Q.  You don't recall?

 2   A.  Correct.

 3   Q.  I'd like to direct your attention --

 4             THE COURT:  Overruled.

 5             MR. HOLZBERG:  I have no further questions.

 6             THE COURT:  Cross-examination.

 7   CROSS-EXAMINATION

 8   BY MR. WIMS:

 9   Q.  Good afternoon, Dr. Cohen.

10   A.  Good afternoon.

11   Q.  Dr. Cohen, where are you from?  Where were you born?

12   A.  I was born in Brooklyn.

13   Q.  Where did you grow up?

14   A.  In Brownsville on Pitkin Avenue many years ago.

15   Q.  You described your work force earlier in response to Mr.

16   Holzberg's question.  Do you know what the gender breakdown of

17   your current work force is?

18   A.  I would say 80 to 90 percent are female, and the number is

19   a lot less than it used to be six or eight years ago.

20   Q.  Are you currently married, Doctor?

21   A.  Yes.

22   Q.  How long have you been married?

23   A.  Thirty-nine years.

24   Q.  Do you have children?

25   A.  No.

1   Q.  Do you have a specific recollection of the plaintiff during

2   the time that she worked for Metropolitan Dental?

3   A.  Certain recollections, yes.

4   Q.  Could you share those with the judge and jury, please.

5   A.  Yes.  The most recent recollection was when I saw Tessa the

6   last time, not in court, but the last time.  She and her mother

7   came up to my office, which was on the second floor, and handed

8   me a sheet of paper that's about three-quarters the size of

9   this letter, this one presented to me by Tessa and her mother.

10        Tessa, over a significant period of the time that she

11  worked for us, would -- had full access to me.  She had my home

12  phone number.  She had my cell number.  She knew my sister who

13  worked in the office.  She had real access to Mario, and Tessa

14  came up to me -- sorry -- Tessa came up to me and gave me a

15  letter.  If we have a copy of it here someplace, I could read

16  it so that everyone can hear it.  And it was like I was being

17  evaluated by one of my employees.  In other words, the words

18  sexual harassment, touching, the filth that you heard at the

19  beginning when the other attorney hit you with all those F

20  words, right.  She criticized -- if I had the letter -- if you

21  have it.

22  Q.  I'm just asking about your recollection, Doctor.

23  A.  My recollection was that I was being evaluated by a mother

24  and daughter who worked for me who were an important part of

25  the operation.  And they started ragging -- they ragged on

1   Mario, Mario.

2          MR. HOLZBERG:  Objection, your Honor.  Hearsay.

3          THE COURT:  Overruled.

4   A.  Mario is the overall supervisor and my close confidant in

5   the office.  I'm a dentist for 50 years.  For 33 of those years

6   Mario has been my main guy to go to, along with many other

7   people.  He represented me and my office and what's right for

8   patients and making sure that everyone was in line in the

9   office and that people weren't dragged -- there are 49 rooms in

10  the office.  It's a very big place.  None of the doors, none --

11  these are eight-by-eight rooms.  None of them have locks, none

12  of them.  They are made so that staff -- it's a very big dental

13  office -- staff can walk in and out at will, without knocking

14  on the door.  There is no knock that has to be opened.  So some

15  of that that you heard before simply isn't true and it's an

16  exaggeration of fact.  Tessa wanted to be in a higher position

17  than she was.  She was a decent dental assistant.

18          MR. HOLZBERG:  Objection, your Honor.  Speculation.

19          THE COURT:  Sustained.

20  A.  My opinion was --

21          THE COURT:  Excuse me, Doctor.  I am going to

22  interrupt now.

23          Counsel, I am going to ask you to place specific

24  questions to your client so that if Mr. Holzberg has an

25  objection, he can place them meaningfully.

1   Q.  The letter from plaintiff you just described.  Did it make

2   any mention of alleged sexual improprieties?

3   A.  Nothing.  Absolutely nothing.  It started here, went to

4   here --

5              MR. HOLZBERG:  Objection, your Honor.  Hearsay.

6              THE COURT:  Overruled.

7   A.  -- was badmouthing my management and Mario's being critical

8   about it.  And then she solved the whole problem by standing up

9   with her mother, and walking out of the office.

10  Q.  When you say she was badmouthing your management, what do

11  you mean by that?

12  A.  Me and the management that was in place.

13  Q.  But specifically?

14  A.  Particularly Mario.  Mario was the person who kept things

15  legitimate and the billing correct, and, and, and when someone

16  would sneak out of the office.  There was an instance, more

17  than one, where the party we're talking about here, Tesa, snuck

18  out of the office, and went to the gym next door.  Who would

19  deal with a confrontation like that?  The manager.  And we had

20  plenty of documentation from that.

21  Q.  Do you recall if she was disciplined for that, Dr. Cohen?

22  A.  Mario would have disciplined.  And I don't know exactly

23  what the discipline was.  It had something to do with keeping a

24  closer eye on her, along with a lot of other people.

25  Q.  What is your primary concern, Dr. Cohen, in operating your

1   practice?

2   A.   That I provide a service that's quality, that people who

3   come in there, it is a big office, that people who come in get

4   treated like human beings.  And not -- and the opposite, chaos

5   doesn't ensue.  In other words, someone sitting in a chair who

6   has been waiting too long.  Who is going to walk over and tell

7   the hygienist to please go take care of that other person if

8   they didn't do it on their own?  Mario is the one who deals

9   with all of that stuff all day long.  If there is a question

10  about a bill, a question about a doctor's attitude, anything,

11  anything like that, and if it's appropriate, he'll bring it to

12  me.  He'll bring the issue to me.

13  Q.   You indicated earlier the plaintiff was a licensed dental

14  hygienist, correct?

15  A.   Yes.

16  Q.   Now, does that change the analysis given she was licensed,

17  did Mr. Orantes still act as her direct supervisor as a

18  licensed professional?

19  A.   Yes.  The dental work was under her purview.  She was a

20  licensed -- I don't recall her not being a competent hygienist.

21  But, there was some -- there were problems like there are with

22  anyone.  Right now, it's almost impossible to get a hygienist.

23  There are very few hygienists around, particularly after COVID.

24  And it is almost impossible to get enough hygienists to take

25  care of the patients.

1  Q.  As a practicing dentist, Dr. Cohen, do you have special

2  supervisory obligations regarding professionals?

3  A.  Yes.

4  Q.  Regarding licensed professionals?

5  A.  Everything ultimately comes to me.  If there's -- I hope

6  I'm explaining this correctly.  If there's a screw up, if there

7  is a misunderstanding, if someone forgot to put an appointment

8  in the book and a patient's waiting for an hour in the waiting

9  room, and it has to be addressed, Mario is the one who will

10  walk over and make sure that she's taken care of.  Not Tesa.

11  Mario.

12        Everyone with a license has certain, has certain

13  guidelines and standards that they work within.  Mario, more

14  than me, is the one who that's all he does.  He walks around

15  and makes sure that things are the way they're supposed to be.

16  That patients are treated correctly.  Not dentally.  That's for

17  the doctors.  But that they're paid attention to.

18        And on my heart, that's, that's what he does.  His

19  speech, when he's in the office, is that he's there and he

20  works, honestly, he works for the patient.  In other words,

21  he's there --

22        MR. HOLZBERG:  Objection, your Honor.

23  A.  -- he's there to represent that the patients are being

24  properly --

25        THE COURT:  Sustained.  Stricken.

 1  Q.  Mr. Holzberg asked you about an anonymous letter that was

 2  sent to the office in 2015.  Do you recall the substance of

 3  that letter, Dr. Cohen?

 4         THE COURT:  Yes or no.

 5  A.  I don't -- I mean it's a long time ago, and...

 6  Q.  My question is merely --

 7  A.  It was vulgar.

 8  Q.  Do you recall the substance of the letter?

 9  A.  Not in the particular.

10  Q.  Okay.  Do you know what it related to?

11  A.  Yes.

12  Q.  Did you, do you have a recollection as to whether you

13  thought the allegations in that letter were credible?

14  A.  I have an absolute clear recollection that after we looked

15  into it and I spoke to Mario.  Mario wouldn't lie to me.  That,

16  that -- that the -- the allegations that were in this, this

17  letter, this anonymous letter, with filthy language, and

18  talking about Mario, that he did this, and he did that, I

19  checked every time I heard anything like that.  All right.  I

20  in one way or another I would speak to Mario and clear my mind

21  so that I had done the right thing.  And my place, my office,

22  had done proper -- yeah.

23  Q.  As we sit here today, Dr. Cohen, do you know who authored

24  that letter?

25  A.  I heard rumors that it was --

1   Q.  I'm not asking about rumors.

2   A.  No, I don't.  No, I don't.

3   Q.  Do you know who sent it via fax to the office?

4   A.  No.

5   Q.  Was there any, other than the plaintiff in this case, was

6   there anyone who filed a lawsuit against Metropolitan Dental?

7              MR. HOLZBERG:  Objection, your Honor.

8   Q.  Alleging similar things as in that letter?

9              THE COURT:  Sustained.

10  A.  No.

11             THE COURT:  Answer is stricken.

12  Q.  You testified earlier, Dr. Cohen, that there was no written

13  handbook for Metropolitan Dental when the plaintiff worked at

14  Metropolitan Dental.  Correct?

15  A.  I believe so, yes.

16  Q.  Is there one now?

17  A.  Yes.

18  Q.  Is it in writing?

19  A.  Yes.

20  Q.  Do you recall when that was implemented?

21             MR. HOLZBERG:  Objection, your Honor.

22             THE COURT:  Overruled.

23  Q.  Do you recall?

24  A.  I don't remember the exact year.  I would say at least five

25  years ago.

1   Q.  Approximately five years ago you said?

2   A.  At least.

3   Q.  Okay.  Do you know why there was no written policy prior to

4   that time?

5   A.  No.

6           The policy existed --

7           THE COURT:  Excuse me.  You've answered.  Wait for

8   another question.

9           THE WITNESS:  Okay.

10  Q.  Why do you trust Mr. Orantes so much, Dr. Cohen?

11  A.  He's proven himself over a lifetime.

12  Q.  Do you recall when he was first hired?

13  A.  Yes.

14  Q.  What year was that if you remember?

15  A.  It was 33 or 34 years ago he started.

16  Q.  Approximately 1990.  1980?

17  A.  No, not 1980.  When he was hired, he was I think 17 years

18  old.

19  Q.  Okay.

20  A.  He's 52 or 53 now.

21  Q.  Do you recall the capacity in which he was initially hired?

22  A.  As a biller.  He's very smart.

23  Q.  Please keep your voice up just so the jury and everyone can

24  hear you.

25  A.  I'm sorry.

1    Q.  Started off as a biller.  And then did he progress from

2    there?

3    A.  Yes.

4    Q.  Do you recall what his next position was?

5    A.  He started off as a biller.  The billing department was

6    much bigger than it is now.  He became in charge of the billing

7    department.  And he's sharp.  And he -- he has the ability to

8    manage a situation.  He understands dentistry.  He's very

9    friendly with most of the doctors that work there, which is a

10   tremendous asset when -- during that time, I, I was -- I was

11   sick for a couple of -- for a little while.  And I relied on

12   Mario mainly to keep everything going.  I would have meetings

13   with the other doctors.

14         Mario is the -- for want of a different expression,

15   he's the glue that holds one department in contact with

16   another.  When we had a lot of specialists there, Mario

17   organizes, makes sure there's the staff that's necessary,

18   patients that are confirmed, the ones that don't keep the

19   appointment, get another call.  This is all Mario's doing.  And

20   without him, it would be much more chaotic.

21   Q.  When plaintiff worked for Metropolitan Dental, how

22   frequently would you have contact with her, Dr. Cohen?

23   A.  She had access to call me up and did numerous times.

24   Q.  I mean, in the course of her work, how frequently would you

25   have contact with -- would you see her every day when she

1   worked there?

2   A.   If I was in the office, yes, without a doubt.  Every day.

3   Q.   You were in the office every day when she worked at

4   Metropolitan Dental?  "She" being plaintiff?

5   A.   When -- there was a period when I was sick.

6   Q.   I'm sorry, Doctor?

7   A.   I'm sorry.  There was a period where I had, I had a heart

8   attack.

9   Q.   When was that?

10  A.   In -- in -- 2013.

11  Q.   I'm sorry to hear that, Doctor.  Are you better now?

12  A.   I hope so.  I think so.

13  Q.   So, just so I understand.  Prior to the heart attack in

14  2013, you were formally at Metropolitan Dental every day?

15  A.   Every day, and that included weekends, and it included

16  taking work home to finish what we didn't do in the office.

17  And Mario, so you understand, did the same thing.

18  Q.   After your heart attack, did you work more hours?

19  A.   I couldn't for a while.  After my heart attack, I had a

20  back operation.

21  Q.   Do you recall what year that was?

22  A.   It was 2014.

23  Q.   So this the heart attack and the back operation were --

24  A.   And the heart attack.

25  Q.   -- were during plaintiff's tenure, correct?

 1   A.  I needed a back operation.  When I went in for the back

 2   operation, my heart stopped.  And I woke up in a different

 3   hospital.  I coded.  I woke up in a different hospital, with a

 4   pacemaker, on life support.

 5            MR. HOLZBERG:  Your Honor, objection as to relevance.

 6            THE COURT:  Overruled.

 7            Are you ready to move on, counsel?

 8            MR. WIMS:  Yes, Judge.

 9            THE COURT:  Thank you.

10   Q.  Dr. Cohen, the health problems you described, is that the

11   cause of the reduced schedule for you?

12   A.  Yes.

13   Q.  Okay.  And you testified earlier that you had fewer

14   employees than previously.  Was that related to your health

15   problems?

16   A.  To a degree, because I couldn't pay attention the way I

17   used to.  That and COVID, and -- now we have about 35

18   employees.  Not 100 and something.

19   Q.  Okay.

20   A.  Which is someone's recollection.

21   Q.  Just a few more questions, Doctor.

22            Do you recall plaintiff Qorrolli telling you that

23   Mr. Orantes had acted inappropriately with her ever?

24   A.  No.  I remember her starting a conversation about Mario,

25   the day she gave me that letter.  There is not a word in the

 1  letter that's constructive that makes an accusation against me

 2  or Mario talking about -- it was her frustration with being

 3  told what to do, and her resistance to that.

 4  Q.  But that was, that letter was the last day she worked

 5  there, right?

 6  A.  Yes.

 7  Q.  So my question was, do you recall while she worked there

 8  her ever making a complaint to you about -- let me finish my

 9  question please.

10  A.  I'm sorry.

11  Q.  -- improprieties on behalf of Mr. Orantes?

12  A.  Never.  No.

13  Q.  Now you also testified in response to Mr. Holzberg's

14  question that plaintiff's mother was also employed at

15  Metropolitan Dental?

16  A.  Correct.

17  Q.  And did I hear you correctly that you said there were two

18  terms or two tenures for the mother?

19  A.  We checked our records and Nexhmije, her mother, worked

20  for, worked there at my office on Fulton Street, the one that's

21  closed now.  I'm not so sure what happened right after that.

22  But, when Tesa came back, was a hygienist and came to the

23  office, and told me that her mother was a hygienist as well,

24  and I know that I can't find a hygienist, you have to advertise

25  and you try to keep what you have.  That I asked Tesa, I mean,

1    why -- if something was going on, why would Tesa's mother, why

2    would Tesa ask her mother to come back to the office where

3    these things were supposedly going on.

4         They weren't going on.  It was resistance, they wanted

5    a job where they could control things.  That's exactly what

6    happened.  I was there, and I know it.

7    Q.  So you've known plaintiff's mother for longer than you've

8    known plaintiff?

9    A.  Yes.

10   Q.  Would you describe your relationship with plaintiff's

11   mother as that of friends?

12   A.  Yeah.

13   Q.  In addition to being a former employee?

14   A.  Yeah, I mean, never saw each other socially, and I never

15   called up to say how you doing.  But they had absolute access

16   to me.  And -- go ahead.

17   Q.  Did plaintiff's mother ever raise any concerns about

18   alleged improprieties by Mr. Orantes to you?

19   A.  No.

20   Q.  Are you certain of that, sir?

21   A.  I'm positive.

22   Q.  Finally, Dr. Cohen, did I hear you correctly earlier?  You

23   said that none of the doors, none the locks on the doors --

24   A.  There are no locks on the doors.

25   Q.  I thought you said they didn't work.

1   A.  No.  No.

2   Q.  You are saying they don't exist?

3   A.  The cameras in the ceilings that were put there 25 year

4   ago, when we built the place, have become non-functional over

5   time.  Right.  And I didn't reinvest and buy new cameras.  I'm

6   talking about there are 49 dental rooms in total.  There is a

7   laboratory, the different specialty areas.

8   Q.  No locks on any of the doors?

9   A.  The room is a dental room is usually eight by eight.  In

10  the middle of the room is a big dental chair.  And then

11  cabinetry along the periphery of the room.  I don't understand

12  how anyone can do -- can go into a room and hope for privacy.

13  Q.  So --

14  A.  When --

15  Q.  If the plaintiff had testified previously that doors were

16  locked at the 225 Broadway location, would that be a true

17  statement, sir?

18  A.  I don't know how -- I don't know of any rooms that have a

19  lock on them.

20  Q.  You have been in that location how long?

21  A.  25 years.  I built it.

22  Q.  Have you been in all the rooms?

23  A.  Every room.  Every single room.

24          MR. WIMS:  No further questions for this witness,

25  Judge.

```
 1              THE COURT:  Redirect?  Oh, I'm sorry, counsel.
 2   Mr. Whertvine reminds me it's probably a good time for an
 3   afternoon recess.
 4              Ladies and gentlemen, let Mr. Whertvine know when
 5   you're ready to return.  Feel free to take 5, 10 minutes,
 6   whatever you need.
 7              (Jury excused)
 8              THE COURT:  You may step down.
 9              THE WITNESS:  Thank you.
10              THE COURT:  So, Mr. Holzberg.
11              MR. HOLZBERG:  Yes, your Honor.  With respect to the
12   examination of Dr. Cohen, I'm curious as to why I was not
13   allowed to impeach him on prior inconsistent statements that
14   were given at his deposition.
15              THE COURT:  So, one, you have to lay a foundation
16   through the testimony before you can impeach a witness.  We've
17   been over that before.
18              MR. HOLZBERG:  Sure.
19              THE COURT:  Two.  You cannot use your examination here
20   through the back door to bring in things from the anonymous
21   fax.
22              The issue is the plaintiff's allegations of
23   inappropriate behavior vis-a-vis the plaintiff.  I did not
24   interfere one wit, and I don't believe there were any
25   objections by defense counsel, to any questions concerning the
```

 1  plaintiff and Dr. Cohen.

 2           So, next?

 3           MR. HOLZBERG:  Right.  One thing, though, that, your

 4  Honor, I was asking Dr. Cohen was whether or not he ever

 5  checked the cameras.

 6           THE COURT:  And what does that relate to?

 7           MR. HOLZBERG:  Whether or not he investigated claims

 8  of sexual harassment made against Mr. Orantes.

 9           THE COURT:  Where?

10           MR. HOLZBERG:  What do you mean where?

11           THE COURT:  Where were those complaints of sexual

12  harassment against Mr. Orantes?

13           MR. HOLZBERG:  Any complaints of sexual harassment

14  against Mr. Orantes.

15           THE COURT:  You're not referring to the anonymous fax?

16           MR. HOLZBERG:  No.  Generally speaking.

17           THE COURT:  Well, then, you didn't set that up.  Did

18  the plaintiff complain about, did you ask the witness about the

19  plaintiff's complaints against Mr. Orantes?

20           MR. HOLZBERG:  He said that there were none.

21           THE COURT:  So, how does that lead us to the cameras?

22           MR. HOLZBERG:  I am asking him if in response to

23  complaints he ever checked cameras, and he said no, or he

24  didn't recall, they didn't work.  But at his deposition

25  transcript he said no, he never did.  So I'm trying to refresh

1   his recollection where he says he doesn't recall checking

2   videos, that during his deposition he said no, I never did.  I

3   couldn't be bothered.

4           THE COURT:  Okay.  So that line of questioning is not

5   sufficiently at the time tethered to the plaintiff's

6   allegations in the prior examination that you made of this

7   witness, the examination of Dr. Cohen today.

8           Next?

9           MR. HOLZBERG:  What about the gross revenue of

10  Dr. Cohen's practice?

11          THE COURT:  I allowed you to examine him on that.  I

12  overruled the objection.

13          MR. HOLZBERG:  Your Honor, I had asked whether or not

14  the practice grossed anywhere from 18 to $20 million and I

15  believe that your Honor had sustained that objection and told

16  me to move on.

17          THE COURT:  I don't believe so.  Let me check.  I

18  thought the witness said he didn't remember.

19          Excuse me one second.

20          I'm in what is in our draft transcript, page 59, it is

21  the end of the direct examination.  And I don't see a sustained

22  objection with respect to the inquiry with respect to how much

23  was grossed in the practice.  You asked a question about 2019

24  and the witness answered I don't recall.  You asked you don't

25  recall?  The witness said, correct.

1          MR. HOLZBERG:  Right.  And then at that point I was

2     attempting to use his deposition transcript because he

3     testified to that at his deposition.

4          THE COURT:  Well, there was an earlier objection and I

5     ruled overruled.  Not sustained.  Overruled.  And then you said

6     I have no further questions.

7          So, I did not sustain an objection, and you moved on,

8     and ended your examination.

9          MR. HOLZBERG:  At that time, when Dr. Cohen said he

10    did not recall, if I recall correctly, didn't I try to then use

11    his deposition transcript?

12         THE COURT:  I'll read beginning at line 13:

13    "Q.  I'd like to direct your attention" And then I say

14    "overruled" in response to an objection that had been made just

15    moments before.  And then you say:  "I have no further

16    questions."

17         MR. HOLZBERG:  My apologies, your Honor.  I

18    misunderstood.

19         THE COURT:  That's okay.  It happens.

20         MR. HOLZBERG:  Thank you.

21         THE COURT:  No problem.

22         Mr. Wims, anything?

23         MR. WIMS:  No, your Honor.

24         THE COURT:  Okay.  So, at 5 o'clock, we'll have a

25    chance to discuss the doctor's letter about Mercedes Vila.

1   Counsel, you can take a very brief recess here.  But the jury's

2   going to be ready in moments.  So make it the briefest of

3   recesses, come back promptly, please.

4           (Recess)

5           THE COURT:  Dr. Cohen, you may take the stand.  Bring

6   in the jury.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Counsel, please be seated.

3              Counsel, Mr. Holzberg.

4              MR. HOLZBERG:  Sorry, your Honor.

5              THE COURT:  And don't leave your materials there,

6    please.  Thank you.  I appreciate it.

7              Counsel, you may continue.

8              MR. HOLZBERG:  Thank you.

9    REDIRECT EXAMINATION

10   BY MR. HOLZBERG:

11   Q.  Dr. Cohen, you testified that in response to the anonymous

12   fax that was received, you spoke with Mario regarding that

13   letter.  Correct?

14   A.  Yes.

15   Q.  I'd like to direct your attention to your deposition

16   transcript, page 109, line 16.

17   A.  Just one second.

18   Q.  You were asked the question:

19   "Q.  Are you ready to be questioned about this document?

20   "A.  No.

21   "Q.  Okay.  Please let me know when you're ready.

22   "A.  I've never read anything like this."

23              Did I read that correctly?

24   A.  Yes.

25   Q.  Now, also, Dr. Cohen, you said that in response to this

1  anonymous letter that you conducted an investigation, correct?

2  A.  The investigation was speaking with Mario and probably some

3  other, some of the other people there.

4  Q.  Dr. Cohen, I'm now going to hand you your deposition --

5  A.  This happened six or seven years ago so --

6  Q.  -- from October 22 of 2020.

7         Dr. Cohen, you now have a copy of your deposition

8  transcript from October 22, 2020?

9  A.  I guess so, yes.

10  Q.  Again, the testimony that you gave at your deposition in

11  October 22 of 2020, you were under oath at that time, correct?

12  A.  Yes.

13  Q.  The testimony you gave was closer in time to the events as

14  they occurred than today, correct?

15  A.  Repeat that again?

16  Q.  When you testified in October of 2020, it was closer in

17  time to the time that these events occurred than we are today

18  right now?

19  A.  Correct.

20  Q.  It's your testimony that you conducted an investigation in

21  response to the anonymous fax?

22  A.  Me conducting the investigation meant speaking with Mario,

23  and asking what is this, and who would have such venom as to

24  send an anonymous letter to all the different fax machines in

25  my office.

1   Q.  Dr. Cohen, at your deposition, page 209, line 22, you were

2   asked:

3   "Q.  Putting aside anything specific, to the best of your

4   recollection, generally speaking, what, if anything, did you do

5   to investigate?

6   "A.  I don't have a recollection, a clear recollection of it.

7   I'm not going to guess.

8   "Q.  I just want to be clear that if we were to go before a

9   jury, you're not going to testify to anything other than you

10  don't recall; is that correct?

11  "A.  If we were going in front of a jury, you can be absolutely

12  certain that everything I told you I would tell them."

13          Did I read that correctly?

14  A.  I wasn't following you along.  What page was that?

15  Q.  Page 209 and 210.

16  A.  This is of the newest one you gave me, correct?

17  Q.  That's correct.

18  A.  Where are you starting to read?

19  Q.  I'm starting on page 209, at line 22, to line 11 on page

20  210.

21  A.  All right.

22  Q.  So I read that correctly?

23  A.  Yes.

24  Q.  Thank you.

25          Now, Dr. Cohen, you said that there's currently a

 1  handbook in place at Metropolitan Dental Associates?

 2  A.  Yes.

 3  Q.  But to be clear, during the time that Tesa was employed,

 4  there was no written policy or handbook, correct?

 5  A.  I assume so, yes.

 6  Q.  You don't know whether or not there was --

 7  A.  I don't know what date it was.  It's about five, six years

 8  old.  That's what I know.

 9  Q.  Dr. Cohen, you testified that the most important thing for

10  you at MDA is quality patient care.  Correct?

11  A.  The treatment of the patients, that's right.

12  Q.  Isn't it true out of 392 reviews you only have a 1.5 star

13  rating on Yelp?

14          MR. WIMS:  Objection.

15          THE COURT:  Sustained.  The jury shall disregard.

16          MR. HOLZBERG:  I don't have any further questions.

17  Thank you.

18          THE COURT:  Any recross?

19          MR. WIMS:  Your Honor, I understand you instructed the

20  jury to disregard.  We'd like the question stricken from the

21  record as well if possible, please.

22          THE COURT:  Yes.  Yes.

23          MR. WIMS:  Thank you.

24          THE COURT:  Thank you.  Any recross?

25          MR. WIMS:  Yes.  Very briefly.

 1          THE COURT:  That's fine.

 2   RECROSS EXAMINATION

 3   BY MR. WIMS:

 4   Q.  You still have your deposition transcript in front of you,

 5   Dr. Cohen?

 6   A.  I have the new one that he just gave me and --

 7   Q.  Would you turn to page 209, please, sir?

 8   A.  Of the latest one?  Of the one from --

 9   Q.  October.

10   A.  What page, David?

11   Q.  209, sir.

12   A.  Which line, David?

13   Q.  17.  Page 209, line 17.

14   A.  That's absolutely accurate.

15   Q.  Mr. Holzberg just suggested that at your deposition you

16   said you didn't recall what response you took to the anonymous

17   fax.  On page 209, where Mr. Holzberg asked you about your

18   investigation, you say beginning on line 17 --

19          MR. SMITH:  Objection, your Honor.

20   Q.  "I don't recall the exact steps or the timing of those

21   steps."

22          Correct?

23   A.  Yes.

24   Q.  That's not materially different than what you said today;

25   is it, sir?

1   A.  Correct.  I think it's materially the same.

2   Q.  Have you had any experiences since 2020 that might aid you

3   in recalling what response you had to that letter, sir?

4   A.  No.

5   Q.  You were deposed twice, correct?

6   A.  Correct.

7          THE COURT:  So, counsel, there's been an objection

8   here.  And I understand that with respect to completeness, you

9   want to add the testimony on the same page where Mr. Holzberg

10  began, you want to add to the testimony the question and answer

11  just preceding it.

12         Is that what I understand so I can rule on this

13  objection?

14         MR. WIMS:  Yes, Judge.  209:14-21.  He started on 22,

15  Mr. Holzberg.

16         THE COURT:  Yes.  For completeness, you may.  The

17  objection is overruled.  Please read the question and answer.

18  Q.  Mr. Holzberg's question was:

19  "Q.  So just to be clear, Dr. Cohen, you don't recall what

20  steps you took to make sure that this was handled?

21  "A.  I don't recall the exact steps or timing of those steps,

22  except that I evidently looked into it, and was satisfied that

23  I got as true an answer as I could possibly get from Mario that

24  these allegations were false."

25  A.  That's -- that's factual.

1  Q.  So --

2  A.  That's exactly how I felt.

3  Q.  So you did take action in response, sir?

4  A.  Yes.

5  Q.  Thank you.

6          MR. WIMS:  No further questions for this witness, your

7  Honor.

8          THE COURT:  Thank you.  Redirect?

9          MR. HOLZBERG:  Thank you, your Honor.

10  REDIRECT EXAMINATION

11  BY MR. HOLZBERG:

12  Q.  So Dr. Cohen, it's your testimony today that you took

13  action in response to this letter?

14  A.  Yes.

15  Q.  And did you conduct any independent investigation to

16  ascertain the veracity of this letter?

17          MR. WIMS:  Objection, your Honor.  Asked and answered.

18          THE COURT:  You may answer that.

19          Well, objection sustained.  You may rephrase the

20  question, in addition to what you've just testified to, did

21  you.

22  Q.  In addition to what you just testified to, did you conduct

23  any independent investigation to ascertain the veracity of this

24  letter?

25  A.  Yes, I'm sure that -- I know I spoke with Mario at some

1    point and asked him who would do this.  Who would try to

2    sabotage my business by doing something like that.  By writing

3    a letter like that.

4              THE COURT:  So --

5    A.  If there was anyone around that knew something about it, I

6    asked what else could I do.

7    Q.  Dr. Cohen, I'd like to direct your attention to page 204 of

8    your deposition from October 22, 2020, line 17.

9              THE COURT:  Excuse me one second.

10   Q.  Line 17.

11             THE COURT:  Excuse me one second.

12             MR. HOLZBERG:  Sure.

13   A.  204, line 17?

14   Q.  Hmm-hmm.

15   A.  Okay.

16             MR. HOLZBERG:  Your Honor, may I proceed?

17             THE COURT:  Yes.

18   "Q.  My question to you again was did you conduct any

19   independent investigation to ascertain the veracity of this

20   letter?

21   "A.  Not to my recollection.  The possibility exists if this

22   was very recent that I might have walked over to someone and

23   asked them."

24             Did I read that correctly?

25   A.  Yes.

1   Q.  It's fair to say that your recollection at that time would

2   be better than it would be today, correct?

3   A.  I recall it as best I can.

4   Q.  Sure.

5   A.  As best I can.

6   Q.  October 22, 2020, would you say that your memory was better

7   than today or worse than today?

8   A.  I'm not a neurologist.  I don't know.

9           MR. HOLZBERG:  I have nothing further.

10          THE COURT:  Thank you.  Any recross?

11          MR. WIMS:  No, your Honor.

12          THE COURT:  Thank you.

13          Plaintiff may call your next witness.

14          You may step down, Dr. Cohen.

15          THE WITNESS:  Thank you.

16          (Witness excused)

17          THE COURT:  Mr. Holzberg, you may call your next

18   witness.

19          MR. HOLZBERG:  Thank you, your Honor.  We're going to

20   call the plaintiff Fortesa Qorrolli.

21          THE COURT:  Thank you.

22          Mr. Holzberg, could I ask your assistance.  Do you

23   want to clear your exhibits off the witness stand.

24          MR. HOLZBERG:  Absolutely.

25          THE COURT:  Mr. Qorrolli, if you can remain standing

 1    for a moment.  Thank you.

 2              Counsel, you may begin.

 3              MR. HOLZBERG:  Thank you, your Honor.

 4     FORTESA QORROLLI,

 5         called as a witness by the Plaintiff,

 6         having been duly sworn, testified as follows:

 7    DIRECT EXAMINATION

 8    BY MR. HOLZBERG:

 9    Q.  Good afternoon, Tesa.

10    A.  Good afternoon, Zach.

11    Q.  I'm going to start by asking you some questions about your

12    background.

13              In what state and county do you currently reside?

14    A.  Manhattan, New York.

15    Q.  How long have you lived in Manhattan?

16    A.  Three years.

17    Q.  Do you live with anyone?

18    A.  Yes, my husband, and my daughter.

19    Q.  What is your husband's name?

20    A.  Rock Ahmetaj.

21    Q.  How long have you married to your husband?

22    A.  Three years.

23    Q.  You said you have a daughter?

24    A.  Yes.

25    Q.  How old is she?

```
 1   A.   Eight months.

 2   Q.   Congratulations.   Where were you born?

 3   A.   Albania, Kosovo.

 4   Q.   Did there come a point in time that you moved to the U.S.?

 5   A.   Yes.

 6   Q.   When was that?

 7   A.   1996.

 8   Q.   How old were you at that time?

 9   A.   Six.

10   Q.   Are you okay?

11        What's your highest level of education?

12   A.   Associate's in dental hygiene.

13   Q.   Where did you obtain your degree?

14   A.   Hostos Community College.

15   Q.   What did you study at Hostos Community College?

16   A.   Dental hygiene.

17   Q.   What year did you graduate from Hostos Community College?

18   A.   May of 2009.

19   Q.   Do you hold any licenses regarding your ability to work as

20   a dental hygienist?

21   A.   Yes.

22   Q.   What licenses?

23   A.   A registered dental hygienist.

24   Q.   When did you first receive your license?

25   A.   In 2009.
```

1  Q.  After receiving your license in 2009, did you get a job

2  working as a dental hygienist?

3  A.  Yes, I did.

4  Q.  Where did you begin working at that time?

5  A.  Metropolitan Dental Associates.

6  Q.  Can you please describe for us how you got your job at

7  Metropolitan Dental Associates?

8  A.  Yes.  Late '90s, 1999, I want to say, my mom worked as a

9  dental assistant for Dr. Paul Cohen.  So when I graduated, I

10 didn't really have much experience, I was looking for a job.

11 My mom advised she knows of a dentist who has multiple

12 locations and I should go and, you know, ask to see Dr. Cohen,

13 show him my résumé, and tell Dr. Cohen that I was Nexhmije's

14 daughter, and remind him who Nexhmije was and that she worked

15 for him as a dental assistant.

16          So I did that.  I actually just walked in the office,

17 I asked to speak to Dr. Cohen.  Dr. Cohen met with me.  I told

18 him who I was.  And as soon as I told him that I was Nexhmije's

19 daughter, my mom worked for you as a dental assistant back in

20 the day, he immediately said, you know, wow, I know your mother

21 very well, I know her work ethic, she was one of my best

22 workers.  And he decided to hire me on the spot.  He didn't

23 really interview me or even look at my résumé.  He just hired

24 me.

25 Q.  Do you recall what month you started working at MDA?

1  A.  Yes.  December of 2009.

2  Q.  When you were hired in December of 2009, what was your

3  position?

4  A.  Dental hygienist.

5  Q.  What were your responsibilities as a dental hygienist?

6  A.  I was to treat patients, perform dental cleanings, evaluate

7  their oral health, see children, place sealants, place fluoride

8  treatment.

9  Q.  During the time that you worked at MDA, did they have more

10  than one location?

11  A.  They did.  Four locations.

12  Q.  At which location did you work?

13  A.  225 Broadway.

14  Q.  Were there various departments within MDA?

15  A.  Yes, there was.

16  Q.  Which departments did you work in?

17  A.  I worked at the general practice department, also rotated

18  between the periodontal department as well.

19  Q.  When you first started working at MDA, how were you paid?

20  A.  Hourly on W-2.

21  Q.  At that time, what was your hourly rate of pay when you

22  first started working there?

23  A.  $35 an hour.

24  Q.  Did there come a time that your rate of pay changed?

25  A.  Yes, it did.

1  Q.  When was that?

2  A.  About three, four months into my employment, that was the

3  agreement I had with Dr. Cohen.  He said listen, you know,

4  being you don't have much experience, I would like to start you

5  off with $35 an hour.  In three, four months, once I see that

6  the office is getting better, producing, and everything is

7  going well, I want you to give me a call.  And if I feel that

8  we can give you a raise because we are doing better, then I

9  will do that.

10         So I waited three, four months and I called Dr. Cohen,

11  and Dr. Cohen gave me a raise.

12  Q.  What was your new rate of pay?

13  A.  $40 an hour.

14  Q.  Was there any subsequent change in your rate of pay?

15  A.  No.

16  Q.  You testified that your mother had previously worked for

17  Dr. Cohen in the late '90s, right?

18  A.  Yes.

19  Q.  Did there come a time that your mother started working for

20  MDA again?

21  A.  Yes, she did.

22  Q.  How did that come about?

23  A.  So at the time of my interview, when I told Dr. Cohen that

24  I was Nexhmije's daughter, I said my mom is also now a

25  hygienist.  And he said, really.  Please tell her to give me a

1   call, and I want her to come here and work for us.  So I said,

2   I said I will, but I'm sorry, my mom has a job and she's very

3   happy where she is.  She just advised that I come and I

4   interview with you for a job.  And so he insisted to please

5   have mom call me.  I really want to talk to her.

6          So I did that.  I went home, I told my mom Dr. Cohen

7   hired me.  However, he wants you to call him and speak to him

8   in regards to possibly working there as well.  My mom said, you

9   know, I don't think that's a good idea.  No.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Excuse me, counsel.  Thank you.

2          You can certainly relate the conversation with

3   Dr. Cohen, but not the conversation with your mom.  Thank you.

4   A.  And so she called Dr. Cohen and Dr. Cohen begged her to

5   quit her job.

6          THE COURT:  Excuse me.  Unless you're part of the

7   conversation, you can't relate it.  Thank you.

8   Q.  Tessa, did there come a point in time that your mom then

9   started working at Metropolitan Dental Associates?

10  A.  Yes, she did.

11  Q.  Do you recall approximately when your mom came back to work

12  with you at MDA?

13  A.  I want to say December of 2009 and beginning of January

14  2010.

15  Q.  So maybe only a month or two after you had started?

16  A.  Yes.

17  Q.  What position did your mom have at MDA?

18  A.  Also, registered dental hygienist.

19  Q.  Same as you?

20  A.  Yes.

21  Q.  When your mom came back to work at MDA, in which department

22  was she working in?

23  A.  She was working the same department as me, general

24  practice.

25  Q.  Were you both working at 225 Broadway?

1  A.  Yes.

2  Q.  During the time that you worked at MDA, who were your

3  supervisors?

4  A.  Dr. Cohen, Mario, and the doctors that were working on the

5  floor with us at the time.

6  Q.  Was Mario your supervisor throughout your employment at

7  MDA?

8  A.  Yes, he was.

9  Q.  What was Mario's role at MDA?

10  A.  He was a manager, office manager.

11  Q.  As office manager what types of things was he responsible

12  for?

13  A.  He was responsible for everything.  He took care of the

14  schedule.  He took care of our hours.  He even had authority on

15  the floor at times telling us what treatment should be

16  rendered, why wasn't specific treatment rendered.  To myself,

17  as a hygienist, that I was a licensed dental hygienist, and

18  even the doctors who were licensed doctors, he would tell us

19  this needs to be done.  If it wasn't done, he would take us to

20  Dr. Cohen and yell at us and threaten to fire us.  So he had

21  all authority over everything there.

22  Q.  Can you provide a specific example of what you were just

23  referring to, please.

24  A.  Yeah.  There were times when patients did not need certain

25  treatment.  There was times when I refused to do certain

1    treatment because the patient didn't need it or it was already

2    done just six months ago.  Because insurance covered it every

3    six months, they wanted that insurance to be maximized and get

4    done every six months.

5    Q.  In addition to your hours, was there anything else that

6    Mario had control over with respect to your employment?

7    A.  Yeah.  He controlled my whereabouts.  He wanted me to text

8    him every time that I left the building.  He wanted me to text

9    him every time that I came back.  Even if it was for a cup of

10   coffee that I left, I had to text him, even though I was always

11   clocked in and clocked out.

12   Q.  Was Dr. Cohen your supervisor throughout your employment at

13   MDA?

14   A.  Yes, he was.

15   Q.  When you first started working at MDA, what was your

16   schedule?

17   A.  I started working four days a week, Monday through

18   Thursday.

19   Q.  And what were your hours?

20   A.  I don't recall too well, but I believe 9 to 5.

21   Q.  Did there come a point in time that your schedule changed?

22   A.  Yes, it did.

23   Q.  When was that?

24   A.  Shortly after, three, four months after.

25   Q.  Three, four months after you started working at MDA?

1   A.   Yes.

2   Q.   Why did your schedule change at that time?

3   A.   I am not too sure.  There was just this one time that Mario

4   came downstairs while I was working and just asked me who I

5   was.  That was actually the first time that I had met Mario.  I

6   told him that I was the new hygienist.  He said:  I don't give

7   a shit who you are.  Going forward, you are going to be working

8   six days a week.

9        At that point I was shocked.  I didn't know what was

10   going on.  I didn't realize that this person had full authority

11   of what happens with my schedule and what days I have to work,

12   even though I had agreed with Dr. Cohen otherwise.  So I told

13   him, I said:  I'm sorry, but I can't work six days a week.  I

14   agreed to work four days a week.  He said:  I don't give a sit.

15   You work six days a week or you don't work here anymore.

16   Q.   When Mario said to you, I don't give a shit, what was your

17   reaction?

18   A.   I was stunned.  I didn't even know what to think at that

19   point.  I was scared, seeing that I am now under his control

20   and nothing I say or do will matter.  I would just have to

21   either do what he's telling me to do or I would have to quit.

22   I don't have a job.

23   Q.   At that time did you need your job?

24   A.   Absolutely.

25   Q.   Why is that?

1    A.  Well, first off, I made my mom quit her job to come and

2    work with me with Dr. Cohen.  Secondly, we had just gotten a

3    mortgage.  We had bills to pay and most of these things

4    depended on me and my mom.  So if I quit, my mom wouldn't have

5    a job.  And so I had no choice.  I had to endure what I was

6    going through and just try to keep my job for as long as

7    possible.  I assumed that was may be something that would pass.

8    Q.  Where were you living at the time?

9    A.  We were living in Brooklyn.

10   Q.  After this interaction with Mario, did you speak to

11   Dr. Cohen about what Mario had said to you?

12   A.  Absolutely.

13   Q.  What did Dr. Cohen say in response?

14   A.  He said if Mario needs to you work six days a week, then

15   you have to work six days a week.

16   Q.  How did that make you feel?

17   A.  Unheard.  I mean, we just had an agreement for me to work

18   four days a week.  You said OK to that.  So now things are

19   changing on me after I make my mom quit and come here to work

20   with me.  Obviously, now, I can't say, well, listen, I'm sorry.

21   It's either I work the four days or I am going to quit.  So I

22   had no choice.  I had to just do what they had told me to do.

23   Q.  Now I am going to ask you some questions about your

24   experience working with defendant Orantes.  How would you

25   describe the amount of contact that you had with defendant

1   Orantes?

2   A.   Daily.

3   Q.   How long did you work at MDA?

4   A.   Six and a half years.

5   Q.   So for six and a half years you had daily contact with

6   Mario?

7   A.   Yes.

8   Q.   How would you describe your working relationship with

9   defendant Orantes?

10   A.   Scary and horrible.

11   Q.   Can you please explain what you mean by that.

12   A.   Yeah.  Mario was just a vicious and manipulative man.  He

13   harassed me many times.

14          MR. WIMS:  Objection, your Honor.

15          THE COURT:  Overruled.

16   A.   I rejected those advances.  He then made up scenarios that

17   were not true about me or my mom to Dr. Cohen, stating that we

18   were not good workers, that we didn't work hard enough, that we

19   were not worth having there, that we were a waste of

20   Dr. Cohen's time, that Dr. Cohen should just fire us, throw us

21   the fuck out.  And then I would, obviously, again, not be able

22   to say much because both me and my mom were there.  I couldn't

23   stand up too much for myself.  And so I would go back to work,

24   try to work in a very vulnerable state where I couldn't really

25   get myself together.

1          Mario would come down, sometimes that same day, the

2     next day, or two days later and try to play the good guy with

3     me and say:  This is not me.  This is all Dr. Cohen.  I am here

4     to protect you, that I won't let anything happen to you.  And

5     so when he would try to hug me and kiss me a few times in the

6     cheek, I would reject him.  He would storm out of the room and

7     then the cycle would just continue.

8          A couple of days later, again, he would find other

9     things to blame me -- blame on me.  He made me responsible for

10    probably every little thing in that office, from my job, which

11    was the hygiene part, to even why is the air conditioner in

12    room 5 perio broken, which nothing to do with me.  He put as

13    much responsibility on me so he could have as much reason to

14    blame everything on me as possible.

15    Q.  When you say that he blamed things on you, can you give any

16    specific examples.

17    A.  Yes.  As I stated -- again, there was a time when he

18    stated:  The air conditioner in room 5 is broken.  Let me call

19    Dr. Cohen.  And he said Tessa knew that the air conditioner was

20    broken and she didn't let anybody know.  Instruments.  Why are

21    instruments missing?  Why are the rooms not equipped with

22    instruments?  Why are the Cavitrons broken?  Why are the

23    assistants in their rooms not cleaning their traps?  Why are

24    patients waiting?  Why are they not getting cleanings?  Why are

25    they upset?  Charts at the front desk.  Why don't they have

1  legibility.  You name it.

2  Q.  You said that there were issues regarding patient wait

3  times?

4  A.  Absolutely.  That was the biggest issue there.

5  Q.  Can you describe for us your experience pertaining to those

6  patient complaints.

7  A.  Well, the schedule there is horrific.  They schedule

8  patients every ten minutes.  If it's three hygienists, four

9  hygienists, you are looking at 50 patients that are scheduled.

10  So when Mario would pull off these woman, like Faten and

11  Marina, off the floor, at that point, instead of having three,

12  four hygienists on the floor, it would be just be me and my

13  mom.

14          Yes, we would get backed up.  Yes, there were patients

15  that would complain because they were waiting too long.  And

16  then Mario would blame that on me.  When Dr. Cohen would get

17  these complaints, he would blame that on me and say that it was

18  my fault, that I wasn't moving fast enough, that I wasn't

19  working hard enough.  Meanwhile, it was because we were left

20  shorthanded.

21          My mom at that time was 45 years old.  She is seeing

22  more patients than any other hygienist who was like 20, 25.

23  Even myself.  So everything was just being blamed on us.

24  Q.  You said that you saw Mario taking women into rooms?

25  A.  Yes, of course.

1   Q.   Which women did you see him do that with?

2   A.   Marina, Faten.

3   Q.   Who is Marina?

4   A.   Marina is the other hygienist who worked with us.

5   Q.   What did you see between Mario and Marina?

6   A.   When we would be working on the -- with Marina on the

7   floor, we would be in rooms.  There was three rooms at the

8   general practice.  Mario would just come downstairs and tell

9   Marina: Give me a minute.  Follow me.  She would drop what she

10  was doing, even if she was in the middle of a procedure with a

11  patient.  She would follow Mario.

12          Mario would take her by the hand, walk inside the

13  room, close the door behind him, be there for 30 minutes,

14  sometimes 40 minutes.  She would come out, lipstick smudged all

15  over her lips, all over her mouth.  At times I witnessed her

16  coming out happy, smiling, laughing, and at times she would

17  come out very upset, watery eyes, crying.

18          Incidents where I myself, when we got really backed up

19  after the incident, where Dr. Cohen was blaming us why these

20  patients were waiting, I said: Enough is enough.  And I went

21  looking for Mario to tell Mario: This is why we are backed up.

22  Because this person is missing from the floor.

23          When I went upstairs to look for Mario, I opened the

24  door to the lunch room and behind the lunch room I find Mario

25  and Marina kissing.  So as soon as I saw that, I said there

1   goes everything that I've been telling Dr. Cohen, and nothing

2   was done about it

3   Q.  When you opened the lunch room door and Mario and Marina

4   were inside, can you describe specifically what you saw,

5   please.

6   A.  Yeah.  They were behind the door.  So I walked in.  They

7   were behind the door.  Mario was on the wall side.  Marina was

8   in front of him.  Her lap coat was down to her shoulders.  She

9   had lipstick smudged again around her lips.  And Marina saw me,

10  and then I saw her, and I just turned around, and I walked

11  right back downstairs, and I said nothing to her.

12  Q.  You said you saw Mario take Marina by the hand into a room

13  and then she would come out with lipstick smudged on her face

14  as well?

15  A.  Yes.

16  Q.  How many times did you see this happen between Mario and

17  Marina?

18  A.  Very often.  I want to say Marina worked there part time,

19  three days a week.  And out of the three days, two days,

20  sometimes every single day.

21  Q.  How long did Marina work at MDA?

22  A.  Marina worked there -- I left in 2016, so I want to say she

23  started some time in 2014.  So maybe a year and a half I worked

24  with her, two years.  I don't recall exactly when she started.

25  Q.  Now, you also mentioned a woman by the name of Faten?

1   A.  Yes.

2   Q.  Who is Faten?

3   A.  Faten was also the hygienist that worked there for a very

4   long time before me and my mom started working there in the

5   beginning.

6   Q.  Faten was there while you worked there?

7   A.  Yes.  She worked with us for a few years before she got

8   fired.

9   Q.  What did you observe between Mario and Faten?

10  A.  Most of the time, I observed Faten being upset, very quiet,

11  and to herself.  Most of the time I observed -- Faten's room

12  was room 2 in the general practice, and Mario walked in the

13  room while Faten was there and closed the door behind him with

14  her there.  Again, in there for 30, 40 minutes.

15          That was a room that was constantly used, and we were

16  always around that area.  There was no noise happening.  There

17  was not much there going on.  There was no discussion

18  happening.  And at times when the door -- when he would open

19  the door, Mario would come out and so would Faten, she wouldn't

20  realize she walked in there with a lab coat closed but now her

21  lab coat was unbuttoned.  When she would walk out, she walk out

22  looking straight down, not even able to look at anybody in the

23  face, because it was very obvious.

24  Q.  How many times did you see Faten coming out of a room like

25  that with Mario?

1  A.  Many times.  Faten was not working at all.  She was

2  constantly roaming around the hallways with a cup of coffee in

3  her hand, maybe four, five coffees a day.  And every time that

4  Mario walked by, at times, she -- he wouldn't even tell her to

5  follow me.  She would just follow him into a room.

6  Q.  Now, you testified that Faten got fired?

7  A.  Yes, she did.

8  Q.  Do you know the circumstances surrounding her getting

9  fired?

10  A.  Yes, I do.

11       MR. WIMS:  Objection, your Honor.

12       THE COURT:  I am going to allow the answer to stand.

13  Objection is overruled.

14       Move to your next topic.

15  Q.  When you observed Mario taking Marina and Faten into these

16  rooms, how did that make you feel?

17  A.  Scared.  Scared and -- I knew that these women were being

18  left in peace.  They were able not to work as hard as I had to

19  work.  And so I knew that when I walk into that room with him,

20  it would be either giving into his sexual advances, if I wanted

21  to be left to be able to work in peace, or I would have to

22  continue suffering what I was suffering with Mario constantly

23  blaming me and threatening me in front of Dr. Cohen to have me

24  fired.

25  Q.  Were there any other ways that that impacted you?

1  A.  It impacted me physically as well.  All of that workload

2  was totally on me and my mom.

3  Q.  Now, aside from what you -- were there any other women that

4  you observed Mario with in the office?

5  A.  Yes.  Mercedes as well.

6  Q.  Who is Mercedes?

7  A.  Mercedes was the receptionist at the periodontal office.

8  Q.  What did you observe between Mario and Mercedes?

9  A.  Mario with Mercedes constantly made comments to her about

10  her body, about how she dressed, about how beautiful she was,

11  about her legs.  One time, as I was passing by, dismissing or

12  calling a patient, I don't recall, he said to her:  Oh, you

13  have really nice legs.  You would look really nice with those

14  heels and nothing else on.

15         Another incident where I was passing by the general

16  practice and passing by the perio department.  Mario passed by

17  her, rubbed himself, his groin area on her butt, and just

18  walked by her after, and then I overheard Mercedes say, you're

19  an asshole, and he just laughed about it, and he walked into

20  the department.

21  Q.  Were there any other comments that you personally heard

22  Mario make to Mercedes?

23  A.  In regards to the way she dressed, in regards to her legs,

24  that's what I heard.

25  Q.  When you personally observed Mario rub his groin against

1   Mercedes' butt, do you recall where that took place?

2   A.   Yeah.   That took place in a pretty open space.   It

3   definitely wasn't a small elevator or small type space where

4   Mario didn't have room to walk by.   It was a very wide space.

5   Mario went behind her because right in that area was the lab,

6   where I believe that's where she was stopped, inquiring about

7   whatever she was inquiring, and passed by her and rubbed

8   himself on her.   So that space was very wide enough where Mario

9   did not have no reason to be touching Mercedes.

10  Q.   You mentioned that, as a result of observing this, you were

11  afraid that Mario would do the same to you, is that correct?

12  A.   Correct.   And he did.   It was just a matter of --

13          THE COURT:   Excuse me.   You have to wait for the next

14  question.

15          THE WITNESS:   Yes.

16  Q.   What did Mario do to you?

17  A.   He did.   He touched me.   He made comments to me.   He made

18  unwelcome sexual comments to me.   He made unwelcomed sexual

19  advances on me.   He touched me, except that I didn't let him

20  have sex with me.   That's what I was afraid of in that room.

21  Q.   You were afraid that he was trying to have sex with you?

22  A.   Right.   I may have to possibly give in in order to be able

23  to just keep my job until I can find a different job, until I

24  can get the hell out of here.

25  Q.   When did these unwelcomed sexual advances start?

1   A.   The cycle itself started very frequently, very quick into

2   the employment.  As I said, three, four months within my

3   employment, Mario came downstairs with the whole incident about

4   how he now wanted me to work six days.  That's when he showed

5   me who Mario is and that I can do whatever the hell I want

6   here.

7            Very shortly after that is when the incidents started.

8   They first started off by blaming me to Dr. Cohen, telling

9   Dr. Cohen that she is not working.  We don't need her here.

10  She is stupid.  She is a fucking moron.  Getting Dr. Cohen to

11  believe everything that he was saying.  And once he saw that I

12  was becoming very vulnerable, very -- crying almost every day,

13  then he realized, you know what, maybe now is the time that I

14  can go in there to start to harass her.  That's exactly when

15  that started.

16           MR. WIMS:  Objection, your Honor.  We ask this be

17  stricken.  This witness is not competent to testify about when

18  Mr. Orantes or anybody else realized.

19           THE COURT:  Yes.  The last portion of the answer is

20  stricken.

21           Just describe what you saw and what you heard.

22           THE WITNESS:  Right.

23           THE COURT:  Excuse me.  Wait for another question.

24  Q.   When you say that Mario made unwelcomed sexual advances

25  towards you, how often did he do this?

1   A.   Very often.  This was something he did continuously for six

2   and a half years that I was there.  No, he didn't have sex with

3   me.  However, every time that he had a chance to come in that

4   room, he put his hands around me.  He hugged me.  He touched

5   me.  He wiped my tears off my face.  He grabbed my face and he

6   told me that he loved me.  It was a continuous thing.  I can't

7   even recall incidents as to when what happened because it was a

8   continuous thing that happened six and a half years that I was

9   there.

10  Q.   When you say that it was very often, can you describe what

11  you mean by that.

12  A.   Yeah.  Two times, three times a week.

13  Q.   So two to three times a week you're saying that Mario would

14  make unwelcomed sexual advances to you for six and a half

15  years?

16  A.   Yes.

17  Q.   Now, you said that Mario made unwelcomed sexual comments to

18  you?

19  A.   Yes.

20          MR. HOLZBERG:  Please let the record reflect that the

21  witness is crying.

22          THE COURT:  Well, do you wish to take a break?

23          THE WITNESS:  No.  I'm OK.

24  Q.   Are you OK?

25          Tessa, can you tell us the unwelcomed sexual comments

1  that Mario made to you over the six and a half years that you

2  were employed at MDA?

3  A.  Yes.  He has told me many times that he loved me and that

4  he cared for me, that I was beautiful, that I had a very nice

5  body, that I had a nice butt, I had a firm body.  These were

6  just comments that he continuously made to me.  At times he

7  would make it in private in the rooms, and then at times just

8  randomly when he would pass by and see me.

9  Q.  And these comments, how often do these comments occur?

10 A.  Very frequently, two to three times a week.  The cycle was,

11 he got me to Dr. Cohen.  He tried to blame things on me.  Then

12 right after that, he came downstairs and that's when he would

13 either try to sexually harass me or he would make these

14 comments to me, get me to believe that, hey, this is somebody

15 that likes me and that I am going to have to give in.  If I

16 give in, he will protect me.  He will be on my side.  And I

17 won't have to fight for my job or my living.

18 Q.  When you say that Mario also touched you during the course

19 of your employment, can you please describe for us how he

20 touched you over the six and a half years that you worked

21 there?

22 A.  Yeah.  He put his hands around me many times.  He has

23 hugged me.  He has kissed me on my cheek, his hands around my

24 waist.  Then the elevator incident where I was going to the

25 gym.  I ran into him and he said, you know, where are you

1    going?  He first grabbed my butt and thigh area and said, oh,

2    nice butt.  You look good.  Then he asked me:  How many squats

3    do you do?

4    Q.  Now, you testified that these advances were unwelcomed,

5    right?

6    A.  Yes.

7    Q.  Can you explain why you found them to be unwelcomed?

8    A.  Because I wasn't interested in Mario.  I just wanted to be

9    left to work in piece.  I wanted to do my job.  I wanted to

10   grow within my profession.  I gave no sign to Mario that that

11   was something I wanted to be a part of.  They still kept

12   coming.

13   Q.  When you say they still kept coming, what are you referring

14   to?

15   A.  The sexual harassment advances, the touching, the hugging,

16   the I love you, you're beautiful.

17   Q.  Now, you also say that these were unwelcomed sexual

18   advances, is that right?

19   A.  Yes.

20   Q.  Why do you say that they were sexual in nature?

21   A.  Because he touched me.  He touched me.  He grabbed my butt.

22   He kissed me on the cheek.  There was incidents where right

23   after complaining about me he ran downstairs, closed me into a

24   room and then kissed me on my cheek, lingered around for me to

25   look up and hope that he would kiss me and I would kiss him

1    back.

2              MR. WIMS:  Objection.

3              THE COURT:  Sustained.  The last part of the answer is

4    stricken.

5    Q.  Tessa, there was an instance that Mario kissed you on your

6    cheek and then lingered in front of your face?

7    A.  Yes.  For me to look up to him and kissed him.  And I

8    pushed him back, I pushed him away and I just said stop.  So he

9    turned around and just said:  Calm down.  He opened the door

10   and he just slammed it, left the room.  And then two, three

11   days later, guess what happened.  I got called upstairs because

12   there was a created chart that wasn't done.  So for some reason

13   it became my responsibility at that point.  I was the one to

14   blame for that.

15   Q.  You testified that you told Mario to back off, right?

16   A.  Absolutely.  I told Mario to back the fuck off, yes.

17   Q.  Did you tell Mario that these advances that he was making

18   to you were unwelcomed?

19   A.  Yes.  I told him:  Don't touch me.  Don't put your hands on

20   me.  Don't come near me.  He looked at me.  What are you

21   talking about?  I said:  You know exactly what I'm talking

22   about.

23   Q.  What was Mario's response when you told --

24   A.  There was no response.  He tried to play stupid, like he

25   didn't know what I was talking about, like I'm not doing

1   anything.

2   Q.  Did there come a point in time during these six and a half

3   years of your employment that these incidents began to

4   intensify?

5   A.  Yes, they did, of course.

6   Q.  When was that?

7   A.  More towards the end of my employment, like around 2014, I

8   want to say.

9   Q.  How did they begin to intensify at that time?

10  A.  They just got a lot more frequent, a lot more unbearable

11  with him threatening me almost every day to Dr. Cohen.  Every

12  day feeling scared, not knowing how I was going to keep my job,

13  because I was giving my 100 percent to this job.  I was doing

14  everything in my power and somehow I was still getting called

15  and being told that everything was my fault that was going

16  wrong in the office.  I just didn't know what to do.  My only

17  thing was, either let me -- I was never going to give into

18  Mario.  Let me quit.  I couldn't quit because I didn't want to

19  fail my family.  I was helping them pay bills, pay a mortgage.

20  I just made my mom quit her job to come here.  Or give into

21  Mario.  That's not something that I would have ever allowed

22  myself to do.  So I felt like I was going crazy.

23  Q.  Tessa, to the best of your recollection, can you recall any

24  specific incidents of unwelcomed sexual advances in 2014?

25  A.  No, I don't recall anything in 2014.

1  Q.  Do you recall any specific instances of sexual harassment

2  in 2015?

3  A.  I do recall that incidents happened, yes, but I don't

4  recall exactly which incident when.  It has been so long.

5  Q.  Is there something that might help you remember?

6  A.  Yeah.  I kept a diary.  So when these incidents occurred, I

7  wrote down everything on my notes on my phone.  That's the only

8  thing that I have.

9  Q.  Would looking at your diary help you to remember specific

10  instances of sexual harassment that occurred in 2015?

11  A.  Yes, absolutely.

12  Q.  Now, this diary, when did you start keeping the diary?

13  A.  Probably, in 2014.

14  Q.  Do you recall when you stopped making entries in the diary?

15  A.  May of 2016, when I quit.

16  Q.  Where did you maintain this diary?

17  A.  I maintained it on my phone on my notes.

18  Q.  When you made an entry into your diary, was it made while

19  you were experiencing any particular condition?

20  A.  Yes.

21  Q.  What condition are you referring to?

22  A.  When I was scared, when I was crying, when I was having

23  panic attacks.  So right after the incident occurred I wrote

24  everything down.

25  Q.  So you recorded these entries immediately after the

1    incidents occurred?

2    A.   Yes.

3    Q.   These were made at the time when the events occurred?

4    A.   Correct.

5            MR. WIMS:  Objection.  Leading.

6            THE COURT:  Overruled.

7    Q.   How do you know that?

8    A.   Well, if you go back to those entries, there are many

9    mistakes --

10           THE COURT:  Excuse me.

11           Counsel, place your next question.

12           The jury shall disregard.

13   Q.   When you made these entries, did you have time to reflect

14   on these incidents prior to entering them into your diary?

15   A.   No.

16           MR. WIMS:  Objection.  Leading.

17           THE COURT:  Overruled.

18   Q.   You testified you are not able to remember every specific

19   incident of sexual harassment in 2015, correct?

20   A.   No.

21           MR. HOLZBERG:  Now I'd like to show what's been

22   previously marked as Plaintiff's Exhibit 3.

23           Your Honor, may I proceed?

24           THE COURT:  Yes.

25           MR. HOLZBERG:  Thank you.

1    Q.  Tessa, you now have in front of you what's been marked for

2    identification purposes Plaintiff's Exhibit 3.  Can you please

3    direct your attention to page 3 of Plaintiff's Exhibit 3.  If

4    you could, please read it to yourself.  I'm referencing the

5    bottom portion of the page.  Once you're done, please let me

6    know.

7    A.  Sure.

8           Yes.

9    Q.  Now, Tessa, in looking at Plaintiff's Exhibit 3, does this

10   refresh your recollection regarding any specific instances of

11   sexual harassment in 2015?

12   A.  Yes, it does.

13   Q.  Please tell me what you recall from 2015.

14   A.  So this incident happened when -- originally, I complained

15   about sexual harassment to Dr. Cohen.  This was in January of

16   2015.  So in February, as I said, Mario waits some time, Mario

17   came downstairs, randomly -- I was working in a room on a

18   patient.  As I was working he said to me:  Drop what you're

19   doing.  Follow me, please.  I need a minute.  I dropped what I

20   was doing.  I left the patient in the chair with everything in

21   the mouth.

22          I went to room 5 perio and Mario called Dr. Cohen on

23   the phone and told Dr. Cohen:  Dr. Cohen, just so you know, all

24   the rooms are not equipped with instruments.  Just as a

25   reminder, back then when I was working, we kept the instruments

1   strictly in one room.  Rooms never had our instruments anywhere

2   else, just because we didn't want to keep them everywhere and

3   lose them.  That was always the rule.  And all of a sudden,

4   now, it was an issue and Dr. Cohen was yelling on the phone

5   that I was a fucking moron, that I was incompetent, that I

6   didn't know what I was doing, and Mario should just throw me

7   the fuck out.

8        Obviously, I became very overwhelmed.  I was crying at

9   that point when I realized that this is just becoming very

10   unbearable.  I'm now getting blamed for something that was

11   never an issue and, all of a sudden, somehow it's an issue.  I

12   was crying and crying and crying, and Mario then tells

13   Dr. Cohen:  Dr. Cohen, she is just crying too much.  She cannot

14   follow you.  Dr. Cohen said:  Good.  I'm glad.  I hope that

15   this will finally make her realize that she needs to get her

16   act together.

17        I hung up the phone with Dr. Cohen.  Then tells me:

18   Listen, come here.  Brings me closer to his body, hugs me,

19   takes my face with his hands, wipes tears off my face, hugs --

20   kisses me on the cheek and says:  Listen, I love you, OK.

21   Nothing is going to happen.  I promise you.

22        Again, I was just crying unbearably.  I was shaking.

23   I couldn't stop crying.  Mario kept telling me:  Calm down,

24   calm down.  But I said:  I can't calm down.  Just calm down.

25   So I told him:  OK, OK.  So he opened the door, left the room,

1   and I was just left in that condition crying.

2   Q.  You said that was in February of 2015?

3   A.  Yes.  In that situation, just like that, while I was

4   crying, I had to go back in the room, and I had to see a

5   patient.  Luckily, I had goggles on me --

6           THE COURT:  Excuse me.  There is no question.

7   Q.  What did you do after that incident with Mario?

8   A.  I complained to Dr. Cohen.  That was just what I had to do.

9   I went to Dr. Cohen.  I told him:  Listen, this is not true.

10  What he's saying to you about me is not true.  I just need you

11  to believe me.  And there was no response to that.  It was like

12  I was talking to a wall.  Go back downstairs and just do your

13  work.

14  Q.  Tessa, are you able to recall any other instances of sexual

15  harassment from February of 2015?

16  A.  Yes.

17  Q.  Go ahead.

18  A.  The incident in the elevator also happened in February of

19  2015.

20  Q.  Can you please describe for the jury what you are referring

21  to as the incident in the elevator.

22  A.  Yes.  I was going to the gym.  I went inside and Mario

23  happened to be in the elevator.  He asked me where I was going.

24  I told him the gym.  And he then said to me:  Oh -- he said,

25  oh -- he grabbed my ass and he said, nice butt.  You look good.

1    And he then said:  How many squats do you do?  I don't remember

2    if I answered him or I just looked at him in disgust, but that

3    was it.  That was the incident in the elevator.

4    Q.  Did there come a point in time in February of 2015 that you

5    told Dr. Cohen that you could no longer work six days a week?

6    A.  I want to say yes because at that point it just became six

7    days a week, 12 hours a day, 7:30 to 7:30 p.m.  So yes.  That

8    was the time when I just felt myself like, OK, it has to come

9    to an end.  I can't continue this way.  So I don't recall

10   exactly when, but yes.

11   Q.  Is there anything that would help you recall?

12   A.  My diaries are the only thing that I kept that could help

13   me recall.

14   Q.  Please direct your attention to page 5 of Plaintiff's

15   Exhibit 3, about the top of the page.

16   A.  Yes.

17   Q.  Can you tell us what you recall regarding your conversation

18   with Dr. Cohen.

19   A.  Yeah.  This was sort of a wakeup call for me with, you

20   know, what I really felt and thought of Dr. Cohen.

21        My mom wasn't feeling well at all at that point.

22        THE COURT:  Excuse me.  I think you were asked to tell

23   the jury about the conversation with Dr. Cohen.  Could you tell

24   the jury what you said to Dr. Cohen and what he said to you.

25        THE WITNESS:  Sure.

         1          THE COURT:  Thank you.

         2   A.  I told Dr. Cohen:  Dr. Cohen, I'm so sorry, but it's

         3   beginning to get very hard for us to work six days a week.  My

         4   mom isn't feeling well.  She feels like she has a lot of

         5   tightness in her chest.  This is just a lot of work.  I also

         6   cannot continue to work six days a week.  Dr. Cohen said:  I

         7   don't give a shit.  I don't care for your health or your mom's

         8   health.  My office comes first.  If you don't like it, you can

         9   get out of here.  To be exact:  You can get the fuck out of

        10   here.  Those are the words that he used with me continuously in

        11   the office.  That's how he spoke to us.

        12   Q.  What words?

        13   A.  Profanity.  You can get the fuck out.  I am going to throw

        14   you the fuck out.

        15          So I was at that point kind of shocked that that's the

        16   response that I got.  I felt like I was going to get a

        17   different response from Dr. Cohen.  I said OK.  And I went

        18   downstairs and, again, I started to cry and it was a lot to

        19   handle.  Mario then came downstairs and said -- and just a

        20   reminder, Mario was the one who initially made us work the six

        21   days, not Dr. Cohen; Mario.

        22          Then he came back downstairs and he said:  What's

        23   going on?  Why was Dr. Cohen yelling at you?  I said:  Mario, I

        24   can't work six days.  It's just too much right now.  Please.  I

        25   need you to understand.  He said:  Listen, I like you.  You're

```
1    a beautiful girl.  I think you have so much potential.  Don't
2    worry, we will work it out.  We will work it out.
3              That was it.  He, again, left the room and left me in
4    that state where I had -- I had nothing to do
5    Q.  Now, you just mentioned that you were in a room with Mario,
6    correct?
7    A.  Yes.
8    Q.  This was in February of 2015?
9    A.  Correct, yes.
10   Q.  And to the best of your recollection, were there locks on
11   the doors in MDA?
12   A.  Absolutely, yes.  You could lock the door from the inside
13   once you closed that door.  I locked it myself when I was
14   changing in there, so I know that.
15   Q.  What do you mean?
16   A.  When I would come in sometimes with clothing, I would have
17   to change into my scrubs.  And if the bathroom was being used,
18   I had to quickly change.  So I would close the door, lock the
19   door for myself to change in there.  So those doors, those
20   rooms had locks.  I locked it myself.
21   Q.  Were there ever any instances in which you were in a room
22   with Mario in which he looked the door?
23   A.  All the time.  Mario closed the door behind him and locked
24   the door.
25   Q.  Do you recall any further instances of unwelcomed sexual
```

1   advances that Mario made towards you in 2015?

2   A.  Many of them happened.  I just don't recall what happened

3   when.  I don't recall exact year.

4   Q.  Is there anything that would help you remember?

5   A.  My diaries, if I wrote it down there, yes.

6   Q.  Tessa, please direct your attention to Plaintiff's Exhibit

7   3, page 7.  Please read the bottom of the page.  I believe it

8   may go on to the next page.  Let me know when you are ready.

9   A.  OK.

10  Q.  You're good?

11  A.  Yes.

12  Q.  Do you recall any further instances of sexual harassment

13  that occurred in 2015?

14  A.  Yes.

15  Q.  Please tell me what you recall.

16  A.  As I previously stated, Mario was in charge of everything

17  that we did.  And so there was a time when Mario came

18  downstairs -- he sent an assistant to come downstairs and asked

19  me to do perio charting on a patient.  So I looked who the

20  patient was, and I saw that the patient was not even a patient

21  that was seen in our office.  The patient was seen at a

22  completely different office, which was the Fulton office.  So I

23  actually refused and I told Jeannette, that was the assistant

24  that asked me to do it, I said:  I'm sorry.  I said:  You can

25  tell Mario that I can't do this because I didn't see this

1   patient.  So legally I am not going to enter something into a

2   patient's chart if I never saw the patient.  She told me Mario

3   that Tessa refused to do it.

4           THE COURT:  Excuse me.  I'm striking this testimony.

5           Did there come a time, the occasion that you are

6   remembering, where you met Mario and had a conversation with

7   him?

8           THE WITNESS:  Yes.

9           THE COURT:  Could you tell the jury about that

10  conversation that you had with Mario, what you said to him and

11  what he said to you.

12          THE WITNESS:  Right.

13          Because I refused to do what Mario asked me to do,

14  Mario then came downstairs.  He called Dr. Cohen on the phone

15  and told Dr. Cohen that I'm refusing to do what he asked me to

16  do.  Dr. Cohen yelled at me.  Again, I was threatened to be

17  fired, called names, that I was a fucking moron, that I was

18  incompetent.  We hung up the phone.

19          And then Mario takes my hand, comes close to me and

20  says:  Well -- I actually said:  Why don't you ask somebody

21  else to do this perio charting, the other hygienist, which was

22  a male hygienist, Supian.  He then said to me -- Mario then

23  said to me:  Tessa, why are you bringing Supian into this?  I

24  said:  I'm just asking you, why don't you ask somebody else to

25  do it because I'm not comfortable doing it.  Then Mario came

 1  close to me.  He took my hand.  He touched me on the cheek and

 2  he said:  Honey, you women are so vulnerable and full of hate.

 3  I didn't know what he meant by that.  I just -- I didn't do the

 4  perio charting and that was it.  His response to that was, you

 5  women are very vulnerable and full of hate.

 6  Q.  Do you recall anything else from that interaction with

 7  Mario?

 8  A.  Not that I recall.

 9  Q.  Do you recall approximately when that was in 2015?

10  A.  May.

11  Q.  May?

12  A.  Yes.

13  Q.  To the best of your recollection, are there any other

14  instances of sexual harassment that occurred in 2015 from

15  Mario?

16  A.  I'm pretty sure there were more.  I just don't remember

17  what one occurred at this point.

18  Q.  Tessa, I'd leak to direct your attention to page 9 of

19  Plaintiff's Exhibit 3, the bottom of the page.  Please read

20  page 9 at the bottom and let me know when you are ready.

21  A.  OK, yes.

22  Q.  Do you recall when any other instances of sexual harassment

23  occurred?

24  A.  July of 2015.

25  Q.  Can you please describe for the jury another instance of

1    sexual harassment that occurred in July of 2015.

2    A.  Yes.

3             MR. WIMS:  Objection, your Honor.

4             THE COURT:  Yes.  You may rephrase that, counsel.

5             It's stricken.

6    Q.  Can you please describe what you experienced with Mario in

7    July of 2015.

8    A.  Yes.  So this incident had specifically to do with the

9    schedule.  The schedule was slow, the periodontal department.

10   Again, I was the one to blame for it.  I took the blame for it.

11   The reason why it was slow is because I wasn't doing my job.  I

12   was expected to be in every department treating patients, 30

13   patients, and, at the same time, I had to make sure that the

14   perio schedule in a different department was full.

15           So Mario called Dr. Cohen in regards to that and

16   Dr. Cohen, I remember very vaguely, told Mario:  You should

17   throw her the fuck out.  At that point I just said:  Listen,

18   whatever happens to me, let it happen at this point, and so

19   hung up the phone.  I was crying.  Mario pulls my hand, gets

20   close to me and tells me:  Honey, please, I expect so much more

21   from you as a woman.  I expect so much more from you.  You have

22   got what it takes to sell to these patients, make these

23   patients come and see you every three months.  And I told him,

24   I said:  I don't know what I can do or what I have to do.

25   Q.  Tessa, do you recall any specific instances of sexual

 1   harassment in 2016?

 2           MR. WIMS:  Objection.

 3           THE COURT:  Sustained as to form.

 4   Q.  Do you recall any other unwelcomed advances from Mario in

 5   2016?

 6           MR. WIMS:  Objection.

 7           THE COURT:  Sustained as to form.

 8   A.  I do.

 9           THE COURT:  Excuse me.

10           THE WITNESS:  I'm so sorry.

11   Q.  What do you recall transpired between you and Mario in 2016

12   that you found to be unwelcomed?

13   A.  2016, in January, I do recall an incident where Mohammed,

14   one of the billers, called me upstairs and asked me why were

15   certain procedures not done on patients and why a specific

16   hygienist didn't do a procedure on a specific patient.  When I

17   looked at the chart and I looked at everything that was there,

18   I said, I can't speak for another hygienist.  However, just

19   looking at the history, it seems like maybe the patient didn't

20   need this treatment.  Then he asked me why is it that these

21   three patients that he brought up with chart numbers --

22           THE COURT:  Excuse me.  Is this a conversation with

23   Mr. Orantes?

24           THE WITNESS:  No.  It's actually a conversation with

25   the biller.  Sorry.

1          THE COURT:  Ladies and gentlemen, I am going to strike

2     that conversation.

3          Did you on that day have a chance to talk with

4     Mr. Orantes?

5          THE WITNESS:  Yes.

6          THE COURT:  Could you tell the jury what you said to

7     him and what he said to you.

8          THE WITNESS:  Yes.  Absolutely.

9          THE COURT:  Thank you.

10         THE WITNESS:  Mario pulled me in the room with

11    Mohammed in there and yelled at me for the fact that there was

12    three patients who had really good insurances, private

13    insurances and that these patients had rescheduled.  They

14    didn't get any treatment.

15         And Mario advised us that going forward we were to see

16    the patients that had the good insurances over the patients

17    that had the bad insurances, which is the government insurance,

18    the Fidelis, the Medicaid insurances.  So those patients got

19    priority.  For that reason, we decided that going forward we

20    were going to give priority to those patients.

21         In the end of that meeting, Mario made a comment where

22    he said to Mohammed and to me:  Maybe if you worked out your

23    brain as much as you worked out your ass, you'd be better off

24    in life because, to him, that was common sense, that I should

25    have known not to leave the good insurances rescheduled.  I

1    should have known that I should have rescheduled the patients

2    that had the bad insurances instead.  That's when Mario made

3    the comment to me in front of everybody and said:  Maybe if you

4    work out your brain as much as you work out your ass at the

5    gym, you will be better off in life.

6    Q.  Tessa, do you recall when Mario made that comment to you?

7    A.  Yeah.  January of 2016.

8    Q.  Now, Tessa, you were talking about Mario was giving you

9    some instructions with regard to scheduling patients based on

10   their insurance, right?

11   A.  Yes.

12   Q.  Can you please tell us what Mario told you with respect to

13   patients' insurances.

14           MR. WIMS:  Objection.  Asked and answered.

15           THE COURT:  Sustained.

16           We will move on to the next topic.

17   Q.  Tessa, after all of those instances that you just described

18   between 2015, 2016, why did you stay there?

19   A.  I had bills to pay.  I had to keep a roof over my head.  My

20   mom was there with me.  We were both working there.  My dad was

21   working at the time, but his paycheck was very little.  So we

22   had no choice.  I couldn't really quit, you know, and be

23   without a paycheck.  If my mom was working elsewhere, it would

24   have been easy, but for both of us to risk getting fired or

25   quitting at the same time, that was not doable at all.  It was

1  impossible for me to start looking anywhere else because I was

2  under Mario's control 24/7 that I was there.  Twelve hours a

3  day Mario had total control over where I was.  So it's not like

4  I could take a day off very freely and go out or look for a job

5  or do anything.

6  Q.  Did you ever take days off while you worked at MDA?

7  A.  Yeah, I did.

8  Q.  Did you have to request time off from anyone?

9  A.  Yes.  I had to request time off from Mario.  And most of

10 the time when I did request time off from Mario, which Mario

11 OK'd, he would call me on those days that I did request that he

12 approved and then he would tell me:  Don't think that just

13 because I gave you the day off that you are not responsible for

14 what goes on in this office every day.  Even on my days off,

15 Mario made sure that he had control over me.

16        If you look at my time sheets or my clock-ins or the

17 days off I took, very little days off in six and a half years.

18 In fact, I never even took vacation in six and a half years.  I

19 took my vacation time, but I gave it to my mom.  I went to work

20 because I did not want to risk missing work.  But every time I

21 wasn't there, I went back to a really messy situation where

22 Mario gathered a bunch of stuff on me and it was just

23 unbearable.  So I made sure not to really miss many -- I barely

24 took off.  When I did, it was with a doctor's note or it was

25 because I needed to be there for my family.

1   Q.  When you say that Mario controlled your whereabouts, can

2   you explain what you mean by that?

3   A.  Yeah.  Mario, I think I stated previously, had me text him

4   every time that I wasn't in the office, every time that I left

5   to go get a coffee, anywhere that I went, even though I did

6   clock out.  So I don't know why I had to text him.  Then again

7   on my days off, when I would not be in the office, he would

8   call me.  He would call me and he would harass me while I was

9   off, on my days off.

10  Q.  You said that your hours were what again at that time?

11  A.  7:30 in the morning until 7:30 p.m., 12 hours.

12  Q.  Did you have a break for lunch?

13  A.  Forty-five-minute break.

14  Q.  During that break for lunch, were you allowed to leave the

15  premises?

16  A.  Yes.

17  Q.  What did you do during your breaks?

18  A.  Usually, I may have took my lunch early, around 11 or 12.

19  I went to the gym.  Lunch break I went to the gym.  Or I went

20  to lunch.  I went to have lunch.

21  Q.  Now, you said there are also instances where you were out

22  getting coffee?

23  A.  Yes.

24  Q.  Did you ever offer to get Mario a coffee?

25  A.  When I texted Mario, when Mario told me I want you to text

1    me when you leave the building, so I texted him, and I said:  I

2    am going to get coffee.  He said:  Get me a cup of coffee also.

3    I said:  Sure.  So I got him a cup of coffee.  Every time that

4    I went to get coffee, that I texted him, that he asked for a

5    cup of coffee, I got him a cup of coffee.  That act alone kept

6    Mario off my back for a little while.  Not completely, but it

7    got Mario to be on my good side slightly.  I did that.  I

8    played along to get along.

9    Q.  From a professional standpoint, during the course of your

10   employment, were there ever instances in which Mario asked you

11   to do something that you found to be unprofessional or make you

12   uncomfortable?

13   A.  Besides, hey, come close to me, come here and hug me, yeah.

14   Q.  I'm saying in terms of your work.

15   A.  Absolutely.  Again, as I mentioned earlier, he asked me to

16   do certain procedures on patients that didn't need certain

17   treatment or to perform perio charting on a patient that I

18   never saw because technically I could open up the chart and

19   enter numbers.  But I didn't feel comfortable doing that

20   because I had never seen that patient in the six and a half

21   years that I was there.  So Mario had the authority to tell me

22   to do whatever he wanted, and I had to do it.  I had no way of

23   saying, no, I am not going to do it.  That one time that I did

24   that with the perio charting, of course, I was threatened to be

25   fired.

1   Q.  When you say that Mario asked you to do work on patients

2   that they didn't need, can you elaborate what you mean by that.

3   A.  Yeah.  So certain -- a patient needs a cleaning every six

4   months.  Obviously, sometimes patients will need further

5   treatment, whether it's a deeper cleaning or treatment that you

6   may need because you have gum issues or problems with your

7   teeth.  For the most part, insurances will cover a regular

8   cleaning every six months.  So when a patient comes in, if

9   insurance states, for whatever reason, that insurance covers a

10  deep cleaning or a bigger procedure that pays more money more

11  often, then Mario made sure to tell us that this needed to be

12  maximized.  If it wasn't, you would get a call to Dr. Cohen,

13  the charts would open up and Mario would go through each chart

14  and say:  Listen, this procedure should have been done.  This

15  insurance covered this procedure.  This procedure wasn't done.

16  That's what happened.

17          That was me and my mom, but not the other hygienists.

18  The hygienists that were actually sleeping with him actually

19  never met with Mr. Cohen.

20          MR. WIMS:  Objection.  We ask that it be strucken.

21  There is no foundation.

22          THE COURT:  Yes.  It's stricken.  The jury should

23  disregard.

24  Q.  Tessa, how many times throughout the course of your

25  employment at MDA did Mario ask you to perform work like that?

1   A.  Constantly, all the time.  That was --

2   Q.  Can you be more specific.

3   A.  Yeah.  Every single day, and then every other day Mario

4   would go through these charts and he would bring it to

5   Dr. Cohen's attention.  Dr. Cohen didn't come in the office

6   every day.  He came in twice a week.

7           THE COURT:  Excuse me.  I want to you listen with care

8   to the question that is asked and answer just that.

9           Can you place your next question so we can have focus

10  here.

11          MR. HOLZBERG:  Sure.

12          THE COURT:  It's 5:00.  I just noticed.

13          I'm very sorry, Mr. Holzberg.  Is this OK time to

14  break?

15          MR. HOLZBERG:  Absolutely, your Honor.

16          THE COURT:  Thank you so much.

17          Ladies and gentlemen, don't discuss the case.  Have a

18  good evening.  Bye-bye.  See you at 9:30 sharp.

19          (Jury not present)

20          THE COURT:  Just a couple practice issues.

21          Mr. Holzberg, I don't want you standing there at the

22  podium with your materials when the jury is coming in or going

23  out because you may very well be working with materials that

24  they shouldn't see.  I know you have your laptop.  You have

25  other materials there.  I ask you to be conscious of that.

1           MR. HOLZBERG:  My apologies, your Honor.

2           THE COURT:  No problem.

3           More generally, counsel, if you are going to work with

4    deposition testimony, as a courtesy to the witness and to your

5    adversary, please give them notice of the page and lines and

6    then pause so they have a chance to go to the page and look at

7    the lines.  There may be an objection or not.  But at least it

8    gives your adversary counsel and the witness a chance to

9    respond in a thoughtful fashion.  So thank you for that as

10   well.

11          I know we have Mercedes Vila to discuss.  But before

12   we get there, I want to give counsel a chance to raise any

13   other issues.

14          Mr. Holzberg.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. HOLZBERG:  Nothing at this time, your Honor.

2     Thank you.

3          THE COURT:  Thank you.

4          Mr. Wims?

5          MR. WIMS:  No, your Honor.

6          THE COURT:  Okay.  So, let's address this issue from

7     Ms. Vila.

8          During the lunch break, as I mentioned, I received as

9     an attachment to an e-mail, or my chambers received, a letter

10    from Dr. Sharma, dated February 2, 2023, at 1:35 in the

11    afternoon about Mercedes Vila.  And it recites various serious

12    medical conditions that she has:  Metastatic breast cancer,

13    moderate to persistent asthma, and spondylolisthesis, and he

14    lists as well anxiety disorder.

15         He explains that he is her doctor and has been since

16    September of last year, September of 2022, and that he follows

17    her closely.  And then he says in the last paragraph, "The

18    patient cannot attend court, trial sessions due to her medical

19    conditions.  Please afford her the appropriate accommodations."

20         So, Mr. Holzberg, you were going to advise us this

21    afternoon whether Ms. Vila will be appearing for trial to give

22    her testimony in person.

23         MR. HOLZBERG:  Correct, your Honor.  As your Honor

24    noted in this letter, she will not be appearing in person

25    tomorrow.

1          THE COURT:  No, I don't know that.  I have the letter.

2      So I think you told us at the final pretrial conference that

3      you had subpoenaed her.

4          MR. HOLZBERG:  Correct.

5          THE COURT:  And when I asked you earlier today if she

6      would be appearing in person, you said you did not know, but

7      would be able to tell us this afternoon.

8          So, will she be appearing in person for her testimony?

9          MR. HOLZBERG:  She will not.

10         THE COURT:  Okay.  Do you have an application?

11         MR. HOLZBERG:  Yes, your Honor.  We would like to make

12     an application to use Ms. Vila's deposition transcript on the

13     basis that she is unavailable under Rule 32(4)(C).

14         I apologize, your Honor.  It was 32(a)(4)(C).

15         THE COURT:  Are you making an offer of the entire

16     deposition or have you designated portions that you believe are

17     admissible under the rules of evidence?

18         MR. HOLZBERG:  Your Honor, we would seek to introduce

19     the entire transcript, or, in the alternative, specific

20     portions.

21         THE COURT:  Okay.  Your application to offer the

22     entire transcript is denied.  Now, we're not going to have

23     inadmissible testimony come in through deposition.

24         So, there is a whole issue here of whether she's truly

25     unavailable, and I'll find she is, I'll give Mr. Wims an

1   opportunity to take a position on that and hear argument.  But,

2   if I find that she is unavailable, you must designate those

3   portions that you believe are admissible testimony at trial.

4        Now, I don't believe you've made that designation in

5   the pretrial order.  Am I right?  Have you provided Mr. Wims

6   with any designations for this deposition?

7        MR. HOLZBERG:  Well, two things, your Honor.  With

8   respect to the joint pretrial order, no, because we weren't

9   aware of the fact that she was going to be unavailable at the

10  time of trial.  But with respect to the portions of her

11  deposition transcript, yes.  If you recall, at the pretrial

12  conference with your Honor, about a week and a half ago, your

13  Honor had indicated that I should meet and confer with Mr. Wims

14  regarding our proffer.  I did meet and confer with Mr. Wims at

15  or around the time of that conference, and I specifically

16  informed Mr. Wims of the pages of relevant testimony that we

17  intended to offer.

18        THE COURT:  So you have provided Mr. Wims with your

19  designations.

20        MR. HOLZBERG:  Correct.

21        THE COURT:  Do you have a copy of that for me?

22        MR. HOLZBERG:  No, your Honor.  It was during our meet

23  and confer.  I would be happy to reduce it to writing and

24  provide it.

25        THE COURT:  Okay.

1              MR. HOLZBERG:  And the Court as well, your Honor.

2              THE COURT:  There are at least two issues here.  One,

3    whether there will be an objection with respect to

4    availability.  And two, whether there are any objections with

5    respect to the admissibility of designated portions.

6              So, before I turn to Mr. Wims, did you want to say

7    anything else, Mr. Holzberg?

8              MR. HOLZBERG:  No, your Honor.  Thank you.

9              THE COURT:  Mr. Wims.

10             MR. WIMS:  Thank you, your Honor.

11             We object on a number of grounds.  First of all, there

12   is no indication that Ms. Vila is in fact unavailable.  The

13   doctor indicates in a conclusory fashion, after listing some of

14   or all of the diagnosis she has, that she's unavailable, but

15   doesn't say why.  Amongst those listed are asthma, I can't

16   imagine that would keep her from being able to appear.  Breast

17   cancer, anxiety disorder, and a back condition.

18             Conceivably, at least theoretically, Ms. Vila suffered

19   from all of these conditions and was being treated by this

20   doctor when we were here in October.  None of those conditions

21   prevented her from going to work, which is where we deposed

22   her.  So there is no new information here.

23             In addition, there is a issue of notice.  This letter

24   is dated February 2.  Today is February 6.  Counsel should have

25   gotten that to us immediately, not four days after it was

1    allegedly created.

2          And obviously, this doctor has been treating her since

3    September, the month before we were last before you in October.

4    So, there's no new information here.  It doesn't explain what

5    of any of the listed conditions might prevent her from coming

6    to the courthouse.

7          She indicated she worked in Manhattan during her

8    deposition.  Seems to me wherever that is, she can get there,

9    she can get here.

10         There is also the issue, Judge, we checked the

11   Metropolitan's records regarding Ms. Vila.  There was only a

12   year overlap between the tenures of plaintiff and Ms. Vila.

13   She left in 2010.  So, there is nothing she could testify to

14   that would be within the statutory statute of limitations

15   period.  The plaintiff started in December 2009.  Ms. Vila was

16   there when she started, and left in December of 2010.

17         It's unclear also from the letter, Judge, what kind of

18   doctor this is.  Whether he's treating her for anxiety and is

19   perhaps a psychiatrist or something, or if he's an oncologist

20   who is dealing with the cancer.

21         The letter has a lack of factual detail.  So, we're

22   unable to ascertain that from its writing.

23         THE COURT:  Did you get specific designations from the

24   plaintiff with respect to portions of the deposition he seeks

25   to offer?

1          MR. WIMS:  In our discussion, during the meet and

2     confer, Mr. Holzberg made reference to several pages of

3     Ms. Vila's deposition transcript.  But at that time, he was

4     still anticipating her coming in person, so he didn't say these

5     are the portions which we designate and would like to be

6     admitted.  Because, up until just a moment ago, they were

7     seeking to admit the entire transcript.

8          THE COURT:  Okay.  So ordinarily, if a doctor writes a

9     letter indicating it would interfere with someone's health or

10    medical condition for them to appear at trial and give

11    testimony, I give that great weight.  It would be presumptively

12    evidence that the witness is unavailable.  We don't want to

13    force anyone to worsen their health by a visit to court or to

14    interfere with medical treatment.

15         This is a tougher question, however.  I think what I

16    have here is a witness who doesn't want to come to court.

17    Didn't want to come during the last trial, doesn't want to come

18    during this trial, and has a doctor who is willing to write a

19    letter.

20         This is a witness who has serious medical conditions,

21    but is not at home or in a hospital, is coming to work.  We

22    wouldn't even have her deposition but for my order in advance

23    of the last trial, because of the record which was presented to

24    me -- and perhaps was not entirely accurate -- that she was

25    truly unavailable.

 1          I have the February 2, 2023, letter from Dr. Sharma,

 2     and I have the October 24, 2022, record from Dr. Sharma.  In

 3     the October letter, Dr. Sharma indicated that the patient had a

 4     severe anxiety disorder, and it was not advisable for her to

 5     continue to be exposed to situations that exacerbate her

 6     anxiety.  He also talked about the difficulties she would have

 7     remaining seated for prolonged periods.  That, of course, could

 8     have been dealt with, and I don't expect there would be a

 9     prolonged examination in any event.

10          So, Mr. Holzberg, make a proffer to me, if you would,

11     please, of why this witness's testimony is important to the

12     plaintiff.

13          MR. HOLZBERG:  Thank you, your Honor.

14          So Ms. Vila's testimony is relevant to the plaintiff's

15     claim for a variety of reasons.  First and foremost, Ms. Vila

16     testified at her deposition that she was aware of the fact that

17     Ms. Qorrolli and her mother complained to Dr. Cohen I believe

18     she said 100 times.  Ms. Vila also testified that she was there

19     with Ms. Qorrolli a couple of the times that she complained to

20     Dr. Cohen.  The testimony was that they were complaining about

21     the harassment.

22          THE COURT:  Well, "harassment" is a generalized term.

23     What did Ms. Vila witness the plaintiff complaining to

24     Dr. Cohen about?

25          MR. HOLZBERG:  In the context of her deposition, your

 1  Honor, Ms. Vila was saying with respect to harassment she was

 2  referring to sexual harassment.  She --

 3          THE COURT:  No, I'm sorry, counsel.  I'm not going to

 4  let a generalized term be used.  Who knows what that meant in

 5  her mind.

 6          So, when Ms. Vila observed or witnessed the plaintiff

 7  complaining to Dr. Cohen about Mr. Orantes' treatment of the

 8  plaintiff, what was the complaint Ms. Vila testified, could

 9  testify or did testify to?

10          MR. HOLZBERG:  Your Honor, please allow me one moment

11  while I pull up her transcript.

12          THE COURT:  Well, counsel, okay.  You don't know.

13          What is the other basis?  I'll give you a chance to

14  find it later, counsel.  I just want to get a sense here of

15  what --

16          MR. HOLZBERG:  Sure.  The other proffer that we make

17  is that Ms. Vila testified that she specifically observed Mario

18  touching Tesa inappropriately, where she was uncomfortable.

19          THE COURT:  I'm sorry.  Who was uncomfortable?  The

20  plaintiff or Ms. Vila?

21          MR. HOLZBERG:  The plaintiff.

22          THE COURT:  How did the deponent make that assessment

23  that the plaintiff was uncomfortable?

24          MR. HOLZBERG:  Based on what she observed, your Honor.

25  This is on page 62 of the deposition transcript of Ms. Vila.

1    Line 7.  I actually believe, your Honor, this was Mr. Wims'

2    question to Ms. Vila during her deposition.  Mr. Wims had asked

3    Ms. Vila on page 62, line 7:

4    "Q.  Okay.  Did you ever see Mario sexually harass plaintiff

5    Qorrolli or Tesa Qorrolli?

6    "A.  I've seen him like touch her, like, you know, like I said,

7    just like inappropriate where she was uncomfortable.  Or like

8    she'll pass by, he'll touch her by the waist.  But nothing like

9    what I experienced, just that type of thing.  He would be

10   walking across the hall and kind of like bump into you and

11   start laughing.  Like I've seen that with her and a lot of

12   other people.  It was a common thing he did."

13           THE COURT:  So your offer, what you seek to designate

14   is on page 62, line 7, to line what?

15           MR. HOLZBERG:  The entirety of her answer is done on

16   line 21 it looks like.

17           THE COURT:  That's what you seek to offer?

18           MR. HOLZBERG:  Correct.  No.  And in addition to that,

19   we would also like to offer specific instances in which Mario

20   sexually harassed Ms. Vila.  Ms. Vila testified in her

21   deposition that there were instances in which Mr. Orantes made

22   inappropriate comments to her.  On page 20 of her deposition

23   transcript, she said that he would call her upstairs -- I'm now

24   reading, this is line 10.  "Before I got to go upstairs or get

25   on the elevator, he was already down in the hallway and he just

1   leaned on me like, I can't explain it --" wait.  Sorry.  "He

2   rubbed himself on me and he made like an inappropriate

3   comment."

4   "Q.  Do you happen to recall the inappropriate comment that he

5   made to you?

6   "A.  I do.  My fiancé at the time, that's now my husband, he

7   gave me a purse, like some designer bag.  He said something on

8   the lines of that bag would look really nice with no clothes on

9   and just heels.

10  "Q.  To the best of your recollection, did he ever make any

11  other inappropriate sexual comments to you?

12  "A.  Yeah.  Like, whenever I wore a skirt, he would make

13  comments about my legs, that I have really nice legs, long

14  legs, or just, you know, like where was I going.  Was I going

15  to get some.  Like things like that.  This is in front of

16  people.  You know, wherever you ran into him, he would say

17  things like this to humiliate you."

18          Your Honor, we'd proffer this testimony as under the

19  city law the standard for punitive damages is a conscious

20  disregard to the rights of others as well as the rights, the

21  conscious disregard of the rights of the aggrieved individual.

22  This is directly relevant to punitive damages.  The fact that

23  Mario was not only sexually harassing the plaintiff, but was

24  also disregarding the rights of other female employees at

25  Metropolitan Dental.

1          THE COURT:  The Federal Rules of Evidence are going to

2     govern here.  Obviously, the identity of the claims are going

3     to help inform the judgment under Rule 401 and 403.  But, I'm

4     not allowing inadmissible evidence to come in just because

5     you've brought a city claim.  Okay?

6          So, I'm not going to allow testimony about any

7     inappropriate behavior that Ms. Vila experienced without doing

8     an analysis under 404(b).  Okay?

9          Now, with respect to the plaintiff's own experience of

10    interactions that were appropriate or inappropriate, but her

11    own experience of interactions with Mr. Orantes or Dr. Cohen,

12    that's a different matter.  To the extent that Ms. Vila was a

13    witness to those interactions between the plaintiff and one of

14    the defendants, there would not be a problem of whether or not

15    it would be otherwise admissible under Rule 404(b).  Okay.

16         MR. HOLZBERG:  Your Honor, with respect, I understand

17    what your Honor is saying with respect to the city law.

18    However, it is our contention that these acts that were

19    experienced by Ms. Vila are also admissible to show a pattern

20    under the federal law.

21         THE COURT:  So, same ruling.  It doesn't matter if it

22    is a city or a federal or a state statute.  The nature of the

23    claims here will inform the relevance analysis.  But the

24    evidence has to be admissible under the Federal Rules of

25    Evidence.

1          MR. HOLZBERG:  Your Honor, why is it not admissible?

2          THE COURT:  So, it's your job to explain to me why it

3    is admissible.  Number one.  Number two, have you finished

4    making your designations or do you have other designations you

5    wish to make?

6          You've made one for page 62, and one for page 20.

7          MR. HOLZBERG:  Your Honor, I would also put forth that

8    it is admissible under Rule 804 of the Federal Rules of

9    Evidence.

10         THE COURT:  Okay.  But, do you have any other

11   designations you wish to make so we can do an analysis of

12   admissibility?

13         MR. HOLZBERG:  Yeah, your Honor.  May I have an

14   opportunity to compile a list that I can provide later tonight?

15   I can go through now to give specific pages, but I would

16   appreciate an opportunity to be able to submit a letter later

17   on with more specific proffers as to not waste the Court's

18   time.

19         THE COURT:  I appreciate that, Mr. Holzberg.  Thank

20   you.

21         So, the designations should have been done long before

22   now.  Just putting that on the record.  You may of course make

23   your designations this evening in writing.  Provide them to

24   defense counsel so he has an opportunity to discuss them with

25   you and see whether or not there is an objection or not.

1   Perhaps some of this is going to be entirely admissible in the

2   defendant's view and there will be no objection.  Perhaps there

3   will be objections.  I don't know.

4          But the first point is to make your designations, in

5   writing, provide them to defense counsel, discuss them with

6   defense counsel.  And when we meet tomorrow morning at

7   9 o'clock, we can address anything that you have designated to

8   which there is an objection.

9          Now, Mr. Wims has an overarching objection on the

10  finding of unavailability.  But there is a separate issue, even

11  if I find the witness is unavailable, is the testimony that you

12  intend to designate tonight admissible.  Okay?

13         MR. HOLZBERG:  Understood.

14         THE COURT:  Thank you.

15         MR. HOLZBERG:  Thank you.

16         THE COURT:  How much time is left in your direct

17  examination, Mr. Holzberg?

18         MR. HOLZBERG:  Of the plaintiff, your Honor?

19         THE COURT:  Yes.

20         MR. HOLZBERG:  Maybe 45 minutes.

21         THE COURT:  Okay.

22         MR. HOLZBERG:  I'm not positive.  But if I had to

23  estimate, I would think in that neighborhood.

24         THE COURT:  Okay.  I don't want you revisiting what

25  you went over today.

1           MR. HOLZBERG:  Understood.

2           THE COURT:  Okay.  Good.  And then when her

3  examination is done, then you'll be calling Mr. Orantes?

4           MR. HOLZBERG:  That's correct, your Honor.

5           THE COURT:  Okay.

6           MR. HOLZBERG:  After Mr. Orantes, we'll be calling --

7  we'll either seek to use Ms. Vila's testimony or we'll be

8  calling then the plaintiff's mother.

9           THE COURT:  Then that's it?

10          MR. HOLZBERG:  Correct.

11          THE COURT:  Okay.  So, it sounds like this trial will

12  end tomorrow with its presentation of evidence.

13          MR. HOLZBERG:  More likely than not.

14          THE COURT:  Okay.  So, counsel, I don't know that we

15  need another charging conference.  Nobody had an objection to

16  my last charge.  I looked at your requests, they were the same

17  as the requests that you'd made originally.  There is very

18  little change to make to my charge.

19          I have to say, I'm going to think about whether I need

20  to give a curative instruction at all with respect to the

21  allegations about, I don't know if it's insurance fraud or

22  medical malpractice or whatever.  I don't expect that to be a

23  big part of this case.  It's come in just as sort of background

24  to set the context for the relationship.

25          You know, I'm trusting, Mr. Holzberg, that this is not

1    the basis of your summation to try to smear the dental practice

2    with other misconduct, other than the harassment of female

3    employees.  Am I right?

4           MR. HOLZBERG:  That's correct, your Honor.

5           THE COURT:  Okay.  So counsel should think about

6    whether I need to charge the jury with respect to these

7    collateral issues.  I'm not sure I do at this point, but I'm

8    going to keep listening, and, of course, I will listen to

9    counsel if you have a specific request.

10          And with that, good night.  I'll see you at 9 a.m.

11          (Adjourned until February 7, 2023, at 9 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

PAUL COHEN

Direct By Mr. Holzberg . . . . . . . . . . . .48
Cross By Mr. Wims  . . . . . . . . . . . . . .64
Redirect By Mr. Holzberg . . . . . . . . . . .84
Recross By Mr. Wims  . . . . . . . . . . . . .88
Redirect By Mr. Holzberg . . . . . . . . . . .90

 FORTESA QORROLLI

Direct By Mr. Holzberg . . . . . . . . . . . .93

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   FORTESA QORROLLI,

 4                    Plaintiff,              New York, N.Y.

 5             v.                             18 Civ. 6836 (DLC)

 6   METROPOLITAN DENTAL
     ASSOCIATES, D.D.S. - 225
 7   BROADWAY, P.C., et al.

 8                    Defendants.

 9   ------------------------------x

10                                           February 7, 2023
                                             9:00 a.m.
11
     Before:
12
                         HON. DENISE COTE,
13
                                             U.S. District Judge
14

15                          APPEARANCES

16

17
     DEREK SMITH LAW GROUP, PLLC
18        Attorneys for Plaintiff
     BY:  ZACHARY I. HOLZBERG
19            DEREK SMITH
              CONSTANCE MOLLICK
20
     DAVID WIMS, LAW OFFICES
21        Attorneys for Defendants
     BY:  DAVID C. WIMS
22              and
     GILWITLAW
23        Attorneys for Defendants
     BY:  MARK D. GILWIT
24          (Trial resumed; jury not present)

25            THE COURT:  Please be seated.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1           We don't have Mr. Wims.  My deputy is checking.

 2           Mr. Gilwit, do you know where Mr. Wims is?

 3           MR. GILWIT:  I spoke to him approximately 20 minutes

 4  ago.  He was on a train on his way.  He only lives in Brooklyn.

 5  I am not certain.  He expected to be here by 9.

 6           Would you like me to try to make the phone call

 7  outside?

 8           THE COURT:  My deputy has been in touch by phone with

 9  someone who indicates that Mr. Wims is walking into the

10  courthouse.

11           MR. GILWIT:  Thank you.

12           THE COURT:  Mr. Holzberg, please.

13           MR. HOLZBERG:  We are going to stay in the courtroom,

14  your Honor.

15           THE COURT:  Thank you.

16           Counsel, thank you for your patience.  I have no idea

17  where Mr. Wims is and why he wasn't here on time at 9:00.

18           I am going to get off the bench, and my deputy will

19  tell me if and when he arrives.  Thanks so much.

20           (Recess)

21           THE COURT:  Mr. Wims, it's 9:15.  We have been waiting

22  for you for 15 minutes.

23           MR. WIMS:  I apologize, your Honor.  There were some

24  train complications.

25           THE COURT:  We have a number of matters to deal with

1    this morning.  I don't want anyone to be late again.

2           Two issues.  A juror has indicated that it's difficult

3    for the juror to hear you, Mr. Wims, when you move away from

4    the mic when examining witnesses.  So please make sure you stay

5    close to the mic so that they can hear what you have to say.

6           Secondly, a juror told my deputy that they were

7    confused by the absence of the term sexual harassment on the

8    court reporter's monitor when that was the witness' or somebody

9    used the term.  I don't know if it was the witness or the

10   lawyer.

11          I am going to explain to the jury that we have

12   wonderful court reporters, that the monitor includes and the

13   court reporter's work includes the use of shortcuts and that

14   the transcript that's finally prepared has everything written

15   out, that they are assisted in that process of preparing a

16   transcript by the technology that they use and that counsel

17   have an opportunity, should there be any errors or omissions

18   from the transcript, always to make an application to correct

19   the transcript.

20          Any objection to me giving such advice in substance to

21   the jury when they arrive?

22          MR. HOLZBERG:  Good morning, your Honor.  No objection

23   from the plaintiff.

24          MR. WIMS:  No objection from defendants, your Honor.

25          THE COURT:  Thank you.

1          We have the issue of Ms. Vila's testimony to address,

2     but I want to make sure I know all the issues that counsel want

3     to address first thing this morning.

4          Besides Ms. Vila's testimony, Mr. Holzberg, do you

5     have any other issue you need to address with the Court this

6     morning?

7          MR. HOLZBERG:  Not at this time, your Honor.  Thank

8     you.

9          THE COURT:  Thank you.

10         Mr. Wims, other than Ms. Vila's testimony, is there

11    any other issue the defendants wish to raise first thing this

12    morning?

13         MR. WIMS:  There is not, your Honor.

14         THE COURT:  I'm prepared to finish listening to

15    counsel on the issue of availability and then to rule.

16         I received this morning a letter, it bears the date

17    February 6 and was docketed February 6, in which the plaintiff

18    provides on page 4 the designations of the Vila transcript that

19    the plaintiff wishes to offer.

20         Mr. Holzberg, did you confer with defense counsel last

21    night, as I requested, with respect to these proposed

22    designations?

23         MR. HOLZBERG:  Your Honor, I submitted the letter with

24    the written designations, as your Honor instructed.  I did not

25    hear from defendants' counsel.

1    However, as I mentioned, I specifically spoke with Mr.

2    Wims during a meet and confer after the pretrial conference in

3    which we discussed these portions as well, and at that point

4    Mr. Wims told me that he did not consent, he objected to us

5    proffering any portion of Ms. Vila's transcript at that time.

6          THE COURT:  But you did not identify these specific

7    designations until last night.  Am I right?

8          MR. HOLZBERG:  I identified to Mr. Wims during our

9    meet and confer the specific pages on which Ms. Vila's

10   testimony that we intended to offer.

11         THE COURT:  So these pages that are listed here or

12   another set of pages?

13         MR. HOLZBERG:  Correct.

14         THE COURT:  Which?

15         MR. HOLZBERG:  The pages that are listed in the letter

16   are the pages that I indicated to Mr. Wims in our meet and

17   confer.  It was the same subject testimony that we had

18   discussed.

19         THE COURT:  There are 11 pages here.  Just for

20   clarity, Mr. Holzberg, so I understand what's transpired, you

21   identified these 11 pages to Mr. Wims, these specific 11 pages,

22   during the meet-and-confer process?

23         MR. HOLZBERG:  I identified specific pages to Mr.

24   Wims.  I honestly don't recall the exact 11 pages that I

25   mentioned.  I know that I did mention pages that are contained

 1   within this letter, your Honor.

 2           THE COURT:  Last night is the first time you made the

 3   specific designations and certainly the first time you did so

 4   in writing.

 5           MR. HOLZBERG:  In writing, yes.

 6           THE COURT:  Thank you.

 7           MR. HOLZBERG:  Yes.

 8           THE COURT:  I'll hear from counsel with respect to the

 9   availability issue, and I'll address that first.

10           Mr. Holzberg, did you want to add anything to your

11   argument about the unavailability of Ms. Vila?

12           MR. HOLZBERG:  Yes, your Honor.  Thank you.

13           Just one minor note.  I know that counsel had

14   indicated that there was an issue with respect to notice, given

15   the fact that the letter is dated February 2.  I just wanted to

16   clarify, for purposes of the record, I understand that the

17   letter is dated on February 2.  However, I didn't receive the

18   letter until yesterday afternoon.  So as soon as I received the

19   letter, I would say within less than half an hour I sent it to

20   counsel immediately.  That was when I emailed it to the Court.

21   I understand that the letter is dated the 2nd, but I only

22   received it yesterday afternoon.

23           THE COURT:  Who did you receive it from?

24           MR. HOLZBERG:  I received it from a woman by the name

25   of Anna, last name is Gomez, Anna Gomez, at 1:17 p.m., and she

1    is from the medical practice.

2            THE COURT:  Did you subpoena Ms. Vila?

3            MR. HOLZBERG:  We did, your Honor.

4            THE COURT:  Thank you.

5            Anything else, Mr. Holzberg, before I turn to Mr.

6    Wims, on the availability issue?

7            MR. HOLZBERG:  Sure.

8            The only thing that I would say with respect to

9    availability specifically is, the letter very clearly states

10   that the patient cannot attend court trial sessions due to her

11   medical conditions.  I think it's very clearly articulated that

12   she is unavailable, and I think it's offensive that Mr. Wims is

13   claiming that it's not clear from the record as to her

14   availability.

15           THE COURT:  Thank you, Mr. Holzberg.

16           Mr. Wims, do you wish to be heard on the issue of

17   availability of Ms. Vila?

18           MR. WIMS:  Yes, your Honor.

19           First of all, to respond to counsel's comments about

20   the letter being dated February 2 and it not being presented

21   until the 6th, Judge, you were clear in your rulings, in your

22   directives at the final pretrial conference that Mr. Holzberg

23   was to give notice as soon as practicable.  It was his

24   obligation to determine if his witness was going to appear in

25   person or otherwise, and he had means to enforce that via the

1    subpoena.

2           Now, these 11 pages of excerpts that Mr. Holzberg put

3    in the letter last night at approximately 11:00 is the first

4    time I'm seeing these passages and him proffering them.  We

5    discussed two of those pages in a meet and confer prior to the

6    pretrial conference.

7           Additionally, nothing has changed since we were here

8    in October, Judge.  Ms. Vila ostensibly has the same

9    conditions.  They allowed her to go to work, where she was

10   deposed.  She could come here.  The Court can control the

11   number of people in the courtroom as necessary.  And then the

12   testimony of Ms. Vila is from 2010.  She is testifying to

13   events that allegedly transpired prior to the statute of

14   limitations period.

15          MR. HOLZBERG:  Your Honor, we are addressing

16   availability.

17          MR. WIMS:  Excuse me, sir.

18          MR. HOLZBERG:  Not the substance.

19          MR. WIMS:  Excuse me, sir.

20          The probative value of what Ms. Vila testified to in

21   her deposition is outweighed grossly so by the prejudice to

22   defendants.

23          Counsel is attempting to get in through the back door

24   what has been ruled improper through the front.  We ask -- most

25   importantly, Judge, they have not met their burden of proof as

1   to unavailability.  Therefore, we ask that you exclude the

2   deposition testimony.  If Ms. Vila shows up, she can testify.

3   Thank you, your Honor.

4         THE COURT:  We were told yesterday she is not going to

5   appear, so the plaintiff isn't seeking to enforce the subpoena.

6         Am I right, Mr. Holzberg?

7         MR. HOLZBERG:  I mean, if the marshals would enforce

8   the subpoena, we would be happy to do that, but she is not

9   going to appear.

10         THE COURT:  Mr. Holzberg, I have no application from

11   you.  I was told yesterday she would not be appearing.

12         MR. HOLZBERG:  Correct.

13         THE COURT:  If you are going to ask me now to send out

14   the marshals, I really needed more notice than this.

15         MR. HOLZBERG:  Understood.

16         THE COURT:  Thank you so much.

17         MR. HOLZBERG:  Your Honor, may I just add one more

18   thing with respect to availability?

19         THE COURT:  Certainly.

20         MR. HOLZBERG:  Thank you.

21         One thing that Mr. Wims mentioned -- Ms. Vila also

22   updated me since, obviously, the last trial and said that she

23   is not working anymore.  She had -- she texted me and said:  I

24   had to leave my job because I could no longer work.  And I also

25   know that she is unavailable because she said that she had a

1   surgery recently and is in recovery from her surgery.  She is

2   no longer working, even though previously when her deposition

3   was taken she was at the time.

4           THE COURT:  Mr. Holzberg, you have not given me any of

5   those facts until this very moment.  This is a rebuttal to the

6   defendants' response to your showing.  Now we have new facts

7   I'm hearing for the very first time.  They weren't presented to

8   me at the final pretrial conference.  They weren't yesterday.

9   Thank you very much, but this is too late to hear these new

10  facts.

11          MR. HOLZBERG:  The only reason I mentioned with

12  respect to her working, I don't think that has anything to do

13  with her availability.  I am just addressing it because counsel

14  raised it, to preserve the record.

15          THE COURT:  The fact that her deposition was taken

16  while she was at work has been discussed with the Court.  It

17  was discussed back in October.  It was discussed every time we

18  have had this discussion.  This is not a new topic.

19          MR. HOLZBERG:  Understood.  I just want to clarify

20  that currently she is no longer working.

21          THE COURT:  I don't know that.  That's your

22  representation, counsel, based on something she apparently said

23  to you.  Thank you very much.

24          Counsel, I expect we have a jury.  Does anyone need a

25  recess before we begin?

 1               Excuse me one second.

 2               Does anyone need a brief recess before we begin?

 3               MR. WIMS:  One minute, Judge.

 4               THE COURT:  Great.  Just make it brief.  Thank you so

 5     much.

 6               (Recess)

 7               THE COURT:  Ms. Qorrolli, you can retake the stand.

 8     Thank you.

 9               MR. HOLZBERG:  Your Honor, should I wait to take the

10     podium until the jury comes in?

11               THE COURT:  Yes.  I am going to have those initial

12     remarks I mentioned.

13               MR. HOLZBERG:  Understood.

14               THE COURT:  Thank you so much.

15               (Jury present)

16               THE COURT:  Good morning, ladies and gentlemen.  I

17     want to thank you all for the effort you have made to be on

18     time so we can complete this trial as efficiently as possible.

19               Two observations by me before we continue with the

20     witness' testimony.

21               One, I've advised counsel to make sure to use the mic

22     so that you can hear clearly.  If at any time you have

23     difficulty hearing the witness or an attorney, please just

24     raise your hand.  I'll try to be alert to that and make sure

25     that you can hear every word.

1          Secondly, there was a question one of you mentioned to

2     my deputy about the court reporters' screen that they use as

3     they are doing their job and make a transcript.  Let me just

4     give you some brief background about court reporters in this

5     district.  We are so fortunate.  We have an extraordinary group

6     of court reporters who are highly trained and who provide us

7     with extraordinary service.  Our transcripts in this district

8     are noted for being produced quickly but accurately.  To do

9     that, they have lots of modern equipment and training and use

10    shorthand terms and all kinds of tricks to keep going quickly,

11    no matter how quickly a witness or an attorney is speaking or

12    how quickly I'm speaking.

13         So one of the things they do in the evening, they have

14    long days, is help translate all the shorthand terminology and

15    shortcuts they have used into a full English transcript.  And

16    counsel have access to a transcript and can point out to me, or

17    to each other and then me, any errors or omissions that they

18    see in it.

19         If at the end of this trial, during your

20    deliberations, you make a request to see any portion of the

21    testimony just to refresh your recollection, I am confident we

22    will be able to provide to you an accurate transcript of what

23    was said.  That's how the process works.  I don't want anyone

24    to be distracted or confused by what might appear on a screen

25    as the court reporters are doing their work.  Thank you so

1   much.

2          I am going to advise Ms. Qorrolli, you are still under

3   oath.

4          Counsel.

5          MR. HOLZBERG:  Thank you, your Honor.

6   FORTESA QORROLLI, resumed.

7   DIRECT EXAMINATION

8   BY MR. HOLZBERG:

9   Q.  Good morning, Tessa.

10  A.  Good morning.

11  Q.  When we left off yesterday do you remember that we were

12  discussing some instances of unwelcomed sexual advances from

13  defendant Orantes?

14  A.  Yes, I do.

15  Q.  And we went through some of your diary?

16  A.  Yes, we did.

17         THE COURT:  Actually, you didn't, counsel.  The diary

18  was used to refresh the witness' recollection.  Thank you.

19         MR. HOLZBERG:  Understood.

20         THE COURT:  Thank you so much.

21  Q.  Tessa, you heard defendants' counsel say in his opening

22  statement that you were only touched twice.  Is that true?

23  A.  That's not true.

24  Q.  Can you please elaborate.

25         THE COURT:  Excuse me, counsel.  Can you place a

1    question directly to the witness so she knows what you are

2    asking her.

3              MR. HOLZBERG:  Sure.

4              THE COURT:  Thank you so much.

5    Q.  You said that you were touched more than twice?

6              MR. WIMS:  Objection.

7              THE COURT:  Sustained.

8              You could ask how many times the witness was touched,

9    counsel, if you'd like to inquire.

10             MR. HOLZBERG:  Thank you, your Honor.

11   Q.  How many times were you touched?

12   A.  There is not a number of times.  It happened randomly,

13   continuously over the six and a half years.  You don't have a

14   number of times.

15   Q.  Tessa, what did you do in response to these unwelcomed

16   sexual advances?

17             MR. WIMS:  Objection.

18             THE COURT:  Sustained as to form.

19   Q.  Tessa, you said that you found Mario touching you and

20   making comments about you to be unwelcomed, right?

21             MR. WIMS:  Objection.

22             THE COURT:  Sustained as to form.

23   A.  Yes.

24             THE COURT:  The answer is stricken.

25             MR. WIMS:  Move to strike.

1          THE COURT:  It is stricken, counsel.

2          MR. WIMS:  Thank you.

3   Q.  Tessa, when Mario touched you, what did you do in response?

4          MR. WIMS:  Objection.

5          THE COURT:  Overruled.

6   A.  I rejected him.  I wanted nothing to do with that, and then

7   I went and I complained to Dr. Cohen.  I told him why he was

8   touching me and what he was attempting to do to me.

9   Q.  Can you please describe to the jury what you told Dr. Cohen

10  when you complained to him about Mario.

11  A.  I told Dr. Cohen in very simple words, I said:  I'm not

12  going to allow myself to be sexually harassed like the other

13  women here to get away with not working.

14         MR. WIMS:  Objection.

15         THE COURT:  Overruled.

16  A.  Not seeing patients and not getting the blame for things

17  that you blame on me all the time.

18  Q.  When Mario complained about you to Dr. Cohen, what was your

19  reaction?

20  A.  I was humiliated.  I worked very hard.  Actually, that

21  hygiene department was completely on me and my mother there.  I

22  gave in all my hours.  I gave in all my days that to place, six

23  days a week, 12, 13 hours a day there.  With leaving my house

24  and getting back home, I would leave at 6 a.m. and get back

25  home at 9 p.m. at times.  Still to be threatened or to be

1    constantly blamed for things that had nothing to do with me

2    just because I wasn't having sex with him, and I wasn't

3    allowing him to get what he wanted from me, was not right.

4    Q.  Can you please tell us what information you shared with

5    Dr. Cohen supporting your claim that Mario was harassing you.

6            THE COURT:  Can you focus us on a time frame, counsel.

7    Thank you.

8            MR. HOLZBERG:  Sure.

9    Q.  Tessa, do you recall how many times you complained to

10   Dr. Cohen?

11   A.  I don't recall the number of times to be exact.  Throughout

12   the six and a half years, as soon as this vicious cycle

13   started, I went right to Dr. Cohen because in the beginning I

14   knew that he was the one to go to.  Even though I was scared of

15   losing my job for complaining, I still went to him.  This

16   happened from the very beginning that I started complaining to

17   Dr. Cohen.  I know there was a few incidents that maybe it was

18   more severe where I remembered I wrote down on my diaries, but,

19   in general, every time that I got a chance to speak to

20   Dr. Cohen I told him about it.  And the main thing was, don't

21   believe him.  What he's telling you about me is not true.

22   Q.  Can you clarify what you just said.

23   A.  Yes.  Him telling Dr. Cohen that I wasn't seeing enough

24   patients, that patients were leaving because I wasn't fast

25   enough, I wasn't attending to patients.  Traps not being

1   cleaned in rooms that assistants working with doctors had to

2   take care of.  Mario wanted me in every single corner of that

3   office taking care of every single thing in that office.

4   Everything that went wrong was my fault.

5   Q.  Do you recall any specific instances that you complained to

6   Dr. Cohen in 2015?

7   A.  I do.  Beginning of, I want to say, in January of 2015

8   specifically, I said to myself I am going to go there and I am

9   going to tell him about Marina and Faten and I don't care what

10  happens at this point.

11       So I went to Dr. Cohen.  Again, I was just tired of

12  all the threats and all the blaming, and I told Dr. Cohen -- he

13  was complaining to me about his Yelp reviews, why are they so

14  horrible.  Why are patients waiting three hours.  So I told

15  Dr. Cohen.  I said:  Well, you know you have four of us on the

16  floor.  I said:  That's what you think.  But in fact you only

17  have me and my mom.  And he was confused.  What do you mean?  I

18  said:  Well, Marina and Faten are constantly disappearing with

19  Mario.  That workload is falling on us.  Dr. Cohen's response

20  was:  You're delusional and get your act together, or I am

21  going to throw you the fuck out.

22  Q.  What did you tell Dr. Cohen about Marina?

23  A.  I told Dr. Cohen that Mario comes to takes Marina off the

24  floor.  So they are inside rooms, they are inside the lunch

25  room.  She is not around to work.  And he does the same thing

1    with Faten and it's just me and my mom working.  And I

2    specifically mentioned the incidents that occurred with Marina

3    in the lunch room and that how every time she goes into that

4    room she comes out with lipstick all over lips and she doesn't

5    care.  She was flaunting it.  She wasn't shamed.  She wanted us

6    to know what was going on, in fact.

7              MR. WIMS:  Objection.

8              THE COURT:  Sustained.  That last comment is stricken.

9    Q.  Is there anything else that you told Dr. Cohen about

10   Marina?

11   A.  I don't recall.

12   Q.  Is there anything that would refresh your recollection?

13   A.  My diary.

14   Q.  Please take a look at Plaintiff's Exhibit 3, page 3, in the

15   middle of the page.

16   A.  Yes.

17   Q.  Does that refresh your recollection?

18   A.  Yes.  I told Dr. Cohen that Marina and him were in a

19   personal relationship and I walked in on them.

20             MR. WIMS:  Objection.

21   A.  In the lunch room behind the door and found them kissing.

22             THE COURT:  Overruled.

23   Q.  To the best of your recollection, what was Dr. Cohen's

24   response to that?

25   A.  His end response to this specific incident that I just

1  explained was:  You're delusional.  I want you to go back to

2  work.  If you don't like it, you can get the fuck out.  That

3  was his response always to every complaint that I had.  Made me

4  believe that in fact I'm just, you know, delusional and

5  gaslighting me to think that I should just not believe

6  technically what I'm skiing and what I'm witnessing is not true

7  and that I should accept it and work.  Otherwise, get out and

8  don't work.

9  Q.  You also said that you told Dr. Cohen about Faten?

10 A.  Yes.

11 Q.  Can you remind the jury who Faten is, please.

12 A.  Faten is also the other hygienist that was on the floor

13 with us.  There was four of us there:  My mom, myself, Faten,

14 and Marina.

15 Q.  What did you tell Dr. Cohen about Faten?

16       THE COURT:  Again, counsel, could you give us an

17 approximate time.  Could you focus the witness on a time

18 period, if she has a recollection.

19       MR. HOLZBERG:  Sure.

20 Q.  Tessa, we were just talking about your complaint in January

21 of 2015, correct?

22 A.  Yes.

23 Q.  In January of 2015, what did you then tell Dr. Cohen about

24 Faten?

25 A.  I told Dr. Cohen that Faten is not seeing patients.  We are

1   seeing 30 patients, and she is seeing four, five patients a day
2   and Dr. Cohen, I was actually surprised, but I was happy.  He
3   said:  Well, get me the day sheets.  So we got him the day
4   sheets.  So he saw my page was around noon, 1:00.  I had like
5   15, 18 patients, close to 20 patients.  So did my mom.  Faten
6   had like three or four patients and Dr. Cohen was in shock:
7   All he said to Mario was fire her.  After he fired her, Mario
8   came downstairs and begged me to tell Dr. Cohen that that's not
9   true and that I should bring Faten back.
10  Q.  What did you say in response?
11  A.  I did that.  I went to Dr. Cohen and Dr. Cohen actually
12  said:  I don't want to hear it.  It's over.  But Mario, after
13  that incident, came down specifically to room 2 in the general
14  practice and told me:  Tessa, I want you to go up there and I
15  want you to tell Dr. Cohen that that's not true.  Faten did see
16  patients, but she just didn't write them on the sheet.  I
17  didn't want to do that because I needed a hygienist who
18  actually worked so we can clear this heavy workload.  But
19  because I didn't want to be fired by Mario, I actually went up
20  there and I told Dr. Cohen that exactly and Dr. Cohen, for
21  once, said:  No, I am not bringing her back.  And that was it.
22  Q.  Do you recall any other instances that you complained to
23  Dr. Cohen in 2015?
24  A.  I don't recall.  Many incidents that I complained.
25  Throughout the years it was a constant -- whenever I get the

1  chance to complain --

2           MR. WIMS:  Objection.  Nonresponsive.

3           THE COURT:  After the witness said, I don't recall,

4  the remainder is stricken.

5           MR. WIMS:  Thank you.

6  Q.  Tessa, when did you resign from your employment at MDA?

7  A.  On May of 2016.

8  Q.  Do you recall any specific complaints that you made to

9  Dr. Cohen about Mario's unwelcomed sexual advances in 2016?

10          MR. WIMS:  Objection.

11          THE COURT:  Sustained.  Rephrase.

12 Q.  Do you recall complaining to Dr. Cohen about Mario and the

13 way that he was treating you in 2016?

14 A.  Yes.  I called Dr. Cohen on the phone and I complained to

15 him.

16 Q.  Do you recall specifically when that was in 2016?

17 A.  I don't.  No, I don't recall exactly what month.

18 Q.  Is there anything that would refresh your recollection?

19 A.  My diary.  If it is in there it will.

20 Q.  Please take a look at Plaintiff's Exhibit 3, page 18, in

21 the middle of the page.

22 A.  Yes.

23 Q.  When do you recall complaining to Dr. Cohen in 2016?

24 A.  March of 2016.

25 Q.  Can you please tell us the substance of your complaint to

1   Dr. Cohen in March of 2016.

2   A.  Yes.  It also had to do with patients waiting three hours.

3   Again, I told Dr. Cohen, it's just me and my mom.  The other

4   hygienists are not around.  They are disappearing.  Dr. Cohen

5   said:  What are you talking about?  Then I mentioned the letter

6   that I got faxed over in October and then I said:  Remember

7   that letter that I got faxed over that you saw.  And I said:

8   I'm pretty sure that now I'm confirming everything that I've

9   been telling you all these years is true.  And he just said:

10  You're full of crap.

11  Q.  Do you recall anything else that you told Dr. Cohen in

12  March of 2016?

13  A.  About Marina.  That was when I had complained about Marina

14  and him at that point being in a sexual relationship.

15          MR. WIMS:  Objection.

16          THE COURT:  Overruled.

17  Q.  Do you remember specific details of what you discussed with

18  Dr. Cohen?

19  A.  No.

20  Q.  Is there anything that would refresh your recollection as

21  to specific details of your conversation?

22  A.  My diary.  If I wrote it in there, like I said, it's in

23  there, yes, I can read it.

24  Q.  Please take a look again at Plaintiff's Exhibit 3, page 18.

25  Please read the middle of the page and let me know when you are

1   done.

2   A.  Yes.  I said:  I'm tired of being blamed and because I'm

3   not having sex with Mario, he is putting this blame on me and

4   I'm tired of it.  And you need to get me out of this situation.

5   Again, his end response to all of these complaints in this

6   diary that I had written up was:  You're full of crap.  But I

7   stated to him:  I am not going to give in sexually to this

8   animal for him to sexually abuse me just to get away with not

9   working here.  And that was it.

10  Q.  Do you recall any other instances in which you complained

11  to Dr. Cohen in 2016?

12  A.  No.

13  Q.  Is there anything that would refresh your recollection?

14  A.  Diary.

15  Q.  Please direct your attention to Plaintiff's Exhibit 3, page

16  18 and 19.

17  A.  Yes.

18  Q.  Can you please tell us what you recall in terms of other

19  complaints you made in 2016.

20  A.  Yes.  In 2016, April, one month before I quit, I gave in a

21  letter to Dr. Cohen, and that letter stated everything that

22  Mario was putting us through as far as work and threatening and

23  blaming us and trying to get Dr. Cohen to fire me and my

24  mother.

25          And when I gave that letter to Dr. Cohen, he was in

1    the lunch room.  I went to him.  He was waiting to conduct a

2    meeting.  I had an envelope and a letter and I said:

3    Dr. Cohen, I have something to give you.  He said:  What's

4    this?  I said:  Everything I've been complaining to you about

5    in person.  This letter is going to make you understand that

6    what Mario has been telling you about us is not true.  I want

7    you to gather all these incidents since we have been here that

8    I am going to tell you on this paper, if you read it all,

9    you'll see how many of these incidents are just bullshit.

10   That's not true, what Mario is saying about us.

11          Dr. Cohen said:  Sure, I'll read.  I told him:

12   Please.  I beg you with everything I have, just please read

13   this letter, because this is like close to the end of me.  I

14   want you to read it and I want you to help me out here.  And

15   Dr. Cohen sure said:  Sure, I'll read it.  I said:  Promise me.

16   I begged to him as I was crying to him.  He knew something

17   wasn't right because he saw me crying and begging him.

18          I gave him the letter.  And as I gave him the letter,

19   Mario comes by and saw me and my mom there and asked:  What's

20   going on?  I just said nothing.  I went back to work.  We went

21   back downstairs.  Mario then came after me, I want to say a few

22   minutes, maybe 10, 15 minutes after, put me in a room and asked

23   me:  What's going on?  I said nothing.  He interrogated me,

24   asking me why I was upstairs, what was I doing alone with

25   Dr. Cohen.

1        I didn't tell him that I gave him a letter because I

2   was afraid that he was going to go and take the letter from

3   Dr. Cohen without Dr. Cohen actually reading it.  And so then

4   he said:  Listen.  Come here.  He hugged me.  And he said:

5   Everything is going to be OK, I promise.  I won't let anything

6   happen to you.  I said:  Yeah, I know.  And then we opened the

7   door.  I left the room and that was it for that day.

8        So I waited that night.  I waited the morning of.  The

9   next day I called Dr. Cohen myself on the phone and I said:

10   Dr. Cohen, did you read this letter?  He said no.  I said:  I

11   need to you read the letter, please.  I said:  You have to read

12   it.  I didn't want to tell him, if you are not going to read it

13   and do nothing about it, I am going to come to a point that I

14   am going to have to leave.

15        I kept begging him, thinking that he will understand,

16   this is a desperate thing, I need you to read this, because I

17   can't continue being verbally, mentally harassed the way I was

18   for six and a half years, every single day having to come to

19   work, knowing that I am giving it my 100 percent, my hours my

20   days here, and yet I am still being put to be the bad one, that

21   I'm not doing my job.

22        So he said:  Tessa, I'll read it, I promise I'll read

23   it.  I said:  Dr. Cohen, again, I'm not going to be one of

24   these women.  I am not to going to let myself be sexually

25   harassed, have sex with Mario to keep this job, so please read

1  this letter.

2          MR. WIMS:  Objection.

3          THE COURT:  Overruled.

4  A.  He said:  Sure, I'll read it.  I have to get back to what I

5  was doing, but I'll read it.

6  Q.  To the best of your knowledge, did there ever come a point

7  in time that Dr. Cohen read your letter?

8          MR. WIMS:  Objection.

9  A.  I believe he read it.

10          THE COURT:  Excuse me.  I am going to let you inquire,

11  but the objection is sustained as to form.

12  Q.  Tessa, the letter that you gave to Dr. Cohen, do you recall

13  specifically when that was?

14  A.  Yes.  May of -- April of 2016.

15  Q.  Do you remember approximately when in April that was?

16  A.  No.  Maybe beginning of April.  I want to say 6, 7 because

17  I know that May 16 I quit.  So it was like a month and a half,

18  maybe, after I gave the letter that I quit.

19  Q.  Soy you continued working about a month and a half after

20  that letter?

21  A.  Right.  I didn't give the letter and storm out on Dr. Cohen

22  the way he said that I did, no.  I would never do that.  I

23  wanted to keep my job.  I needed to keep my job.  I hope that a

24  month and a half would have been enough time for him to get

25  back to me.  I didn't give him the letter and storm out

1   unprofessionally that same day with my mom and leave him

2   shorthanded.  I didn't do that, even after everything I have

3   endured there.

4   Q.  The letter that you gave to Dr. Cohen in April of 2016, was

5   there any mention of sexual harassment in that letter?

6   A.  No.

7   Q.  Why not?

8   A.  For one, throughout the six and a half years I mentioned

9   this to Dr. Cohen in regards to myself, in regards to what I

10  have seen with others, many times, continuously.

11          Secondly, I was very afraid that if I wrote that on

12  that letter and if Mario got Dr. Cohen and took that letter

13  away from him, which almost happened, that Mario would not let

14  Dr. Cohen read that letter, and then Mario would find out that

15  I am telling this to Dr. Cohen and that he would fire me.  I

16  was afraid of retaliation, yes, and the possibility of being

17  sued for a defamation, because Mario would never accept what he

18  did, so I just didn't write that in.  But I did write

19  everything that he was doing there because of the fact that I

20  was not having sex with Mario, because other hygienists that

21  were --

22          MR. WIMS:  Objection.

23  A.  -- they were not going through the same thing as me.

24          THE COURT:  Ladies and gentlemen, I am going to let

25  the plaintiff describe her thought process to you as she has.

1    Thank you.

2           The objection is overruled.

3    Q.  Tessa, you testified yesterday that Mario had control over

4    your schedule, is that true?

5    A.  Absolutely.

6    Q.  Were there instances where Mario sent you home from work?

7    A.  Yes, there was.  Not many instances.

8           THE COURT:  Excuse me.  You have answered yes.

9    Q.  How many times?

10   A.  I don't recall exactly how many times.  Not many times.

11   The reason for that is because --

12          THE COURT:  Excuse me.  You have answered the

13   question.  Thank you.

14   Q.  Did Mario ever tell you why he was sending you home?

15   A.  No reason.  Just get out.  Take your stuff and go home.  To

16   prove to Dr. Cohen --

17          THE COURT:  Excuse me.

18          THE WITNESS:  Sorry.

19          THE COURT:  Ms. Qorrolli, this works with you

20   listening carefully to the question asked and answering that

21   and not adding.  Thank you.

22   Q.  Tessa, were there also instances in which Mario changed

23   your hours?

24   A.  Yes.

25   Q.  How many times did he do that?

1   A.  Can't recall.  Many times.

2   Q.  Tessa, you also testified that your mom was working at MDA

3   the same time that you were, right?

4   A.  Yes.

5   Q.  And Mario was also your mother's supervisor?

6   A.  Yes, he was.

7   Q.  How would you describe Mario's relationship with your

8   mother?

9   A.  Horrible.  Not good.

10  Q.  Why?

11  A.  Why?

12          THE COURT:  Excuse me, counsel.  That question, it's

13  too vague.

14          MR. HOLZBERG:  Understood.

15  Q.  Tessa, can you please explain to us what you observed that

16  forms the basis of your opinion that they didn't have a good

17  working relationship.

18  A.  Yes.  My mom would work in the same department as us, and

19  every time that she would see Mario take me to rooms, she would

20  come around after us and linger around the area, whether it was

21  in the general practice department or the periodontal

22  department.  When Mario would see her, Mario would tell her:

23  Why are you following us?  Mind your own business.  This is an

24  employee/employee thing.  So he knew that my mom was not going

25  to allow something like that to happen.

1           MR. WIMS:  Objection, your Honor.  The witness can't

2    testify as to what Mr. Orantes knew.

3           THE COURT:  Yes.  That portion of the answer is

4    stricken.

5    Q.  Was there anything else that formed the basis of your

6    opinion?

7    A.  Dr. Cohen trusted my mom a lot, and he loved my mom a lot.

8           THE COURT:  OK.  I'm striking the answer.  I am going

9    to ask you to listen to the question and respond to that

10   question.  You can describe conversations.  You can describe

11   what you saw.

12   Q.  Can you please describe what, if anything else, you saw

13   between Mario and your mother that supports your view on their

14   relationship?

15   A.  Yes.  Mario called my mom names.  Mario actually told my

16   mom that you're old and called her names like:  You're a

17   fucking moron.  You're a fucking idiot.  Slammed the door on

18   her when she attempted to walk in on us once.  He turned around

19   and he told her:  Again, mind your own business, you have no

20   business being here, and slammed the door in her face and

21   called her Hitler, and that she wanted to control me around

22   that office and know where my whereabouts were.

23   Q.  How did it make you feel that Mario treated your mother

24   that way?

25   A.  Horrible.  It hurt.  Not because she is my mother, but she

1    has a very good work ethic.  She is a very hard worker.

2              MR. WIMS:  Objection.

3    A.  Never says no.  Never complains.  So Mario was treating her

4    this way because of me.

5              MR. WIMS:  Objection.

6              THE COURT:  Yes.  Stricken.  The jury shall disregard.

7    Q.  Tessa, when you made all of these complaints to Dr. Cohen,

8    to the best of your knowledge, was Mario aware of the fact that

9    you were complaining?

10             MR. WIMS:  Objection.

11             THE COURT:  Sustained as to form.

12   A.  Yes, he was.

13             THE COURT:  Excuse me.

14             THE WITNESS:  Sorry.

15             THE COURT:  The answer is stricken.

16   Q.  Do you have any knowledge as to whether or not Mario was

17   aware of you complaining to Dr. Cohen?

18   A.  Yes, I do.

19             THE COURT:  Yes or no.  And you answered yes.

20             Next.

21   Q.  What makes you say yes to that?

22   A.  The vicious cycles were getting a lot worse.

23             MR. WIMS:  Objection.  Nonresponsive.

24             THE COURT:  Yes.  Sustained.  Stricken.

25   Q.  Did there ever come a point in time that Dr. Cohen told you

1    that he had discussed your complaints with Mario?

2    A.  Yes.

3    Q.  To the best of your recollection, in response to you

4    complaining about Mario to Dr. Cohen, what did Dr. Cohen tell

5    you?

6    A.  I was always full of crap.  You're delusional.  That's not

7    true.  This is bullshit.  He did nothing about it.  Totally

8    disregarded those complaints.

9    Q.  When you complained to Dr. Cohen, what, if any, action did

10   he take in response to your complaints?

11              MR. WIMS:  Objection, your Honor.  She just answered

12   that question.

13              THE COURT:  Overruled.  You may answer.

14   A.  No action.

15   Q.  Was there any investigation that took place?

16   A.  No.

17   Q.  Were you ever interviewed in connection with any complaints

18   that you made?

19   A.  No, never.

20   Q.  To the best of your knowledge, did you observe or were you

21   present for any of your coworkers being interviewed in

22   connection with your complaints?

23   A.  No, never.

24   Q.  What do you feel that Dr. Cohen should have done in

25   response to your complaints?

```
 1              MR. WIMS:  Objection.

 2              THE COURT:  Sustained.

 3   Q.  Tessa, to the best of your recollection, what policies were

 4   in place to protect against sexual harassment in the workplace?

 5   A.  There were no policies.

 6              MR. WIMS:  Objection.

 7              THE COURT:  Overruled.

 8   A.  There were no policies.  There was no handbook, no

 9   policies, no human resources, no one that we knew you can go

10   and complain to aside from Dr. Cohen, who was the only person,

11   the owner.  No office, specific office, designated area,

12   nothing.

13   Q.  You complained to Dr. Cohen because he was the owner?

14   A.  Right, yeah.  He was the only one that I could complain to.

15   Q.  Aside from yourself, when you complained to Dr. Cohen, did

16   there ever come a point in time where you observed other

17   employees complaining to Dr. Cohen about Mario?

18              MR. WIMS:  Objection.

19              THE COURT:  Overruled.

20   A.  Yeah.  I observed Mercedes complaining.  Also, there was a

21   letter that was sent to the office.

22              MR. WIMS:  Objection.  The question was about what she

23   observed, Judge.

24              THE COURT:  Yes.  The last part of the answer is

25   stricken.
```

1    Q.  Who was Mercedes, again?

2    A.  Mercedes worked at the periodontal department.  She was a

3    receptionist there.

4    Q.  Now, you mentioned that there was a letter that you had

5    seen?

6    A.  Yes.

7    Q.  And do you recall when that letter -- or when you first saw

8    that letter?

9    A.  It got sent on October of 2015.  I don't recall now --

10            MR. WIMS:  Objection, your Honor.  She answered.

11            THE COURT:  Overruled.

12   A.  I don't recall if I saw it the same day or the very next

13   day, but that's when I saw it, around that time.

14   Q.  How did you see that letter for the first time?

15   A.  That letter got faxed to every fax machine in 225 Broadway,

16   and one of the receptionists that got the letter came to me and

17   said, look --

18            MR. WIMS:  Objection.

19            THE COURT:  Overruled.

20            MR. WIMS:  Hearsay.

21            THE COURT:  Overruled.

22   A.  I took the letter and I made a copy of it and I kept a copy

23   for myself.

24   Q.  You're saying that that letter was faxed to every machine

25   in the entire office?

1   A.  Correct, yes.

2   Q.  To the best of your recollection, around October of 2015,

3   how many fax machines would you say were in the office at that

4   time?

5   A.  Seven, eight.  The building department may have had way

6   more than just that, but just considering how many departments

7   we had in the general practice downstairs was Bonnie's room,

8   eight fax machines.

9   Q.  Who is Bonnie?

10  A.  Bonnie is Dr. Cohen's sister.

11  Q.  Does she also work at MDA?

12  A.  She does, yes.

13  Q.  What's her role at MDA?

14  A.  She works at the accounting office, I think, just

15  overseeing everything that's there.

16  Q.  Do you recall what happened immediately after that letter

17  came into the office?

18  A.  Yeah.  Everyone saw Mario running around.  There was a huge

19  commotion, him trying to go to every department, grab this fax,

20  that letter that got sent over.

21          MR. WIMS:  Objection, your Honor.  Plaintiff is

22  testifying --

23          THE COURT:  Yes.  Sustained.  Stricken.

24          You may inquire as to what the witness saw.

25          MR. HOLZBERG:  Sure.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  What did you see immediately after the letter was faxed to

2  the office?

3  A.  I saw Mario running around, taking this letter from every

4  department.  And everyone was on their feet kind of talking

5  about it.  That's why I inquired about it.  What's going on?

6  Then they showed me the letter.  This just came in.  That's

7  when I took a copy of it.

8  Q.  To the best of your recollection, what was that letter in

9  regard to?  Without giving specifics of what was in the letter,

10  what was that letter about?

11         MR. WIMS:  Objection.

12         THE COURT:  Counsel, I'll let you ask a leading

13  question.

14  Q.  Do you recall the substance of that letter?

15         THE COURT:  No.  I am going to let you ask a leading

16  question, counsel, that would require a yes or a no as an

17  answer.

18         MR. HOLZBERG:  Understood.

19  Q.  Did you read the letter?

20  A.  Yes.

21  Q.  After reading the letter, can you please describe in sum

22  and substance the nature of that letter?

23         THE COURT:  No.  Counsel, I'm doing it the reverse

24  way.  I'm saying, please put in your question what the

25  substance is and ask the witness whether or not she agrees with

1   your characterization.  I am letting you ask a leading

2   question, counsel.

3          MR. HOLZBERG:  I understand that, your Honor.  I

4   apologize.  I am not sure what you are trying --

5          THE COURT:  That's fine.  Move on to your next topic.

6          MR. HOLZBERG:  I'll try.

7   Q.  Tessa, did that letter contain allegations of sexual

8   harassment against Mario?

9   A.  Yes, it did.

10          MR. WIMS:  Objection.

11          THE COURT:  Overruled.

12   A.  Yes, it did.

13   Q.  As far as you know, did Dr. Cohen receive that letter as

14   well?

15   A.  Yes.

16   Q.  Can you please describe for the jury your reaction the

17   first time you read this letter.

18          MR. WIMS:  Objection.  Asked and answered.

19          THE COURT:  Overruled on that ground.

20          Counsel, I am not going to ask for her emotional

21   reaction.  I am not going to let you inquire as to a mental

22   process that would allow her to talk about whatever she would

23   like to talk about.

24          MR. HOLZBERG:  Understood.  Thank you.

25   Q.  What was your emotional reaction in response to reading

1    that letter for the first time?

2    A.  I wasn't shocked.  I wasn't surprised.  I read it and I

3    said:  I already know all of this.

4    Q.  Once this letter was sent to the office, did anything

5    change?

6    A.  Nothing.  In fact.

7              THE COURT:  Excuse me.  You have answered.  Thank you.

8    Q.  In what way did things not change?

9    A.  It added fuel to the fire.  No action was taken --

10             MR. WIMS:  I'm sorry, your Honor.  I was unable to

11   hear that last -- the beginning of the answer.

12             THE COURT:  The witness said:  It added fuel to the

13   fire.

14             MR. WIMS:  Thank you.

15             THE COURT:  Next question.

16   Q.  Can you please explain what you mean by that, that it added

17   fuel to the fire?

18             MR. WIMS:  Objection.

19             THE COURT:  Sustained.

20   Q.  When you say that nothing changed, how so?

21             MR. WIMS:  Objection.  Asked and answered.

22             THE COURT:  Sustained on other grounds.

23   Q.  After that letter was received at the office, did Mario's

24   behavior change at all?

25             MR. WIMS:  Objection.  Asked and answered.

1        THE COURT:  Sustained.

2   Q.  To the best of your knowledge, was Mario ever disciplined

3   in connection with that letter?

4   A.  Never.

5        MR. WIMS:  Objection.

6        THE COURT:  Overruled.

7   Q.  What was your answer?

8   A.  Never.  In fact --

9        THE COURT:  Excuse me.  Please.  Thank you.

10  Q.  Tessa, did you have a conversation with Dr. Cohen in regard

11  to this letter that you are talking about?

12       MR. WIMS:  Objection.  Asked and answered.

13       THE COURT:  Overruled.

14  A.  Yes, I did.

15  Q.  Do you recall when that was?

16  A.  Again, I know that it was one of the incidents that I

17  mentioned in the diary.  I don't recall exactly when.  But it

18  was the incident where Dr. Cohen complained about those Yelp

19  reviews, about that patients are waiting too long.  That's when

20  I mentioned the letter and we discussed the letter.  That's the

21  reason why these things are going on here, because of what's

22  going on in the office and what Mario is doing.

23       MR. WIMS:  Objection.

24       THE COURT:  Overruled.

25  A.  And Dr. Cohen's answer was, you're delusional.  You're full

1   of crap.  That's not why.

2   Q.  So that letter that you are referring to was in October of

3   2015?

4   A.  Yes.

5   Q.  You then gave Dr. Cohen your letter in April of 2016?

6   A.  Correct.

7   Q.  The letter that you gave Dr. Cohen in 2016, did you give

8   that letter to anyone else at MDA?

9   A.  I gave it to Bonnie, his sister.

10  Q.  Do you recall when you gave that letter to Bonnie?

11  A.  Maybe a few days, if not a week after I gave it to

12  Dr. Cohen, after I saw that Dr. Cohen was not reaching out to

13  me because he didn't read it.  So I said, I am going to give it

14  to Bonnie.  I know Bonnie going is to read it --

15          THE COURT:  Excuse me.  I am going to strike the

16  answer.  It's very important that the jury have your testimony,

17  but how this works is that you have to answer the question

18  that's asked and not volunteer other things that haven't been

19  asked.

20          THE WITNESS:  OK.

21  Q.  I think my question to you, Tessa, was when you gave that

22  letter to Bonnie.

23  A.  A few days, if not a week later.

24  Q.  And you said that that was -- I'll rephrase.

25          Why did you give the letter to Bonnie?

 1   A.   Because I didn't hear back from Dr. Cohen.

 2   Q.   How did it make you feel that you hadn't heard back from

 3   Dr. Cohen?

 4        MR. WIMS:   Objection, overruled.

 5   A.   Humiliated.

 6        THE COURT:   Next.

 7   Q.   Do you recall where you were when you gave the letter to

 8   Bonnie?

 9   A.   Yes.

10   Q.   Where were you?

11   A.   The lunch room on the first floor.  I was clocking out for

12   lunch.

13   Q.   Do you recall anything else that you specifically said to

14   Bonnie at that time?

15   A.   Yes.  I said I want you to give this letter to Dr. Cohen.

16   Please make sure that he reads it.  I gave it to him.  I

17   haven't heard back from him.  Because I want to make sure that

18   you give this letter to Dr. Cohen.

19   Q.   Tessa, did there come a point in time that you decided to

20   leave your employment at MDA?

21   A.   Yes.  May of 2016.

22   Q.   What made you decide to leave?

23   A.   The fact that nothing was changing.  It was becoming

24   unbearable.  I felt that I wasn't able to wake up anymore to go

25   to work.  I was scared every day.  I just -- I didn't really

1    see purpose to life.  I thought that this is it for me.  I

2    didn't see a way out.

3           MR. WIMS:  Objection.  Your Honor.  We ask that it be

4    stricken.  The question was why.

5           THE COURT:  Overruled.

6    Q.  Were you done with your answer, Tessa?

7    A.  Yes.

8    Q.  Tessa, when you say that you couldn't wake up in the

9    morning, can you please describe what you mean by that?

10          MR. WIMS:  Objection.

11          THE COURT:  Overruled.

12   A.  I couldn't sleep.  That's one.  Waking up in the morning,

13   going to work meant that I had to endure the pain that I was

14   going through with Mario, the verbal abuse, the mental abuse,

15   the threats.  And every day that I would survive I would think,

16   OK, I got through today and how am I going to get through

17   tomorrow.  So waking up in the morning meant that I had to go

18   to work and deal with Mario again, and I couldn't do it

19   anymore.

20          THE COURT:  Do you want a break?

21          THE WITNESS:  No.  I'm OK.

22          THE COURT:  Ms. Qorrolli.

23          THE WITNESS:  I'm OK.  Thank you.

24          THE COURT:  Counsel, please continue.

25          MR. HOLZBERG:  Thank you, your Honor.

1    Q.   Tessa, how was Mario's behavior towards you impacting you?

2              MR. WIMS:   Objection.

3              THE COURT:   Overruled.

4    A.   I was very humiliated, very.   Like I said, I gave him my

5    everything.   It was my first job.   I wanted.

6              MR. WIMS:   Objection, your Honor.

7              THE COURT:   Sustained.

8              Next question.

9    Q.   Tessa, when Mario -- strike that.

10             When you decided that you needed to leave your

11   employment, how were you feeling emotionally at that point?

12             MR. WIMS:   Objection.

13             THE COURT:   Overruled.

14   A.   Emotionally not stable, not at all.   I came to a point

15   where I told my mom, I said:   I just don't want to live anymore

16   because I don't know what to do.   I wasn't stable at all.   It

17   was getting very difficult for me to get myself together to go

18   to work, to focus at work, because throughout the day my only

19   concern was how to stay away from Mario, how to survive the day

20   and not be fired, prove myself to Dr. Cohen that what he's

21   saying is not true about me.   So it was just a continuous cycle

22   of mental and verbal abuse and sexual harassment that I just

23   could not stand anymore.

24             MR. WIMS:   Objection.

25             THE COURT:   Overruled.

```
 1                Next question, counsel.

 2                Mr. Holzberg, ask a question, or are you finished?

 3                MR. HOLZBERG:  No.  I am going to ask another

 4      question, your Honor.

 5                THE COURT:  Thank you.

 6      Q.  Tessa, you said that you didn't want to live anymore?

 7      A.  No, I didn't.

 8      Q.  You didn't want to live anymore?

 9      A.  No.

10      Q.  How did that make you feel?

11                MR. WIMS:  Objection.

12                THE COURT:  Sustained.

13      Q.  Do you recall when you first thought that?

14                MR. WIMS:  Objection.

15                THE COURT:  Overruled.

16      A.  After many years of this vicious cycle, towards 2014 and

17      '15 and '16, that's when it really came to the point where I

18      couldn't take it anymore.

19      Q.  In what ways was it affecting you?

20                MR. WIMS:  Objection.

21                THE COURT:  Sustained.

22      Q.  Was there any impact on your work?

23      A.  Absolutely, yes.

24      Q.  Can you please explain how your work was impacted.

25                MR. WIMS:  Objection.
```

```
1              THE COURT:  Overruled.
2   A.  It impacted my work physically because that overload fell
3   completely on me, 30, 40 patients a day at one time, 50
4   patients in a 12-hour day.  And also mentally because mentally
5   I had to deal with people, with patients, not with objects, so
6   I had to be there.  But in fact my mind was not there.  It was,
7   oh, my God, when am I going to hear Tessa, 1806 or Tessa, call
8   your mom and get upstairs and be threatened to be fired.  And
9   then a few days or a few hours later, Mario comes downstairs
10  and tells me, oh, I love you and everything will be OK.  I
11  won't let anything happen to you.  Hug me and kiss me.
12              MR. WIMS:  Objection.
13              THE COURT:  Excuse me.
14              Counsel, that wasn't responsive to the question you
15  asked.  I am not going to strike it, but I am going to ask the
16  witness again, please, to listen to the question that's asked
17  and respond to that.  Counsel, I am going to ask you to move
18  on.  OK.
19              MR. HOLZBERG:  Sure.
20  Q.  Tessa, as a result of deciding to -- that you needed to
21  leave your employment, did you change any of your daily habits
22  or routines?
23  A.  Yes.
24              THE COURT:  That's an answer, yes.
25  Q.  In what way did you change your daily habits or routines?
```

1   A.  I decided that I needed to seek help.

2   Q.  Anything else?

3   A.  I don't recall.

4   Q.  When you say that you decided that you needed to seek help,

5   can you please explain.

6   A.  Yeah.  It was either I am going to quit, which wasn't an

7   option at the time, or I will give in to Mario and he will

8   leave me alone, just like the other hygienists who were left

9   alone.

10            MR. WIMS:  Objection.

11            THE COURT:  Sustained.  Stricken.

12  Q.  At what point did you decide that you needed to seek

13  treatment?

14  A.  Sometime in 2015.

15  Q.  Did there come a point in time that you ultimately sought

16  treatment?

17  A.  Yes, I did.

18  Q.  Had you previously ever sought treatment before related to

19  your mental health?

20  A.  Never in my life.

21  Q.  Had you previously taken any medications related to your

22  mental health?

23  A.  Never.

24  Q.  How would you describe your mental health prior to working

25  at MDA?

```
 1              MR. WIMS:  Objection.

 2              THE COURT:  Overruled.

 3   A.  I was a normal human being.  I was very happy, very

 4   content.  I didn't have anxiety.  I didn't have panic attacks.

 5   I wasn't scared of everything.  I was happy.  I had no reason

 6   to doubt life or think that this is all there is to life.  I

 7   had a beautiful life.  I had a family to go home to.  I had

 8   everything I wanted.

 9   Q.  When did you start feeling anxiety while working at MDA?

10              MR. WIMS:  Objection.

11              THE COURT:  Sustained.

12   Q.  Tessa, how would you say that your mental health changed as

13   a result of working at MDA?

14              MR. WIMS:  Objection.

15              THE COURT:  Overruled.

16   A.  My mental health.  Anxiety all the time.  Any time that

17   there is a meeting or there is anywhere that I --

18              THE COURT:  I'm sorry.

19              Your mental health changed because you started to

20   experience anxiety.  Any other changes in your mental health?

21              THE WITNESS:  Panic attacks, PTSD.

22              MR. WIMS:  Objection.

23              THE COURT:  Overruled.

24   Q.  Tessa, when you say that you were feeling anxious, can you

25   please describe to the jury how you were feeling anxious.
```

 1              MR. WIMS:  Objection.

 2              THE COURT:  Sustained as to form.  Excuse me.  I'm

 3   sorry.  Waiting for the next question here.

 4   Q.  Tessa, can you please describe what the anxiety felt like

 5   to you.

 6              MR. WIMS:  Objection.

 7              THE COURT:  Overruled.

 8   A.  It felt like my heart wanted to just rip out of my chest,

 9   not knowing what to expect all day, 12 hours, in that state of

10   mind.  Any time that Mario passed by, my body shook.

11              MR. WIMS:  Objection.

12              THE COURT:  Overruled.

13   Q.  How often would you say that you felt that anxiety?

14   A.  Every single day.

15   Q.  Tessa, you also said that you started experiencing panic

16   attacks?

17   A.  Yes.

18   Q.  Can you please describe what it felt like when you had a

19   panic attack.

20              MR. WIMS:  Objection.

21              THE COURT:  Overruled.

22   A.  It felt like I couldn't breathe.  I started to cry.  That

23   was daily.  That was every time that I walked into that

24   building that's what I felt, until I got over that and said OK,

25   let's go through this day now.  Let's see what's going to

1    happen.

2    Q.  How often would you say that you had panic attacks while

3    working at MDA?

4             MR. WIMS:  Objection.

5             THE COURT:  Overruled.

6    A.  Very frequently.  Definitely every time Mario called me

7    upstairs, that was all the time.  Even times when Mario passed

8    by and didn't even approach me, because I would be afraid that

9    he would come back and approach me.  Every time that I saw

10   Mario.  Again, I wasn't afraid of Mario.

11            MR. WIMS:  Objection, your Honor.

12            THE COURT:  Excuse me.  There is an objection, so you

13   should pause.  After the objection is sustained, the remainder

14   of the answer is stricken.

15            Counsel, do you want to place another question?

16            MR. HOLZBERG:  Yes.  I apologize.  Was there a ruling

17   with respect to the objection?

18            THE COURT:  I thought I said it was sustained.  Sorry,

19   counsel, if I wasn't clear.

20            MR. HOLZBERG:  No problem.

21   Q.  Tessa, what other symptoms did you feel while you had a

22   panic attack?

23            MR. WIMS:  Objection.

24            THE COURT:  Overruled.

25   A.  Shaking, crying, heart beating really fast, my hands

1   getting really shaky, watery.  My body very hot.  I felt like I

2   couldn't breathe.

3   Q.  Tessa, you had also cried at work?

4   A.  All the time.

5   Q.  Tessa, when you said that you sought help, who ultimately

6   did you speak with?

7   A.  Dr. Lee, Seung Ho Lee.

8   Q.  What kind of doctor is Dr. Lee?

9   A.  He's a psychiatrist.

10  Q.  Had you ever seen a psychiatrist before?

11  A.  Never.

12  Q.  Do you recall when you started seeing Dr. Lee?

13  A.  June of 2015.

14  Q.  Where did you see Dr. Lee?

15  A.  In his office, New Jersey.

16  Q.  About how many times would you say that you saw Dr. Lee?

17  A.  In the beginning, twice a month, and then it was every

18  month.

19          MR. WIMS:  Objection.  The answer was nonresponsive,

20  Judge.

21          THE COURT:  Overruled.

22  Q.  How long did you see Dr. Lee?

23  A.  I saw Dr. Lee, my last visit with him sometime in 2021.

24  Q.  Was there a reason that you stopped seeing Dr. Lee in 2021?

25  A.  Yeah.  I became pregnant.

1   Q.  Why was you being pregnant a reason to stop seeing Dr. Lee?

2   A.  I didn't want to take the medication anymore, for that

3   reason, of course, and also I didn't want to relive having to

4   see Dr. Lee, speak to him, and having those thoughts of MDA

5   come back to me, so I just thought it would affect my baby.  I

6   didn't want to deal with that anymore.  I just wanted to focus

7   on my pregnancy.

8   Q.  As a result of your sessions with Dr. Lee, did Dr. Lee

9   prescribe you any medications you were just mentioning?

10  A.  Yes, he did.

11  Q.  What kind of medications did Dr. Lee prescribe you?

12  A.  Antianxiety, antidepressant, and for PTSD.  That was the

13  big thing.  Yeah.

14  Q.  Do you recall the specific medications that he had

15  prescribed to you?

16  A.  Yeah.  Klonopin, Lexapro, and Zoloft.

17  Q.  Did there come a point in time that you took those

18  medications?

19  A.  Yes.

20  Q.  Had you ever taken those medications previously?

21  A.  Never.

22  Q.  How did you feel taking those medications for the first

23  time?

24  A.  That fact alone was just as depressing as what I was going

25  through at work, honestly.  I never took medication in my life

1   and here I now, after I graduate, after I get a nice job, I'm

2   now employed, now I have to take medication to keep my job.  So

3   that didn't feel well at all.

4   Q.  What was the reason that you decided to speak with Dr. Lee?

5   A.  Because I couldn't cope with the situation at work.  I

6   didn't know how I was going to continue doing this.  As I

7   stated, quitting wasn't an option because of bills and things I

8   had to take care of.  I needed to keep my job.  So I thought I

9   am going to see somebody because this person is going to help

10  me cope and teach me ways where I can ignore what Mario is

11  doing and somehow overcome it, even if it meant taking

12  medication.

13  Q.  Do you have any prior history of any psychiatric disorder?

14          MR. WIMS:  Objection.  Asked and answered.

15  A.  Never.

16          THE COURT:  Overruled.

17  A.  Never.

18  Q.  Tessa, how long did you take those medications for?

19  A.  The whole time that I needed it.  From when I started

20  seeing him in June of 2015, up until I quit and then after

21  that, if I needed it occasionally or as needed, Dr. Lee said I

22  could continue to take it.  When I became pregnant, I said I'm

23  not taking this crap anymore and that's it.

24  Q.  Do you recall the dosage of each medication that Dr. Lee

25  prescribed to you?

1            MR. WIMS:  Objection.

2            THE COURT:  Overruled.

3  A.  I recall the Klonopin for sure because that was the main

4  one that Dr. Lee wanted me to take daily, regardless of whether

5  I had contact with Mario or not, but especially when Mario

6  called me, he said, I want you to be in a room and take the

7  medication and wait five minutes and then see Mario -- the

8  Klonopin --

9            THE COURT:  Excuse me.  That is stricken.  I believe

10  the question was, do you recall the dosage.

11            THE WITNESS:  Yes.

12            THE COURT:  Do you recall the dosage?

13            THE WITNESS:  Yes, I do.

14            THE COURT:  What was that dosage?

15            THE WITNESS:  Five milligrams for Klonopin.

16  Q.  Do you remember the dosages of any of the other medications

17  you were prescribed?

18  A.  Yes.  Twenty milligrams for Lexapro and then I believe 100

19  milligrams for Zoloft.

20  Q.  Did there ever come a point in time that those dosages were

21  changed?

22  A.  Yes.

23  Q.  Do you recall when that was?

24  A.  Shortly after, not too long after, the Klonopin increased

25  to ten milligrams.

1   Q.  The Klonopin dosage was increased?

2   A.  Yes.  To ten milligrams.

3        MR. WIMS:  Objection, your Honor.  It's nonresponsive.

4   The question was when.

5        THE COURT:  Sustained.  Stricken.

6        You may inquire, though.

7   Q.  You said that the Klonopin dosage increased?

8   A.  Yes.

9   Q.  So you began seeing Dr. Lee while you were still employed

10  at MDA, right?

11  A.  Correct.

12  Q.  Around June of 2015?

13  A.  Yes.

14  Q.  And then you left MDA in May of 2016, right?

15  A.  Yes.

16  Q.  Did you feel as though the treatment that you were

17  receiving from Dr. Lee was helping you?

18  A.  No.  In the beginning, I felt that maybe it was just

19  mentally believing that it was going to help me, but after a

20  few visits I remember telling Dr. Lee, this is not --

21       THE COURT:  Excuse me.  You weren't asked about the

22  conversation.  Thank you.

23  Q.  As a result -- strike that.

24       In May 2016, at that time what made you decide to

25  quit, in May of 2016?

```
1              MR. WIMS:  Objection.  Asked and answered.

2              THE COURT:  Sustained.

3   Q.  What was your mental state in May of 2016?

4              MR. WIMS:  Objection.  Asked and answered.

5              THE COURT:  Sustained.

6   Q.  Tessa, what, if any impact, did you working at MDA have on

7   your relationships with your family?

8   A.  It had a lot of impact.  I no longer had the energy to be

9   around my family.  At the end of the day, I was very drained of

10  all that energy, of any desire to continue socializing.  I

11  didn't really spend much time with family.  I went straight

12  home.  And I went straight to bed.  At times I didn't shower.

13  I did not even remove my scrubs because I just wanted to fall

14  asleep, forgot about everything.  Again, because the next

15  morning it was hard for me to get myself to go to work.  I

16  would just get up with the scrubs on, just brush my teeth and

17  walk out the door.  I wouldn't have breakfast or nothing.

18  Q.  When you say that it impacted you socially, how so?

19             MR. WIMS:  Objection.  She just answered that, your

20  Honor.

21             THE COURT:  Overruled.

22  A.  Socially, at the time I was 21, and I was looking forward

23  to being with friends after work, enjoying life.  Because of

24  everything that I was enduring throughout the day, I was left

25  with no energy for anything else.  I didn't meet with any
```

1   friends.  I didn't go to any social events that I was invited

2   to.  I just didn't have the energy for it.  I didn't have

3   anything to really say because my mind was not there.  I was

4   constantly in fear.  So I didn't want to go anywhere where I

5   was feeling lost and not present.  So I just cut a lot of

6   social connections with a lot of friends, a lot of family, and

7   I was just to myself.

8   Q.  Tessa, as you sit here today, how would you say that your

9   experience at MDA has impacted your current mental state?

10          MR. WIMS:  Objection.

11          THE COURT:  Overruled.

12   A.  I am just tired of it all.  I mean, I still feel anxiety.

13   I can't get myself to just see outside the box anymore.  I'm

14   constantly scared still, constantly overthinking, constantly

15   worrying.  And I can't get myself to feel that, OK, it's over

16   now and nothing can harm you anymore and you have your life

17   ahead of you.

18   Q.  Tessa, do you feel as though your experience at MDA has

19   changed you?

20   A.  Forever.

21          MR. HOLZBERG:  I have no further questions.  Thank

22   you.

23          THE COURT:  Cross-examination.

24          Excuse me, Ms. Qorrolli.  Do you need a break?

25          THE WITNESS:  No.  I'm OK.  Thank you.

1    CROSS-EXAMINATION

2    BY MR. WIMS:

3    Q.  Good morning, Ms. Qorrolli.

4    A.  Good morning, Mr. Wims.

5    Q.  Now, you testified yesterday that Mr. Orantes allegedly

6    made physical contact with you, contact with you on four

7    different occasions, correct?

8    A.  Many different occasions, but I may have remembered

9    specific four, yes.

10   Q.  You listed specifically those four yesterday, correct?

11   A.  Correct.

12   Q.  And those are the only instances that you recall, correct?

13           MR. HOLZBERG:  Objection, your Honor.

14           THE COURT:  Overruled.

15   A.  As listed on my diaries, yes.  There are many incidences

16   that I can think that Mario touched me, but, yes.

17   Q.  But you don't remember any other instances, correct?

18   A.  No, I don't recall.

19   Q.  In fact, you didn't remember those four.  You had to refer

20   to your diary to refresh your recollection, correct?

21   A.  I had to refer for the timing, yes.  I don't remember when

22   it happened, what month, what year.  For the timing, yes, I had

23   to refer to that.

24   Q.  Now, Mario, or I'll refer to him as Mr. Orantes,

25   Mr. Orantes blamed you for long patient wait times, correct?

1    A.  Correct, yes.

2    Q.  Do you think that that constitutes sexual harassment?

3    A.  That doesn't constitute sexual harassment, no.

4    Q.  Now, when you were disciplined, you were disciplined a

5    number of times at Metropolitan Dental, correct?

6    A.  All the time.

7    Q.  And there were issues with you disappearing on the clock,

8    correct?

9            MR. HOLZBERG:  Objection, your Honor.  Foundation.

10           THE COURT:  Overruled.

11   Q.  Correct?

12   A.  That is not correct.

13   Q.  Wait a minute.  Didn't Mr. Orantes require you to text him

14   every day because you had previously disappeared during work

15   hours?

16   A.  No, that's not true.

17   Q.  That never happened?

18   A.  That never happened.

19   Q.  Why did you text him every day?

20   A.  He told me to text him every day.

21   Q.  Did he say why?

22   A.  No, he didn't.  He just said:  Going forward, I want you to

23   text me every day.  It was over a conversation, something we

24   had discussed.  He was yelling and screaming at me about why

25   patients are not getting cleanings, why patients are waiting so

1   long.  He just said:  Going forward, I want you to text me

2   where you are all the time.  It was because he needed to

3   take --

4           THE COURT:  Excuse me, Ms. Qorrolli.  The same rules

5   are going to apply here.  You can't just speak on and on.  You

6   have to listen to the question that's asked and answer that.

7           THE WITNESS:  Got it.

8           THE COURT:  I am going to strike your answer.

9           The same rule that I applied when your lawyer was

10  asking you questions is the same rule that applies now.

11          THE WITNESS:  I understood.

12  Q.  You have cried a number of times during this trial,

13  Ms. Qorrolli.

14  A.  Yes.

15  Q.  You testified that you were crying all the time when you're

16  at Metropolitan Dental as an employee, correct?

17  A.  Correct, yes.

18  Q.  Is there something in your past that causes you to cry

19  excessively?

20  A.  Metropolitan Dental, yes.

21  Q.  You said you were born in Kosovo?

22  A.  Yes, I was.

23  Q.  Was that during the political unrest and war that occurred

24  there in the '90s?

25  A.  No.

1  Q.  You weren't there then?

2  A.  No.

3  Q.  When were you there?

4  A.  I came here when I was --

5  Q.  I didn't ask you when you came here, ma'am.

6  A.  Prior to 1996, and the war occurred at 1999.  So I was

7  already here in America.

8  Q.  Was there -- withdrawn.

9      Why did you leave Kosovo?

10 A.  For the political situation.

11 Q.  You fled Kosovo due to political unrest and the political

12 climate, correct?

13 A.  Correct.

14 Q.  Do you know what effect that had on your emotional state?

15 A.  No effect.  I was five years old.

16 Q.  Ma'am, my question is, do you know what effect that had on

17 your emotional state?

18      MR. HOLZBERG:  Objection, your Honor.  Asked and

19 answered.

20      THE COURT:  Overruled.

21 A.  It had no effect.

22 Q.  OK.

23      MR. WIMS:  I asked that that be stricken, Judge.

24      THE COURT:  Overruled.

25 Q.  You testified that you saw Dr. Lee, a psychiatrist in New

1   Jersey, correct?

2   A.   Correct, yes.

3   Q.   Did you tell Dr. Lee that you fled Kosovo under those

4   conditions?

5   A.   No.

6   Q.   You did not?

7   A.   I did not.

8   Q.   Why not?

9   A.   Because I didn't go to see Dr. Lee for that reason.   That

10  did not affect me.   That's not why I was there.

11  Q.   You are telling me that you saw a psychiatrist who didn't

12  elicit your personal history, ma'am?

13          MR. HOLZBERG:   Objection, your Honor.

14          THE COURT:   Overruled.

15  A.   He asked me about my personal history, and everything I

16  told him had nothing to do with me feeling the way I was

17  feeling.

18          MR. WIMS:   Your Honor, she has answered.

19  Q.   Essentially, you wanted to be in charge.   You didn't like

20  the fact that when you're an employee, you have to answer to --

21  at MDA you have to answer to Dr. Cohen --

22          MR. HOLZBERG:   Your Honor, objection.

23          THE COURT:   Sustained as to form.

24  Q.   You didn't like being told what to do at work, did you?

25  A.   That's not true.

1   Q.   You did like it?

2   A.   I did not mind being told what to do at work if it had to

3   do with my line of work and if it had to do with something I

4   truly did incorrectly.  If that was the case, I apologized, I

5   asked for criticism.  I even told Dr. Cohen many times, I wish

6   that we would come up here, there would be a legitimate reason

7   that we were being yelled for or being threatened for.  It was

8   just me and my mom.  It wasn't any other hygienists.  So I had

9   no --

10  Q.   Excuse me.

11            THE COURT:  Mr. Holzberg, address your comments to me.

12            If you have an objection, speak to me.

13            Ladies and gentlemen, you understand, as you have

14  heard here, we have a rule in court.  Lawyers get to ask

15  questions.  Witnesses are supposed to respond to the question

16  and not just speak on and things they'd like to add.  That's

17  how it works.

18            I am going to ask you to slow down, Ms. Qorrolli,

19  because there are objections being made by lawyers.  It's hard

20  for me to rule and interrupt you when you keep speaking through

21  those objections.

22            I am going to strike the last portion of the answer

23  that was given, beginning with the phrase:  I even told.

24            MR. WIMS:  Thank you, your Honor.  May I proceed?

25            THE COURT:  Yes.

1   Q.  Dr. Cohen and Mr. Orantes had the right, as the owner and

2   manager, to direct your work performance, correct?

3   A.  Correct.

4   Q.  It was their job to provide you with feedback, correct?

5   A.  Correct.

6   Q.  And much of that that you testified was legitimate

7   feedback, was it not?

8   A.  No, it was not legitimate feedback.

9   Q.  Let me give you an example.  You were disciplined,

10  according to your testimony, for patients waiting too long,

11  correct?

12  A.  Not because it was my fault.

13  Q.  Ma'am --

14  A.  Correct, yes.

15  Q.  Does that constitute sexual harassment?

16  A.  No.

17  Q.  You were disciplined for being on the cell phone during

18  work hours, correct?  In fact, you were written up for it,

19  right?

20          MR. HOLZBERG:  Objection, your Honor.  Foundation.

21          THE COURT:  Overruled.

22  A.  According to --

23          THE COURT:  Excuse me.  That's a yes or no.

24  A.  Yes.

25  Q.  When you testified earlier, you said in response to Mr.

1    Holzberg's question that there were no policies, nothing,

2    right?

3    A.   Right.

4    Q.   In fact, when you were there, Metropolitan had a policy

5    against using personal cell phones during work hours, correct?

6    A.   Right.  Nothing about sexual harassment.

7         THE COURT:  That's a yes or a no.

8    A.   Yes.

9    Q.   When you were entering -- when you were allegedly making

10   entries into your phone at work, you were violating MDA policy,

11   correct?

12   A.   Probably.  But I needed --

13        THE COURT:  Excuse me.

14        Ms. Qorrolli, I don't want to have to advise you

15   again, please.  If you can answer a yes fairly with a yes or a

16   no, please answer it with a yes or a no, if you can do so

17   fairly.

18        THE WITNESS:  OK.

19        THE COURT:  Thank you.

20   Q.   In fact -- withdrawn.

21        Now, a moment ago, Ms. Qorrolli, you were testifying

22   that you gave Dr. Cohen a letter shortly before you resigned in

23   2016, correct?

24   A.   Correct.

25   Q.   And your testimony under oath regarding that was, you put

1   everything in there that Mario was putting us through, correct?

2   A.  Correct.

3   Q.  And us is you and your mother, correct?

4   A.  Correct.

5   Q.  But then Mr. Holzberg asked you, did that letter mention

6   anything about sexual harassment or sexual improprieties.

7          Your answer was?

8   A.  No.

9   Q.  Let me get this straight.  You alleged that you were being

10  sexually harassed for six and a half years, correct?

11  A.  Correct.

12  Q.  And during that time you never made any written complaint

13  regarding the alleged harassment, correct?

14  A.  On that letter, no.

15  Q.  No.  Did you ever make any written complaint alleging

16  sexual harassment?

17  A.  Not written.  Verbally.

18  Q.  I didn't ask you about verbal.  My question was about

19  written.  So the answer is no, correct?

20  A.  Yes.

21          (Continued on next page)

22

23

24

25

1   Q.  So, were you to be believed this harassment was so severe

2   and pervasive that it altered your emotional state but you left

3   it out of the complaint letter that you gave to Dr. Cohen?

4              MR. HOLZBERG:  Objection, your Honor.

5              THE COURT:  Sustained as to form.

6   Q.  Why did you leave it out -- why does your 2016 letter to

7   Dr. Cohen not mention sexual harassment or any other term

8   that's synonymous with that?

9              MR. HOLZBERG:  Objection, your Honor.

10             THE COURT:  Overruled.

11  A.  I answered that with Zach.  I left that out myself because

12  I was afraid of, one, retaliation, Mario taking that letter

13  from Dr. Cohen, and, two, the possibility that Mario will turn

14  around and say, no, this is not true, and sue me for

15  defamation.

16  Q.  I see.  Now, in a prior proceeding under oath in October

17  before this court, you indicated that your attorneys told you

18  to leave it out.  Now today it's because you chose to do it?

19  A.  I inquired with my attorneys, I asked them, and they

20  advised that you can leave it out if you've complained to him

21  in person.

22  Q.  That wasn't my question.  My question was previously under

23  oath, you testified the lawyers told you to leave it out,

24  correct?

25             MR. HOLZBERG:  Objection.

```
 1              THE COURT:  Overruled.
 2   A.  I was afraid.
 3   Q.  Is that correct?
 4   A.  That's correct, yes.
 5   Q.  So which time were you lying?  Under oath in October or
 6   today?
 7              MR. HOLZBERG:  Objection, your Honor.
 8   A.  I'm not lying.  I said it then.
 9   Q.  You said two different things.
10   A.  No.
11   Q.  Ma'am.  You just said in October, you said on advice of the
12   lawyer, you left it out.  Today when Mr. Holzberg questioned
13   you, you just said I chose not to because I was worried about
14   retaliation.
15              THE COURT:  Overruled.
16   A.  In October I also stated that I was afraid.
17              THE COURT:  Excuse me.  Excuse me.
18              THE WITNESS:  Sorry.
19              THE COURT:  One question at a time.
20   Q.  Sure.
21              THE COURT:  Next question.
22   Q.  October or today, which time were you lying?
23   A.  I wasn't lying.  I said it both times.
24   Q.  Now, in fact, you were not just a hygienist at Metropolitan
25   Dental, but you were sort of the head hygienist, correct?
```

1    A.  No, I wasn't.

2    Q.  You were not?

3    A.  I was not.

4    Q.  Okay.  You were responsible for scheduling other hygienists

5    to ensure sufficient coverage on the floor, correct?

6    A.  I was made responsible.

7    Q.  It's a yes or no question, ma'am.

8    A.  Yes, yes, yes.

9    Q.  That's why I say you were the head.

10   A.  No, I wasn't.  I never got a raise.  I never got promoted.

11   Q.  There's no question, Ms. Qorrolli.

12   A.  Right.

13   Q.  Sometimes you got in the trouble because you didn't have

14   sufficient coverage on the floor?

15   A.  That's not true.

16   Q.  Correct?

17   A.  That is not true.

18   Q.  Assuming that it is for a moment --

19            MR. HOLZBERG:  Objection, your Honor.

20   Q.  -- that would be a legitimate reason for an employer to

21   discipline you, correct?

22   A.  Correct.

23            THE COURT:  Overruled.

24   Q.  Correct?

25   A.  Correct.

1    Q.  But you never made any legitimate errors at work.  It was

2    just Dr. Cohen and Mr. Orantes conspiring against you, correct?

3              MR. HOLZBERG:  Objection.  Argumentative.

4              THE COURT:  Sustained.

5    Q.  So we established that you left out sexual harassment from

6    the letter you gave Dr. Cohen, but you included it in this

7    lawsuit, correct?

8    A.  Correct, yes.

9              MR. WIMS:  Your Honor, I'd like to approach the

10   witness show her a document.  Copies for counsel.  Would the

11   Court --

12             MR. HOLZBERG:  Objection.  I know you don't have the

13   document.

14             THE COURT:  Mr. Whertvine.

15             Can we have a number for this document, please,

16   Mr. Wims, defense exhibit?

17             MR. WIMS:  A, your Honor.

18             THE COURT:  There's no question pending.

19             MR. HOLZBERG:  Understood.  I object to --

20             THE COURT:  Counsel may show an object to the witness.

21   Until there is a question, there is no ground to object.

22   Q.  Now, one of the things you testified to yesterday,

23   Ms. Qorrolli, you said that Mr. Orantes allegedly grabbed your

24   butt in the elevator?

25   A.  Yes.

1   Q.  And you said that was in February 2015?

2   A.  I believe so, yes.

3   Q.  Say that again?

4   A.  I believe so, yes.

5   Q.  Okay.  So, then after, let's talk for a moment about after

6   you left employment at Metropolitan Dental.  You filed the

7   charge of discrimination with the EEOC, correct?

8   A.  Yes.

9   Q.  That was sworn to under oath under penalty of perjury,

10  correct?

11          MR. HOLZBERG:  Objection.

12          THE COURT:  Overruled.

13  Q.  Correct?

14  A.  Correct.

15  Q.  Now, I just showed you a page from your charge of

16  discrimination.

17          THE COURT:  Excuse me, counsel.  You can't testify.

18          MR. WIMS:  Understood.

19          THE COURT:  So, question is withdrawn.

20          MR. WIMS:  Understood, Judge.

21  Q.  Do you see paragraph 43 there?

22          MR. HOLZBERG:  Your Honor, objection.

23  Q.  Ms. Qorrolli?

24          THE COURT:  I'm directing your attention to

25  Defendant's Exhibit A.

1           Counsel, what's your question, so plaintiff's counsel

2   can decide whether to object.

3           MR. WIMS:  Sure.

4   Q.  This says --

5           THE COURT:  Excuse me.  This is not in evidence.  You

6   can't read from it.

7           MR. WIMS:  You're right.

8   Q.  Does this paragraph describe the incident regarding the

9   alleged grabbing of your butt?

10          MR. HOLZBERG:  Objection, your Honor.

11          THE COURT:  Sustained.

12  Q.  You told the EEOC that he pretended to do that, didn't you?

13          MR. HOLZBERG:  Objection, your Honor.  Reading from

14  the document.

15          THE COURT:  Objection is overruled.

16          You may be seated, counsel.

17          MR. HOLZBERG:  He's reading from the document.

18          THE COURT:  Excuse me.  Counsel may ask did you tell

19  the EEOC the following.  Put the document aside.

20          Place a question.

21  Q.  Did you tell the EEOC that he didn't grab your butt but

22  pretended to?

23  A.  I don't recall.

24  Q.  Say that again?

25  A.  I don't recall.

1    Q.  It's in front of you, correct?

2    A.  I didn't read the document.

3              THE COURT:  Excuse me, counsel, that's not how you --

4    you know what?  We'll take our morning recess.  Let

5    Mr. Whertvine know when you're ready to resume.

6              Please be seated.  And Mr. Wims, if you could move

7    away from the -- thank you.

8              Ms. Qorrolli, you can step down.

9              THE WITNESS:  Sure.

10             (Jury excused)

11             (Continued on next page)

1              THE COURT:  So, Mr. Wims, it's fine to impeach a

2    witness with a prior inconsistent statement.  But, as I believe

3    I've discussed with Mr. Holzberg before, first you need to lay

4    a foundation.  This document is not in evidence.  Perhaps you

5    are going to offer it at some time.  I have no idea.  But

6    unless and until you do and it's received in evidence, you

7    cannot read from it.

8              MR. WIMS:  Understood, your Honor.

9              THE COURT:  Now, you can place questions to a witness

10   about prior statements, but you can't read from the document

11   yourself, unless it's in evidence, and you can't have the jury

12   read from the document itself unless it's in evidence.

13             MR. WIMS:  Understood.

14             MR. HOLZBERG:  Your Honor, if I may.

15             THE COURT:  Yes.

16             MR. HOLZBERG:  So, as your Honor stated, this is not

17   in evidence.  And at no point do I believe it ever will be in

18   evidence as Mr. Wims did not list that he was going to be using

19   any exhibits in his joint pretrial order.

20             THE COURT:  You do not have to list in your pretrial

21   order exhibits you will use on cross-examination, counsel.

22   It's your evidence in chief that you must list on your pretrial

23   order.

24             MR. HOLZBERG:  Understood.  Also, with respect to this

25   document, this is just one page of presumably a much larger

1   document, so it's incomplete, and it doesn't even show whether

2   or not it's signed.  I'll represent to the Court that our

3   office prepared the EEOC charge and it's signed by me.  Not the

4   plaintiff.

5           THE COURT:  Well --

6           MR. WIMS:  Your Honor, it sounds as if counsel wishes

7   to testify.

8           MR. HOLZBERG:  I'm telling the judge and there's no

9   jury here.  I'm allowed to tell her the facts.

10          MR. WIMS:  I am aware there is no jury here.

11          THE COURT:  Unless and until this is offered as an

12  exhibit, it's just fine for counsel to use it in

13  cross-examination with the witness.

14          MR. HOLZBERG:  Okay.

15          THE COURT:  Mr. Wims can't read from it and can't ask

16  the witness to read from it.

17          MR. HOLZBERG:  Understood.  Thank you.

18          MR. WIMS:  It's fine for me to ask the witness to read

19  it to herself.

20          THE COURT:  Of course.

21          MR. WIMS:  Okay.  Just wanted to make sure, Judge.

22  And I do have the entire document.  I just did one page because

23  it's 30 pages so it would be easier to draw her attention to

24  that particular portion.

25          THE COURT:  You can't bring out through questions of

 1   the witness what this document says, unless the document is

 2   received in evidence.

 3            MR. WIMS:  Understood.

 4            THE COURT:  And Ms. Qorrolli is now on

 5   cross-examination.  So, Mr. Holzberg, I know you'll respect

 6   that during our break.  Okay.  Good.

 7            Counsel, is there anything we need to discuss at the

 8   break?

 9            Mr. Holzberg?

10            MR. HOLZBERG:  Nothing else at this time, your Honor.

11   Thank you.

12            THE COURT:  Thank you.  And Mr. Wims, anything else?

13            MR. WIMS:  No, your Honor.

14            THE COURT:  Okay.  Good.  Have a short recess.

15            (Recess)

16            THE COURT:  Bring in the jury.  Ms. Qorrolli, you may

17   retake the stand.  Please be seated, counsel.

18            (Continued on next page)

19

20

21

22

23

24

25

```
 1              (Jury present)
 2              THE COURT:  Mr. Wims.
 3              MR. WIMS:  Thank you, Judge.
 4  BY MR. WIMS:
 5  Q.  Would you read, Ms. Qorrolli, paragraph 43 to yourself,
 6  please.
 7  A.  Yes.
 8              THE COURT:  You're referring to Defendant's Exhibit A?
 9              MR. WIMS:  Yes, your Honor.
10              THE COURT:  Thank you.
11  Q.  Here you allege --
12              THE COURT:  Excuse me.  Not here.
13  Q.  In this document --
14              THE COURT:  Excuse me, counsel.  No.  There can't be a
15  reference to the document.
16              MR. WIMS:  Understood.
17  Q.  You told the EEOC that he pretended to touch your body
18  parts, correct?
19              MR. HOLZBERG:  Objection.
20              THE COURT:  Overruled.
21  A.  I didn't tell the EEOC anything.  I spoke to my
22  attorneys --
23              THE COURT:  Excuse me.  So that's a no.
24              THE WITNESS:  No.
25  Q.  That's what Defendant's Exhibit A says, correct?
```

 1          MR. HOLZBERG:  Objection, your Honor.

 2          THE COURT:  Sustained.

 3  Q.  You told the EEOC that Mr. Orantes pretended to touch your

 4  arm, correct?

 5  A.  I didn't tell the EEOC anything, no; that is not correct.

 6  Q.  Did you tell the EEOC that Mr. Orantes pretended to touch

 7  your leg?

 8  A.  No.

 9  Q.  Your testimony earlier, Ms. Qorrolli, was that you saw

10  Mario and Marina kissing at some point in the lunchroom,

11  correct?

12  A.  Yes.

13  Q.  Now, in a prior proceeding, you said you didn't see them

14  kiss, but that you had seen the immediate aftermath, the

15  smeared lipstick, correct?

16          MR. HOLZBERG:  Objection.  Foundation.

17          THE COURT:  Overruled.

18  Q.  Correct?

19  A.  Correct, yes.

20  Q.  So now, several months later, you saw them kissing.

21  A.  She had lipstick all over her lips and her mouth, so yes,

22  they were kissing.  It was obvious.

23          MR. WIMS:  Judge, would you ask the witness to answer

24  the question, please.

25          THE COURT:  Well, I'll let you place the question

```
 1    again, counsel.
 2              MR. WIMS:  Thank you, your Honor.
 3    Q.  Why did the story change, Ms. Qorrolli?
 4              MR. HOLZBERG:  Objection, your Honor.
 5              THE COURT:  Overruled.
 6    A.  The story didn't change.
 7    Q.  I'm sorry?
 8    A.  The story didn't change.
 9    Q.  In October before this court you testified that you saw
10    Marina and Mario kissing.
11    A.  Correct.  They were behind the door.
12              THE COURT:  That's a correct, you said, yes?
13              THE WITNESS:  Yes, yes.
14    Q.  You can't see through doors, can you?
15    A.  When I open the door.
16    Q.  That's not answering my question.
17    A.  No, I can't see through doors.
18    Q.  In fact, you didn't see them kissing.  You saw the lipstick
19    smeared allegedly after the fact.
20    A.  No.
21    Q.  Correct?
22    A.  No.  They were still together chest to chest.  They were
23    not separate.
24    Q.  Did you see the lips touch?
25    A.  They were very close to each other face to face.
```

```
 1    Q.  I didn't ask you that.

 2    A.  No, I didn't see their lips touch.

 3    Q.  Why did you say under oath that you saw them kissing?

 4    A.  Because she had lipstick smudged all over her mouth and

 5    lips.

 6    Q.  Do you understand what perjury is, Ms. Qorrolli?

 7              MR. HOLZBERG:  Objection.

 8              THE COURT:  Sustained.  Next question.

 9    Q.  Are there other alleged facts in this lawsuit that you wish

10    to change now?

11    A.  My story remained the same.  I'm not changing anything.

12    The facts what happened were stated.

13              THE COURT:  So that was a no.

14              THE WITNESS:  No.

15    Q.  Now, you initially got the job at Metropolitan Dental

16    because your mother and Dr. Cohen had a former professional

17    relationship and were friends, correct?

18              MR. HOLZBERG:  Objection, your Honor.

19    A.  No, not correct.

20              THE COURT:  Overruled.

21    A.  I wouldn't say they had a relationship or were friends.

22    But my mom was one of Dr. Cohen's best workers, actually.

23    Dr. Cohen took my mom as an example at his Fulton office that

24    everyone should be as hard working as she was and should work

25    exactly the way she worked.  So that's all it was.  There was
```

1   no friendship.

2   Q.  She worked there twice, correct, your mother?

3   A.  Yes.  She worked for Dr. Cohen at Fulton, in the late '90s,

4   and then again with me at Metropolitan Dental.

5   Q.  In the late '90s when she worked at Fulton, who was the

6   office manager?

7   A.  Not Mario.  My mom knew nothing of Mario or who Mario was.

8           THE COURT:  So you don't know.

9           THE WITNESS:  No.

10  Q.  Do you know who the office manager was then?

11  A.  No.

12  Q.  When you first started working there, did your mother know

13  Mario?

14  A.  No, she did not.

15  Q.  She just met him in 2009?

16  A.  Correct.

17          THE COURT:  Yes?

18          THE WITNESS:  No.  My mom didn't know Mario or about

19  Mario.  No.

20  Q.  But she knew Dr. Cohen?

21  A.  She knew Dr. Cohen, yes.

22  Q.  And you would have us believe that you were being harassed

23  at a workplace that your mother shared with you, correct?

24          MR. HOLZBERG:  Objection, your Honor.

25          THE COURT:  Sustained as to form.

1   Q.  You allege that you were being harassed while your mother

2   worked there, correct?

3   A.  Correct.  At Metropolitan Dental.

4   Q.  Did you ever tell her anything about the allegations you're

5   making today?

6   A.  Of course.

7   Q.  You told her that, what -- withdrawn.

8          What did you tell her?

9   A.  I told her that there was times when he touched my butt,

10  there was times when he grabbed me by the arm, he took me in

11  the room, that he hugged me, that he attempted to kiss me on

12  the lips, he kissed me on the cheek.

13         She knows of these incidents that happened because I

14  told her this.  She didn't see it because the door was closed.

15  But I told her.

16  Q.  When did you tell her?

17  A.  Right after the incidents happened.

18  Q.  What did she do about it?

19  A.  She made sure that I -- she asked me, she said you didn't

20  do anything else, right?  And I said no, I would never let him

21  do anything else to me.  She wasn't happy about it.

22  Q.  She told you to continue working there?

23  A.  No, she didn't.

24         MR. HOLZBERG:  Objection, your Honor.

25         THE COURT:  Overruled.

1   A.  No, she didn't.  We were both wishing and hoping we could

2   just quit and leave, but we couldn't.  It was hard.

3   Q.  There subsequently came a time when your sister and brother

4   also came to work at Metropolitan Dental, correct?

5   A.  My sister, yes.

6   Q.  Your brother never worked there?

7   A.  Yes, my brother, yes.

8   Q.  You brought your siblings to a job that you claim you were

9   being sexually harassed at?

10  A.  Yes.  So can I explain?

11         THE COURT:  Yes.

12  A.  Yes.

13  Q.  Why did you do that?

14  A.  So Mario was short of assistance, and Mario asked me can

15  you please find someone, I need someone.  So I said I don't

16  have anybody but my sister fits, you know, for whatever -- I

17  forget where she was working actually.  Maybe the billing

18  department.  And so, but it was for a very short period of time

19  because he was short staffed.  And so I advised that she can

20  come and work upstairs where Mario was in the department.  The

21  reason why I did that was because --

22         THE COURT:  Excuse me.  You've answered.

23  Q.  In your testimony, you referred to Mr. Orantes as an

24  animal?

25  A.  Yes.

1    Q.   Then you bring your sister and brother to work with the

2    alleged animal?

3    A.   Yes.

4    Q.   Did your sister have any problem with Mr. Orantes while she

5    worked there?

6    A.   No.  My sister quit maybe after a few weeks.  Not even.

7    Q.   Did your mother, was she subject to any unwelcomed sexual

8    advances by anyone at Metropolitan Dental?

9    A.   No.

10   Q.   What year was that when your sister worked there?

11   A.   I don't recall.

12   Q.   What year was it when your brother worked there?

13   A.   I don't recall.  Maybe 2013 I want to say.

14   Q.   There was another incident where you were disciplined

15   because you disrespected or failed to follow the orders of a

16   Dr. Goodbinder, correct?

17   A.   I don't recall that but --

18   Q.   You do not?

19   A.   No.

20   Q.   But you recall being sent home a number of times you

21   testified to earlier, correct?

22   A.   Yes, I just don't recall what incident happened and what it

23   was for.

24   Q.   Now, you indicated that there were occasions when you would

25   talk with Dr. Cohen and he or Mr. Orantes would use profanity

1    like fuck, shit, damn.   Right?

2    A.   Yes.

3    Q.   And this upset you and caused you to cry, correct?

4    A.   That didn't upset me and cause me to cry.   The fact he

5    wasn't doing nothing about it and then calling me a fucking

6    moron and a fucking idiot and he is going to throw me the fuck

7    out, and that along with him not doing anything about my

8    complaints, that upset me, yes.   It's hard to work in a place

9    where you're called a fucking moron.

10             THE COURT:   Excuse me.   You've answered, so,

11   Ms. Qorrolli, really, please.

12   Q.   Throughout your tenure at Metropolitan Dental,

13   Ms. Qorrolli, you received free dental work from Metropolitan

14   Dental, correct?

15   A.   I never received free dental work.

16   Q.   Okay.   You never did?

17   A.   I never did anything at Metropolitan Dental as far as --

18   Q.   I'm sorry?

19   A.   I never received free dental work, no.

20   Q.   You had family members who did, correct?

21   A.   No.

22   Q.   None of your family members ever --

23   A.   I believe my dad may have did a denture, but he had

24   insurance.   It wasn't free.

25   Q.   Didn't you just say no?

```
 1   A.  Not me.  I've never received any dental work, no.  Not my
 2   mom.
 3   Q.  Your father got dental work and paid for it?
 4   A.  He had insurance.  I don't think that he paid for it.
 5   Q.  I am not asking about --
 6   A.  No.
 7   Q.  Do you know how he paid for it?
 8   A.  He didn't pay for it.  His insurance paid for it.  Not him.
 9   Q.  How do you know that?  Did you see the bill?
10   A.  I didn't see the bill, but he had his insurance and it was
11   on file.
12   Q.  Thank you.  You've answered.
13            Now, you testified, Ms. Qorrolli, that you were
14   subject to improper conduct the entire six-plus years you
15   worked there, correct?
16   A.  Correct.
17   Q.  And there came a time when you approached Mr. Orantes to
18   request a loan for personal reasons, correct?
19   A.  A loan for personal reasons?
20   Q.  Yes.
21   A.  No, I don't recall.
22   Q.  Didn't you ask for a loan in connection with your brother's
23   criminal case?
24   A.  No, I don't recall.
25            MR. HOLZBERG:  Objection, your Honor.
```

 1  Q.  You don't recall or no?

 2          THE COURT:  Excuse me, counsel.

 3          The jury shall disregard the last question.

 4  A.  That's not true.

 5          THE COURT:  And you can move on to another topic,

 6  counsel.

 7  Q.  Did you ask Marina to come testify at this trial?

 8  A.  No.

 9  Q.  Why not?

10  A.  Marina still works at Metropolitan Dental and Marina is in

11  a relationship with Mario as of today.  So Marina is not going

12  to come here and testify for me.

13  Q.  How would you know what her relationship status is?

14  A.  It's been confirmed.

15  Q.  You don't know that?

16  A.  It's been confirmed to me.

17          MR. HOLZBERG:  Objection.

18          THE COURT:  Excuse me.

19  Q.  You were told that?

20  A.  Yes.

21          THE COURT:  Sit down, Mr. Holzberg.

22          The jury shall disregard this last line of questions

23  and answers.

24          Mr. Wims, next.

25  Q.  Did you ask Faten to come testify at this trial?

```
 1    A.  No.

 2    Q.  Why not?

 3    A.  I don't have Faten's number.  I don't talk to Faten.  We're

 4    not in contact.  I haven't spoken --

 5         THE COURT:  Excuse me.  You've answered.  Thank you.

 6    Q.  Fiona.  Did you ask her to testify?

 7    A.  No.

 8    Q.  Why not?

 9    A.  I don't have contact with these people.  I don't have their

10    phone numbers.  I don't speak to them.  It's been seven years

11    since I quit.  So, no, I don't.

12         THE COURT:  That's sufficient.

13    Q.  Did you ask Mercedes Vila to come testify?

14    A.  I did, yes.

15    Q.  Is she here?

16    A.  She cannot be here because she has cancer, although we do

17    have her testimony that hopefully we can play for the jury.

18    Q.  You are aware that your attorney can subpoena witnesses

19    when they don't wish to come to court?

20    A.  Right, yes.

21    Q.  Do you know whether he did that with those people?

22    A.  He did that with Mercedes, but due to her medical condition

23    and her cancer, she cannot be here.

24    Q.  What about Fiona and Marina?

25    A.  We couldn't get their contact information.  I tried to look
```

1    for them.  Their numbers don't work, the ones I have at least

2    on my phone.  So, there was no way to get in contact with them.

3    Q.  And you said Faten or Fiona still works at Metropolitan

4    Dental?

5    A.   Neither Faten nor Fiona.  Marina still works at

6    Metropolitan Dental.

7    Q.  Which name?

8    A.  Marina.

9    Q.  Marina.  Did you ask your attorney to require the

10   defendants to produce their employee so she could testify?

11          MR. HOLZBERG:  Objection, your Honor.  Attorney-client

12   privilege.

13          THE COURT:  Sustained.

14   Q.  Did you attempt to get court intervention to make her

15   testify?

16   A.  I didn't attempt to do anything.  My attorney has all the

17   information that he needs.  So no, on my end I didn't attempt

18   to contact anybody in regards to this case.  I was told not to

19   contact anyone.

20          THE COURT:  Excuse me.

21          THE WITNESS:  Sorry, yes.

22   Q.  And when you testified earlier and you said, well, this all

23   started shortly after I began working but I couldn't leave

24   because I had just taken out a mortgage, just bought a house,

25   correct?

```
 1   A.  Right, correct.

 2   Q.  What year did you buy the house?

 3   A.  I believe December of -- I forget the exact year, but it's

 4   been 10 years.

 5   Q.  2013, 10 years ago?

 6   A.  No.  2011.  2011.

 7   Q.  That's when you purchased the home?

 8   A.  Yeah, hmm-hmm.

 9   Q.  Now, you saw Dr. Lee from 2015 until 2021?

10   A.  Yeah.  June of 2015, yes, my last appointment with him I

11   don't recall what month exactly, but it was in 2021 some time.

12   Q.  Didn't you previously testify you stopped seeing Dr. Lee in

13   2016 because you lost your insurance?

14   A.  Yes.

15           MR. HOLZBERG:  Objection, your Honor.

16   A.  Yes.

17           THE COURT:  Overruled.

18   A.  Yes, I did.  And then I --

19           THE COURT:  Excuse me.  You've answered.  Yes.

20   Q.  Ma'am, you understand you can't keep changing your

21   testimony under oath?

22   A.  I'm not changing my testimony.

23   Q.  You just said you previously testified that you stopped in

24   2016.  Today you said you stopped in 2021.

25   A.  Right.  After 2016 I then continued to see him after that.
```

```
 1              THE COURT:  Excuse me.

 2   A.  I didn't just -- I may have stopped in 2016, but, I then

 3   continued when I got insurance again.

 4              THE COURT:  Excuse me.

 5              THE WITNESS:  Sorry.

 6              THE COURT:  Next question, counsel.

 7              MR. WIMS:  I'd like to show the witness a document,

 8   your Honor.

 9              THE COURT:  What's its number?

10              MR. WIMS:  B.  No number.  It's a letter, Judge.

11              THE COURT:  Defendant's Exhibit B.

12   Q.  Do you recognize what's been marked as Defendant's Exhibit

13   B, Ms. Qorrolli?

14   A.  Yes.

15   Q.  Can you tell us what it is?

16   A.  Can I just read it quickly?

17   Q.  Absolutely.

18   A.  Okay.

19   Q.  If you'd turn your attention to page two of this document,

20   Ms. Qorrolli.

21   A.  Okay.

22   Q.  In the center of the page.  There is a sentence that begins

23   with "I have unexpectedly."

24              Can you take a look at that, please.

25   A.  The second page, right?
```

1    Q.  Yes, ma'am?

2    A.  You said -- where what sentence?

3    Q.  It begins "I have unexpectedly."

4    A.  I'm sorry.  I don't see that here.

5    Q.  Let me point it out to you.

6    A.  Please, thank you.

7            Oh, okay.

8            Yes.

9    Q.  In that sentence you're describing what you saw with

10   Mr. Orantes and Marina, correct?

11   A.  Correct.

12           MR. HOLZBERG:  Your Honor, objection.  It's not in

13   evidence.

14           MR. WIMS:  I can rephrase, your Honor.

15   Q.  You didn't mention that you saw Marina and Mr. Orantes

16   kissing.  Here you say the shirt was just unbuttoned, correct?

17           MR. HOLZBERG:  Objection, your Honor.  Reading from

18   the document.

19           THE COURT:  Yes.  So, Mr. Wims, are you offering a

20   document or a portion of the document so that you can read from

21   it?

22           MR. WIMS:  No, Judge.

23           THE COURT:  Okay.  So, fine.

24           Please be seated, counsel.

25   Q.  In this document when you described the incident, did you

1   say you saw them kissing?

2   A.  This was an incident --

3          THE COURT:  Excuse me.

4   A.  No, I didn't, no, sir.

5   Q.  Why not?

6   A.  This was an incident that I just wrote on my notes, my

7   diary, as to what I discussed quickly with Dr. Cohen.  I may

8   have forgot to write it here, but it was clearly said, as I

9   stated in my prior testimony, that I explain to Dr. Cohen the

10  situation exactly what happened as far as me walking into the

11  room, and into the lunchroom, and seeing them together.

12  Obviously they were kissing.

13         THE COURT:  Thank you.

14  Q.  Your testimony --

15         THE COURT:  Ms. Qorrolli, when I tell you to stop

16  talking, I want you to stop talking.

17         THE WITNESS:  Got it.

18  Q.  Your testimony is you forgot to write it here when

19  describing that situation?

20  A.  Right.

21  Q.  Now, yesterday, Ms. Qorrolli, you indicated that Mario

22  grabbed your butt?

23  A.  Yes.

24  Q.  Correct?

25  A.  Correct.

1   Q.  Now, when I took your deposition and I asked you did

2   Mr. Orantes ever touch your buttocks, you answered no.

3          MR. HOLZBERG:  Objection, your Honor.

4   Mischaracterizing the testimony.

5          THE COURT:  Overruled.

6          Please be seated, counsel.

7   A.  I don't recall that.

8   Q.  May I show you?

9   A.  Sure.

10  Q.  Ms. Qorrolli, would you turn to page 82 of your deposition

11  transcript, that's on the second page of the document I handed

12  you.

13         My question at your deposition was:

14  "Q.  Did Mario --"

15  A.  What line am I looking at?

16  Q.  82:17.  I'm sorry.  Line 20.

17  "Q.  Did Mario ever grab your buttocks?

18  "A.  Not my butt."

19  A.  Right.

20         MR. HOLZBERG:  Objection.

21         THE COURT:  Excuse me.  Counsel, you are going to have

22  a chance for redirect, and you can ask more questions on this

23  topic.  Let's let cross-examination happen.

24         Thank you, counsel.  Please be seated.

25         MR. HOLZBERG:  Your Honor, that's not the complete

 1    statement for purposes of the record.

 2             THE COURT:  Please be seated.  Please be seated.

 3             MR. HOLZBERG:  Thank you.

 4             THE COURT:  You'll have a chance on redirect.

 5    Q.  Why did you say he grabbed your butt in this trial,

 6    Ms. Qorrolli?

 7             MR. HOLZBERG:  Your Honor, can we have a side bar

 8    please?

 9             THE COURT:  No.  Please be seated, counsel.

10    A.  Because my butt and my thigh are right there.  So when he

11    took his hand and he grabbed my thigh, that's my butt and...

12    Q.  When he did that?

13    A.  Yeah.

14    Q.  That's when you indicated to the EEOC he was pretending to

15    touch your butt?

16    A.  No, I didn't write he was pretending.

17    Q.  So, in the deposition you said he didn't grab your butt.

18    Trial you said he did.  Which time were you lying under oath,

19    Ms. Qorrolli?

20             MR. HOLZBERG:  Objection, your Honor.

21             THE COURT:  Sustained.

22    A.  I wasn't lying.

23    Q.  Which one is true, Ms. Qorrolli?

24             THE COURT:  Sustained, counsel.

25    Q.  Now, Ms. Qorrolli, is it your testimony that Mr. Orantes

1  and/or Dr. Cohen would frequently summon you and your mother?

2  A.  Yes.

3  Q.  To certain places at the MDA workplace?

4  A.  Only me and my mother, yes.

5  Q.  And you're not alleging that anyone sexually harassed your

6  mother, are you?

7  A.  No.

8  Q.  So then, the fact that she was included, doesn't that mean

9  legitimate discipline was being imposed on you?

10  A.  No.

11  Q.  What does it mean?

12  A.  It means I wasn't giving into Mario's sexual desires, so my

13  mom was taking the blame as well.

14  Q.  How did you arrive at that conclusion?

15  A.  Because my mom was trying to protect me while there.

16  Q.  That doesn't answer my question.  How did you arrive at

17  that conclusion?

18  A.  Because the work we did was in fact good.  Otherwise for

19  six-and-a-half years, if we were really the shitty employees

20  that Mario and Dr. Cohen claimed we were, I think we would have

21  been fired.  Right?  But no.

22  Q.  Didn't you testify that you were threatened with being

23  fired?

24  A.  Of course, yes.  But why weren't we fired.

25  Q.  Please let me finish my question.

```
 1              Didn't you testify that you and your mother were

 2   threatened with being fired?

 3   A.  Absolutely.  Every single day.

 4   Q.  You just said if we weren't doing our jobs, we would have

 5   been fired.  You were threatened from the beginning.

 6   A.  Right.

 7   Q.  So you weren't doing your job, right?

 8   A.  No, that's not why.

 9   Q.  You understand in employment you are not the person who

10   gets to evaluate your work performance, right?

11              MR. HOLZBERG:  Objection.

12              THE COURT:  Overruled.

13   A.  Not correct.

14   Q.  You get to?

15   A.  I'm a licensed professional and so --

16   Q.  I didn't ask you about that.  You get to evaluate your own

17   work performance at work?

18   A.  I don't have an answer for that.

19   Q.  You are going to have to.

20              MR. HOLZBERG:  Your Honor.

21   A.  No.

22              MR. HOLZBERG:  Counsel's arguing with the witness.

23   Q.  So no, you understand you don't --

24              THE COURT:  Mr. Holzberg, please be seated.

25   A.  Right, no.
```

 1   Q.  You and your mother were being summoned to work before you

 2   alleged any improprieties, correct?

 3   A.  That's how it started.

 4   Q.  So, it started as legitimate discipline?

 5   A.  No.

 6   Q.  You just said it did.

 7   A.  No, it wasn't legitimate.

 8   Q.  You understand the gentlemen seated next to me are the

 9   persons who decide whether it's legitimate or not; not you,

10   correct?

11   A.  Right.  Right.

12   Q.  So, why did you say it's illegitimate then?

13   A.  Because Mario pulled charts that did not have my signature

14   and they did not have work that I performed.  It was a

15   completely different hygienist.  And I and my mother got the

16   blame for that hygienist.  Why didn't this hygienist perform

17   the job or why didn't this hygienist do this specific

18   procedure.  So that wasn't my job, it was --

19   Q.  So Mr. Orantes --

20        MR. HOLZBERG:  Your Honor, may the witness finish her

21   testimony.

22        THE COURT:  Excuse me.  So, Mr. Wims, you cannot

23   interrupt the witness.  If you want me to instruct the witness

24   to stop speaking, you must speak to me.  The court reporter

25   cannot take more than one person speaking at a time.

```
 1                    Place your next question, Mr. Wims.

 2             MR. WIMS:  Okay.

 3   Q.  Isn't it a fact that sometimes you were blamed for patient

 4   wait times because you were the person who would schedule

 5   hygienists coverage?

 6   A.  That's not true.

 7   Q.  It's not?

 8   A.  No.

 9   Q.  Okay.  Now, you also got in trouble for using the phone at

10   work, correct?

11   A.  I had okay to use my phone when I needed as per Mario.

12   Mario himself.

13   Q.  Did you ever get in trouble for using your phone at work?

14   A.  Yes.  There was times that Mario used that against me.

15             THE COURT:  Yes, you've given your answer.

16   Q.  That was a written policy that you signed off on when you

17   started working there, correct?

18   A.  Yeah, yeah.

19   Q.  So you violated the rules on a regular basis, correct?

20             MR. HOLZBERG:  Objection, your Honor.

21             MR. WIMS:  That's her testimony.

22             THE COURT:  Overruled.

23   A.  No.

24   Q.  Correct?

25   A.  No, the policy was --
```

1          THE COURT:  Excuse me.  You've given your answer.

2          THE WITNESS:  Sorry.

3   Q.  You didn't like being told what to do?

4   A.  That's not true, no.

5   Q.  You just graduated from hygienist school in 2009, right?

6   A.  Right.

7   Q.  Your first job, you did everything perfectly, correct?

8   A.  No, no.  According to Dr. Cohen, yes.

9   Q.  You did everything perfectly?

10  A.  According to Dr. Cohen, he was very happy with us three

11  months into our employment, and then it changed.

12         THE COURT:  Excuse me.  Okay.

13         THE WITNESS:  Sorry.

14         THE COURT:  Mr. Wims, Ms. Qorrolli, you must slow

15  down.  Only one of you can speak at a time.  When there is an

16  objection, it needs to be ruled on, and you should not answer

17  until I rule on it.

18         THE WITNESS:  Right.  I'm sorry.

19         THE COURT:  Mr. Wims, place your next question.

20  Q.  Why did Dr. Cohen continue to discipline you if you were

21  doing everything perfectly?

22  A.  That's when Mario started attacking us and making up lies

23  about us.  That's when Dr. Cohen started believing those lies.

24  But before that we were an example employee.  He called us and

25  told us he's so happy to have us here.  He gave us raises for

1   it.  And four months after, as soon as that happened, which was

2   three, four months within our employment, that started to

3   happen with Mario.  And then all of a sudden Dr. Cohen didn't

4   believe us anymore, because Mario is now telling him, no, they

5   are not working hard enough, they are not good employees.  We

6   should throw them the fuck out.  We don't need them.  And Mario

7   comes downstairs and tries to touch me, hug me.

8   Q.  Thank you, Ms. Qorrolli, but you just testified the

9   discipline started right away before any improprieties so

10  clearly you weren't a perfect employee, were you?

11  A.  That's how it started d with that happening.  And then

12  Mario getting me to feel very vulnerable, very scared that,

13  listen, I can't complain.

14          THE COURT:  Okay, Ms. Qorrolli.  Thank you.

15  Q.  No.  When you're caught making a conflicting statement, is

16  it your experience that crying alleviates that problem?

17  A.  No.

18          MR. HOLZBERG:  Objection your Honor.

19          THE COURT:  Excuse me.

20  A.  No.

21          THE COURT:  Overruled.  Please be seated.

22  Q.  Is that yes or no, ma'am?

23  A.  No.

24  Q.  No?

25  A.  No.

1   Q.  Okay.  In fact, when you started as a hygienist, you just

2   graduated from school, right?

3   A.  Yes.

4   Q.  So, this was your first job, correct?

5   A.  Yes.

6   Q.  Yet, you think that you knew everything that was necessary

7   for the position?

8   A.  No.

9   Q.  No?

10  A.  I was just gaining my experience.

11  Q.  Why wouldn't you listen to the good doctor and Mr. Orantes?

12          MR. HOLZBERG:  Objection, your Honor.

13          THE COURT:  Sustained.

14  Q.  Now, after making the entries that are in your diary that

15  we've referred to and Mr. Holzberg referred to, you enter them

16  at the time of the alleged events?

17  A.  I'm sorry.  I didn't hear you.

18  Q.  Would you enter the diary markings or entries at the time

19  that you experienced the described events?

20  A.  Yes.

21  Q.  And then at the end of the day you'd go back and edit

22  those?

23          MR. HOLZBERG:  Objection your Honor.

24          THE COURT:  Overruled.

25  A.  Never.  That entry was made --

1           THE COURT:  So you've answered.

2    A.  No, never.

3    Q.  You never altered any entry in your diary after initially

4    making it?

5    A.  No.

6    Q.  You never -- withdrawn.

7           Did you ever see Dr. Cohen act improperly in a sexual

8    way with anyone at Metropolitan Dental?

9    A.  Dr. Cohen, never.

10   Q.  Did you ever hear Dr. Cohen make any inappropriate sexual

11   comment at MDA?

12   A.  No.  Not Dr. Cohen.

13   Q.  Okay.  Did you ever see Mr. Orantes act improperly in any

14   sexual way at Metropolitan Dental?

15   A.  All the time.

16   Q.  All the time?  Okay.  And what year was the first time you

17   saw that?

18   A.  I don't recall the year.

19   Q.  So --

20   A.  I don't recall the month.  I don't recall the day.  It was

21   a continuous thing.  That was what Mario did.

22   Q.  Thank you.

23   A.  Right.

24   Q.  If you don't recall when --

25   A.  Right.

 1  Q.  -- how can you say it was all the time?

 2          MR. HOLZBERG:  Objection.

 3  A.  Because it happened very frequently.

 4          THE COURT:  Overruled.

 5          You have an answer, Mr. Wims.  Slow down.  Next

 6  question.

 7  Q.  So, you've listed a number of people you claim were former

 8  co-workers, like Marina, for example.  You never witnessed

 9  Mr. Orantes, quote unquote, harassing Marina, did you?

10  A.  Aside from --

11  Q.  No.  Did you witness --

12  A.  No, because the door was closed.

13  Q.  I didn't ask you why.

14  A.  So I couldn't see inside the room.

15          MR. WIMS:  Your Honor.

16          THE COURT:  Stricken.

17          MR. WIMS:  Thank you.

18          THE COURT:  So did you --

19          THE WITNESS:  No.

20  Q.  Okay.  And you never witnessed Mr. Orantes acting sexually

21  inappropriate with your mother?

22  A.  No.  Not my mother, never.

23  Q.  And you never witnessed Mr. Orantes acting sexually

24  inappropriate with Fiona?

25  A.  With Fiona, yes, I have.

1    Q.   What did you see?

2    A.   He would come, again, take Fiona wherever she was, come

3    here, give me a minute, put his arms around her waist, take her

4    in a room, and close the door behind him, and be in there for

5    20, 30 minutes.  And what happened in there, I don't know.

6    Q.   Right?

7    A.   Right.

8    Q.   That's not acting sexually inappropriate if you don't know

9    what happened, right?

10   A.   Right.  That's what I witnessed shortly after --

11              THE COURT:  Excuse me.  So, Ms. Qorrolli.

12              THE WITNESS:  I'm so sorry.  I'm trying so hard.

13              THE COURT:  I don't know that you are.  I want you to

14   slow down.  If you can answer a question with a yes or a no, do

15   so, please.  Thank you.

16   Q.   So you didn't see Mr. Orantes behave inappropriately with

17   Fiona, correct?

18              MR. HOLZBERG:  Objection, your Honor.

19   Mischaracterizes the testimony.

20              THE COURT:  Sustained.  Next question.

21   Q.   Did you see Mr. Orantes act sexually inappropriate with any

22   co-worker?

23   A.   Faten, Marina, Mercedes, Fiona.

24   Q.   You just said with Fiona there were in the door so you

25   didn't see it.

1  A.  Right.

2  Q.  Correct?

3  A.  Correct.

4  Q.  So, why did you say Fiona?

5  A.  That's your assumption that I didn't, you know, notice what

6  was going on but --

7  Q.  You saw through the door?

8  A.  No. I saw him grab her by the arm, by the waist, take her

9  into the room.  That's what I witnessed.  I witnessed him

10 touching her before walking into the room.

11 Q.  If I were to touch Mr. Gilwit's arm now, is that sexual

12 harassment?

13 A.  When you are at work, especially a male employer, I mean, I

14 don't think that their hands should be on any part of a woman.

15 So yes.

16 Q.  I'm at work now.

17 A.  Yes, it is sexual harassment.

18 Q.  If I grab his arm, it's sexual harassment?

19 A.  Right.  You don't touch an employee in any way, on any part

20 of the body, in my opinion.  My husband can touch me.  That's

21 about it.  But nobody else.

22         THE COURT:  So, Ms. Qorrolli, I am going to ask you,

23 please, to listen to the question that's asked, and respond to

24 the question and not volunteer information.

25         THE WITNESS:  Right.

1          THE COURT:  Thank you.

2   Q.  Did you ask your mother to intervene, Ms. Qorrolli, when

3   you allege you were being harassed?

4   A.  No.

5   Q.  You said it caused you a great deal of anxiety, correct?

6   A.  Correct, yes.

7   Q.  But paying the mortgage was more important, correct?

8   A.  Absolutely.  My bills and having food on my table.

9          THE COURT:  Excuse me.  That's a yes.

10  Q.  How severe could it have been if paying the bill was more

11  important?

12         MR. HOLZBERG:  Objection, your Honor.

13         THE COURT:  Overruled.

14  A.  If I was there alone, it would have been much easier

15  because I would have quit that very next day.  But because both

16  me and my mom were there together, it was very difficult.

17  Because, I mean, it's not easy to find a job.  You can't just

18  go, especially with that experience, walk out and find a job

19  the very next day.  So we didn't have savings for six months

20  where we could have stayed home and just paid our mortgage.  We

21  had just saved all our money, put it down for a house payment,

22  and at this point it was paycheck to paycheck that we needed to

23  survive with bills, mortgage, food.  We were all adults.  We

24  weren't kids.  So...

25  Q.  Now, why couldn't you quit and your mom keep working?

1   A.  Because if I quit, my mom would have been fired.

2   Q.  She was an at-will employee.

3   A.  Right.

4   Q.  She could be fired for any reason or no reason at all,

5   correct?

6   A.  Right.

7   Q.  How would that be any different?

8   A.  Well, I didn't want to risk it.  I didn't want the risk of

9   her being fired.  It would be a lot greater than just being

10  there and being fired.  You're there, you're fired, but I

11  didn't want to quit and then have her get fired right after.

12  If I was sure that Dr. Cohen would have kept her after I left,

13  I would have left there immediately.  I even attempted to go

14  back to school and Dr. Cohen called my mother and said if she

15  doesn't quit school and come back to work full-time, then I'm

16  going to fire you both.

17  Q.  And he would have been within his rights to do that?

18  A.  Absolutely.  Of course.

19  Q.  So when you repeatedly say I was always getting threatened

20  with being fired, that's not putting you in jeopardy in any

21  way; that's the normal employment relationship.

22  A.  Right.  But mentally it doesn't sit well when you are doing

23  your job.

24           MR. HOLZBERG:  Objection.

25           THE COURT:  Sustained.  Objection is sustained.

 1              Place your next question.  Answer is stricken.

 2   Q.  Did Mr. Orantes ever grab your breasts?

 3   A.  No.

 4   Q.  Did he kiss you on the mouth?

 5   A.  No.

 6   Q.  Did he grab your genitalia?

 7   A.  No.

 8   Q.  So, you allege that what he did was impose discipline on

 9   you because, in your mind, that was him trying to control you,

10   correct?

11   A.  No, what he did was try --

12              THE COURT:  You've answered.

13   A.  No.

14   Q.  Now, you talked about your emotional state in response to

15   questions from Mr. Holzberg.

16   A.  Yes.

17   Q.  You said it was extreme in terms of the anxiety and

18   depression, right?

19   A.  Yes.

20   Q.  But in fact, at some point when you were seeing Dr. Lee,

21   you voluntarily discontinued the medication, correct?

22   A.  Correct.

23   Q.  Why?

24   A.  Because I became pregnant.

25   Q.  No, no.  From 2015 to 2016 when you were seeing Dr. Lee, at

1   some point you had discontinued the medications yourself,

2   correct?

3   A.  I don't recall.  I really don't recall.

4          THE COURT:  That's your answer.

5   A.  No.

6   Q.  Then, you got pregnant and you discontinued them again,

7   correct?

8   A.  Absolutely, yes.

9   Q.  You have a child now?

10  A.  I do.

11  Q.  Congrats.

12  A.  Thank you.

13  Q.  Did you begin taking the medications again after the --

14  excuse me -- after the baby was born?

15  A.  No.

16  Q.  Why not?

17  A.  The baby actually now gives me reason to live.

18  Q.  Why didn't you start taking the meds again after the baby

19  was born?

20  A.  Because I'm not at Metropolitan Dental, so now I am going

21  to try to live my life and try to better my life and forget

22  about everything that happened and go on with life.

23  Q.  You weren't at Metropolitan Dental in 2016.

24  A.  No, I wasn't.

25  Q.  When you stopped when you were seeing Dr. Lee.

1   A.   In May, after May of 2016, I wasn't.  And after I quit, I

2   don't recall stopping.  But if I did stop them for a little

3   while, it's because I thought I'm done with Metropolitan

4   Dental, I don't have to take the Klonopin anymore, because I'm

5   not going to have the panic attacks anymore because I'm not

6   going to see Mario anymore.  So maybe I did stop taking them.

7   I don't recall.  If I felt I needed to take it again, for

8   whatever reason, I had panic attacks, then Dr. Lee advised take

9   it as needed.  So that's what I did.

10  Q.   Is it possible you stopped taking them because you weren't

11  experiencing any anxiety and depression?

12  A.   No, it's not.

13  Q.   That's not possible?

14  A.   No.  I had a life at that point.  I tried to work out, I

15  tried to recuperate myself, I try to do things that would get

16  me to be myself again without having to take medication because

17  I didn't want to take medication.  That was not me.  I never

18  took medication in my life.  So I didn't want to be someone

19  that depended on anxiety medication and antidepressants.  I

20  didn't want that for myself.  I know who I was, and I know I

21  tried to be that person who I was without taking that

22  medication.

23  Q.   Another thing that you were disciplined for while working

24  at Metropolitan Dental, Ms. Qorrolli, is you weren't selling

25  enough?

1   A.  Oh, yes.

2   Q.  Correct?

3   A.  Absolutely.

4   Q.  Okay.  What was your job to sell?

5   A.  My job was to sell an antibiotic that was only to be

6   prescribed to patients in their gums if needed, and when, you

7   know, certain times there was patients that didn't need that

8   antibiotic.  Because we had to meet a quota at the end of the

9   day, we had to sell a certain amount.  If we didn't meet it, we

10  were, me and my mom specifically, no other hygienist, they did

11  not have to sell.  Faten doesn't even know what the antibiotic

12  is.  Marina doesn't sell.  She never sold before.

13          MR. WIMS:  Objection, your Honor.

14          THE COURT:  Excuse me.  There is an objection.

15          MR. HOLZBERG:  Your Honor, is there a ruling on the

16  objection?

17          THE COURT:  Yes.  It's sustained with respect to

18  everything that doesn't concern directly the plaintiff.

19  References to other employees are stricken.

20  Q.  Now, did Mr. Orantes ever ask you to have sex with him?

21  A.  No.

22  Q.  Did he ever attempt to have sex with you?

23  A.  By touching me, hugging me, kissing me, yes, he did

24  attempt.  I didn't let him have sex with me.

25          This is the whole point, that I didn't let him have

1 sex with me.  That's why I'm here today.  That's why my mental

2 state is not where it needs to be, because I didn't let him

3 have sex with me.

4    THE COURT:  Ms. Qorrolli.

5 A.  No, he didn't have sex with me.

6 Q.  I asked you did he attempt to?

7 A.  Yes.

8 Q.  How did that occur?

9 A.  Threatening me, coming down --

10 Q.  Hold on.  Hold on.  Threatening you with what?

11 A.  With not doing my job correctly.

12 Q.  Hold on.

13 A.  Okay.

14 Q.  That's legitimate discipline.

15 A.  Okay.

16 Q.  What else you got?

17    MR. HOLZBERG:  Objection, your Honor.  Counsel is

18 testifying.

19    THE COURT:  Excuse me, yes.  Counsel, new question.

20 Q.  That is legitimate discipline.

21    THE COURT:  No, Mr. Wims, no testifying here.

22    MR. WIMS:  Sorry.

23    THE COURT:  Place a question.

24 Q.  Threatening you based on work performance is legitimate

25 discipline, correct?

1   A.   It wasn't about my work performance.  It has nothing to do

2   with me.

3   Q.   That's legitimate discipline when that happened, correct?

4   A.   Yeah.

5   Q.   You said kissing me?

6   A.   Right.

7   Q.   You testified he kissed you once on your cheek?

8   A.   No.

9          MR. HOLZBERG:  Objection, your Honor.

10  Mischaracterizes the testimony.

11         THE COURT:  Overruled.

12  Q.   You testified he kissed you one time at your cheek.

13  A.   Maybe the incident that I mentioned in the diary.

14  Q.   That's a yes or no question.

15  A.   Yes.

16  Q.   Isn't it a fact that you weren't a good hygienist and the

17  sexual harassment allegations is just a cop out?

18         MR. HOLZBERG:  Objection.

19         THE COURT:  Sustained.

20  A.   Dr. Cohen gave me a raise.

21         THE COURT:  Excuse me.  There's no question pending.

22  A.   I must be good.

23  Q.   Did you ever inquire of Dr. Cohen as to a transfer to a

24  different department or location?

25  A.   No, I didn't.

1   Q.  Why not?

2   A.  I don't know.  I didn't.

3   Q.  Because you wanted to bring a sexual harassment lawsuit?

4   A.  No, that's not why.

5           MR. HOLZBERG:  Objection, argumentative.

6           THE COURT:  Overruled.

7   Q.  No?

8   A.  No, that's not why.

9   Q.  You filed it shortly after you left MDA, correct?

10  A.  Right.

11  Q.  When did you first retain Mr. Holzberg as your attorney?

12  A.  I don't recall.

13  Q.  Do you remember the year?

14  A.  Maybe in 2016, '15.

15  Q.  So in other words, you started keeping the diary after you

16  had a lawyer coaching you?

17  A.  No.

18          MR. HOLZBERG:  Objection, your Honor.

19  Mischaracterizes the testimony.

20          THE COURT:  Overruled.

21  A.  My diary was kept way before I started seeing an attorney.

22  Q.  Did Mr. Holzberg refer you to Dr. Lee?

23  A.  No.  I started seeing Dr. Lee even before I saw my

24  attorney.

25  Q.  How did you come into contact with Dr. Lee?

1  A.   I searched for a psychiatrist that was near me in New

2  Jersey, and he came up, and I decided to see him because he was

3  close to my house.  So I knew that after work, he was open late

4  hours at 8 p.m.  9 p.m. was his latest appointment.  He was the

5  only one I was able to see, because everybody else would be

6  either on the weekends only or short hours.  So I didn't really

7  have much option as far as who I can see.  But I happened to

8  find him and I went to him.

9  Q.   He had seen your mother previously?

10  A.   No.

11  Q.   You said you never told Dr. Lee about Kosovo?

12  A.   No, I didn't.

13  Q.   Are you aware that Dr. Lee is a pediatric psychiatrist?

14        MR. HOLZBERG:   Objection your Honor.

15  A.   He's not a pediatric psychiatrist, no.

16  Q.   No?

17  A.   No.

18  Q.   What kind of psychiatrist is he?

19  A.   He's a psychiatrist.  I mean, he sees patients of all ages.

20  Q.   Have you even his patients and the ages there?

21  A.   I've seen my mom come there with me.

22  Q.   Your mom is a patient with Dr. Lee?

23  A.   With me, yes.  We went there together for these reasons.

24  Q.   That's not what I asked you.

25  A.   Yes.

1    Q.  Is your mother --

2    A.  Correct.

3    Q.  -- Dr. Lee's patient?

4    A.  Yes, she is.

5    Q.  Okay.  So, just a moment ago when you said she wasn't, you

6    lied again?

7             MR. HOLZBERG:  Objection, your Honor.

8    Mischaracterizes the testimony.

9             THE COURT:  Sustained.

10   A.  I didn't say --

11            THE COURT:  Stricken.

12   Q.  Now, yesterday, you indicated that you saw what you

13   believed to be, quote unquote, insurance fraud at Metropolitan

14   Dental, correct?

15            THE COURT:  Yes or no.

16   A.  Yes.

17   Q.  And you have been licensed as a hygienist in the State of

18   New York since 2009?

19   A.  Yes.

20   Q.  Are you aware of any obligations of a licensee to report

21   alleged insurance fraud?

22   A.  Yes.

23   Q.  Did you report it?

24   A.  I told Dr. Cohen that Mario was making us do procedures

25   that shouldn't be done.

1  Q.  Did you report it to your licensing authority?

2  A.  I didn't, no.

3  Q.  Why?

4  A.  Because I actually didn't do it.  I actually didn't do that

5  procedure.  That's why I got in trouble for it.  I didn't do

6  that procedure.

7  Q.  So, specifically, just to hash that out a little bit.  What

8  was the alleged fraud?

9  A.  Telling me that I should be doing perio charting on a

10  patient that I've never seen before that was in a completely

11  different office, at the Fulton office.

12  Q.  You didn't do that, correct?

13        THE COURT:  Excuse me.  Okay.  So we're just going to

14  lower the temperature here.

15        Mr. Holzberg.

16        MR. HOLZBERG:  Your Honor, may the witness please

17  finish her testimony.

18        THE COURT:  Yes.  Let me read the question.

19        "And you didn't do that, correct?"

20        THE WITNESS:  Correct.

21        THE COURT:  That's a yes or a no.

22        THE WITNESS:  Yes.

23        THE COURT:  Thank you.

24  Q.  And you didn't see any insurance fraud?

25  A.  I did.

1   Q.  You said the person made an attempt to do that and you

2   chose not to do it?

3   A.  Right.

4   Q.  So there wasn't an actual insurance -- you were asked to do

5   it and you declined.

6   A.  Right.

7   Q.  Then why did you say you saw insurance fraud yesterday?

8   A.  That is insurance fraud.  And they asked me to do

9   procedures that a patient didn't need.  But because insurance

10  covered it, they wanted it done.  And because I didn't do it, I

11  was called upstairs and I was threatened to be fired.  So that

12  is illegal.  You are not supposed to do that.  You don't go

13  based on what the patient's insurance covers.  That is

14  insurance fraud.

15          I told that to Dr. Cohen.  These are the things I am

16  getting blamed for here.  Not because there is something -- it

17  wasn't because of me.  It was because another hygienist didn't

18  perform a deep cleaning.  I cannot force another hygienist to

19  perform a deep cleaning on a patient.  That's their license,

20  that's on them.

21  Q.  Thank you, Ms. Qorrolli.

22  A.  Right.

23  Q.  You indicated that you weren't the same person.  You no

24  longer wanted to socialize after beginning working at

25  Metropolitan Dental.  Correct?

1   A.  Correct, yes.

2   Q.  And yet, during that time period, you met your husband?

3   A.  No.  No.

4   Q.  When did you meet him?

5   A.  I met my husband in 2017.

6   Q.  Right.  So, when you are alleging you were taking

7   medication and no longer the person -- you just testified --

8   A.  Right.

9   Q.  -- you saw him until 2021?

10          MR. HOLZBERG:  Objection.  Mischaracterizing the

11   testimony.

12          THE COURT:  Yes.  Please be seated.  Objection is

13   sustained.

14          Mr. Wims, put one question and one question only at a

15   time to the witness.

16          Mr. Wims, next question.

17          MR. WIMS:  Yes, ma'am.

18   Q.  You were still taking medication in 2017 when you met your

19   husband, correct?

20   A.  Yes.  As needed.  If I needed it.

21   Q.  I'm sorry?

22   A.  As needed.  If I needed it, yes.

23   Q.  Only if you needed it?

24   A.  Yes.

25   Q.  You were able to determine whether you needed it?

```
 1   A.  Absolutely, yes.

 2   Q.  You are a doctor?

 3   A.  If I feel anxiety, I am going to take my medication.

 4   Q.  Are you a psychiatrist, Ms. Qorrolli?

 5           MR. HOLZBERG:  Objection.

 6   A.  I decide if I take medication or not.

 7           THE COURT:  Excuse me.  Please.  Do not present

 8   argumentative questions, Mr. Wims.

 9           MR. WIMS:  I apologize, your Honor.

10           THE COURT:  Next question.

11   Q.  How old is your child?

12   A.  Eight months.

13   Q.  Eight months?

14   A.  Hmm-hmm.

15   Q.  You said you stopped taking the medication when you became

16   pregnant?

17   A.  Yes.

18   Q.  When was that?

19   A.  September of 2021.

20   Q.  Were you still seeing Dr. Lee at that time?

21   A.  I don't recall when in 2021 I stopped seeing him, but yes,

22   I was.  I don't recall what month that was, how long prior to

23   that, I don't recall.

24   Q.  So you were dating your husband while you were in the

25   throes of anxiety and depression?
```

```
 1   A.  Absolutely.

 2           MR. HOLZBERG:  Objection, your Honor.  Argumentative.

 3           THE COURT:  Overruled.

 4   A.  Yes.

 5   Q.  After being distressed, and you would go out to the bars

 6   and socialize and meet men?

 7   A.  I didn't go to the bars and meet men.  That's not how I met

 8   my husband.  I actually did not go to bars.

 9   Q.  Now, in the letter that you gave to Dr. Cohen, a month

10   prior to your resignation, you already indicated it didn't

11   mention anything about sexual improprieties, correct?

12   A.  Right.

13   Q.  But, it did mention --

14           MR. HOLZBERG:  Your Honor, objection.  The document is

15   not in evidence.

16           THE COURT:  Yes.

17   Q.  Did you mention issues with periodontal charting in that

18   letter, Ms. Qorrolli?

19   A.  I don't recall.

20   Q.  I'm sorry?

21   A.  I don't recall.

22   Q.  Is there anything that would refresh your recollection?

23   A.  The letter itself maybe.

24           THE COURT:  What's the exhibit number of the document

25   you're showing?
```

 1              MR. WIMS:  Marked for identification as Exhibit C,

 2   Judge.

 3              THE COURT:  Defendant's Exhibit C.  Thank you.  Please

 4   place your question.

 5   Q.  You complained about patient charting, correct?

 6   A.  I didn't really read the whole thing.  Is there a specific

 7   area you want me to read about it?

 8   Q.  You wrote the whole thing, correct?

 9   A.  Yeah, I just don't know what I said.  I don't recall.  It's

10   been --

11   Q.  Second paragraph.  First page.

12   A.  -- years.

13              The second paragraph has nothing about charting.  So

14   I'm not sure if it's maybe the third paragraph here?

15   Q.  The sentence that begins --

16              MR. HOLZBERG:  Objection, your Honor, the document is

17   not in evidence.

18   A.  Not to do --

19              THE COURT:  Mr. Wims, do you wish to offer the

20   document into evidence?

21              MR. WIMS:  No, Judge.  I'm going to just ask her

22   without make --

23   Q.  You indicated here, Ms. Qorrolli, that the problems began

24   with Mario because he found out how much Dr. Cohen was paying

25   you?

1          MR. HOLZBERG:  Objection, your Honor.  To the extent

2    he's referring to the document.

3          THE COURT:  Sustained.

4    Q.  Did you believe that that's how problems started between

5    you and Mr. Orantes?

6          THE COURT:  Put the full question so the witness is

7    clear what the question is, Mr. Wims.  Place a full question.

8    Q.  Is it your belief Mario found out how much money you were

9    making and had some sort of problem with that?

10          THE COURT:  That's a yes or a no.

11   A.  Yes.  Part of the reason, yes.

12   Q.  Whether he did or not, in fact, did you ever -- withdrawn.

13          Did you ever ask him if that was an issue?

14   A.  No.

15   Q.  Whether it was or not, that would be completely unrelated

16   to sexual harassment, correct?

17   A.  Right.

18   Q.  And you said today under oath that you put everything in

19   this letter that Mario was doing to you.

20   A.  Right.

21   Q.  Everything except sexual harassment?

22   A.  Correct.

23   Q.  You're sure that when you spoke with Dr. Cohen previously,

24   you didn't accidently leave that part out again?

25   A.  No.

1        MR. HOLZBERG:  Objection, your Honor.  Argumentative.

2        THE COURT:  Sustained.

3   A.  No.

4   Q.  Another point you say Mr. Orantes threatened to throw you

5   out of the office if you didn't see a certain number of

6   patients?

7   A.  Yes.

8   Q.  What does that have to do with sexual harassment?

9   A.  He only threatened me.  He didn't threaten anybody else.

10  He threatened me and my mom because I wasn't giving into the

11  sexual advances.  That is why I got blamed for these things.

12       MR. WIMS:  Your Honor, can that be stricken.

13       MR. HOLZBERG:  Your Honor --

14       THE COURT:  You're objecting, Mr. Holzberg?

15       MR. HOLZBERG:  Yes.

16       THE COURT:  You may be seated.

17       Mr. Wims, I'm denying your request that the answer

18  that the witness gave be stricken.

19       MR. WIMS:  Okay.

20       THE COURT:  Next question.

21  Q.  You alleged that Mr. Orantes was stealing money from

22  Metropolitan Dental and Dr. Cohen, correct?

23  A.  Yes.

24  Q.  Did you see him steal anything?

25  A.  No.

1   Q.  Do you normally make allegations without proof?

2   A.  I don't.

3   Q.  Just this time?

4           MR. HOLZBERG:  Objection, your Honor.  Argumentative.

5           THE COURT:  Sustained.

6   Q.  You didn't see him steal anything, but you told Dr. Cohen

7   he was stealing?

8   A.  Yes, and Dr. Cohen knew.

9           THE COURT:  Excuse me.  Is that a yes?

10          THE WITNESS:  Yes.

11  Q.  Why would you do that without evidence, Ms. Qorrolli?

12          MR. HOLZBERG:  Objection, your Honor.

13          THE COURT:  Sustained.

14  Q.  Why did you do that, Ms. Qorrolli?

15  A.  Because that's what Mario did.  And so, everyone spoke

16  about it, everyone said something about it, so that's what

17  happened.

18  Q.  Hold on a second.

19  A.  In fact.

20  Q.  But you didn't see it, correct?

21  A.  I've heard of incidents that happened.  No, I didn't --

22  Q.  You didn't see it?

23  A.  No.

24          THE COURT:  Mr. Wims, you have to let the witness

25  finish her answer.

```
 1            MR. WIMS:  I apologize.

 2            MR. HOLZBERG:  Thank you, your Honor.

 3   Q.  Why did you tell Dr. Cohen that when you didn't know it?

 4   A.  Because I wanted to give every idea to Dr. Cohen that this

 5   person that you trust so much, you should really look into him,

 6   because you shouldn't trust him.

 7   Q.  Including false ideas like he was stealing, correct?

 8            MR. HOLZBERG:  Objection, your Honor.  Argumentative.

 9            THE COURT:  Sustained.

10   Q.  You wanted to give Dr. Cohen that idea by giving him

11   false --

12   A.  No, that was the rumor.  Everybody spoke about that.

13   Q.  False allegations?

14   A.  I didn't make it up.  I told Dr. Cohen what I heard.  That

15   was it.  I didn't tell Dr. Cohen this is what he did.

16   Q.  You said to Dr. Cohen "I heard he did this"?

17   A.  Yes, yes.

18   Q.  I handed you your diary.  Can you show me where it says you

19   heard it?

20            THE COURT:  Excuse me.

21            MR. HOLZBERG:  Objection, your Honor.

22   A.  I don't know if I have it.

23            MR. HOLZBERG:  This is not her diary.

24            THE COURT:  Please be seated.

25            MR. WIMS:  I'm sorry.  Let me rephrase, your Honor.
```

1  Q.  I handed you the letter.

2  A.  Yes.

3  Q.  Can you show me where it says you heard it?

4  A.  I don't know that I told him about that here or what I told

5  him.  But --

6  Q.  But you said the letter contains everything that

7  Mr. Orantes was putting you through?

8  A.  Yes.  Me personally.

9  Q.  Except for sexual harassment.  And you heard through the

10  grapevine -- as opposed to witnessing -- the alleged theft,

11  correct?

12           MR. HOLZBERG:  Objection, your Honor.  Argumentative.

13           THE COURT:  Sustained.

14  Q.  You believe that you were being picked on at Metropolitan

15  Dental, correct?

16  A.  Yes.

17  Q.  And to the best of your recollection, when did that begin?

18  A.  Three, four months after I started working there.  So in

19  beginning, mid of 2010.  I started in 2009, so in 2010, that's

20  when it started.

21  Q.  Okay.  Now, the four incidents of touching that you alleged

22  in your testimony yesterday, you said those were in 2015,

23  correct?

24           MR. HOLZBERG:  Objection, your Honor.

25  Mischaracterizes the testimony.

```
 1              THE COURT:  Overruled.  Overruled.
 2   Q.  You said that was in 2015, correct?
 3   A.  Yes, yes.
 4   Q.  So why he would be picking on you at the beginning of your
 5   tenure?
 6              Your mom was a returning employee, correct?
 7   A.  Right, yes.
 8   Q.  Why would he do that?
 9   A.  I don't know.  That's when he started.  That's when he came
10   down.
11   Q.  Right away?
12   A.  Right away.  After our agreement with Dr. Cohen after
13   getting a raise.  That was the first time I saw Mario.  That
14   was the first time I met Mario.  The way I met him was --
15              THE COURT:  Excuse me.  Thank you.
16              Next question.
17   Q.  Your experience with working at Metropolitan Dental was
18   very difficult for you, correct?
19   A.  Very difficult, yes.
20   Q.  And you culminated it with a letter where you left out
21   everything you are saying today, correct?
22              MR. HOLZBERG:  Objection, your Honor.  Argumentative.
23              THE COURT:  Sustained.
24   Q.  One of the reasons that you and your mother were summoned
25   regularly by Dr. Cohen and Mr. Orantes is the two of you
```

1   composed two-thirds of the hygienists on the floor, correct?

2   A.  Not correct.

3   Q.  How many hygienists were there in your department?

4   A.  The reason why he summoned us -- I wouldn't have sex with

5   Mario.  That's it.  There is no other reason why.

6          THE COURT:  Answer is stricken.  I'm going to read the

7   question to you.

8          "How many hygienists were there in your department?"

9   A.  Four.  Two that were working prior to us even starting

10  there.  So they were head hygienists, not us, and yet we were

11  still called over them.

12  Q.  You said Mr. Orantes never asked you to have sex?

13  A.  No.  I don't think he was that stupid to ask you to have

14  sex.

15  Q.  But you just said he was summoning you and your mother

16  because you wouldn't have sex with him?

17  A.  Right.

18  Q.  He never asked you to?

19  A.  Right.  But he attempted to.

20  Q.  So how did you form that conclusion?

21  A.  Because he's touching me and then he's kissing me and then

22  he's telling me he loves me.

23  Q.  He kissed you one time, correct?

24  A.  No.

25          MR. HOLZBERG:  Excuse me.  Can the witness please

1    finish her testimony rather than Mr. Wims cutting her off.

2              THE COURT:  Mr. Holzberg, please.

3              The question was "He kissed you one time, correct?"

4    She answered "no."

5              Next question.

6    Q.  How many times did Mr. Orantes kiss you --

7    A.  The --

8    Q.  -- Ms. Qorrolli?

9    A.  Many times.  The incident that I have written there is the

10   specific incident that I recalled what and how it happened.

11   That's the incident that I mentioned once or twice.  It

12   happened continuously over six-and-a-half years.  Mario always

13   tried to play the good guy with me.  He always told me he loved

14   me.

15             MR. WIMS:  Your Honor.

16             THE COURT:  Please, Ms. Qorrolli.

17   A.  I can't, I don't recall how many times.  I don't have a

18   number for you, unfortunately.  I don't.

19   Q.  Okay.  So, when you testified in October before the judge

20   that he kissed you one time, that was inaccurate?

21             MR. HOLZBERG:  Objection, your Honor.

22   Mischaracterizes the testimony.

23             THE COURT:  Overruled.

24   A.  One time based on that.

25   Q.  I'm sorry?

1   A.  One time based on those events that I described in there

2   that I had written down, yes.  Specific events.

3   Q.  So you misspoke under oath in October when you said it was

4   once?

5           MR. HOLZBERG:  Objection, your Honor.

6   Mischaracterizes the testimony.

7           THE COURT:  Overruled.

8   Q.  Correct?

9   A.  No.

10  Q.  You didn't misspeak?

11  A.  I don't think so, no.

12  Q.  Many times today; one time in October.  Those are

13  consistent?

14          THE COURT:  Mr. Wims, place a question.

15  Q.  Which one was it, Ms. Qorrolli?

16          MR. HOLZBERG:  Objection your Honor.

17          THE COURT:  Sustained.

18  Q.  It was just the one time, wasn't it, Ms. Qorrolli, that he

19  kissed you on your cheek?

20  A.  It wasn't, Mr. Wims, no.

21  Q.  No?

22  A.  No.

23  Q.  Okay.  Now, in fact, you were crying when it occurred,

24  correct?

25  A.  Yes.

1  Q.  Mr. Orantes may have been trying to console you, correct?

2  A.  Not correct.

3       MR. HOLZBERG:  Objection, your Honor.  Calls for

4  speculation.

5       THE COURT:  Sustained.

6  Q.  You say that he hugged you first, correct?

7  A.  He said come here.  He hugged me, took my face, wiped the

8  tears off my face, and then he kissed me on my cheek and he

9  said it will be okay, you'll be okay.

10 Q.  So he consoled you?

11 A.  No.

12 Q.  Did you feel better after he said that?

13 A.  Absolutely not.  I felt more distressed than ever, actually

14 because, I knew that --

15      THE COURT:  That's fine.

16      THE WITNESS:  Right.

17 Q.  So, this incident in 2015, after six years of alleged

18 harassment, you felt worse than ever in that instance?

19 A.  Yes, that didn't console me, no.

20 Q.  But you cried a lot at work, correct?

21 A.  Correct, yes.

22 Q.  Like at this trial, correct?

23 A.  Correct.

24 Q.  Did you ever think to yourself, Ms. Qorrolli, if I can

25 improve my work performance, Mr. Orantes and Dr. Cohen would

```
 1    leave me alone?

 2    A.  No.  I'm a great employee.  Okay.  I work very hard.

 3              THE COURT:  Thank you.  You said "no."

 4    A.  No.

 5    Q.  Your work performance could not be improved.  It was

 6    perfect, correct?

 7    A.  Not my work performance.

 8              MR. HOLZBERG:  Objection.

 9    A.  It was someone else's work performance that they threatened

10    to fire me over.

11              THE COURT:  Overruled.  Excuse me.

12              Just a yes or a no.  If you can answer fairly with a

13    yes or a no.

14    Q.  Did you have a persecution complex, Ms. Qorrolli?

15              MR. HOLZBERG:  Objection.  Argumentative.

16              THE COURT:  Overruled.

17    A.  No.

18    Q.  No?  You seem unsure when you answered that.

19              MR. HOLZBERG:  Objection, your Honor.  That's --

20              THE COURT:  Overruled.

21    Q.  Am I making your nervous?

22    A.  You're not.  You are actually not making me nervous.

23    Q.  Why are you crying?

24    A.  I am not crying.  I know this is your job.  I'm trying to

25    respect that.  But it's very difficult when I know the
```

1    situation, and you are twisting things around to make it seem

2    like, you know, I'm somehow just saying things that are not

3    coming together here for the full picture.

4           But I stated many times how these occurrences occurred

5    and how the cycle occurred.  I wish I believed that he was

6    consoling me, but you can't console somebody when you threaten

7    to fire them and five minutes later you come and hug them.

8    That's not consoling them.

9           THE COURT:  Ms. Qorrolli.

10          THE WITNESS:  I'm so sorry.

11   Q.  To be clear, Ms. Qorrolli, it wasn't your place to tell

12   Dr. Cohen or Mr. Orantes how to run their practice, correct?

13   A.  No.  No, it was not.  I was just giving feedback.  It's not

14   my place to tell anybody how to run their practice.

15   Q.  Were you under the impression because you and your mother

16   both worked there that you would have greater weight than

17   another employee?

18   A.  Absolutely not.  And that's not what we wanted.

19          THE COURT:  Excuse me.

20   A.  No.

21   Q.  You previously testified, Ms. Qorrolli, that at some point,

22   you told your boyfriend about what you claim happened at

23   Metropolitan Dental, correct?

24   A.  Yeah, I mean, I was telling him --

25          THE COURT:  Yes.

1    A.   -- that I went there, yes.

2    Q.   He said he would come up to Metropolitan Dental and take

3    care of the problem?

4    A.   He told me to quit many times.

5            THE COURT:   Is that yes or no?

6    A.   Yes.   He made a comment about something, yes.

7    Q.   What did you understand that to mean?

8    A.   That he was very upset.

9            MR. HOLZBERG:   Objection.   Calls for speculation.

10           MR. WIMS:   Effect on the listener, Judge.

11           THE COURT:   Yes.   Sustained.

12           Next.   Let's move on.

13   Q.   You wanted your boyfriend to beat him up before you can

14   make a written complaint of sexual harassment?

15   A.   No, I never wanted that.   That's not true.

16           MR. HOLZBERG:   Objection, your Honor.   Argumentative.

17           THE COURT:   Let's move on, counsel.

18   Q.   Why did you send and receive texts with Mr. Orantes almost

19   on a daily basis?

20   A.   He wanted me to text him how much we sold at the end of

21   every day.   He wanted to be aware of that, because that was

22   reason for him to then the next day call Dr. Cohen and say they

23   didn't sell enough or they didn't see enough patients.   And I

24   can assure you that I saw more patients than any other

25   hygienist on that floor, but they never got called up.   It was

1   us.  So it was him keeping track of how many patients we were

2   seeing, how much we were selling.  We had to sell.  I mean, you

3   know, whether patients needed it or not, we had to sell

4   treatments.

5          THE COURT:  Thank you.

6   A.  Yes.  We had to make money.

7   Q.  Mr. Orantes repeatedly accommodated you while you worked

8   for Metropolitan Dental, correct?

9          MR. HOLZBERG:  Objection, your Honor.  Argumentative.

10          THE COURT:  Actually --

11          MR. HOLZBERG:  Also calls for a legal conclusion.

12          THE COURT:  Mr. Holzberg, you can just say the word

13   "objection."  It's fine.

14          MR. HOLZBERG:  Thank you.

15          THE COURT:  Thank you.  Sustained.

16   Q.  Mr. Orantes allowed you to leave work and go to the gym to

17   workout, right?

18   A.  No, I used my lunch for that.  I clocked in and clocked out

19   for that.  I didn't have to tell him what I was doing on my

20   lunch.

21          THE COURT:  Excuse me.  You've answered.

22   Q.  Would you get Mr. Orantes coffee while you worked there?

23   A.  Yes.

24   Q.  While he was allegedly being an animal to you?

25   A.  Yes.

1  Q.  Why did you do that, Ms. Qorrolli?

2  A.  Because instead of giving him sex and satisfying him

3  sexually to keep him off my back, when I offered him a cup of

4  coffee, I noticed that he was actually cooling off a bit.  So,

5  anything I could offer Mr. Orantes besides sex, I would offer

6  him.  Anything he asked me to do work-wise, I did it.  As long

7  as he just let me work in peace.  And every time I did that,

8  many days went by, I didn't get called and I didn't get

9  threatened in front of Dr. Cohen.  Now Mario was being nice.

10  I'm the nice person now with Mario.  Mario actually liked me

11  now.  So, yeah.

12  Q.  But in this lawsuit you are alleging Mr. Orantes sexually

13  harassed you?

14  A.  I am, yes.

15  Q.  So how do you explain the fact that you've testified that

16  Dr. Cohen was, quote unquote, on your back as well?

17  A.  That's because Mario made him be on my back.  Not because

18  Dr. Cohen actually --

19  Q.  Let me inquire --

20      MR. HOLZBERG:  Excuse me.  Can the witness finish her

21  testimony, please.

22      THE COURT:  Mr. Holzberg, please be seated.

23      MR. HOLZBERG:  Thank you.  Can she finish, your Honor.

24      THE COURT:  Please be seated, Mr. Holzberg.

25      Next question.

1    Q.  Did you hear Mr. Orantes tell Dr. Cohen that?

2    A.  Yes.  I did, yeah, of course.

3    Q.  Where was this?

4    A.  On the phone, when he could take me into a room, he would

5    call Dr. Cohen on the phone.  He would take me into Dr. Cohen's

6    office.  I mean, Dr. Cohen never alone himself called me, Tesa,

7    1806.  Dr. Cohen never told me himself that --

8            THE COURT:  Ms. Qorrolli, you are not responding to

9    the question.  So, I'm going to ask counsel to put the question

10   to the witness that you'd like answered.  And Ms. Qorrolli,

11   listen with care and answer just that question.

12   Q.  You never heard Mr. Orantes tell Dr. Cohen to ride you or

13   discipline you, did you?

14   A.  I did, yes.

15   Q.  I'm not asking you if you heard him Dr. Cohen discipline

16   you.  Did you ever hear Mr. Orantes tell Dr. Cohen to ride you

17   or discipline you?

18   A.  Yes.

19           MR. HOLZBERG:  Objection, your Honor.  Asked and

20   answered.

21   Q.  When?

22   A.  All the time, he would call Dr. Cohen on the phone and,

23   Dr. Cohen, I have something to tell you.  The air conditioner

24   in room 5 is broken and Tesa knew and told me he nothing about

25   it.  I'm trying to explain that --

```
 1              THE COURT:  Thank you.
 2   Q.  So, him saying the air conditioner is broken is Mr. Orantes
 3   telling Dr. Cohen to give you a hard time?
 4   A.  Yes.  Because it has nothing to do with me.  I'm not their
 5   tech.  I don't fix air conditioners.
 6   Q.  It has nothing to do with sexual harassment either.
 7   A.  It does have to do with getting me to feel very stressed
 8   out and vulnerable and then opening the door saying it's okay,
 9   hugging me.  That's just the cycle he played with me for
10   six-and-a-half years.  That's what I went through.
11   Q.  I understand that's what you say.
12   A.  The incident itself threatening me didn't have to do with
13   sexual harassment.  But the afterwards --
14              THE COURT:  You have to wait for a question.
15              THE WITNESS:  So sorry.
16   Q.  There are no witnesses to the alleged improprieties that
17   you say Mr. Orantes did to you, correct?
18   A.  Couldn't have been.  The door was closed.
19   Q.  Ma'am, that's a yes or no question.
20   A.  Yes.
21   Q.  Yes?
22   A.  No, yes, you're right.  There wasn't any.
23   Q.  There weren't any witnesses?
24   A.  No.  Door closed.  No, sir.
25   Q.  You don't have a single document that corroborates your
```

1   allegations in any way, correct?

2         MR. HOLZBERG:  Objection your Honor.

3   A.  I couldn't take out my phone and record him.

4   Q.  Ma'am, is that a yes or no?

5   A.  No.

6   Q.  So this jury is to take your word, correct?

7   A.  I'm here to tell my story.

8         THE COURT:  Yes or no?

9   A.  Yes, yes.  If they feel that --

10        THE COURT:  Excuse me.

11  Q.  We just identified a number of inconsistent statements you

12  made --

13        THE COURT:  Mr. Wims, place a question.

14  Q.  How could the jury believe you in light of the inconsistent

15  statements, Ms. Qorrolli?

16  A.  That's up to the jury.

17        MR. HOLZBERG:  Objection.  Argumentative.

18        THE COURT:  Sustained.  Sustained.

19  Q.  Were you able to leave work to go to the gym and get back

20  within the lunch period?

21  A.  Absolutely.

22  Q.  How long was it?

23  A.  I had a 45-minute break.

24        THE COURT:  Thank you.

25  Q.  Did you take a shower after you worked out before coming

1   back to work?

2   A.  No.

3   Q.  No?

4   A.  No.

5   Q.  You sure you weren't subject to discipline for that too?

6   A.  No.  I spent 20 minutes at the gym.

7          THE COURT:  Excuse me.  You've given your answer.

8   Q.  Weren't there several occasions when Mr. Orantes said you

9   didn't in fact arrive back on time after your workout?

10  A.  I did.  And whatever time I arrived, 5 minutes, 10 minutes,

11  I clocked in.

12         THE COURT:  That's a no?

13  A.  No.

14  Q.  There were times when he noted you didn't get back on time.

15  A.  I don't recall that.  No, I don't recall that.

16  Q.  Why did you just say 5 or 10 minutes after then?

17  A.  If it's on file, and I clocked in 5, 10 minutes after, then

18  that happened, yes.  But I don't recall.

19  Q.  You don't know?

20  A.  I don't know, no.

21  Q.  There came a time when your father had some medical

22  problems, correct?

23  A.  Correct, yes.

24  Q.  Mr. Orantes allowed you to leave to tend to that, correct?

25  A.  With a doctor's note; correct, yes.

1  Q.  And there were deaths in the family while you worked there.

2  Mr. Orantes allowed you to leave to attend to those matters,

3  correct?

4  A.  I don't recall.  In 2010, my aunt passed away.  That was

5  right when I started, so I don't think that I left.  I don't

6  recall that it was for that.

7  Q.  Okay.

8  A.  No.  Only with a doctor's note for myself and for my family

9  was able to leave.  Never --

10       MR. HOLZBERG:  Your Honor, may the witness please be

11  able to finish her testimony.

12       THE COURT:  Mr. Holzberg, please be seated.  Thank

13  you.

14       Mr. Wims, next question.

15  Q.  Your mother lost her nephew while you were there, correct?

16  A.  Yes.

17  Q.  So, you just said the only death was --

18  A.  Now that you mention, I recall.  But I didn't recall at the

19  time, yes.

20  Q.  The medications you listed earlier.  Are you aware of their

21  effect on your memory?

22  A.  No.

23  Q.  Did you discuss it with your doctor?

24  A.  It's been a very long time since then.  So there's things I

25  don't recall with exact timings and dates.  I know her nephew

1    passed.  I don't know exactly if it was during the time of our

2    employment, how soon.  I don't know when it happened.  So, but,

3    yes, my aunt passed, and now that you mention, her nephew also

4    passed, yes, while we were employed at Metropolitan Dental.

5             THE COURT:  So, we are going to take our luncheon

6    recess now.  Ladies and gentlemen, we'll resume at 2 o'clock.

7    Thank you so much.

8             (Jury excused)

9             (Continued on next page)

1          THE COURT:  Counsel, if you can be seated, please,

2   Mr. Wims.

3          Ms. Qorrolli, you can step down.

4          THE WITNESS:  Thank you.

5          THE COURT:  Please be seated, counsel.

6          How much longer on cross-examination?

7          MR. WIMS:  Best estimate, 15, maybe 20 minutes, your

8   Honor.  Almost done.

9          THE COURT:  Counsel, this has been very challenging to

10  supervise.  It's not my practice and it's certainly difficult

11  to have to intervene to try to respond to what's happening

12  here.  So let me take it one by one.

13         Ms. Qorrolli, it is essential that you slow down, that

14  you listen with care to the question that's asked.  If you can

15  fairly answer with a yes or a no, that you answer just yes or

16  no.  If in fairness you cannot respond with a yes or a no, of

17  course you must complete your answer.

18         This is not an occasion for you to just say everything

19  you would like to say.  You may only respond to the question

20  asked.

21         After cross-examination, your attorney will have an

22  opportunity to conduct redirect examination and ask you

23  questions.  So you have to trust your lawyer to come back with

24  questions that will help complete the record and give you a

25  chance to add additional information that it is important that

 1   the jury hear.

 2           Do you hear what I'm saying, Ms. Qorrolli?

 3           MS. QORROLLI:  Yes, I understand.

 4           THE COURT:  Thank you.

 5           Mr. Holzberg, when you are unhappy with a ruling that

 6   I make, no shaking of your head, no muttering, no speaking

 7   objections.  Just say the word "objection."  If I'm confused as

 8   to the ground for the objection, I feel free to ask you for an

 9   explanation.  Thank you.

10           Mr. Wims, you cannot talk over the witness.  When you

11   ask an open-ended question about why, for instance, something

12   happened, the witness is being invited to give an essay to this

13   jury as an explanation, and I'm going to let her give her

14   explanation.  If you ask a more pointed question with a yes or

15   a no answer that would fairly respond to the question, fine.

16   I'll try to support that.  But if you have a style of

17   questioning that asks open-ended questions, the witness in

18   fairness gets to answer in an open-ended way.

19           MR. WIMS:  Understood, your Honor.  Thank you.

20           THE COURT:  So, these court reporters are doing

21   extraordinary work here trying to capture what is happening.

22   The pace of interruptions, the amount of time that you are all

23   talking over each other, is extraordinary, and I'm not sure the

24   record can capture that.

25           So, I am going to ask you all, attorneys and witness,

1    please, to slow down and don't interrupt each other.

2           Objections should generally not be made during an

3    answer.  Ordinarily, the appropriate time for an objection is

4    at the end of an answer, so there's no interruption.  And then

5    a request can be made to the Court to strike a portion of the

6    answer or all of the answer as non-responsive or whatever.

7           It's important that we have a clear record here for

8    the jury, and we can't capture that if everybody's speaking at

9    the same time.  Thank you all for your cooperation.

10          Now, I did not charge the jury in our prior case about

11   the fact that every party has subpoena power and the ability to

12   enforce subpoenas to obtain testimony.  That was a subject of

13   conversation this morning, and I want counsel to reflect on

14   whether I should give an oral instruction to the jury or

15   compose a written instruction about the parties' powers to

16   issue subpoenas to compel testimony.

17          In all honesty, this is a subject that I normally

18   leave just for summation about uncalled witnesses, about the

19   tactical decision to call a witness or not.

20          These other witnesses are largely irrelevant to the

21   plaintiff's claims, but they have some relevance.  It depends.

22   I don't want to do an exegesis on that right now.  But it is

23   certainly improper to argue or imply that subpoena power does

24   not exist, and that's where it may be important for me to

25   clarify to the jury that, of course, in every civil case, a

1    party has a power to subpoena witnesses to testify.

2          Again, I think it's irrelevant to the principal issues

3    the jury has to focus on here, so I'll ask counsel to reflect.

4    It may be better that we just let this ride and I not say

5    anything.  But I'll give it some reflection myself.

6          Before we break for lunch, is there anything you,

7    Mr. Holzberg, wish to raise?

8          MR. HOLZBERG:  Yes, your Honor, thank you.

9          First of all, I'd like to apologize to your Honor.  As

10   your Honor indicated, I was quite frustrated during the course

11   of the cross-examination.  I felt as though Mr. Wims was

12   interrupting Ms. Qorrolli.  I think that's in part why maybe

13   Ms. Qorrolli was speaking so quickly, to try to get her

14   response out before she was interrupted.  So I apologize for

15   that.

16         THE COURT:  Thank you, Mr. Holzberg.  Your apology is

17   accepted.

18         MR. HOLZBERG:  Thank you.

19         I have a few questions for your Honor.  Your Honor

20   said that Ms. Qorrolli should respond either yes or no as long

21   as she can do so as a matter of fairness.  If she's unable to

22   answer simply yes or no as a matter of fairness, how would you

23   like her to make the Court aware of that?

24         THE COURT:  No.  She should respond to the question.

25   There are two types of questions, if you are just going to

1    broadly characterize questions.  Narrow questions that are

2    intended to ask for a yes or no response or I don't recall.

3    There are questions that are broadly worded calling for an

4    expansive answer.

5           So I'm only talking about the first type of questions.

6    If it's a question that in fairness is simply asking for a yes

7    or a no or a I don't recall, you should answer it with a yes or

8    a no or I don't recall, if you can do so in fairness.  If in

9    fairness you can't, then of course you may say something

10   briefly.  But that type of question should not be answered with

11   an essay answer.

12          MR. HOLZBERG:  Thank you, your Honor.

13          The next item I'd like to ask your Honor is I know

14   your Honor had just said that I should attempt to refrain from

15   speaking objections.  I hear your Honor and I would ask that if

16   that is the case with me, that the same be true with opposing

17   counsel as well moving forward, please.

18          THE COURT:  Absolutely.  It's my rule for all counsel

19   in all cases.  Not just this one.

20          MR. HOLZBERG:  Thank you, your Honor.

21          Then the last item that I'd like to discuss with your

22   Honor, there came a point in time during the cross-examination

23   that Mr. Wims referred to a portion of Ms. Qorrolli's

24   deposition transcript.  He referred to a specific page and

25   line.  In reading Ms. Qorrolli's response, Mr. Wims did not

1    read the entire response.  I raised the issue to your Honor and

2    ask we be able to include the entirety of the response for

3    completeness on the record.  And I believe yesterday when I was

4    questioning Dr. Cohen, that defendant's counsel raised the same

5    issue, and at that time your Honor permitted the other

6    testimony to come in as a matter of completeness.

7            I'm specifically referring to the deposition

8    transcript of Ms. Qorrolli, page 82:20.

9    "Q.  Did Mario ever grab your buttocks?

10   "A.  Not my butt, but like right here next to my butt and

11   thigh, yes (indicating)."

12           Mr. Wims only read "not my butt" and intentionally

13   left out the remaining portion of Ms. Qorrolli's testimony.  I

14   am unsure as to why the rest of that statement would not be

15   permissible to be added to the record as a matter of

16   completeness when defendants did that yesterday.

17           THE COURT:  I don't know what specifically you're

18   referring to yesterday.  I can only take one question, one

19   answer, one objection at a time.  But I try to apply the same

20   standards for direct and cross and all counsel and all

21   witnesses.

22           With respect to this specific inquiry this morning,

23   counsel, I think I noted, at least it's my recollection that I

24   did, but the transcript will show whether I did or not, that

25   you could inquire further on redirect examination.

 1            Actually, this answer, while short, is a good example

 2   of Ms. Qorrolli adding information beyond what she was asked in

 3   the question.  So I did not feel that defense counsel was

 4   unfairly using the deposition testimony.

 5            The question was about buttocks.  The answer should

 6   have been about buttocks.  End of story.

 7            And then, of course, as is always true, opposing

 8   counsel, in this case plaintiff's counsel, have an opportunity

 9   to ask additional questions.  You will be able this afternoon,

10   using this same deposition transcript, to put in the complete

11   question and complete answer if you would like.

12            MR. HOLZBERG:  Thank you, your Honor.

13            Just to follow up on that.  For purposes of making

14   things go smoothly later.  In what format would your Honor like

15   me to do so, so as to not cause an issue later with the jury?

16            THE COURT:  Typically what counsel choose to do is to

17   focus the witness on the occasion of the prior testimony.  So,

18   Ms. Qorrolli, were you deposed in this litigation before trial?

19   Yes.  Did that deposition occur on X date, whatever that date

20   was.  Were you asked this question and did you give this

21   answer.  And she'll either say yes or no or I don't remember.

22            That's one way that it's done, counsel.  There may be

23   other ways that would be entirely appropriate.

24            MR. HOLZBERG:  Thank you, your Honor.  I appreciate

25   it.  I have nothing further.

1              THE COURT:  Thank you.

2              Mr. Wims, is there anything we should address at

3    lunch?

4              MR. WIMS:  No, your Honor.

5              THE COURT:  Thank you.  Have a good lunch.  Counsel,

6    we'll start promptly at 2.

7              MR. WIMS:  Thank you.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      AFTERNOON SESSION

 2                         2:00 p.m.

 3              THE COURT:  Ms. Qorrolli, you may take the stand.

 4              Bring in the jury.

 5              (Jury present)

 6              THE COURT:  Mr. Wims.

 7   BY MR. WIMS:

 8   Q.  Ms. Qorrolli, did you ever see your mother have a panic

 9   attack while working with you at Metropolitan Dental?

10   A.  Yes, I did.

11   Q.  Do you recall whether that was one time or more?

12   A.  Many times.

13   Q.  So your testimony is that you and your mother had panic

14   attacks throughout the time that you worked there?

15   A.  Yes.

16   Q.  And you've indicated yours were caused by the alleged

17   sexual harassment?

18   A.  Yes.

19   Q.  What were your mother's panic attacks caused by?

20   A.  Her seeing what I was going through and what I was being

21   put through.

22   Q.  But you said she didn't see it.  It was behind closed

23   doors, correct?

24   A.  I told her.  She didn't see it.  Aside from touching me,

25   grabbing my hand, putting his arms around my waist, my
```

 1   shoulders, no.  She didn't see what went on in the room as far

 2   as him kissing me on the cheek.

 3   Q.  So she had a panic attack when you told her?

 4   A.  No, I'm not saying when I told her.  She developed anxiety

 5   and panic attacks, and they happened throughout the course of

 6   our employment when Mario called us upstairs, yes.

 7   Q.  Do you know if she sought counseling?

 8   A.  With me.  We went together.

 9   Q.  Didn't you testify earlier that Dr. Lee only treated you,

10   not her?

11   A.  No, I didn't.

12   Q.  You didn't testify to that?

13   A.  No, I didn't.

14   Q.  There was a particular incident where your mother and

15   Fernando had some sort of dispute, correct?

16   A.  Yes.  I think I recall that.

17   Q.  As a result, your mother ended up in tears, correct?

18   A.  Correct, yes.

19   Q.  And had an anxiety attack in the bathroom for ten or more

20   minutes?

21   A.  Because of what Mario said to my mom --

22            THE COURT:  Is that yes or no?

23            THE WITNESS:  Yes.

24   Q.  Your mother's dispute was with Fernando, right?

25   A.  Right.

1   Q.  What do you mean, because of what Mario did?

2           THE COURT:  That was stricken, counsel.

3   Q.  Now, you testified earlier that on one occasion Mr. Orantes

4   said to you, you should work out your mind as much as your ass,

5   or words to that effect, correct?

6   A.  Right.

7   Q.  Were there any witnesses to this statement?

8   A.  Yes, there were.

9   Q.  Who would that be?

10  A.  Mohammed was there, one of the billers, Mario himself, and

11  I think another -- Joelle and another hygienist.

12  Q.  Did Joelle go by Jo, to your knowledge?

13  A.  Yes, Jo.

14  Q.  Did you ask Fernando and Jo to come here to testify to

15  those statements?

16  A.  I don't have their contact information.  I never did.

17  Q.  That wasn't my question, ma'am.

18  A.  No, I didn't.

19  Q.  That's because you didn't have their contact information?

20  A.  Correct.

21  Q.  You still speak to Marina, correct?

22  A.  No.

23  Q.  How did you know she still worked at Metropolitan, as you

24  testified earlier?

25  A.  Because it's what I've heard, that she works still there.

1   I know people --

2          THE COURT:  Excuse me.

3   Q.  The people you heard that from, did you ask them for Jo and

4   Fernando's contact information?

5   A.  No.  They don't know Jo and Fernando.

6   Q.  Fiona?

7   A.  No.

8   Q.  Faten?

9   A.  No.

10  Q.  Marina, Toya?

11  A.  No.

12  Q.  Do you recall there were occasions that Dr. Cohen had told

13  you his practice was losing money?

14  A.  All the time.

15  Q.  And did he indicate to you what you could do to help fix

16  that?

17  A.  Sell, sell -- a lot of selling, a lot of treatment planning

18  and selling to patients to getting patients to agree to

19  treatments.  Whether they need it or not didn't matter.  I had

20  to come to sell because I had to reach a number at the end of

21  the day.  Yes, he did.

22  Q.  Earlier you indicated that Mr. Orantes had called your

23  mother Hitler, correct?

24  A.  Yes.

25  Q.  Now, in fact, didn't he say you're like Hitler around here?

```
 1   A.  That's what he said to that extent, yeah.

 2   Q.  You think that saying you're like Hitler is calling someone

 3   Hitler?

 4   A.  That's what he said.  I am just stating what he called my

 5   mother.  That's the comment he made to my mother, yes.  I don't

 6   know what he meant by it.  I don't know.

 7   Q.  But the comment was, you're like Hitler?

 8   A.  Right.

 9   Q.  Not you are?

10   A.  Right.  You're like Hitler.

11   Q.  Earlier you said he called her Hitler?

12   A.  Right.  He called her the name Hitler.  He said:  You're

13   like Hitler.  He called her that name.

14   Q.  There was another time when and Mr. Orantes had a dispute

15   regarding -- he caught you on your cell phone when you were

16   supposed to be working, right?

17   A.  I don't recall.  Mario --

18           THE COURT:  Excuse me.

19   Q.  Now, did you observe your coworkers using their cell phones

20   during work hours?

21   A.  Yes, of course.

22   Q.  Do you recall if any of them was disciplined as a result?

23   A.  No.

24   Q.  No, you don't recall?

25   A.  I don't recall.
```

1    Q.  No, you don't recall or, no, they were not?

2    A.  No, they were not.  To my knowledge, no.

3    Q.  What's the basis of your knowledge?

4    A.  I have never seen -- we were there -- I was there 12 hours

5    a day, so in the 12 hours I had family, I had people I needed

6    to keep in contact with.  So if I got a phone call in that

7    12-hour shift or a text message I needed to reply to, Mario had

8    no issue with that and no one had an issue with that.  They

9    were able to respond to that message.  And Mario passed by and

10   seen me on my phone time to time, and he has never said

11   anything to me in regards to that or to anybody.  We were not

12   on our phones where we were talking and having conversations

13   and not working for hours.  But if I looked at my phone or if I

14   responded to a quick message, I'm there 12 hours a day, Mario

15   had no issue with that.

16           I even approached Mario myself in regards to that.  I

17   said:  Listen, Mario, do you have a problem with me?  Because

18   if you do, I can even give you my cell phone and you can hold

19   it.  And his response was like:  Tessa, you're crazy.  I don't

20   have an issue with that.  There was no issue with me

21   responding --

22           THE COURT:  Slow down.

23   Q.  Why did you offer to give him your phone?

24   A.  I offered to give my phone just because if there is an

25   issue with that, then here, take my phone.  I won't be on my

 1    phone.  But that's what I'm saying.  He never gave me an issue

 2    with me being on my phone.  I never had a problem with that.

 3    Q.  You were disciplined several times while working for

 4    Metropolitan Dental for arriving late to work, correct?

 5    A.  I don't recall that.  I was there at 7:15 in the morning.

 6    I was the first person --

 7            THE COURT:  OK.  Thank you.

 8    A.  -- to step in the office.

 9            MR. WIMS:  No further questions for this witness, your

10    Honor.

11            THE COURT:  Thank you.

12            Redirect.

13            MR. HOLZBERG:  Thank you, your Honor.

14    REDIRECT EXAMINATION

15    BY MR. HOLZBERG:

16    Q.  Tessa, Mr. Wims had asked you questions about whether you

17    had ever been written up during the time that you were working

18    at MDA, right?

19    A.  Yes.

20    Q.  Do you recall when the first time was that you were written

21    up at MDA?

22    A.  I don't recall, but I do recall that these were writeups

23    started to happen at the end of my employment.  They didn't

24    happen in the beginning or prior to that.

25    Q.  When you say the end of your employment, what time period

 1   are you referring to?

 2   A.   More so after 2014 and '15.

 3   Q.   And you left your employment in 2016?

 4   A.   Yes.

 5   Q.   How many times, to your recollection, were you written up?

 6   A.   I don't recall.  I mean.

 7   Q.   Who gave you these writeups?

 8   A.   Mario.

 9   Q.   Did you feel that the writeups were fair?

10   A.   No.

11   Q.   Why not?

12   A.   Because these writeups were for the fact that Mario noticed

13   I was spending a lot of time with Dr. Cohen in Dr. Cohen's room

14   alone complaining to him, so retaliating against me.  Then he

15   started to make up things and write me up to the point where he

16   even told a lot of employees that when I say something against

17   Tessa, I want you to agree.

18              MR. WIMS:  Objection.

19              THE COURT:  Sustained.  Stricken.

20   Q.   Mr. Wims also asked you somewhat about an EEOC charge that

21   was filed.

22              Do you remember that?

23   A.   That was a long time ago, yes.

24   Q.   To the best of your knowledge, who drafted that EEOC

25   charge?

1  A.  My attorney, you.

2  Q.  And Mr. Wims asked you previously about testimony that you

3  gave at a prior deposition.

4        Do you recall that?

5  A.  Yes.

6  Q.  Do you recall when your deposition was previously?

7  A.  No, I don't recall.

8        THE COURT:  If you could just pull your chair up and

9  put that microphone under your chin and keep your voice up.

10 Thank you.

11       MR. HOLZBERG:  Your Honor, I would like to hand the

12 witness a copy of her deposition transcript.

13       THE COURT:  You have that marked as a plaintiff's

14 exhibit?

15       MR. HOLZBERG:  I am not sure if this was previously

16 marked.

17       THE COURT:  No.  Do you have a number for it now?

18       MR. HOLZBERG:  Let's call it Plaintiff's 6.

19       THE COURT:  Thank you.

20       Showing you Plaintiff's Exhibit 6.

21       MR. HOLZBERG:  Your Honor, may I take these other

22 items off the witness stand as well?

23       THE COURT:  You may.

24 Q.  Ms. Qorrolli I just handed you what's been marked as

25 Plaintiff's Exhibit 6.  This is a copy of your deposition

 1    transcript.

 2            Do you see on the first page of the transcript the

 3    date?

 4    A.   Yes.  January 24, 2020.

 5    Q.   Do you recall giving testimony on January 24, 2020?

 6    A.   Yes, I do.

 7    Q.   At the time of your deposition you were under oath, right?

 8    A.   Yes, I was.

 9    Q.   At that deposition you were asked on page 82, line 20:

10            THE COURT:  Let's just give the witness and counsel a

11    chance to get to page 82, counsel.  Thank you so much.

12            MR. HOLZBERG:  Of course.

13            THE COURT:  You said page 82?

14            MR. HOLZBERG:  Page 82, line 20.

15            THE COURT:  Thank you.

16    A.   OK.

17    Q.   You were asked:

18    "Q.  Did Mario ever grab your buttocks?"

19    A.   I'm so sorry.  82.  I'm on the wrong page.  One second,

20    Zach.  I think this is missing page 82.

21            THE COURT:  Excuse me just one second.

22            Counsel, do you want to approach the witness and

23    assist her.

24            MR. HOLZBERG:  Yes, your Honor.  Thank you.

25            THE COURT:  Thank you.

1          Thank you, counsel.

2    Q.  Again, Ms. Qorrolli, we are looking at Plaintiff's Exhibit

3    6.  This is a copy of your deposition transcript.  We are on

4    page 82, line 20.  You were asked the question:

5    "Q.  Did Mario ever grab your buttocks?

6    "A.  Not my butt.  But like right here next to my butt and

7    thigh, yes."  Then, parenthesis, indicating.

8          Did I read that correctly?

9    A.  Yes.

10   Q.  You testified earlier that Mario grabbed your butt,

11   correct?

12   A.  Yes.

13   Q.  And you testified at a prior proceeding in October that

14   Mario grabbed your butt, correct?

15   A.  Yes.

16   Q.  Ms. Qorrolli, you were also asked questions earlier about

17   other women in the office that you observed Mr. Orantes

18   interacting with.

19          Do you recall that?

20   A.  Yes.

21   Q.  Just to clarify, what did you observe between Mr. Orantes

22   and Marina?

23   A.  Grabbing her, taking her into rooms, his hands around her

24   waist area.  I witnessed them chest to chest.  He was holding

25   her, kissing.

 1   Q.  Ms. Qorrolli, Mr. Wims was asking you whether or not

 2   putting hands on someone's waist, whether you deemed that to be

 3   unwelcomed.

 4           Do you recall that?

 5   A.  Yes.

 6   Q.  What is your perspective on that?

 7   A.  That is unwelcomed.

 8   Q.  Can you explain why you find that behavior to be

 9   unwelcomed?

10   A.  You're an employer.  You don't touch your employee.  You

11   don't put your hands on your employee.  That's unwelcomed.

12   Q.  Who was touching you?

13   A.  Mario.

14   Q.  Mr. Wims had also asked you a question, something having to

15   do with your boyfriend.

16           Do you recall that?

17   A.  Yes.

18   Q.  Just to be clear, your boyfriend at the time, that's not

19   your husband currently?

20   A.  No.

21   Q.  Did you ever ask your boyfriend to do anything to Mario?

22   A.  Never.

23           MR. HOLZBERG:  Thank you.  I have nothing further.

24           THE COURT:  Mr. Wims.

25   RECROSS EXAMINATION

```
 1   BY MR. WIMS:

 2   Q.  Mr. Holzberg just asked you about your EEOC charge.  You

 3   indicated Mr. Holzberg drafted it, correct?

 4   A.  Yes.

 5   Q.  Did you read it before it was filed with the EEOC?

 6   A.  I did read it.  I don't remember.

 7   Q.  Who was the source of the information that the attorney put

 8   in there?

 9   A.  I don't recall.

10   Q.  From whom did Mr. Holzberg get the alleged facts to put in

11   the charge?  Who told him?

12   A.  I told him.

13   Q.  So then when you read the complaint did you say to him,

14   this says pretended to touch, not touch?

15              MR. HOLZBERG:  Objection, your Honor.  The document is

16   not in evidence.

17              THE COURT:  Overruled.

18   A.  No, I didn't say anything.  I told him what I told him.

19   And how he decided to put it in there, I don't know legal

20   proceedings.  I don't know how things are written or what they

21   have to write.  I told him what I had to tell him.  And what

22   they wrote in there, I trusted that they wrote the correct

23   thing.  I don't know.

24   Q.  I understand that you don't know legal proceedings.  You do

25   know the difference between pretending to touch and touching,
```

1  correct?

2  A.  Right.

3  Q.  So --

4        THE COURT:  Next question, counsel.

5  Q.  Is it your contention, Ms. Qorrolli, that you wish to get

6  paid because Mr. Orantes touched your waist?

7  A.  I'm sorry.  Can you repeat the question.

8  Q.  You believe that you are entitled to be paid money because

9  Mr. Orantes touched your waist?

10        MR. HOLZBERG:  Objection, your Honor.

11        THE COURT:  Overruled.

12  A.  I don't understand the question.

13  Q.  Which part don't you understand?

14  A.  Being paid -- for him to pay me to touch my waist?

15  Q.  You are seeking money in this lawsuit, correct?

16  A.  I'm sorry.  I thought -- repeat the question one more time.

17  Q.  You think you are entitled to money damages because

18  Mr. Orantes touched your waist?

19  A.  I'm entitled to money damages for the mental abuse that he

20  put me through for having touched my waist and then the result

21  of not letting him have sex with me, continuing to put me in

22  that situation, yes, because he changed my personality.  He

23  changed who I am.  I'm not the person that I used to be when I

24  started working at Metropolitan Dental.

25        It was a continuous, vicious cycle.  Every day I woke

1    up in that state of mind.  Every day I was afraid to go to

2    work.  Every day I was afraid what was going to happen to me.

3    Every day I had to think maybe I should give into this person

4    so he can just leave me into peace.  It's not easy to wake up

5    every morning to not know if you have a job or not when you

6    have a family to support.

7              MR. WIMS:  Your Honor.

8              THE COURT:  Thank you.

9    Q.  But you discussed this controversy in a joking manner with

10   some of your friends and former coworkers, correct?

11   A.  No.

12   Q.  Didn't you say to Toya via text messages:  Mario is just

13   mad because I wouldn't let him hit it.

14   A.  Right.

15   Q.  He wants to hit it.

16             That's what you said, correct?

17   A.  I don't recall saying that.

18   Q.  OK.  Why did you just say right?

19   A.  I don't recall saying that on the text message.

20   Q.  In your mind, Mr. Orantes wanted to hit it?

21   A.  That's what Mr. Orantes wanted to do, yes.

22   Q.  But he didn't tell you that?

23   A.  He showed me that in other ways.

24   Q.  That wasn't my question, ma'am.

25   A.  No, he didn't tell me that.

1   Q.  And you drew whatever conclusions you drew based on what

2   you saw him do or not do, right?

3   A.  Well, grabbing my ass and putting his arms around my waist

4   and telling me, come closer to me and hugging and kissing me,

5   yes.

6   Q.  Let talk about that.  Grabbing your ass, you said.

7         I am just going to go a little further from what Mr.

8   Holzberg just went over in your deposition.

9   A.  Sure.

10  Q.  He said.  My question:  Did Mario ever grab your buttocks?

11  This is still page 82 of your deposition, line 20.  My question

12  was:  Did Mario ever grab your buttocks?  Your answer was:  Not

13  my butt, but like right here next to my butt and thigh, yes.

14        Next to the butt is not the butt, correct?

15  A.  No.  It is.  It's right here behind me.

16  Q.  Next to the butt is the butt?

17  A.  He grabbed this area.  He grabbed me right in this area.

18  Q.  All I'm asking you is --

19  A.  I felt his hand on my butt.

20  Q.  Is next to the butt the same as the butt?

21  A.  He felt -- I felt --

22        MR. WIMS:  Your Honor, would you ask the witness to

23  answer the question, please.

24        THE COURT:  I am going to ask you, Ms. Qorrolli, to

25  listen carefully to the question that's about to be put to you

1   and answer, if you can, fairly with a yes or a no.

2          Counsel.

3   Q.  Is next to the butt the same as the butt?

4   A.  It is not.  However --

5          THE COURT:  OK.  Thank you.

6   Q.  Then my next question after that:

7   "Q.  And that's the upper leg region that you say he touched in

8   the elevator when you were coming back from the gym?

9   "A.  Correct.  And he has made comments about my ass."

10         So he didn't touch your butt; he made comments about

11  them?

12  A.  No.  He touched my butt.

13  Q.  Why did you just testify as you did at your deposition?

14  You said not my butt, correct?

15  A.  I also indicated at the time of my deposition, with my hand

16  around what area that was.  So, again, when he touched me, I

17  felt his hand right on my thigh and butt area.

18  Q.  What did you feel --

19  A.  I felt his hand on me.

20  Q.  What did you feel when he pretended to touch your body?

21         MR. HOLZBERG:  Objection, your Honor.

22  Mischaracterizes the testimony.

23         THE COURT:  Overruled.  Sustained.  I'm sorry.

24         Next question.

25  Q.  You discussed the gym quite frequently with Mr. Orantes,

 1   didn't you?

 2   A.  Right.  He asked me quite frequently.

 3   Q.  Were you obligated to answer those questions?

 4   A.  No.

 5   Q.  Why did you?

 6   A.  Because I didn't want to say -- walk away and not answer

 7   him.  I wanted to be on his good side.  If he asked me

 8   something, I answered him.  I complied with everything that

 9   Mario asked me, every conversation Mario wanted to have with

10   me.  Everything he wanted me to do, I complied with Mario.

11   Q.  Not according to your testimony.  He wanted you to have sex

12   and you didn't comply?

13   A.  Except having sex, right, correct.

14   Q.  Were you into the gym and working out during the time that

15   you worked at Metropolitan Dental?

16   A.  Yeah.  I had no other time to do it.  I needed to keep

17   sane.

18          THE COURT:  Excuse me.  That's a yes?

19          THE WITNESS:  Yes.

20   Q.  And you discussed that with your coworkers?

21   A.  I don't recall.

22   Q.  I'm sorry?

23   A.  I don't recall.

24   Q.  But when you alleged there was the incident in the

25   elevator, you said his comment to you was, coming from the gym,

1    and you said yes.  Correct?

2    A.  Correct.

3    Q.  And you would tell him when you left for the gym, as you

4    testified earlier, correct?

5    A.  I am not sure if I told him for the gym.  I usually texted

6    him when I went out to get a cup of coffee.  I clocked out on

7    my lunch break to go to the gym.

8    Q.  When you texted him, you would tell him you were going to

9    the gym, right?

10   A.  Right.  When he told me I want you going forward to text me

11   every time you left the building, so if I went to the gym, I

12   also texted him, yes.

13   Q.  You believe that he told you to text him because he wanted

14   to have sex with you?

15   A.  He wanted me to text him because he wanted to know my

16   whereabouts.  He wanted control over where I was the whole

17   time.

18   Q.  Because you were at work, right?

19   A.  No other employee was under that control besides me.

20          THE COURT:  Excuse me.  We are going to stop again.

21          Question, pause, answer, pause.

22   Q.  How many of your coworkers did you ever see Mr. Orantes

23   discipline in front of you?

24   A.  Besides me and my mother, I have never been in a situation

25   where I saw Mr. Orantes disciplining any other employee.  May

 1   have happened when I wasn't there.  Not in front of me.

 2   Q.  As I said a moment ago, you don't know what the other

 3   coworkers experienced behind closed doors with Mr. Orantes or

 4   Dr. Cohen, right?

 5   A.  I don't.

 6   Q.  You would tell Mr. Orantes how many squats you did per

 7   workout session, correct?

 8   A.  I don't recall.  The incident where he asked me on the

 9   elevator how many squats do you do, I don't even recall

10   answering that question.  I don't recall any other time where I

11   told him how many squats I do.

12           MR. WIMS:  I have no further questions for this

13   witness, your Honor.

14           THE COURT:  Thank you.

15           Any redirect?

16           MR. HOLZBERG:  Yes, your Honor.

17   REDIRECT EXAMINATION

18   BY MR. HOLZBERG:

19   Q.  Ms. Qorrolli, even if you may have told Mr. Orantes how

20   many squats you did, that doesn't mean that you wanted him to

21   grab you, did you?

22   A.  No.

23           MR. HOLZBERG:  Thank you.

24           THE COURT:  Any recross?  Mr. Wims, any recross?

25           MR. WIMS:  None, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1                THE COURT:  You may step down.

 2                (Witness excused)

 3                THE COURT:  Plaintiff may call their next witness.

 4                MR. HOLZBERG:  Your Honor, we would like to call

 5     defendant Orantes to the stand, please.

 6                THE COURT:  Mr. Orantes, if you would come up here,

 7     please.

 8                MR. WIMS:  Your Honor, Mr. Holzberg is aware of the

 9     time constrictions Mr. Orantes is operating under.  We

10     discussed this at the final pretrial conference.  That was not

11     the first time the matter was discussed.

12                THE COURT:  OK.  Thank you, counsel.  We will go as

13     long as we can.

14                MR. WIMS:  Thank you.

15                MR. HOLZBERG:  Thank you, your Honor.

16                THE COURT:  Mr. Holzberg, would you clear the witness

17     stand, please, the exhibit.

18                MR. HOLZBERG:  Of course.

19     MARIO ORANTES,

20          called as a witness by the Plaintiff,

21          having been duly sworn, testified as follows:

22                THE COURT:  Ladies and gentlemen, this is a witness,

23     again, that both the plaintiff and the defendant wanted to

24     call, so this testimony is received on both the plaintiff's and

25     defendants' case.
```

1          MR. HOLZBERG:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MR. HOLZBERG:

4    Q.  Good afternoon, Mr. Orantes.

5    A.  Good afternoon, Mr. Holzberg.

6    Q.  I am going to be asking you a number of questions that call

7    for a yes or no answer.

8          Do you understand that?

9    A.  I do.

10   Q.  Can you please provide the state and county in which you

11   currently reside.

12   A.  Chatham, New Jersey.

13   Q.  Mr. Orantes, are you currently married?

14   A.  Yes, I am.

15   Q.  What is your wife's name?

16   A.  Angela Orantes.

17   Q.  How long have you been with your wife?

18   A.  Fifteen years.

19   Q.  Mr. Orantes, you're currently employed at Metropolitan

20   Dental Associates, correct?

21   A.  That is correct.

22   Q.  Dr. Cohen is the sole owner of Metropolitan Dental

23   Associates?

24   A.  That is correct.

25   Q.  If I refer to Metropolitan Dental Associates as MDA, you'll

1    understand what I mean?

2    A.  Yes, I will.

3    Q.  You started working at MDA when you were approximately 17

4    years old, right?

5    A.  Yes.

6    Q.  How old are you right now?

7    A.  51.

8    Q.  You've been at MDA for over 30 years, right?

9    A.  Yes.

10   Q.  You're the office manager of MDA, correct?

11   A.  Yes.

12   Q.  You've been the office manager for almost 25 years?

13   A.  Maybe a little bit longer.

14   Q.  As office manager at MDA, you receive a base salary, is

15   that correct?

16   A.  Yes.

17   Q.  And your base salary is $200,000, correct?

18   A.  Yes.

19   Q.  Metropolitan Dental Associates, Dr. Cohen is your only

20   supervisor, right?

21   A.  Yes.

22   Q.  Meanwhile, you supervise the dental hygienists, true?

23   A.  No.

24   Q.  You do not supervise the dental hygienist?

25   A.  I supervise their schedules.  They are licensed

1   professionals.  So they can only be supervised by Dr. Cohen.

2   Q.  Mr. Orantes, do you recall providing testimony at a prior

3   proceeding in October?

4   A.  Yes.

5   Q.  Do you recall being asked the question on page 227, line

6   25 --

7   A.  I don't have that piece of paper in front of me.

8   Q.  Understood.

9        MR. HOLZBERG:  Your Honor, would you like me to

10   provide him with a copy of the transcript?

11        THE COURT:  You can ask.

12        MR. HOLZBERG:  Thank you.

13   Q.  At that prior proceeding in October, page 227, line 25:

14   "Q.  Meanwhile, you supervised the dental hygienists, true?

15   "A.  Yes."

16        THE COURT:  Did you give that answer to that question

17   at an October proceeding?

18        THE WITNESS:  Yes.

19   Q.  Mr. Orantes, you also supervised the billing department,

20   right?

21   A.  Yes.

22   Q.  What other departments, if any, do you supervise at MDA?

23   A.  I usually supervise the practice in different areas, but it

24   can deal with just schedules and doesn't necessarily need to

25   be -- like, for example, I cannot supervise a dentist or a

1   dental hygienist.  I supervise their schedules.

2   Q.  It's your testimony that you handle scheduling at MDA,

3   correct?

4   A.  No.  It is my testimony that I just said, that I can't

5   supervise dentists or dental hygienists.  That does not include

6   dental assistants, billing, people who do billing, the billing

7   department, front desk receptionist, administrative employees.

8   I just mentioned two types of employees.

9   Q.  Mr. Orantes, at the prior proceeding in October do you

10  recall being asked the question:

11  "Q.  You also handle scheduling at MDA, correct?"

12          And you providing the answer:  That is correct.

13          MR. WIMS:  Objection, your Honor.

14          THE COURT:  Sustained.

15  Q.  Mr. Orantes, during the time that Ms. Qorrolli was working

16  at MDA, there were four different locations, correct?

17  A.  Yes.

18  Q.  Now there are three?

19  A.  Yes.

20  Q.  What are the three locations that MDA currently maintains?

21  A.  225 Broadway, New York, New York; 327 Pennsylvania Avenue,

22  Brooklyn, New York; 88-01 Parsons Boulevard, Jamaica, Queens.

23  Q.  What was the address of the fourth location?

24  A.  447 Fulton Street in Brooklyn.

25  Q.  At the time when all four of these locations were open, you

1  worked with Dr. Cohen in supervising those locations, correct?

2  A.  No.  Just the location I predominantly worked in, which was

3  225 Broadway.

4  Q.  Mr. Orantes, do you recall giving prior testimony in the

5  October proceeding in which you were asked --

6          THE COURT:  Page.

7          MR. HOLZBERG:  I'm sorry, your Honor.  This is page

8  230, line 14.

9  Q.  You were asked the question:

10  "Q.  And at that time, when all four of these locations were

11  open, you worked with Dr. Cohen in supervising those locations,

12  correct?

13  "A.  That is correct."

14  A.  I helped him on occasion, but I am never in those

15  locations.  I am only at the location at 225 Broadway.

16  Q.  Your primary office is located at 225 Broadway?

17  A.  Yes.

18  Q.  And Tessa was employed by MDA as a dental hygienist,

19  correct?

20  A.  Yes.

21  Q.  Tessa also worked at 225 Broadway, right?

22  A.  Yes.

23  Q.  That means that as the office manager you and Dr. Cohen

24  directly supervised Tessa, correct?

25  A.  Together, yes.

1    Q.  Now, at the time that Tessa worked at MDA, there is no

2    handbook that contained policies for employees, correct?

3    A.  I don't believe so.

4    Q.  At the time there was also no written policy pertaining to

5    sexual harassment, right?

6    A.  There were posters on the wall.

7    Q.  Mr. Orantes, do you recall being asked in the October

8    proceeding --

9            THE COURT:  Page.

10           MR. HOLZBERG:  Sorry, your Honor.  I apologize.  231,

11   line 9.

12           THE COURT:  Counsel.

13           MR. HOLZBERG:  Thank you.

14   Q.  On page 231 line 9 you were asked the question:

15   "Q.  There is also no written policy pertaining to sexual

16   harassment, right?

17   "A.  That is correct."

18   A.  And I said the same thing just now.  All I said is there

19   are posters designating sexual harassment on the wall.

20   Q.  Mr. Orantes, are you aware that it's illegal to touch

21   employees inappropriately?

22   A.  Yes.

23   Q.  Are you aware that it's illegal to sexually harass someone?

24   A.  Yes.

25   Q.  Mr. Orantes, despite there being no employee handbook

1   during the time that Ms. Qorrolli worked at MDA, you have

2   suspended employees for violations of MDA's policies, right?

3   A.  Yes.

4   Q.  As office manager you had the authority to discipline

5   employees, right?

6   A.  Yes.

7   Q.  Now, in your capacity as office manager you have never

8   received a complaint of sexual harassment, right?

9   A.  No.

10  Q.  And during the time period when Tessa was an employee of

11  MDA, there was no written policy or procedure in place

12  pertaining to the handling of a discrimination or sexual

13  harassment complaint, correct?

14  A.  No.  Other than the posters on the wall that I mentioned

15  before.

16  Q.  Mr. Orantes, you have the authority to hire and fire

17  employees, correct?

18  A.  Yes.  With Dr. Cohen's supervision.

19  Q.  As office manager at MDA, you have fired dental hygienists

20  before, correct?

21  A.  With Dr. Cohen's consent, yes.

22  Q.  During the time that Tessa was employed at MDA, dental

23  hygienists each saw approximately 15 to 20 patients per day,

24  correct?

25  A.  Some saw less, but I would say no one saw more.

1    Q.  I'm sorry.  Could you repeat that.

2    A.  Some saw less, but none saw more.

3    Q.  What was the last part?

4    A.  No one saw more than 20 patients a day.

5    Q.  Mr. Orantes, you heard mention of an anonymous letter that

6    was sent to the office, right?

7    A.  Yes.

8    Q.  And do you recall seeing that letter at the time that it

9    was received?

10   A.  I remember seeing it, yes.

11   Q.  Do you recall approximately when that letter was received

12   at the office?

13   A.  No, I don't.

14   Q.  To your knowledge, did Dr. Cohen see that letter at the

15   time that it was received?

16   A.  I believe so.

17   Q.  Did you have any conversation with Dr. Cohen regarding that

18   letter after it was received?

19   A.  No.

20   Q.  So Dr. Cohen didn't address that letter with you?

21   A.  He had an investigation on the letter that had nonsense

22   malicious things on it, but I never spoke to him about it.  If

23   he was conducting an investigation, why would he tell me about

24   it.

25   Q.  Do you know the nature of that letter?

1   A.  Scandalous rumors that turned out not to be true.

2   Q.  Are you aware of the fact that that letter contained

3   allegations that you were sexually harassing females employees

4   at Metropolitan Dental Associates?

5   A.  There was no specific names saying that I sexually harassed

6   anyone.  It accused of many different things, but nothing

7   specific in nature.

8   Q.  Isn't it true that the letter directly accused you of

9   sexual harassment?

10          THE COURT:  That's a yes or a no.

11  A.  No.

12  Q.  No?

13  A.  No.

14          THE COURT:  Counsel, move on to your next topic.

15          MR. HOLZBERG:  Your Honor, may I show Mr. Orantes the

16  document to refresh his recollection?

17          THE COURT:  No.

18          MR. HOLZBERG:  I apologize.  One moment.

19  Q.  Mr. Orantes, you have said that there was an investigation

20  that took place in connection with this letter?

21  A.  Yes.

22  Q.  What was the investigation about?

23  A.  Dr. Cohen --

24          MR. WIMS:  Objection.  Asked and answered.

25          THE COURT:  Yes.  Counsel, this is a topic we have

1    discussed together, so you can ask who conducted an

2    investigation or how he knows there was one.  But, otherwise,

3    move on to your next topic.

4              MR. HOLZBERG:  Thank you, your Honor.

5    Q.  Mr. Orantes, to the best of your knowledge, did there come

6    a point in time where there was an outside company that

7    specializes in sexual harassment that was retained to conduct

8    an investigation regarding the allegations contained in this

9    letter?

10   A.  Not that I'm aware of.

11   Q.  Did there come a point in time that an outside law firm was

12   retained to conduct an investigation with respect to the

13   allegations contained in that letter?

14   A.  Not that I'm aware of.

15   Q.  Mr. Orantes, it's your testimony that you were not

16   interviewed in connection with that letter?

17   A.  I don't recall.

18   Q.  Mr. Orantes, do you recall testifying in the October

19   proceeding.  I'm now on page 251, line 22.

20             MR. WIMS:  Objection, your Honor.  He asked the

21   question and then cited the line and continued.

22             MR. HOLZBERG:  I'm waiting for you to bring it up and

23   see if you have an objection.  But I am going to read it page

24   251, line 22.

25             Your Honor, may I proceed?

1          THE COURT:  Yes, you may.

2          MR. HOLZBERG:  Thank you.

3   Q.  You were asked the following question:

4          THE COURT:  Or, were you asked the following question?

5   Q.  Were you asked the following question:

6   "Q.  Mr. Orantes, were you interviewed in connection with the

7   letter that was received to the office?

8   "A.  Yes."

9   A.  What's the question?

10         THE COURT:  Were you asked that question and did you

11  give that answer in a prior proceeding?

12         THE WITNESS:  That was six or seven years ago.  I

13  don't recall.  It's exactly the same thing I said before.

14  Q.  Excuse me, Mr. Orantes.  This is the proceeding from this

15  past October.

16  A.  I don't have papers in front of me.  I don't know

17  specifically what you're talking about.

18         MR. HOLZBERG:  Your Honor, may I show the witness a

19  copy of the transcript?

20         THE COURT:  Sure.

21         MR. HOLZBERG:  Thank you.

22  A.  Thank you.

23  Q.  Mr. Orantes, you have just been handed page 251 of the

24  transcript from this past October, October 2022 proceeding.  We

25  are on page 251, line 22.  Please take a moment and read that

1    to yourself and let me know whether that refreshes your

2    recollection as to whether or not you were asked the question

3    and answer that I just posed.

4    A.  It does.

5    Q.  And?

6    A.  Yes, I was interviewed.

7    Q.  You were asked that question and gave that answer?

8    A.  According to this, yes.

9    Q.  Thank you.

10         Mr. Orantes, were you present when anyone else was

11   interviewed in connection with that letter?

12   A.  I don't recall.

13   Q.  Mr. Orantes, do you recall being asked at the prior

14   proceeding, on page 252, line 6:

15   "Q.  Were you present when anyone else was interviewed?

16   "A.  Not that I believe."

17   A.  I didn't recall.  That was the answer I just gave you.  If

18   that's what it says, that's what I meant.  Not that I believe.

19   Q.  Mr. Orantes, are you familiar with a prior employee of MDA,

20   Mercedes Vila?

21         THE COURT:  We are not going there, counsel.  Proceed.

22   Q.  Mr. Orantes, you maintain that you never sexually harassed

23   the plaintiff, correct?

24   A.  That is correct.

25   Q.  You maintain that you never sexually harassed anyone at

1   MDA, is that correct?

2   A.  That is correct.

3   Q.  Did you ever take Ms. Qorrolli by the hand and bring her

4   into an operatory room?

5   A.  Absolutely not.

6   Q.  Did you ever place your hand on her waist?

7   A.  Never.

8   Q.  Did you ever hug Ms. Qorrolli?

9   A.  Never.

10  Q.  Did you ever grab her cheeks?

11  A.  Never.

12  Q.  Kiss her on the cheeks?

13  A.  No.

14  Q.  Did you ever tell Ms. Qorrolli, I love you?

15  A.  No.

16  Q.  Did you ever tell Ms. Qorrolli, you're beautiful?

17  A.  No.

18  Q.  Did you ever tell Ms. Qorrolli, if you worked out your

19  brain as much as you worked out your ass, you would get a lot

20  further here?

21  A.  Absolutely not.

22  Q.  Anything to that effect?

23  A.  No.

24  Q.  Did you ever touch Ms. Qorrolli's body at any time during

25  her employment at MDA?

1    A.  Never.

2    Q.  Never a finger on Ms. Qorrolli's body?

3    A.  I have not touched any part of Ms. Qorrolli's body ever.

4    Q.  Have you ever touched any female employees at MDA?

5    A.  No.

6            THE COURT:  Counsel, let's focus on the plaintiff.

7    OK.  Thank you.

8    Q.  Mr. Orantes, was there ever an instance in which you were

9    in the lunch room with Marina where Ms. Qorrolli walked in?

10   A.  No.

11   Q.  Mr. Orantes, is Marina still employed at MDA?

12   A.  Yes.

13   Q.  Are you currently in a relationship with her?

14   A.  No.

15           MR. HOLZBERG:  I don't have anything further.  Thank

16   you.

17           THE COURT:  Cross.

18   CROSS-EXAMINATION

19   BY MR. WIMS:

20   Q.  Good afternoon, Mr. Orantes.

21   A.  Good afternoon, Mr. Wims.

22   Q.  Does Metropolitan Dental have an antidiscrimination policy?

23   A.  Now?

24   Q.  Yes.

25   A.  Yes.

```
 1   Q.  Is that in writing?

 2   A.  Yes, it is.

 3   Q.  Is there one regarding harassment?

 4   A.  Yes, there is.

 5   Q.  Do you recall when that was first promulgated?

 6            MR. HOLZBERG:  Your Honor, objection.

 7            THE COURT:  Overruled.

 8   A.  I believe somewhere in 2017.

 9   Q.  Did you play a part in that?

10   A.  Yes, I did.

11   Q.  Are you privy to information as to why it was done in 2017?

12   A.  I think that's just when we got around to it.

13   Q.  Did you ever refer to plaintiff's mother as Hitler?

14   A.  No, I did not.

15   Q.  How would you describe your relationship with plaintiff

16   while you supervised her?

17   A.  It was very difficult to supervise her.

18   Q.  How so?

19   A.  She was a very emotional person.  She always cried any time

20   you told her to do something.  And she never took criticism.

21   Everything she thought that she did nothing absolutely wrong.

22   Q.  You testified a moment ago that you are married and have

23   been for approximately 12 years, did you say?

24   A.  Fifteen years.

25   Q.  Congratulations.
```

1    A.  Thank you.

2    Q.  Was there ever a time when Mrs. Orantes worked with you and

3    plaintiff?

4    A.  Yes.

5    Q.  Do you recall when that was?

6    A.  She didn't really work.  She just came to the office to

7    help me.  It wasn't a matter -- she wasn't employed by us.  She

8    came to the office to help.

9    Q.  Did you ever see plaintiff interact with your wife, sir?

10   A.  No.

11   Q.  Have you ever been in a relationship with Marina?

12   A.  No.

13   Q.  Faten?

14   A.  No.

15   Q.  Mercedes?

16   A.  No.

17   Q.  Fiona?

18   A.  No.

19   Q.  Toya?

20   A.  No.

21   Q.  Doreen?

22   A.  No.

23   Q.  Jeannette?

24   A.  No.

25   Q.  You indicated plaintiff cried a lot at work.  Did you ever

1   wipe her tears away in attempting to comfort her?

2   A.   Other than handing her a tissue, I never touched her.

3   Q.   Do you recall if you handed a tissue on one occasion or

4   more than one?

5   A.   It was probably more than one.  She was always crying.

6   Q.   You heard her allegations and you deny them, correct?

7   A.   That is correct.

8   Q.   Why do you think she would make them then?

9        MR. HOLZBERG:  Objection, your Honor.  Calls for

10  speculation.

11       THE COURT:  Sustained.

12  Q.   Other than this lawsuit, did you ever have a problem with

13  plaintiff?

14  A.   No.

15  Q.   Were you friends?

16  A.   We were just professional -- I just knew her

17  professionally.  I wasn't friends with Tessa.

18  Q.   Did you supervise plaintiff's mother when she worked for

19  Metropolitan Dental?

20  A.   My sense of supervising is when I see something that's

21  wrong in the billing department that requires something that

22  has to do with dentistry, I would speak to Dr. Cohen.  A

23  hygienist, when they treat a patient, has to have certain

24  necessary documents and protocol to submit things to insurance

25  companies, and technically a hygienist works under the auspices

1   of a dentist, so I would not be able to supervise her without

2   Dr. Cohen.

3   Q.  Did you ever ask the plaintiff to submit fraudulent billing

4   to an insurance company?

5   A.  Absolutely not.

6   Q.  I know you denied that you touched the plaintiff.  Is it

7   possible that you brushed against her while working together

8   and she perceived that as intentional?

9   A.  I don't even recall that.  I never brushed intentionally,

10  so I would never know something happened accidentally.

11  Q.  Did she ever say to you, Mr. Orantes, you're making me

12  uncomfortable?

13  A.  Never.  Our conversations were only about a lack of

14  performance in her job.

15  Q.  Do you recall specific incidents of discipline you imposed

16  on the plaintiff?

17  A.  Yes.  There was many times that Ms. Qorrolli would do

18  scaling and root planing on patients.

19  Q.  So the jury can follow you, sir, what does scaling and root

20  planing mean?

21  A.  Scaling and root planing is the treatment that dental

22  hygienists do.  It's like a deeper cleaning than a prophylaxis.

23  And the hygienists would perform that service under the

24  auspices of a dentist.  The dentist would say it was necessary

25  and the hygienist would do it.

1   Q.  You're saying you have a specific recollection of

2   discipline in connection with that?

3   A.  Yes.  She was always missing the documentation that was

4   necessary to do the treatment appropriately, safely, and to

5   submit it to insurance companies.

6   Q.  When you say always, can you explain what you mean.

7   A.  There is many times that she took a shortcut and just did

8   the treatment without doing six point charting, which is

9   required by her licensing board to do.

10  Q.  Six point charting is what in short?

11  A.  That's when you probe a patient's mouth, and the patient

12  has to be physically present to do that.

13  Q.  Did you ever date the plaintiff, Mr. Orantes?

14  A.  Never.

15  Q.  Did you ever want to?

16  A.  Not at all.

17  Q.  How old are you currently, sir?

18  A.  Fifty-one.

19  Q.  Do you have children?

20  A.  I have four children.

21  Q.  Do you have custody of them?

22  A.  I'm the primary care giver of four children, one who is

23  severely disabled.

24  Q.  When you did give plaintiff feedback on her work

25  performance, what did you observe from her?

1    A.  An attitude or always saying that it wasn't her.  It's not

2    her fault.  Crying often, as it always happened that she was

3    unhappy that she was being told that she did something wrong.

4    It's hard to find hygienists, so we tried as much as possible

5    to work with her to try to give her the opportunity to do what

6    she is supposed to do.  But when it comes to licensing issues,

7    there are certain things that can't be missing.  But at the end

8    of the day, when I'm correcting her, I'm just protecting her

9    license and Dr. Cohen's.

10   Q.  Now, do you have the authority at Metropolitan Dental to

11   authorize free dental work?

12   A.  Only with Dr. Cohen's permission.

13   Q.  Do you recall if you ever did that for the plaintiff?

14   A.  Yes, I did.

15   Q.  How do you know that?

16   A.  Because there is dental treatment record of her being

17   treated in my office.

18   Q.  How do you know she didn't pay for that dental work?

19   A.  Because there is no ledger entries of payment.

20   Q.  What about her family members?

21   A.  Her sister had a root canal in our office done by

22   Dr. Foroughi.

23   Q.  This was during the time that the sister worked there?

24   A.  That is correct.

25   Q.  You worked with plaintiff, correct?

1    A.  I don't understand the question.  I apologize.

2    Q.  You formerly worked with the plaintiff at MDA, correct?

3    A.  That's correct.

4    Q.  You worked with the plaintiff's mother?

5    A.  That is correct.

6    Q.  And the sister?

7    A.  That is correct.

8    Q.  And the brother?

9    A.  That is correct.

10   Q.  You say that she and her sister both received free dental

11   care?

12   A.  And her brother.

13   Q.  And her brother?

14   A.  Yes.

15   Q.  How do you know this, sir?

16   A.  There is dental records showing that's the case.

17   Q.  Who authorized the noncharge?

18   A.  I did, after speaking to Dr. Cohen.

19   Q.  So you spoke to him regarding that?

20   A.  I would always speak to him about everything.

21   Q.  You have a specific recollection of that conversation?

22   A.  Yes.

23   Q.  Did there come a time, sir, when the plaintiff approached

24   you regarding a loan?

25   A.  Yes.

1   Q.  First, what year was that, if you recall?

2   A.  I think it was 2013 or 14.

3   Q.  What did she say, if you recall?

4   A.  She needed a loan because her brother had been arrested on

5   a gun charge.

6         THE COURT:  No.  We are not going to -- the jury shall

7   disregard.  She asked for a loan.

8   Q.  Did you provide the loan, sir?

9   A.  No.

10  Q.  Did Metropolitan Dental?

11  A.  No.

12  Q.  Did Dr. Cohen?

13  A.  No.

14  Q.  Do you recall why not?

15  A.  There was a substantial amount.

16  Q.  How much did she ask for?

17  A.  I think it was over $50,000.

18  Q.  When you say I think, what does that mean?

19  A.  It could have been more, but I think it was at least

20  $50,000.

21  Q.  Now, did you ever catch the plaintiff using her telephone

22  during work?

23  A.  Yes.

24  Q.  What did you do in response?

25  A.  I wrote her up for it.

 1   Q.  Do you believe that that occurred one time?

 2   A.  It occurred several times, and, again, the only time that I

 3   would really discipline her is when it was done in front of a

 4   patient.

 5   Q.  You heard the plaintiff indicate that throughout her tenure

 6   you threatened to fire her and her mother?

 7   A.  Yes, I heard that.

 8   Q.  Is that correct, sir?

 9   A.  We would tell her what would be necessary to continue her

10   employment.  I never used the term I am going to fire you.

11   Q.  Was that a conversation that you had with her alone?

12   A.  No.  With Dr. Cohen.

13   Q.  Did you ever have occasion to discipline the plaintiff's

14   mother during her tenure?

15   A.  Yes.

16   Q.  Do you recall about what?

17   A.  Some of the same lackings of recordkeeping and patient

18   care.

19   Q.  Did you know the plaintiff's mother when she had worked at

20   Metropolitan Dental before plaintiff came?

21   A.  Yes.

22   Q.  She was in a different office, though, correct?

23   A.  She was in a different office when it was only that office,

24   and I worked at that same location.  This is before 225

25   Broadway.

1    Q.  So what was your relation to the plaintiff's mother at that

2    time?

3    A.  I was the office manager.

4    Q.  So you were the plaintiff's mother's supervisor the first

5    time the mother worked and when she returned when plaintiff was

6    there?

7    A.  Yes.  Correct.  I probably had less interaction because she

8    was a dental assistant at the time and not a hygienist, but I

9    was the supervisor at the time.

10   Q.  Did the plaintiff's mother ever say to you, my daughter

11   believes you're harassing her?

12   A.  Never.

13   Q.  Did she ever make any complaint of that nature?

14   A.  Not at all.

15   Q.  Did you have occasion to discipline other employees during

16   plaintiff's tenure?

17   A.  Yes.

18   Q.  Did you ever do that in front of the plaintiff?

19   A.  No.

20   Q.  What's the normal procedure if you are going to discipline

21   an employee?

22   A.  The normal procedure is, if it has to do something

23   specifically with that employee, I speak to that employee

24   alone.  And when it had to do with hygiene, we had several

25   meetings with the hygienists because since Dr. Cohen is the one

 1   who has to supervise that, on those instances we would have

 2   most of the hygienists present if there was something wrong

 3   with something that all three of them did.

 4   Q.  Does Metropolitan have a policy regarding cell phone usage

 5   at work?

 6   A.  Yes, it does.

 7   Q.  Do you recall when that was first effected?

 8   A.  That's been there for as long as I can remember.

 9   Q.  What's the penalty for an infraction of that policy?

10   A.  You get a written warning the first time.

11   Q.  And the second?

12   A.  You might get another written warning, and then, after

13   that, you would be fired.

14   Q.  Three strikes you're out?

15   A.  Correct.

16   Q.  Do you recall if plaintiff had three strikes?

17   A.  I don't recall.

18   Q.  Mr. Orantes, we are almost done.

19          You discussed with Mr. Holzberg some alleged

20   differences between what you testified to here today and in a

21   prior proceeding?

22          MR. HOLZBERG:  Objection, your Honor.

23          THE COURT:  Overruled.

24   Q.  Correct, sir?

25   A.  Yes.

 1  Q.  Now, just to be clear, did you investigate when that letter

 2  came in?

 3  A.  I didn't investigate that.  Dr. Cohen did.

 4  Q.  What is your basis for saying that Dr. Cohen did?

 5  A.  Because I believe he interviewed people, and he interviewed

 6  me, I guess, at one point also.  This was a long time ago.

 7  Q.  Did that story change between October and now, sir?

 8  A.  Not at all.  Just what the specifics are and the

 9  recollection.  I've been through this now for several years, so

10  sometimes you forget which conversation you're talking about.

11  Q.  Very good.  Thank you, Mr. Orantes.  No further questions.

12          THE COURT:  Any redirect?

13          MR. HOLZBERG:  Yes, your Honor.

14  REDIRECT EXAMINATION

15  BY MR. HOLZBERG:

16  Q.  Mr. Orantes, you just testified that there were instances

17  in which you were correcting Ms. Qorrolli's work, correct?

18  A.  Yes.  With Dr. Cohen.

19  Q.  Mr. Orantes, you're not a dentist, right?

20  A.  That is correct, I am not a dentist.

21  Q.  And you're not a dental hygienist either, right?

22  A.  That is correct.

23  Q.  Mr. Orantes, did you ever tell Tessa that it was OK to use

24  her phone throughout the course of the day?

25  A.  Other than if she had a family emergency, because I know

1  her father was sick at some point and in the hospital, so I had

2  given her permission to use it for that reason, but never in

3  front of a patient or while treating a patient.

4  Q.  If it was outside of treating a patient, was she allowed to

5  use her phone?

6  A.  If it had to do with that time, yes.

7  Q.  Aside from that time, was she able to use her phone when

8  she was not with a patient?

9  A.  Typically, no.

10  Q.  Can you explain what you mean by typically no.

11      THE COURT:  Counsel, next topic.

12  Q.  Did you ever use your phone while you were at work?

13  A.  Yes.

14      THE COURT:  Counsel, next topic.

15  Q.  Mr. Orantes, you were just discussing issues that you

16  believed there were with Tessa's performance, right?

17  A.  Yes.

18  Q.  Now, does Tessa's performance have anything to do with

19  whether or not you sexually harassed her?

20  A.  No.

21  Q.  And how long have you worked with Dr. Cohen?

22  A.  Since 1989, so that's approximately 33 years.

23  Q.  Do you trust Dr. Cohen?

24  A.  I do.

25  Q.  Do you believe him to be a man of good judgment?

```
 1    A.  Yes.

 2    Q.  Do you believe him to be honest?

 3    A.  Yes.

 4    Q.  You were here yesterday when Dr. Cohen testified, right?

 5    A.  Not for the entire length since I had to leave at 3 because

 6    I have a disabled daughter that I have to take off a bus.

 7    Q.  Were you here when Dr. Cohen testified that he had no

 8    reason to doubt Tessa's honesty?

 9    A.  No, I was not.  I don't believe so.

10           MR. HOLZBERG:  Thank you.  I have nothing further.

11           THE COURT:  Any further questions?

12           MR. WIMS:  No, your Honor.

13           THE COURT:  You are excused.  Thank you.

14           (Witness excused)

15           THE COURT:  Ladies and gentlemen, we will take our

16    midafternoon recess.  Let Mr. Whertvine know when you are ready

17    to resume.  Please be seated, counsel.

18           (Jury not present)

19           MR. GILWIT:  I apologize, Judge.  I was trained to do

20    that.  That's why I always get up.

21           THE COURT:  Thank you, counsel.

22           Mr. Holzberg, anything to discuss at the break?

23           MR. HOLZBERG:  Thank you, your Honor.  Yes.

24           At this point, your Honor, we would look to introduce

25    Ms. Vila's deposition testimony.  Has your Honor made a
```

 1    determination yet regarding that issue?

 2            THE COURT:  Yes.  I am going to keep it out.  I'll

 3    give that ruling at the end of the trial day.

 4            So you have one more witness?

 5            MR. HOLZBERG:  Yes.  If Ms. Vila is not permitted to

 6    testify, we have one more witness.  I should say, we are not

 7    able to use her deposition testimony.

 8            THE COURT:  Yes.  Good.  That's the plaintiff's

 9    mother.  She will take the stand right after our break.

10            MR. HOLZBERG:  Yes, your Honor.

11            THE COURT:  Thank you so much.

12            Then the plaintiff will be resting?

13            MR. HOLZBERG:  Yes, your Honor.

14            THE COURT:  Thank you.

15            Mr. Wims, anything to raise during the break?

16            MR. WIMS:  No, your Honor.

17            THE COURT:  Thanks.

18            Mr. Whertvine will tell us when the jury is ready to

19    resume.

20            (Recess)

21            (Continued on next page)

22

23

24

25

```
 1                    (In open court)

 2                    THE COURT:  Bring in the jury.

 3                    (Jury present)

 4                    THE COURT:  Mr. Holzberg, you may call your next

 5      witness.

 6                    MR. HOLZBERG:  Thank you, your Honor.  As our next

 7      witness, plaintiff would like to call Ms. Nexhmije Qorrolli.

 8                    THE COURT:  Ms. Qorrolli, if you could take the

 9      witness stand.  If could you step up to the witness stand and

10      remain standing.

11                    (Witness sworn)

12                    THE COURT:  Please be seated.

13                    THE WITNESS:  Thank you so much.

14                    THE COURT:  If could you pull your chair forward.

15      Thank you so much.  And you can move that mic so it sits under

16      your chin.

17                    THE WITNESS:  Thank you.

18                    THE COURT:  Please state your full name and spell your

19      last name, your first name and last name.

20                    THE WITNESS:  Nexhmije Qorrolli.

21                    THE COURT:  Could you spell your first name, please.

22                    THE WITNESS:  N-E-X-H-M-I-J-E.

23                    THE COURT:  And your last name.

24                    Ms. Qorrolli do you need a break?

25                    THE WITNESS:  Q-O --
```

```
 1              THE COURT:  Okay.  Ladies and gentlemen, could you

 2     just leave the courtroom for a minute.  Return to the jury

 3     room.  Thank you.

 4              (Jury excused)

 5              THE WITNESS:  I'm so sorry.

 6              THE COURT:  So the record should reflect that the

 7     witness began to cry and could not speak, and so I excused the

 8     jury.

 9              I'm going to ask you to -- as has been mentioned, the

10     plaintiff spent a lot of her time on the stand crying as well.

11     So, I'll ask you to step down, Ms. Qorrolli, and Mr. Holzberg,

12     I'm going to ask you to meet with your witness and tell us when

13     she's ready to give her testimony.

14              MR. HOLZBERG:  Sure.  No problem, your Honor.  Thank

15     you.

16              THE COURT:  Thank you.

17              (Recess)

18              (In open court)

19              THE COURT:  Ms. Qorrolli, are you ready to resume?

20              THE WITNESS:  Yes, I am.  I'm so sorry.  I apologize.

21              THE COURT:  Please bring in the jury.

22              (Jury present)

23              THE COURT:  So, let me ask you again, Ms. Qorrolli,

24     how do you spell your last name?

25              THE WITNESS:  Q-O-R-R-O-L-L-I.
```

```
 1              THE COURT:  Counsel.

 2              MR. HOLZBERG:  Thank you, your Honor.

 3    NEXHMIJE QORROLLI,

 4         called as a witness by the Plaintiff,

 5         having been duly sworn, testified as follows:

 6    DIRECT EXAMINATION

 7    BY MR. HOLZBERG:

 8    Q.  Good afternoon, Mrs. Qorrolli.

 9    A.  Good afternoon to all of you.

10    Q.  I know that this may --

11              THE COURT:  Excuse me, counsel.  Just place a

12    question.

13    Q.  In what county and state do you currently reside?

14    A.  New Jersey, Bergen County.

15    Q.  How long have you lived there?

16    A.  For 10 years.

17    Q.  Who do you live there with?

18    A.  I live with my husband.

19    Q.  What is your husband's name?

20    A.  Emver Qorrolli.

21    Q.  Can you please spell that for the court reporter.

22    A.  E-M-V-E-R Q-O-R-R-O-L-L-I.

23    Q.  How long have you been married to your husband?

24    A.  35 years.

25    Q.  Mrs. Qorrolli, how many children do you have together?
```

```
 1   A.  I have three.

 2   Q.  How old are your children currently?

 3   A.  34, 32, and 29.

 4   Q.  Mrs. Qorrolli, where were you born?

 5   A.  I was born in Kosovo, Albania.

 6   Q.  While living in Albania, were you working?

 7   A.  Yes.

 8   Q.  What was your profession at that time?

 9   A.  I'm a dentist back home.

10   Q.  You were a dentist in Albania?

11   A.  Yes.

12   Q.  How long were you a dentist in Albania for?

13   A.  I was practicing for two years after I got my degree.

14   Q.  Did there come a point in time that you moved to the United

15   States?

16   A.  Yes.

17   Q.  When was that?

18   A.  1996.

19   Q.  Why did you leave Albania?

20   A.  We left for political situation.

21   Q.  How old were your children at that time?

22   A.  Six, four, and 18 month.

23   Q.  Can you please describe to the jury when you left Albania

24   and came to the United States, what was the situation?

25   A.  Yes.  It was May when we arrived first day in America.  We
```

1  had come from Kosovo with no money in our pocket, with my three

2  children, and with only one suitcase clothes.  That's how we

3  started in life, in this country.

4  Q.  When you moved to the United States, did you begin working

5  here?

6  A.  For first two years I couldn't work because my children was

7  little.  But at that time, right away, I start looking into my

8  profession, what I can do about it.  And I finished 24 courses

9  to become dental assistant, and I became -- I got my

10  certificate, and I start working as a dental assistant.

11  Q.  Once you became a dental assistant, did there come a time

12  that you started working?

13  A.  Yes.

14  Q.  Where was your first job?

15  A.  My first job it was through the agency.  I start working

16  for Dr. Cohen, but then it was in Brooklyn office, in Fulton

17  office.

18  Q.  At that time when you worked at the Fulton office, do you

19  recall approximately when that was?

20  A.  Sorry?  Repeat it again, please?  I didn't hear.

21  Q.  When you were working at MDA at the Fulton office, when was

22  that?

23  A.  Oh, it was 1999.  I was working there for about a year.  He

24  started me with $7 an hour.

25              THE COURT:  Excuse me.  The question was when was

```
 1          that.  You've answered that question.
 2                    THE WITNESS:  1999.
 3                    THE COURT:  Thank you.
 4                    THE WITNESS:  Yeah, okay.
 5     Q.   While you were working at MDA in 1999, who was your
 6     supervisor?
 7     A.   It was Sylvia.
 8     Q.   Were you supervised by Mario Orantes at that time?
 9     A.   No.  I never met Mario before.  I never heard about him.  I
10     never met him before.
11     Q.   Did there come a point in time where you received further
12     education in the field of dentistry?
13     A.   Yes, yes.
14     Q.   When was that?
15     A.   It was in 2004.  I decide to go back to school.  I
16     registered at college, in Hostos Community College in Bronx to
17     become dental hygienist.
18     Q.   Did you ultimately get your degree?
19     A.   Yes, I did.  I got my degree, my license, in 2008.
20     Q.   What license did you receive?
21     A.   I received as a RDH, associate.
22     Q.   What is an RDH?
23     A.   Registered dental hygienist.
24     Q.   Did you attend Hostos Community College with your daughter
25     Tesa?
```

```
 1  A.  Yes, I did.

 2  Q.  After you graduated, did you then start working as a dental

 3  hygienist?

 4  A.  Yes, I did.

 5  Q.  Where did you start working at that time?

 6  A.  I start working in Brooklyn, at that time we used to live

 7  in Brooklyn, and I worked for Dr. Klebanov as a dental

 8  hygienist.

 9  Q.  To be clear, Dr. Klebanov is not a part of MDA, right?

10  A.  No, no, no.  That is completely different office in

11  Brooklyn, my first job.

12  Q.  Mrs. Qorrolli, did there come a point in time that you

13  started working at MDA again?

14  A.  Yes.

15  Q.  Can you please tell us how that came about.

16  A.  Tesa graduated year after me.  And I said, let me tell her

17  to go and just look if they have any opening.  You know, you

18  need to get an experience.  So, I referred her to MDA, and I

19  told Tesa, Dr. Cohen knows me good.  And if -- you can tell him

20  that you are my daughter.  But if he's going to ask you that --

21  and tell him that I became a dental hygienist.  But if he's

22  going to ask you for me to go back there or anything, just tell

23  him that I have a job.  I was perfectly fine and happy with my

24  current job.  And Tesa went for an interview, and told him --

25          THE COURT:  No.  You weren't there.
```

```
1              THE WITNESS:  I'm sorry?

2              THE COURT:  You were not there at the interview.  So,

3    afterwards, did you hear back from someone?

4              THE WITNESS:  Yes, I did.

5              THE COURT:  Who was that?

6              THE WITNESS:  Dr. Cohen called me.

7              THE COURT:  What did Dr. Cohen say to you when he

8    called you?

9              THE WITNESS:  Dr. Cohen begged me to go back to work

10   for him when he find out that I became dental hygienist.

11   Q.  To the best of your knowledge, when you referred Tesa to

12   interview at MDA, did she ultimately get the job there?

13   A.  Yes, she did.  Because --

14             THE COURT:  That's a yes.  So, I'm just going to ask

15   you to listen to the question, and answer that question, and

16   not add anything.

17             THE WITNESS:  Okay.

18             THE COURT:  Okay?  So, I'm going to ask counsel to be

19   very clear with your questions to help the witness.

20             MR. HOLZBERG:  Sure, your Honor.  I'm trying.

21             THE COURT:  Thank you.

22   Q.  Mrs. Qorrolli, did you testify that Dr. Cohen called you

23   after Tesa had interviewed with him?

24   A.  After Tesa went for an interview there, Dr. Cohen called me

25   and I had to call him also, and we spoke on the phone.  And
```

1   he --

2              THE COURT:  Thank you.  Thank you.

3              THE WITNESS:  Okay.

4   Q.  Could you please tell us what you discussed with Dr. Cohen

5   over the phone.

6   A.  Over the phone, he told me, Nexhmije, you have to come

7   back.  I told him I have a job.  I'm not interested.  I'm happy

8   with my job.  He goes, please, Nexhmije, you have to come for

9   an interview.  I know who you are, what kind of worker you are,

10  how you work.  I know you are going to turn around for better

11  this place.  So, imagine if you're going to work together with

12  your daughter.

13             And I went for an interview, and I don't know, when he

14  said, like, imagine to work together with your daughter,

15  ultimately, he just changed my mind.  And I decide to go work

16  back for him.

17  Q.  Do you recall when you started working at MDA again?

18  A.  It was late of 2009, beginning of 2010.

19  Q.  What was your position when you were hired again at MDA?

20  A.  As a dental hygienist.

21  Q.  Do you recall how you were going to be paid at that time?

22  A.  Yes.  Hourly with W form.

23  Q.  Do you mean W-2?

24  A.  W-2, sorry, yeah.

25  Q.  What was your hourly rate of pay at that time?

1    A.  $50 an hour.

2    Q.  When you first started working again at MDA, can you please

3    describe your experience.

4    A.  When I first start working at MDA, it seems to be good.

5    Dr. Cohen notice lot of changes.  Even he called us and openly

6    he expressed how happy he got for me to go back to work.  Even

7    sometimes happen call me on the phone, tell me that, Nexhmije,

8    I'm so happy you came back to work for me.  And even he decide

9    to call me and we purchased all new scalers, instruments to do

10   cleaning.  Because he saw a lot of improvement.

11        But this didn't last for long.

12   Q.  When you say that it didn't last long, can you explain what

13   you mean by that, please.

14   A.  It didn't last for long, because once, you know, we met

15   with Mario, Mario found out how Dr. Cohen expressed openly how

16   happy with us --

17        THE COURT:  Excuse me.  Excuse me.  Counsel, I think

18   you are going to have to guide the witness by asking her

19   questions that ask her for what she saw, and the conversations

20   she participated in.

21        MR. HOLZBERG:  Sure.  I'm trying not to ask her

22   leading questions, your Honor, but I'll do my best.

23        THE COURT:  Okay.  Well, is there a point in time that

24   you want to direct her attention to?

25        MR. HOLZBERG:  Yes.

1   Q.  Ms. Qorrolli, when you said that it didn't last long.

2   Shortly after you were hired, was there any change in your

3   employment status?

4   A.  Yes.

5        THE COURT:  Thank you.  When was that?

6        THE WITNESS:  I'm just a little confused with the

7   question.  I'm sorry.

8   Q.  You said that your -- shortly after you started working

9   there, your employment status changed in some way?

10  A.  Again, I'm confused.  Sorry.

11  Q.  Did something happen to your job?

12  A.  Oh.  Yes.  I'm sorry, yeah.

13        When Mario find out that I was being paid with $50 an

14  hour, he decide to fire me.  And he fired me.  And I was on my

15  day off when I got called from Steve.  And he tells me that

16  they don't want to work anymore with you.  Which I got really

17  shocked and I said, what is this?  I'm a good worker, Dr. Cohen

18  likes me, everything is perfect.  He goes I don't know, they

19  just don't want to like you.

20        So I decide to call Dr. Cohen back, and ask him what's

21  going on.  Dr. Cohen, he told me, like, he has no idea.  It's

22  just Mario's decision that he decide to fire me.  And I told

23  him but, Dr. Cohen, you betrayed me.  You made me quit my other

24  job.  And now, we had a mortgage to pay, we had bills to pay.

25  Both our incomes came from the same place.  So I also start

1   crying, and I begged him to give me my job back.  Which he

2   decide to give me my job back, but then they lowered my rate.

3   They paid me $40 an hour.  From 50 to $40 an hour.

4   Q.  So it's your testimony that it was Mario's decision to

5   terminate you?

6   A.  Yes.  Yeah, even Dr. Cohen said that it's clearly Mario's

7   decision.  I don't know what to say, because whatever Mario

8   decide, Dr. Cohen went by that.

9   Q.  At that time, who was your supervisor?

10  A.  Mario.

11  Q.  How often did you interact with Mario?

12  A.  Daily, every day.

13  Q.  How long did you work at Metropolitan Dental?

14  A.  I worked for six years.  Six and something.

15  Q.  You interacted with Mario every day for six years?

16  A.  Yes, yes.

17  Q.  What were your interactions like with Mario at work?

18  A.  It was awful.  It was terrible.  It was scary.  Every day

19  going -- to work being afraid.

20  Q.  Can you explain why it was so awful and terrible working

21  with Mario?

22  A.  Seeing my daughter being sexually harassed every time --

23          MR. WIMS:  Objection.

24  A.  It was killing for me.

25          THE COURT:  Overruled.

1    A.  And not being able to do anything.

2    Q.  When you say not being able to do anything, what do you

3    mean?

4    A.  I mean because everybody was afraid from him.  I was afraid

5    from him.  Tesa was afraid from him.  She was fighting with her

6    life like in a way how to keep him away, and how to keep her

7    job, because both our incomes -- again I want to state this --

8    came from the same place.  We got a mortgage, which it was like

9    living our dream.  We came with a suitcase with no money in our

10   pocket, and being able to purchase a home, it was for us like a

11   dream.  And Mario, he knew that we got a mortgage.

12            MR. WIMS:  Objection.

13   A.  And he knew we are desperate for the jobs.

14            THE COURT:  Yes.  The statements are stricken.

15   Q.  Now, you said that you observed Mario sexually harassing

16   your daughter?

17   A.  Yes, I did.

18   Q.  Can you please tell us what you saw --

19   A.  I saw --

20   Q.  -- between Mario and your daughter?

21   A.  I saw him touching her, I saw him putting his hands on the

22   shoulder, putting his hand around the waist.  I saw him

23   grabbing her, pulling her on the hand, and take her to the

24   room, and close the door.

25   Q.  Did you, when you say that you saw Mario touching her, are

1    there any other instances of touching that you observed?

2    A.  Yes, I did observe.

3    Q.  Can you please tell us what else you observed?

4    A.  Yes, I observed also Marina, she was --

5           THE COURT:  No.  I'm sorry.  Counsel, you may inquire

6    as to observations of interactions with the plaintiff.  Thank

7    you.

8           MR. HOLZBERG:  May I inquire with respect to

9    interactions between Mario and other female employees?

10          THE COURT:  No.

11   Q.  Mrs. Qorrolli, aside from Mario touching your daughter, did

12   you hear Mario making any inappropriate comments to your

13   daughter?

14   A.  Yes.  Beside touching her, also she been called different

15   names.

16   Q.  What names did he call her?

17   A.  All the time, she being called from Mario and Dr. Cohen

18   that you are stupid, you are clueless, you are fucking idiot,

19   you are not worth it, you don't know nothing.  And all this

20   kind of names.

21   Q.  When you say that Tesa was called these things in the

22   office, was this in front of Dr. Cohen?

23   A.  Yes, it was, also in front of Dr. Cohen, also downstairs

24   when he wasn't there.  But also in front of Dr. Cohen when we

25   been called upstairs in his office.

1   Q.  When you and Tesa were called upstairs to speak with

2   Dr. Cohen, was Mario also present?

3   A.  Yes.

4   Q.  Can you please describe for us the best of your

5   recollection what was discussed during those meetings when you

6   were called upstairs with Dr. Cohen and Mario?

7   A.  Okay.  It's long time, like, has been six years after we

8   quit the job.  But, I can recall a lot of incidents.

9        We been called for a lot of things that it wasn't our

10   fault.  Because Mario, his way of manipulation, it was to get

11   us in trouble in front of Dr. Cohen, make us look bad like we

12   didn't do our job, which it wasn't true.  In order for him to

13   then, when we went downstairs, in order for him to go and try

14   to get to Tesa.

15        THE COURT:  Okay.  So, I'm going to strike that

16   answer.

17        I'm going to read the question back.

18        THE WITNESS:  Okay.

19        THE COURT:  If you can answer the question that you

20   were asked, that would be very helpful.

21        "Can you please describe for us, to the best of your

22   recollection, what was discussed during the meetings when you

23   were called upstairs with Dr. Cohen and Mario?"

24        So, who said what?

25        THE WITNESS:  Okay.

```
 1              When we been called upstairs, for instance, Mario
 2     pulled Tesa's chart and my chart, they just say showing to the
 3     Dr. Cohen that, oh, you didn't do deep cleaning, which is
 4     scaling and root planing, with this insurance.  But, he didn't
 5     show that the patient had deep cleaning.
 6              THE COURT:  Excuse me.  What was said?  That's what
 7     you were asked.  What did Mario say?  What did Dr. Cohen say?
 8     What did you say?
 9              THE WITNESS:  Mario said to Dr. Cohen, look,
10     Dr. Cohen.  He grabbed the chart.  Open up the chart.  And said
11     to Dr. Cohen, Dr. Cohen, you see, Nexhmije didn't do deep
12     cleaning on this patient.
13              But he didn't give me chance to explain why I didn't
14     do that cleaning.  Also, he didn't explain to Dr. Cohen that
15     that insurance covered deep cleaning every six month, but I
16     didn't do deep cleaning every six month because patient didn't
17     need deep cleaning every six month.
18              Because I been told, me and Tesa, from Dr. Cohen, that
19     we have to maximize insurances.  So basically, we were
20     threatened from Mario directly, and Dr. Cohen, that we have to
21     maximize insurances.  We have basically, we have to work based
22     on insurances, not based on patient's need.  What patient they
23     need.
24              And it was a lot of other incidents.  It was another
25     one, he took the chart, and showed to Dr. Cohen, that I didn't
```

1   do sealants.  Sealants is procedure for kids.  And he didn't

2   show to Dr. Cohen that a kid had sealants six month ago.  What

3   other sealants I can place on the kid after six month again.

4   So, this kind of blame he tried to do for us, which completely

5   was untrue.

6           THE COURT:  Thank you.

7   Q.  When you were in these meetings in which Mario was blaming

8   you to Dr. Cohen, did you happen to observe Tesa's reaction?

9   A.  Yes, I did.

10  Q.  Can you please describe for us what Tesa's reaction was?

11          THE COURT:  What did you see?

12  A.  Yes.  It was one, not one time, many times.  But a time

13  when it was me, Tesa here, in front of Dr. Cohen and Mario.

14  And them blaming on Tesa, yelling on her, calling her names,

15  you are fucking idiot, you don't know nothing.  All it was

16  blame, like why she doesn't know that air conditioning was

17  broken.  She was sent home.  Why assistant they didn't clean.

18  I was sent home.  And I saw Tesa, like, getting so pale, start

19  shaking, her arteries here, it looks like they want to pop.

20  But same thing happened to me also.  And since then, we -- and

21  still, I have anxiety.  It was an example, like.

22          MR. WIMS:  Objection, your Honor.  Move to strike.

23          THE COURT:  Yes.  The jury shall disregard the last

24  statement of the witness.

25  Q.  Mrs. Qorrolli, did there come a point in time that it came

1   to your attention there were complaints about patient wait

2   times?

3   A.  Yes.  It did.

4   Q.  What do you recall about the patient complaints regarding

5   wait times?

6           THE COURT:  No, counsel.  You may inquire as to a

7   discussion on that topic with either of the defendants.

8           MR. HOLZBERG:  Sure.  Thank you.

9   Q.  Mrs. Qorrolli, did you have any conversations with either

10  Mario or Dr. Cohen regarding complaints from patients regarding

11  wait times?

12  A.  Yes.  Yes.

13  Q.  Can you please describe for us those conversations that you

14  had.

15  A.  Every time in the floor it was me, Tesa, and at least one

16  more hygienist or two, so basically, three hygienists or four

17  hygienists.

18          THE COURT:  Excuse me one second.  I'm sorry to

19  interrupt.  But counsel, you need to direct her to a meeting

20  where the topic was discussed and bring out the conversation.

21          MR. HOLZBERG:  Okay.

22  Q.  Do you recall having a specific conversation with Dr. Cohen

23  and Mario pertaining to patient complaints regarding wait

24  times?

25  A.  Yes.

1    Q.  Do you recall when that was?

2    A.  We went upstairs to complain about the other hygienist,

3    that they not working, they not seeing patient.  And patients,

4    they start complaining for a wait time because all those

5    patients, it was on my hands and Tesa's hands.  The other

6    hygienist having sexual relationship with him used to disappear

7    for an hour from the office.  So --

8            MR. WIMS:  Objection.

9    A.  -- we had to complain to Dr. Cohen.

10           THE COURT:  Yes.  It's stricken.

11           MR. WIMS:  Thank you, your Honor.

12   A.  And Dr. Cohen --

13           THE COURT:  Excuse me.  There's no question pending.

14   Q.  Was there anything else that you discussed with Dr. Cohen

15   when discussing complaints regarding patient wait times?

16           THE COURT:  Counsel, we don't have a conversation yet.

17   We don't have who said what to whom.  If you want to explore

18   this, you may.  But you are going to have to bring out the

19   conversations so we know what this witness recalls as to who

20   said what.

21           MR. HOLZBERG:  Okay.

22   Q.  Mrs. Qorrolli, do you recall where you spoke with Dr. Cohen

23   and Mario regarding these complaints?

24   A.  Yes, I do recall.  It was upstairs.

25   Q.  Was anyone else present with you?

1   A.  Yes, me and Tesa.

2   Q.  Where were you at the time?

3   A.  In Dr. Cohen office.

4   Q.  Do you recall what you said to Dr. Cohen?

5   A.  We had sheets that we have to keep records for every

6   patient, how many patient we see and what procedures we do.

7   And we took our sheets, we went upstairs, and we told Dr. Cohen

8   that me and Tesa been seeing 20 patient, 30 patient a day, and

9   the other hygienist, Marina, and Faten, they wasn't seeing

10  maybe four, five patient.

11       So, Dr. Cohen called Faten upstairs and he told her to

12  bring her sheet.  And himself with a fact so Marina -- Faten

13  has only four, five patient in the sheet, and he decide to fire

14  her, which he did fire her.

15  Q.  During that meeting, did either you or Tesa tell Dr. Cohen

16  or Mario why Faten was seeing less patients?

17  A.  Yeah, we told him that she's not seeing many patient

18  because she's disappearing.  She is disappearing for an hour.

19  And everything we had, me and her to see every patient.

20  Q.  Did you ever observe personally Mario touching Faten?

21  A.  Yes.

22  Q.  Can you please describe what you saw when Mario touched

23  Faten.

24  A.  What I saw when Mario touch Faten.  I saw touch her, walk

25  together and grab her, same thing, and walk in the room and

1   close the door maybe for 30 minutes, up to probably 45 minutes.

2   And that happened in many rooms.  It happened.  I saw close the

3   rooms in perio department, in perio 4, it was a room 4 in

4   general department.  It was in front where we had the exam

5   rooms, even in the front room for up to 30 minutes, 45 minutes,

6   and no one -- nothing, everybody's scared to even say anything

7   or do anything.  He knows that everybody was scared from him.

8   That's why he got freedom to do anything.

9         THE COURT:  Excuse me.  Ladies and gentlemen,

10  disregard the last statement.

11  Q.  Did you ever personally observe Mario touching Marina?

12  A.  Yes.

13        THE COURT:  We're not going to go there, counsel.  Do

14  you want to focus on anything else with respect to the

15  plaintiff?

16        MR. HOLZBERG:  Sure.

17  Q.  Mrs. Qorrolli, when you saw Mario pull your daughter into a

18  room, what were you thinking at that time?

19        MR. WIMS:  Objection.

20        THE COURT:  Sustained.

21  Q.  Did you ever observe Mario go into a room with Tesa?

22  A.  Yes, I did.

23        MR. WIMS:  Objection.

24        THE COURT:  Excuse me one second.  There's been an

25  objection.

```
 1              Overruled.  Ask your next question.
 2    Q.  When you saw Mario and Tesa go into a room, how did you
 3    feel?
 4              MR. WIMS:  Objection.
 5              THE COURT:  Sustained.
 6    Q.  You said you observed Mario and Tesa going into a room,
 7    right?
 8    A.  Yes, I did.
 9              MR. WIMS:  Objection.  Move to strike, your Honor.
10              THE COURT:  Overruled.
11    Q.  Did Tesa ever tell you what went on when she was in a room
12    with Mario?
13    A.  Yes.  She told me.
14    Q.  So you spoke to Tesa about -- strike that.
15              You said you observed Mario putting his hands on Tesa?
16    A.  Yes, I did.
17    Q.  Did you ever speak with Tesa about that?
18    A.  Yes, I did.
19              THE COURT:  That's your answer.  Thank you.
20              MR. HOLZBERG:  Your Honor, may I inquire into the
21    discussion between Ms. Qorrolli and her mother?
22              THE COURT:  We'll take it one question at a time.
23    Q.  Mrs. Qorrolli, what did you discuss with Tesa pertaining to
24    you seeing Mario placing his hands on her?
25              MR. WIMS:  Objection.
```

```
 1                THE COURT:  Overruled.

 2                I'm sorry.  Do you have a year or any way to focus

 3    this at all, counsel?

 4                MR. HOLZBERG:  I'll try.

 5    Q.  Mrs. Qorrolli, how often did you see Mario place his hands

 6    on Tesa?

 7    A.  Many times.

 8                MR. WIMS:  Objection.

 9                THE COURT:  Overruled.

10    Q.  What was your response?

11    A.  Many times.

12    Q.  Over what time period?

13    A.  For six years that we been working there.

14    Q.  About how often would you say that you saw Mario put his

15    hands on Tesa during the time she worked at MDA?

16    A.  I cannot recall how many times, because that was

17    constantly.  Constantly, yeah.

18    Q.  Do you recall any specific instances in which you spoke to

19    Tesa about Mario putting his hands on her?

20    A.  Yes, I do.  Because it was a case that Mario pulled Tesa in

21    the room, and I start really getting afraid, getting scared

22    that what he is going to do.  Because even knowing my daughter

23    that she would ever never give sexually --

24                THE COURT:  No.  Excuse me.  That's not responsive to

25    the question.  Thank you.  Next question.
```

1       MR. HOLZBERG:  Thank you.

2  Q.  Why do you say that you were afraid?

3       THE COURT:  No.  No, counsel.

4  Q.  Mrs. Qorrolli, do you feel as though Mario liked you?

5  A.  No.  Mario never liked me.  Mario hated me.

6       MR. WIMS:  Objection.

7       THE COURT:  Overruled.

8  Q.  What made you feel that way?

9  A.  Made me feel, because he saw that I was trying to protect

10  my daughter --

11       MR. WIMS:  Objection.

12  A.  -- from sexually harassing her.

13       MR. WIMS:  Objection.

14       THE COURT:  Sustained.  Stricken.

15  Q.  Can you provide any specific examples that made you feel as

16  though Mario didn't like you?

17       MR. WIMS:  Objection.

18  A.  Yes, I can.

19       THE COURT:  Overruled.

20  Q.  What are those examples?

21  A.  It was an incident that Mario pulled Tesa in the room, and

22  like I said, I was really scared.  And I ran, and I opened the

23  door.  And I saw Mario very close to Tesa, and he just turned

24  the head and look at me.  And he goes, go out, mind your

25  business.  And he slammed the door and he called me Hitler.

 1   And it was another incident that he called me you are old.

 2   Q.  Can you describe the circumstance in which Mario called you

 3   old?

 4   A.  I cannot really recall exactly the incident.  But, I

 5   remember clearly that he called me you are old.

 6   Q.  Mrs. Qorrolli, was there a point in time that you

 7   complained to Dr. Cohen about the unwelcomed sexual advances

 8   Mario was making towards Tesa?

 9   A.  Yes.

10          MR. WIMS:  Objection.

11          THE COURT:  Sustained.  You may rephrase.

12          MR. HOLZBERG:  Thank you, your Honor.

13   Q.  Mrs. Qorrolli, was there a point in time that you

14   complained to Dr. Cohen about what you had seen in terms of

15   Mario putting his hands on Tesa?

16   A.  Yes.  Together with Tesa, we decide to go upstairs and --

17   Q.  Can you please tell me what you told Dr. Cohen when you and

18   Tesa went upstairs to speak with him?

19   A.  We told Dr. Cohen that Mario many times, how he acted with

20   Tesa, put hands on her and touching her and everything.  Also

21   with other womans.  But Dr. Cohen refused to hear.  He never

22   wanted to admit that.

23   Q.  Do you recall -- well.  I'll strike that.

24          Were there -- strike that.

25          How many occasions did you speak to Dr. Cohen about

1    Mario touching Tesa?

2    A.   Many.

3    Q.   Can you provide any more detail?

4    A.   We came to the point that even we wrote a letter to

5    Dr. Cohen and we gave it to him, because he never wanted to

6    listen to us, so --

7    Q.   My question was do you recall approximately how many times

8    you complained to Dr. Cohen about Mario touching Tesa?

9    A.   I cannot recall how many times, because it was many times.

10   Q.   That was over what period of time?

11   A.   From all six years that we been working.  I said just in

12   the beginning they let us a little bit, it was good.  But,

13   after every time, all the time.

14   Q.   In response to you telling Dr. Cohen that Mario was putting

15   his hands on Tesa, did Dr. Cohen ever take any action in

16   response?

17   A.   Never.  Never.  His response -- always it was --

18          THE COURT:  Excuse me.  You may say what he said to

19   you.

20   Q.   What was Dr. Cohen's response?

21   A.   Dr. Cohen's response it was to Tesa, you are fucking moron,

22   you are crazy, what are you saying.  That's what he said.  He

23   never wanted to admit or believe or to say to her, okay, so

24   give me time, I'm going to start investigating and see what's

25   going on.  He never did it.

1   Q.  So to your knowledge, was there ever any investigation that

2   Dr. Cohen conducted?

3   A.  No.  No, no, no, never, never.  He didn't do any

4   investigation, no.

5   Q.  Were you ever personally interviewed in connection with

6   those complaints that Mario was making advances towards Tesa?

7   A.  Repeat it again?  I'm sorry?

8   Q.  When you complained to Dr. Cohen that Mario was making

9   advances towards Tesa --

10  A.  Yeah.

11  Q.  -- were you ever interviewed in connection with any of

12  those complaints?

13          MR. WIMS:  Objection.

14          THE COURT:  Overruled.

15  A.  Yes.

16          THE COURT:  Were you ever interviewed in connection

17  with complaints you made to Dr. Cohen about the treatment of

18  your daughter?

19  Q.  Were you ever interviewed?

20  A.  Oh, no.  No, never, never.  From Dr. Cohen?  No.  No,

21  never.  No.  Yeah.  Never we been interviewed.

22          Sorry for not understanding the question.

23  Q.  No problem.  Don't worry about it.

24  A.  Yeah.

25  Q.  And as a result of Dr. Cohen failing to take any action in

1    response, did you observe any type of impact it was having on

2    Tesa?

3              MR. WIMS:  Objection.

4              THE COURT:  Sustained as to form.

5    Q.  What, if any, impact did you notice that these advances on

6    Tesa had on her?

7              MR. WIMS:  Objection.

8              THE COURT:  Overruled.  You may answer.

9              THE WITNESS:  Should I answer?

10             THE COURT:  Yes.

11   A.  Okay.  Tesa was abused mentally, Tesa was abused sexually.

12             MR. WIMS:  Objection.

13   A.  Tesa was abused verbally.

14             MR. WIMS:  Move to strike.  Non-responsive, Judge.

15             THE COURT:  Yes, yes.  So I'm going to strike your

16   answer, but I'm going to let counsel inquire as to what you

17   observed about your daughter's emotional state during a period

18   of time.

19             MR. HOLZBERG:  Thank you.

20             THE COURT:  Counsel, would you like to inquire?

21             MR. HOLZBERG:  Yes, thank you, your Honor.

22   Q.  Can you please describe for us any change that you observed

23   in Tesa's mental state during the time she was working at MDA?

24   A.  Yes.  Tesa, every time we been called upstairs, we came

25   downstairs, Tesa, she start crying, including me.  Tesa, she

1   start getting all anxiety, she start getting shaky, she start,

2   I don't know.  I don't know how we been able to start working

3   right after on a patient after all that being yelled and

4   screamed and calling all names and from them upstairs.

5   Q.  You said that you observed that Tesa developed anxiety?

6   A.  Yes.

7   Q.  Prior to working at MDA, did Tesa have anxiety?

8   A.  Never.

9   Q.  Prior to working at MDA, did Tesa have any type of

10  psychiatric issues?

11  A.  Never, ever.

12  Q.  Any problems with her mental health?

13  A.  Never, ever, ever.  Tesa used to be very happy.

14          THE COURT:  Okay.  You've answered.  Thank you.

15  Q.  How would you describe Tesa's emotional state prior to her

16  working at Metropolitan Dental?

17  A.  Yes.  Tesa used to be very happy girl.  Used to be loving,

18  used to be caring, she used to care a lot for her family.  She

19  used to help us a lot.  She used to help me cooking, especially

20  during the holidays.  Always she's been happy.  Because my

21  goal, it was to raise happy kids, loving kids, and caring kids,

22  and hardworking kids.  Which she was.  But she lost all that.

23  She's not anymore.  Tesa changed a lot.

24  Q.  When you say that Tesa changed a lot, in what ways did you

25  observe that she changed from working at MDA?

1   A.  Tesa now she doesn't like to, since then, even when we were

2   in Metro, never wanted to go out with friends.  She never

3   wanted to come anymore.  We came back from work, we worked from

4   7:30 to 7:30 at night, 12 hours.  It was around 9 o'clock when

5   we came back home.  And she used to go straight to the bed.

6   She didn't want to come downstairs anymore, eat dinner with us.

7   It was an incident I saw her, she went sleeping with scraps.

8   And when I asked her next morning why did you do that?  She

9   told me, mom, I have no force anymore, even to dress up or

10  something.  We came to the point, my husband drove us to the

11  work, me and her together --

12          THE COURT:  Do you need to take another break?

13  Ms. Qorrolli?

14          THE WITNESS:  I'm sorry?

15          THE COURT:  Are you okay?  Do you need to take another

16  break.

17          THE WITNESS:  No, I'm okay.  I'm sorry.  I'm okay.

18          THE COURT:  Thank you.  So counsel, place another

19  question.

20          MR. HOLZBERG:  Thank you, your Honor.

21  Q.  Mrs. Qorrolli, did you ever observe Tesa experiencing

22  anxiety while working at MDA?

23  A.  Yes, I did observe her experiencing anxiety.

24  Q.  Please tell us what you observed when Tesa was experiencing

25  anxiety at work.

```
 1   A.  Yes.

 2               MR. WIMS:  Objection.

 3   A.  I observed her --

 4               THE COURT:  Overruled.

 5   A.  I observed her --

 6               THE COURT:  You may answer.

 7               THE WITNESS:  Should I?

 8   A.  I observed her getting so stressed, all her cheeks was

 9   pale, her heart beating was so hard, her chest going like this.

10   Even she couldn't breathe one time.  I had to go and get cup of

11   water --

12               MR. WIMS:  Objection your Honor.

13   A.  -- and give it to her.

14               MR. WIMS:  The question was her observations.

15               THE COURT:  Overruled.

16               Next question, counsel.

17   Q.  Mrs. Qorrolli, did there come a point in time that you

18   observed your daughter experiencing panic attacks while working

19   at MDA?

20   A.  Yes.

21               MR. WIMS:  Objection.

22               THE COURT:  Sustained.

23   A.  It was always just --

24               THE COURT:  Excuse me.  There's been an objection.

25   Thank you.  Next question.
```

1          MR. HOLZBERG:  Sure.

2    Q.  Aside from experiencing anxiety at work, did you observe

3    any other changes to Ms. Qorrolli's emotional state while

4    working at MDA?

5          MR. WIMS:  Objection.

6    A.  Yes, I did.

7          THE COURT:  Overruled.  You may answer.

8          THE WITNESS:  Yeah?

9    A.  I did.  Beside the anxiety, panic attacks, also Tesa got

10   hurt herself.  Tesa from the pain --

11   Q.  Hold on one second.  When you're saying that you observed

12   Tesa experiencing panic attacks, can you please describe what

13   you observed.

14   A.  I saw her shaking, I saw her breathing so fast, I saw her

15   even not being able to breathe, I saw her chest so fast.  I had

16   to go get her cup of water.  And crying.  Even other employees,

17   they saw her.

18         MR. WIMS:  Objection.

19         THE COURT:  Overruled.

20   Q.  How often did you see Tesa having panic attacks while

21   working at MDA?

22         MR. WIMS:  Objection.

23   A.  Few times.  Many times.

24         THE COURT:  Overruled.

25   Q.  You can answer.

1        THE COURT:  She did.  "Many times."

2   A.  Yeah, I said many times, yeah.

3   Q.  Prior to working at MDA, did your daughter ever have panic

4   attacks?

5   A.  No, no, no, never, never.  I said Tesa was very happy, very

6   hardworking, full of life.  She never had any medical problem.

7   Never.

8   Q.  You also said that there came a point in time that Tesa was

9   hurting herself as a result of working at MDA?

10  A.  Yes, yes.

11  Q.  What how was Tesa hurting herself?

12  A.  Tesa start picking constantly on her nose, on the septum of

13  the nose here.  And by picking, picking, picking, she made a

14  hole.  I saw her even bleeding on her nose.  We went to the

15  doctor, and doctor diagnosed she perforated her septum here.

16  And when doctor asked her, and I asked her, why did you start

17  doing this?  She goes, mom, I have to cause myself bigger pain

18  in order to cope with all the stress and other pain they caused

19  to her.  So now, she has problem -- sorry.

20  Q.  Ms. Qorrolli, was there any other change in your daughter's

21  emotional state that you noticed as a result of her working at

22  MDA?

23  A.  Yes.  It's lot of change on her.  Like I said, now she's

24  not happy, always she's moody.  Just so easily she gets angry.

25  She doesn't want to stay anymore with the family or friends,

1   like used to be.

2   　　　　　But thank God now she has her daughter seven month.

3   And she's trying to keep herself good.

4   　　　　　THE COURT:  Next question, counsel.

5   Q.  Mrs. Qorrolli, did you observe these changes in Tesa's

6   emotional state have any impact on her relationships with your

7   family?

8   A.  Yes.

9   Q.  How so?

10  A.  Because Tesa didn't want to come anymore, like used to come

11  before, eat dinner or spend time with us or even helping me,

12  used to help me.  Even not going anymore with friends.  She

13  came to the point one time she goes, mom, I just want to end up

14  my life.

15  Q.  Tesa told you she wanted to end her life?

16  A.  Yes.

17  Q.  Do you recall approximately when that was?

18  A.  I cannot recall exact time.

19  Q.  Can you please describe to us the conversation that you had

20  with Tesa when she told that you she wanted to end her life?

21  A.  Yes.  Because she started explaining to me that at the

22  time, it was when she start telling me more in details what

23  Mario did to her.  Because --

24  　　　　　THE COURT:  That's it then.  Thank you.

25  Q.  To the best of your knowledge, did there ever come a point

1   in time that Tesa sought help in connection with the changes in

2   her emotional state?

3   A.  Yes, she did, yes.

4   Q.  Did Tesa ever talk to you about that?

5   A.  Yes.

6   Q.  What did she tell you?

7          THE COURT:  No, counsel.

8   A.  She --

9          THE COURT:  Excuse me.

10  Q.  Do you know if Tesa ultimately did seek treatment?

11  A.  Repeat it again, sir?

12  Q.  Did Tesa ultimately seek treatment for her mental health?

13  A.  Yes, yes.

14  Q.  What did she do?

15  A.  We decide together to go to see Dr. Seung Lee.  And we

16  expressed ourself everything to him.  And doctor put her on

17  medication.

18  Q.  Mrs. Qorrolli, you said that Tesa's emotional state changed

19  due to her employment at MDA.  Right?

20  A.  Yes.

21  Q.  And is that change still affecting her even now?

22  A.  Yeah, even now.  Yeah.

23  Q.  How so?

24  A.  Thank God for her daughter now she became a mom.  And you

25  know, spending time with baby and raising baby, other than

1    that, she never wanted to go with friends, she never wanted to

2    get when we gathered with the family or go out or -- she's

3    completely changed.  Tesa, she's not anymore she used to be.

4          I feel like all my life, my goal was to raise them

5    happy and loving, now they took all that hard work I did to

6    raise my kids, Dr. Cohen and Mario took it from me.  They threw

7    it in the garbage.

8          MR. WIMS:  Objection.  Move to strike.

9          THE COURT:  So, ladies and gentlemen, I'll give you

10   further instruction about this.  I'm going to let this

11   testimony stand, but there's not a claim here for any damages

12   to this witness.

13         The issue is you should listen to her, as you are,

14   with care, and decide what to accept or if anything to reject

15   of her testimony.  But you are to consider that in connection

16   with the plaintiff's claim.  It's the plaintiff's claim that's

17   at stake here.  And I'll give you more instructions about that

18   later.  Thank you.

19         Next question, counsel.

20         MR. HOLZBERG:  I have no further questions.  Thank

21   you.

22         THE COURT:  Yes.

23   CROSS-EXAMINATION

24   BY MR. WIMS:

25   Q.  Good afternoon, Ms. Qorrolli.

```
 1   A.  Good afternoon.

 2   Q.  You said that after plaintiff started working at

 3   Metropolitan Dental, her personality changed.  Correct?

 4   A.  Yes, correct.

 5   Q.  Did a doctor tell you that that was caused by anything that

 6   happened at Metropolitan Dental?

 7   A.  Yes.

 8   Q.  Which doctor?

 9   A.  Dr. Lee.

10   Q.  Dr. Lee told you that the changes in her personality were

11   attributed to what happened with Mario?

12   A.  He told us that --

13   Q.  Ma'am, it is a yes or no question.

14   A.  Yes.

15   Q.  You heard this conversation?

16   A.  Yes.

17   Q.  So you were in the session with the plaintiff?

18   A.  Yes.

19   Q.  So would it surprise you if your daughter testified earlier

20   that you just traveled to the sessions with her, but didn't go

21   in?  You were there?

22          MR. HOLZBERG:  Objection.

23          THE COURT:  Sustained.

24   A.  I was waiting for her and --

25   Q.  You were a patient of Dr. Lee's as well?
```

1   A.  Yes.

2   Q.  Were you unsure as to that answer?

3   A.  I don't recall the question, what you are asking me.

4   You're making me confused.

5   Q.  Are you currently Dr. Lee's patient?

6   A.  No.

7   Q.  Were you ever?

8   A.  No.

9   Q.  So what were you doing in the session with the plaintiff?

10  A.  I went together with her.

11          THE COURT:  Excuse me.  Excuse me.  Counsel, lower

12  your voice.

13          MR. WIMS:  Sorry, Judge.

14  Q.  What were you doing in the plaintiff's session with

15  Dr. Lee?

16  A.  I didn't feel myself good also, so we went together.

17  Q.  Okay.  How many sessions did you attend with your daughter

18  with Dr. Lee?

19  A.  I don't recall.

20  Q.  What's your best guess?

21  A.  I don't recall.

22  Q.  Did you tell Dr. Lee that you fled Kosovo?

23  A.  No.

24  Q.  Did your daughter tell Dr. Lee that you fled Kosovo?

25  A.  There was no reason to tell, because --

```
 1    Q.  Ma'am.

 2              THE COURT:  Excuse me.  That's a yes or a no.

 3    Q.  Did your daughter tell Dr. Lee that you fled Kosovo?

 4    A.  I don't recall.  I wasn't there.

 5    Q.  You what?

 6    A.  I don't recall I said.

 7    Q.  Then what was the last thing you said, "I wasn't there"?

 8    A.  I don't recall.

 9    Q.  What did you say after that?

10    A.  I said I don't recall.  I wasn't there, did she say or not.

11    I don't recall.

12    Q.  Did Dr. Lee prescribe you medication as well?

13              THE COURT:  That's a question for you, Mrs. Qorrolli.

14    Do you remember if he prescribed medication for you?

15              THE WITNESS:  I don't recall.

16    Q.  You don't recall?

17    A.  No.

18    Q.  He diagnosed you with depression, didn't he?

19    A.  Yes, with anxiety and depression.

20    Q.  Okay.  And he told you that was from Kosovo, correct?

21    A.  Repeat it again, please?

22    Q.  He told you your anxiety and depression were from Kosovo?

23    A.  No, that's not true.

24              MR. HOLZBERG:  Objection.

25              THE COURT:  Overruled.
```

```
 1   A.  That's not true.

 2   Q.  What did he say it was from?

 3   A.  It's from --

 4   Q.  I'm not asking your opinion.  What did the doctor say your

 5   depression stemmed from?

 6   A.  Nothing has to do with Kosovo.  Nothing has to do.

 7   Q.  That wasn't my question, ma'am.  What did the doctor say

 8   was the cause of your depression and anxiety?

 9   A.  From the work.

10   Q.  Exactly.  From Kosovo.

11   A.  No, no, no, not true.  Not from Kosovo.  I'm saying nothing

12   has to do with Kosovo.  We left Kosovo prior to war.

13            THE COURT:  Excuse me.  You may not have heard,

14   counsel.  I think she said from work.  Not from war.

15            THE WITNESS:  Yeah, from work.  Thank you.

16            THE COURT:  Thank you.

17   Q.  How did you meet Dr. Lee?

18   A.  How did I meet Dr. Lee?

19   Q.  Correct.

20   A.  I met him in -- what do you mean by how did I meet Dr. Lee?

21   Q.  How were you introduced to him?

22   A.  Because I needed help.

23   Q.  How were you introduced --

24   A.  My daughter needed help.

25   Q.  How were you introduced to Dr. Lee?
```

1    A.   As Tesa's mother.  I was introduced as Tesa's mother.

2    Q.   The first time that you saw Dr. Lee, you were accompanying

3    your daughter to the appointment?

4    A.   Yes.

5    Q.   Did he diagnose you with depression and anxiety before or

6    after the plaintiff's first session?

7    A.   I cannot recall.

8    Q.   How many times have you been diagnosed with depression and

9    anxiety?

10   A.   How many times?

11   Q.   How many doctors have diagnosed you with depression and/or

12   anxiety?

13   A.   No.  We been seeing only Dr. Lee.  Never before we been to

14   another doctor.

15   Q.   I'm not asking about what you and your daughter have done

16   jointly.  How many times have you been diagnosed by a doctor

17   with depression and/or anxiety?

18   A.   How many times?

19   Q.   Correct.

20   A.   I'm confused "how many times."

21   Q.   Is Dr. Lee the first doctor to diagnose you with

22   depression?

23   A.   Yes.

24   Q.   Anxiety?

25   A.   Yes.

1   Q.  When did that diagnosis occur, Ms. Qorrolli?

2   A.  It was like around I believe we -- 2014.  Around 2014.

3   Something like that.  I cannot recall exact.

4   Q.  Dr. Lee told you that this was a result of what was

5   happening at work?

6   A.  Yes.  Because we were explaining to him everything.

7           THE COURT:  Excuse me.  That was a yes.

8           THE WITNESS:  Yes, okay, sorry.

9   Q.  What's your first language, Ms. Qorrolli?

10  A.  My first language is Albanian.

11  Q.  The plaintiff is your oldest daughter?

12  A.  I'm sorry?

13  Q.  Is the plaintiff your oldest child?

14  A.  Yes.  She's my first.

15  Q.  Did she learn English or Albanian first?

16  A.  I did learn only --

17  Q.  Did she learn English or Albanian first?

18  A.  Albanian.

19  Q.  What did you experience working for Metropolitan Dental

20  that contributed to your depression, Ms. Qorrolli?

21  A.  Seeing my daughter being sexually harassed.  That was the

22  first, the most.

23  Q.  Let me ask you about that.  You didn't actually see, did

24  you see Mr. Orantes have sex with your daughter?

25  A.  No, I didn't.

1  Q.  Did you see Mr. Orantes kiss your daughter?

2  A.  No, I didn't.

3  Q.  Did you see Mr. Orantes expose his penis to your daughter?

4  A.  Expose what?

5  Q.  His penis.

6  A.  No.

7  Q.  Did you see him remove your daughter's clothes in front of

8  you?

9  A.  No.

10 Q.  So what you saw was him disciplining her, and you didn't

11 like it.

12 A.  No, that's not true.

13       MR. HOLZBERG:  Objection your Honor.

14       THE COURT:  Overruled.

15 A.  That's not true.  I saw him touch --

16       THE COURT:  Thank you.  Now, after this

17 cross-examination, Mr. Holzberg is going to ask you more

18 questions.

19       THE WITNESS:  Okay.

20       THE COURT:  So don't worry.

21       Wait one minute.  Maybe we need another break here?

22       A JUROR:  Yes.

23       THE COURT:  Okay, great.  Ladies and gentlemen, we'll

24 take a brief recess.  Thank you.

25       (Jury excused)

 1              THE COURT:  Please be seated, counsel.  You may step

 2    down.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  Ms. Qorrolli, I'm going to ask you to sit

 5    back there.  Thank you.

 6              MR. HOLZBERG:  Your Honor, may the plaintiff use the

 7    bathroom?  We're taking a break, right?

 8              THE COURT:  Yes.  Very quickly.

 9              MR. HOLZBERG:  May I go as well?

10              THE COURT:  Sure.

11              MR. HOLZBERG:  Thank you.

12              THE COURT:  Mrs. Qorrolli, I'm going to ask you to

13    stay.  Thank you.

14              (Recess)

15              MR. HOLZBERG:  Your Honor, can Mrs. Qorrolli now use

16    the bathroom now that her daughter is back?  They couldn't go

17    together.

18              THE COURT:  Absolutely.  If she needs to.  But

19    counsel, this is -- absolutely.  If she needs to.  Absolutely.

20    If she must.

21              MR. HOLZBERG:  Thank you.

22              THE COURT:  Ms. Qorrolli, why don't you come back up

23    here and take the witness stand.  I expect we'll be ready to

24    continue shortly.  Thank you so much.

25              (Jury present)

```
 1              THE COURT:  Mr. Wims, you may continue.
 2              MR. WIMS:  Thank you, your Honor.
 3   BY MR. WIMS:
 4   Q.  You testified, Ms. Qorrolli, that you saw Mr. Orantes touch
 5   the plaintiff's waist?
 6   A.  Yes.
 7   Q.  That's not a sexual harassment, is it?
 8   A.  It is, it is.
 9              MR. HOLZBERG:  Objection, your Honor.
10              THE COURT:  Overruled.
11   A.  Especially when it comes from your manager?
12              THE COURT:  Excuse me.
13              THE WITNESS:  Sorry.
14              THE COURT:  You've answered yes.  In your view it is.
15   So these questions imply in your view.
16   Q.  You saw Mr. Orantes touch her shoulder.  Correct?
17   A.  Yes.
18   Q.  And the hand?
19   A.  Yes.
20   Q.  But you never saw anything that was explicitly sexual, did
21   you?
22   A.  When Tesa --
23              THE COURT:  Yes or no.
24   Q.  Did you ever see him make an explicitly sexual act with
25   your daughter?
```

```
 1   A.  Not having sex.  I didn't see that.

 2             MR. HOLZBERG:  Objection.

 3             THE COURT:  Overruled.

 4   A.  She didn't allow that.

 5   Q.  Many times she was in the room with Mr. Orantes without

 6   you, correct?

 7   A.  Yes.

 8   Q.  So how do you know what she allowed?

 9   A.  How did I know what?

10   Q.  How do you know what she allowed?

11   A.  Because I know my daughter, who she is.

12   Q.  Okay.

13   A.  She would do everything, but never, ever giving sexually to

14   anybody to keep her job.

15   Q.  Do you have daily contact with your daughter?

16   A.  Yes, I do.

17   Q.  Did she have postpartum depression after the baby?

18   A.  After the baby, no.

19   Q.  No?

20   A.  No.  She got very happy.

21   Q.  Okay.  When --

22   A.  The depression, of course, is there, but not from the baby.

23   Q.  You know --

24   A.  That baby brought a joy in our life.  Thank God for that

25   baby.  We tried to forget.
```

1   Q.  You were able to determine what caused your daughter's

2   alleged depression?

3   A.  What do you mean depression?

4   Q.  How do you know the baby didn't do it?

5           MR. HOLZBERG:  Objection your Honor.

6           THE COURT:  Sustained.

7   A.  The baby?

8   Q.  Leaving Kosovo with one suitcase and your kids, it has to

9   be quite stressful, huh, Ms. Qorrolli?

10           MR. HOLZBERG:  Objection your Honor.

11   A.  It was kind of stressful.

12           THE COURT:  Excuse me.  There is an objection.

13           THE WITNESS:  Okay.  Sorry.

14           THE COURT:  It's sustained.

15   Q.  You used the terms awful, terrible, scary.

16   A.  Yes.

17   Q.  Right?

18   A.  Yes.

19   Q.  Which one of those did you experience when you saw

20   Mr. Orantes touch plaintiff's waist or shoulder?

21   A.  All of them.

22   Q.  It was awful?  How so?

23   A.  It was awful, it was scary.

24   Q.  How was it awful was my question.

25   A.  How was it awful?

1    Q.   Yes.

2    A.   Seeing your daughter being touched by her manager, that is

3    more than awful.  That is killing.  More than awful.  That is

4    killing.  Because your manager not supposed to touch you.  Not

5    supposed to make any comments on you.  Never.

6    Q.   Is that what a manager is supposed to do in America or

7    Kosovo?

8              MR. HOLZBERG:  Objection, your Honor.

9              THE COURT:  Sustained.

10   Q.   When Mr. Orantes allegedly touched her shoulder, it was

11   scary and terrible for you?

12   A.   It was embarrassing.

13   Q.   That's not what you said before.  You said it was awful

14   terrible and scary.

15   A.   It was embarrassing, it was very low from a manager being a

16   man and touching a woman, your employee.  It's terrible, it's

17   scary, it's awful, it's a shame.  Which they did to every woman

18   work in Metropolitan Dental Associate.  Every woman.

19   Q.   What about every woman?

20             THE COURT:  Counsel, let's not.

21   A.   They been sexually harassed.

22             THE COURT:  Let's go to a topic, new topic.

23   Q.   You indicated that Ms. Qorrolli was mentally and sexually

24   abused by Mr. Orantes, correct?

25   A.   Yes.

1   Q.  You never saw her being sexually abused by Mr. Orantes, did

2   you?

3   A.  No, because --

4   Q.  You've answered.  Thank you.

5   A.  No, I said --

6   Q.  You've answered.  Thank you.

7   A.  Just let me explain, please.

8   Q.  I'm not going to do that.  It was a yes or no question.

9          THE COURT:  Mr. Holzberg gets to ask you more

10  questions.

11         THE WITNESS:  Okay.

12  Q.  So why did you say that you saw her, under oath, mentally

13  and sexually abused when you just acknowledged you didn't?

14  A.  I did saw her being sexually abused.

15  Q.  You just acknowledged that you didn't.

16         THE COURT:  Excuse me, Mr. Wims.

17  A.  That's not true.

18         THE COURT:  Don't argue with the witness.  Place

19  another question if you have a question.

20  A.  I acknowledged that I didn't see her having sex.

21         THE COURT:  There is no question pending.

22         THE WITNESS:  Okay.

23  Q.  You helped the plaintiff write a letter in 2016 shortly

24  before the both of you resigned, correct?

25  A.  Yes.

```
 1   Q.  And you, after helping her compose that, you were with her
 2   when she gave it to Dr. Cohen, correct?
 3   A.  Yes.  Both of us, we went upstairs together.
 4   Q.  You read that letter before you gave it to him, right?
 5   A.  Yeah.
 6   Q.  Why didn't it mention anything sexual, harassment, abuse?
 7            MR. HOLZBERG:  Objection, your Honor.
 8            THE COURT:  Sustained.
 9   Q.  Why didn't you put that in the letter?
10   A.  We been told him verbally all the time.  But, she didn't
11   put in that letter because she was afraid that Dr. Cohen will
12   give to Mario, and once Mario find out, you know what he's
13   going to do.  He's going to fire us on the spot.
14   Q.  Wait a minute.
15   A.  Yeah.
16   Q.  You said she didn't put it in the letter.  You just said
17   you wrote the letter with her.
18   A.  Together.  But she wrote it.  But we were together.
19   Q.  So a moment ago when you said the two of you wrote it, you
20   misspoke?
21   A.  Both of us, but we cannot write one letter both of us.  We
22   been there both of us, we said both of us, but she did her
23   handwriting.  We cannot write same letter both two people.
24   Q.  The letter was typed, correct?
25   A.  Huh?  I cannot recall.  I know that we wrote it.  I cannot
```

1   recall if it was typed or not.  It has been six years ago.

2   Q.  Okay.

3   A.  We been waiting for this moment.

4   Q.  One of the things that you testified to was you said

5   plaintiff doesn't cook with you during the holidays anymore.

6   A.  Hmm-hmm.

7           THE COURT:  Is that yes?  Is that correct?

8           THE WITNESS:  Yeah.

9   Q.  And you believe that that's somehow related to the

10  Metropolitan Dental?

11  A.  Yes.

12  Q.  What's your basis for believing that, Ms. Qorrolli?

13  A.  Everything is related to Metropolitan Dental.

14  Q.  All I'm asking you is what is your basis for believing

15  that, ma'am.

16  A.  I don't understand the question.  What it's based on.

17  Q.  You said you believe --

18  A.  Yeah.

19  Q.  -- that her not cooking with you on the holidays is

20  attributable to her experience at Metropolitan Dental, correct?

21  A.  I just gave an example for holidays.

22  Q.  Is that correct or no?

23  A.  It's correct, correct.

24  Q.  What's your basis for that conclusion?

25  A.  My basis it's because all the time she's depressed.  All

1   the time she just goes with her life day by day.

2   Q.  The fact she's depressed doesn't mean she's not cooking

3   with you anymore because of what she experienced at

4   Metropolitan Dental.

5           MR. HOLZBERG:  Objection your Honor.

6           THE COURT:  Sustained.  Sustained.  Next topic.

7   A.  That's stupid.

8   Q.  You also said it was stressful for you watching your

9   daughter be sexually harassed at work?

10  A.  Yes, very.

11  Q.  You didn't see any sexual harassment at work of your

12  daughter?

13  A.  I said what I saw.  I cannot say what I didn't see and what

14  didn't happen.  I never said Tesa had sex with Mario, because

15  never happened.  I saw her what I said so far.

16  Q.  What you saw?

17  A.  I'm not make any lies.

18  Q.  Mr. Orantes taking her into a room and then close the door.

19  A.  Yeah, I saw her, yeah.

20  Q.  You don't know what happened behind the closed door.

21  A.  Yeah, behind the closed door.  I don't know what happened

22  with other womans also.  I don't know.  Mario never did this

23  thing in front of everybody.

24  Q.  You've answered.  Thank you.

25          THE COURT:  The jury shall disregard.  It's stricken.

```
 1   Q.  In addition to your daughter, you're also suing
 2   Metropolitan Dental, correct?
 3   A.  Yeah, together.
 4   Q.  What are you suing for?
 5   A.  She's suing for sexual.
 6   Q.  What are you suing?
 7   A.  I'm witness here.
 8   Q.  Please let me finish my question, Ms. Qorrolli.
 9   A.  Yeah.
10   Q.  What are you suing Metropolitan Dental for?
11   A.  I'm together with my daughter now.  I'm a witness.
12           MR. WIMS:  Judge, would you instruct the witness to
13   answer the question, please?
14           THE COURT:  So, Ms. Qorrolli, I'm sorry,
15   Mrs. Qorrolli.  Have you filed a lawsuit against Metropolitan
16   Dental Associates?  You.  Personally as a plaintiff.
17           THE WITNESS:  Me personally?  We did file --
18           THE COURT:  No, you.  Have you?
19           THE WITNESS:  Me personally?
20           THE COURT:  Yes.  Are you a plaintiff in a lawsuit
21   against Metropolitan Dental Associates?
22           THE WITNESS:  Here I'm witness.
23           THE COURT:  Absolutely right.  But, apart from this
24   trial, have you filed a separate lawsuit against Metropolitan
25   Dental Associates?
```

1          THE WITNESS:  Oh, now, sorry, now I understand the

2     question.

3          Yes, we did file another separate lawsuit against

4     Metropolitan Dental sorry.

5          THE COURT:  Thank you.

6     Q.  What are you suing Metropolitan Dental for?

7     A.  We suing for overtime.

8     Q.  Unpaid overtime?

9     A.  Yeah, unpaid overtime.

10    Q.  Who is your lawyer on that case?

11    A.  Same lawyer.

12    Q.  As your daughter?  Mr. Holzberg here?

13    A.  Yes.

14    Q.  Did you ever see Mr. Orantes grope any female at

15    Metropolitan Dental?

16    A.  Say it again?  Did I see?

17    Q.  Are you familiar with the term grope, G-R-O-P-E?

18    A.  Not really.  If you go simple, please.  Grope?

19    Q.  Withdrawn.

20         Given that -- withdrawn.

21         You and Dr. Cohen were friends after your first tenure

22    working at Metropolitan Dental, correct?

23    A.  Not after 10 years.  No.

24    Q.  No.  Let me rephrase.

25    A.  Okay.

 1   Q.  After the first time you worked at Metropolitan Dental, you

 2   and Dr. Cohen were friends, correct?

 3   A.  Yes.

 4   Q.  And he called you and asked you to come back as a friend

 5   while your daughter was there, correct?

 6   A.  Yes, yes, yes.

 7   Q.  So then, you want the jury to believe you thought your

 8   daughter was being harassed?

 9   A.  Yes.

10   Q.  But you never called Dr. Cohen and said, hey, friend, I

11   need you to help me out.

12   A.  I didn't have need to call him, because we been upstairs

13   and told him, complained many times, but he refused to hear

14   that.  He refused to believe that Mario does something like

15   that to my daughter and every other woman.  He never believed

16   that.  Which --

17   Q.  Hold on a second.  You never saw him do anything to any

18   other woman, did you?

19   A.  No, I did see.

20   Q.  What did you see?

21   A.  I did see Faten and Marina.  These two.  The other ones

22   they say, but I don't know what --

23   Q.  What did you see with Marina?

24   A.  With Marina, I saw Marina disappearing for an hour or maybe

25   longer than that.  I saw Marina --

1   Q.  You don't know what happened when she disappeared, correct?

2           MR. HOLZBERG:  Your Honor.

3   A.  No, I know.  Because --

4           THE COURT:  Excuse me.

5   A.  I saw them coming from the room together with Mario.

6           THE COURT:  Excuse me.  There's no question here.

7   There's been an objection.  So I have to sort this out.  So

8   we're just going to slow down.

9           THE WITNESS:  Okay.

10          MR. HOLZBERG:  I just ask that she finish the

11  question -- finish the answer.  I believe she was saying what

12  she observed.

13  Q.  You didn't see what happened behind closed doors with any

14  other female and Mr. Orantes at Metropolitan Dental, did you?

15  A.  Behind closed doors I didn't see.  But I saw Marina coming

16  from the room with her lipstick all over the mouth together

17  with Mario.

18  Q.  You've answered the question.

19  A.  Yes.

20  Q.  So you didn't see it, correct?

21  A.  I didn't see inside the door what happened.

22  Q.  Right.

23  A.  But I saw outside the door when Marina came out --

24  Q.  My question was did you see behind the doors.

25  A.  No, because how you going to see.

```
 1   Q.  No, I didn't ask you why.

 2              THE COURT:  Excuse me, Mr. Wims.  You cannot raise

 3   your voice.

 4              And Mrs. Qorrolli, part of the problem here is that

 5   you have to listen carefully to the question that's asked and

 6   just answer that.  You can't volunteer extra information.

 7   Okay?

 8              THE WITNESS:  Okay.

 9              THE COURT:  And that's causing a problem.  Okay?  So

10   please listen with care to the questions asked.  And again,

11   Mr. Holzberg can ask you more questions in a moment.

12              THE WITNESS:  Okay.

13              THE COURT:  Thank you.

14              So, slow down, counsel.  One question at a time.

15   Q.  Ms. Qorrolli, you claim that at some point Mr. Orantes

16   terminated your employment?

17   A.  Yes.

18   Q.  And that was towards the beginning of the second time that

19   you worked for Metropolitan Dental?

20   A.  Yes.

21   Q.  And did he tell you why he did that?

22   A.  They didn't give me any explanation.  When Steve called me

23   he just --

24              THE COURT:  You've answered.

25              THE WITNESS:  Sorry.
```

1   Q.  They hired you back, correct?

2   A.  Yes.

3   Q.  And do you remember what year that was?

4   A.  Yeah, it was after a year, right, I start working.  Yeah.

5   I think so.

6   Q.  So you weren't under the impression your daughter was being

7   harassed at the job.  They terminated you, then you asked to

8   return to that job?

9          MR. HOLZBERG:  Objection, your Honor.

10   Mischaracterizes the testimony.

11          THE COURT:  Overruled.

12   Q.  Correct?  You wanted to go back to where you claim your

13   daughter was being harassed, right?

14   A.  We needed the job.

15   Q.  Ma'am, did you want to go back to the place where you claim

16   your daughter was being harassed?

17   A.  I told you we needed a job.  Because Dr. Cohen made me

18   quit --

19          THE COURT:  Is that a yes or no?  Did you want to go

20   back, yes or no?

21          THE WITNESS:  I didn't want to go back.

22   Q.  But you did?

23   A.  But I did, yes, correct.

24   Q.  In fact, you could have gone back to the job that you had

25   quit when you returned to Metropolitan Dental, couldn't you?

```
 1                MR. HOLZBERG:  Objection, your Honor.

 2                THE COURT:  Well, sustained as to form.

 3   Q.  You could have returned to the job you quit, couldn't you,

 4   Ms. Qorrolli?

 5   A.  I'm confused here.

 6   Q.  You wanted to stay there, and then try to hit the lottery

 7   with the lawsuit.

 8                MR. HOLZBERG:  Objection.

 9                THE COURT:  Sustained.

10                MR. WIMS:  No further questions, your Honor.

11                THE WITNESS:  I'm very ashamed what you said.

12                MR. HOLZBERG:  Your Honor, may I?

13                THE COURT:  Yes, you may.

14   REDIRECT EXAMINATION

15   BY MR. HOLZBERG:

16   Q.  Mrs. Qorrolli, you said that you went with Tesa to see

17   Dr. Lee, correct?

18   A.  Yes.

19   Q.  But you also saw Dr. Lee yourself, correct?

20   A.  Yes.

21   Q.  And do you recall providing testimony at a prior proceeding

22   in October of 2022, in October you gave testimony?

23   A.  Yes.

24   Q.  Do you recall being asked the following question and giving

25   the following answer.  This question was asked by Mr. Wims.
```

```
 1   I'm on page 372, line 17.  Mr. Wims asked you:

 2   "Q.  When you went to visit Dr. Lee with the plaintiff, did

 3   Dr. Lee tell you what caused your anxiety or depression?

 4   "A.  Yes.

 5   "Q.  What was it?

 6   "A.  It was all from our job.  Hostile work environment,

 7   hostile environment working job."

 8   A.  Yeah.

 9   Q.  Now on line 25.

10   "Q.  The doctor told you that?

11   "A.  Yes."

12          Do you recall being asked that and giving those

13   answers?

14   A.  Yeah, yeah.

15   Q.  Now, Mr. Wims also asked you about another lawsuit that's

16   been filed?

17   A.  Yes.

18   Q.  And that lawsuit, you and Tesa are both plaintiffs suing

19   the same defendants, correct?

20   A.  Yes.

21   Q.  And you are suing them for unpaid overtime?

22   A.  Yes.

23   Q.  You are claiming that in that lawsuit, you were not paid

24   time and a half for hours you worked above 40 hours?

25   A.  Yes.
```

1   Q.  You also said that you observed -- Mr. Wims had asked you,

2   you observed Mario place his hands on other women in the

3   office, correct?

4   A.  Yes.

5   Q.  And you were starting to say.  What did you observe with

6   respect to Marina coming out of rooms with Mario?

7   A.  I saw her, her lipstick was all over her lips, her coat was

8   open when they came together from the room.  And being --

9   Q.  How many times did you see that?

10  A.  Many times.

11  Q.  What about Faten?

12  A.  Same with Faten.

13  Q.  At the time -- now we are going to shift a little bit.

14          Mr. Wims was just asking when you were rehired at MDA,

15  you were subsequently fired?

16  A.  Yes.

17  Q.  Then you got your job back, correct?

18  A.  Yeah.  First time I been fired, but they got me lower rate

19  from 50 to 40.  I got hired again.

20  Q.  When you asked Dr. Cohen to hire you back, had Mario begun

21  harassing Tesa at that point?

22          MR. WIMS:  Objection.

23          THE COURT:  Overruled.

24  A.  Say it again?  I'm sorry?

25  Q.  At the time when you asked Dr. Cohen for your job back --

 1  A.  Yes.

 2  Q.  -- had Mario begun harassing Tesa at that point?

 3  A.  Yeah, Mario began from the beginning.  Yeah.

 4          MR. HOLZBERG:  I don't have any other questions.

 5          THE COURT:  Okay.  It's 5 o'clock.

 6          MR. WIMS:  Your Honor, I was just going to ask one

 7  more question.  I would be done and this witness wouldn't have

 8  to return.

 9          THE COURT:  Does anyone need to leave?  We have the

10  most wonderful jury.  So, ask your one question.

11  RECROSS EXAMINATION

12  BY MR. WIMS:

13  Q.  You subsequently brought your daughter and your son to work

14  at Metropolitan Dental after you claim your daughter was being

15  harassed, correct?

16  A.  I didn't brought them.

17  Q.  Did you allow them to work there?

18  A.  It was their choice.

19  Q.  How did they find out about the opportunity?

20  A.  Because of us.

21          MR. WIMS:  No further questions, your Honor.

22          THE COURT:  Any further questions?

23          MR. HOLZBERG:  No, your Honor.

24          THE COURT:  You may step down.

25          (Witness excused)

 1              THE COURT:  Ladies and gentlemen, we'll see you

 2    tomorrow morning.  Do not discuss the case.

 3              (Jury excused)

 4              MR. HOLZBERG:  Your Honor I just wanted to ask, is it

 5    all right if Mrs. Qorrolli sits at the table for now?

 6              THE COURT:  This evening, yes.

 7              MR. HOLZBERG:  Thank you.

 8              THE COURT:  Absolutely.  She can remain there right

 9    now.  But in the morning, no.

10              MR. HOLZBERG:  Understood.  Thank you.

11              THE COURT:  Thank you.

12              Mr. Holzberg, is there anything that you need to raise

13    with me right now?

14              MR. HOLZBERG:  Yes.  Tomorrow, I mean, now that

15    Mrs. Qorrolli, her testimony is done, our case in chief is

16    over.  Tomorrow I anticipate we'll be giving our closing

17    statements.  So, I know that your Honor had indicated there was

18    going to be further discussion with respect to charging the

19    jury with punitive damages.  I just wanted to raise that to

20    your Honor's attention, knowing obviously tomorrow that the

21    jury may be deliberating shortly after our closing statements.

22              THE COURT:  Thank you.  So, I want to talk to counsel

23    about the charge.  Let me just see from Mr. Wims, is there any

24    other issue we need to address this afternoon?

25              MR. WIMS:  I don't believe so, your Honor.

1          THE COURT:  So let's talk about the jury charge.  As I

2   mentioned yesterday, I was planning to give essentially the

3   same charge to the jury as I gave last time.  That would

4   include a punitive damages charge, the same one that I gave

5   last time.  And I don't believe there were any objections, but

6   counsel, I'm happy to have a charging conference again with

7   you.  Have the charge available for you early in the morning

8   and a charging conference at 9 if you'd like.  It's up to you.

9          I think the one change I'm planning to make is from

10  the old charge at page 30, I had put in a charge of little over

11  a page about statements by those individuals who did not

12  testify.  I think we've largely kept that out, and so, I'm

13  going to read that over, but I'm planning probably to exclude

14  that.  But I don't think there's any other material change to

15  the charge.

16         So would you like a charging conference tomorrow or

17  are you willing to stand on the charging conference we had last

18  time?

19         MR. HOLZBERG:  Your Honor, we are willing to stand on

20  the charging conference we had last time.  We have no objection

21  to the charge that was used last time.

22         THE COURT:  Mr. Wims?

23         MR. WIMS:  We would prefer the conference, Judge.

24         THE COURT:  That's fine.  So, I'll have copies of the

25  jury charge available on counsel's table at 8:30 in the

1    morning.  And we'll have a charging conference at 9 o'clock.  I

2    expect when the jury arrives at 9:30, the plaintiff will rest

3    in front of the jury, the defendant will then rest in front of

4    the jury, and we'll move to summations.

5           Counsel, remember, you know, this is a different

6    trial.  You can't just rely on the summation you gave last

7    time.  It's this record.  Not that record.  So, I hope you're

8    conscious of that.  I'm sure you will be.

9           So, let me put my ruling on the record with respect to

10   Ms. Vila's deposition.

11          The plaintiff has subpoenaed Ms. Vila but decided not

12   to take steps to enforce that subpoena.  Instead has relied on

13   an offer, first, for the entire deposition, and then last

14   night, designated specific passages from roughly I think there

15   were 11 pages for the deposition.

16          The plaintiff has the burden of showing that Ms. Vila

17   is unavailable, and I do not believe he has carried that

18   burden.

19          I don't know of a Second Circuit case that has

20   directly talked about the unavailability standard under

21   804(a)(4).  Counsel haven't cited any to me.  I've looked at

22   *United States v. McGuire*, 307 F.3d, 1205, and *United States v.*

23   *McGowan*, 590 F.3d, 455.

24          But, essentially, I think it's a totality of the

25   circumstances test, weighing anything that's relevant to

1   determine whether a witness is truly unavailable.

2          My bottom line conclusion is that the witness just

3   doesn't want to come, not that she's unavailable.

4          In jury trials, the jury has a right to see the

5   witnesses in person testify before them.  There are exceptions,

6   but they're rare.  In this trial, as in most trials, the

7   availability of witnesses is critical, because the jury gets to

8   assess the witness and whether they're believable or not.  This

9   is, again, a case in which the ability to assess credibility is

10   central to the decision the jury will make on liability and

11   damages.

12          Some of the relevant history here is as follows:  The

13   plaintiff did not take any depositions of any co-workers during

14   the period for discovery, and that includes Ms. Vila's

15   testimony.  On the eve of the first trial, I received an

16   application for Ms. Vila's testimony to be taken by Zoom.

17   There was a representation at that time in counsel's letter

18   that she was unable to appear because she was experiencing

19   stage IV cancer.  I refused to allow Zoom testimony to be used

20   at the jury trial, but allowed the plaintiff to take a

21   deposition, and that is the deposition that we have.

22          As it turned out, the plaintiff was at work at her

23   place of employment, and that place of employment was in

24   Manhattan.

25          At the trial, at page 317, we discussed this issue.  I

1  found it a close call as to whether she was unavailable.  I

2  found the plaintiff's proffer with respect to the testimony

3  that would be offered insufficient, and therefore, the

4  deposition was not offered.  I did not allow it to be offered

5  at the first trial.

6         This time, I believe the pretrial order indicated that

7  the plaintiff was going to call three co-workers, and Ms. Vila

8  was among them.  At the final pretrial conference, I believe I

9  remember correctly that the plaintiff's counsel said that all

10  three had been subpoenaed, but two were beyond the 100-mile

11  limit, so, as it was, only Ms. Vila's subpoena was enforceable.

12         The plaintiff indicated that it intended to call

13  Ms. Vila to testify in person.  There was a discussion about

14  the failure to show that she was unavailable or to provide a

15  proffer of the relevance of testimony if she would be

16  available, and I advised counsel I would need both.

17         This Monday, the trial began, and I inquired as to

18  whether or not Ms. Vila would be testifying at trial.  And

19  plaintiff's counsel indicated that as of that time, Monday

20  morning, he still had no decision on whether or not Ms. Vila

21  would be testifying in person, but expected to know Monday

22  afternoon.

23         At lunch time, I received through plaintiff's counsel

24  a doctor's note dated February 2, indicating that the patient

25  could not attend court due to her medical conditions.

1      We discussed that issue at the end of Monday's trial

2  session, and I still did not have designated deposition

3  passages from the plaintiff, nor did the defense counsel.  So

4  last night, for the first time, plaintiff designated passages

5  from the deposition for the defendant to consider whether or

6  not it had objections.

7      Now, there were two doctors' letters with respect to

8  Ms. Vila's treatment, and I'm sad to say that she has a number

9  of medical conditions from which she's suffering.

10      The October 24 letter indicated that she's suffering

11  from severe anxiety disorder, and was unable to remain seated

12  for prolonged periods.  The doctor's letter at that time ended

13  by a statement "It is also not advisable for her to continue to

14  be exposed to situations that exacerbate her anxiety.  Please

15  allow her the appropriate accommodations."

16      The February 2 letter, which plaintiffs represent they

17  did not receive until February 6 in the afternoon, shortly

18  before it was sent to defense counsel and to me, reports that

19  the witness is suffering from serious health problems, much as

20  the October 24 letter did.  They both refer to a cancer

21  diagnosis.  Specifically in the February 2 letter, the witness

22  is described as having metastatic breast cancer, moderate,

23  persistent asthma, anxiety disorder, and spondylolisthesis.  I

24  believe I described this on the record yesterday.

25      The doctor who wrote the letter is one of those

1   specialists treating her for those conditions.  The letter from

2   February 2 indicates "The patient cannot attend court, trial

3   sessions due to her medical conditions.  Please afford her the

4   appropriate accommodations."

5        As I noted yesterday, I would be inclined, in normal

6   circumstances, to give enormous weight to any doctor's

7   statement and to presume that a doctor's statement of

8   unavailability, if this is what it is, should carry great

9   weight, and in most cases be determinative.

10        One, this wasn't provided to us until the trial had

11   begun.  There's no chance, realistically, for us to address

12   this issue now.

13        Up until yesterday, it was my understanding that

14   plaintiff was still intending for Ms. Vila to testify live.

15        In the circumstances, it appears to me, and I think I

16   mentioned this yesterday, that the doctor has accommodated a

17   witness's desire not to appear because of the emotional stress

18   that that would place the witness under.

19        I'm sorry, but participation in a trial for parties

20   and witnesses, can be stressful.  We would have done everything

21   we could to minimize the stress on any witness.  I have

22   listened to counsel for suggestions about how we can do that.

23   I don't expect the appearance would have been very long, and we

24   would have accommodated her schedule, because counsel cooperate

25   with each other in that regard, and I appreciate that.

1            This is serious business excusing a witness from

2    testifying in person at trial.  And I don't find the plaintiff

3    has carried her burden of showing unavailability of this

4    witness.

5            So thank you, counsel.  I appreciate your cooperation

6    here.  And I'll see you tomorrow at 9 a.m.  Thank you.

7            (Adjourned until February 8, 2023, at 9 a.m.)

1                       INDEX OF EXAMINATION

2    Examination of:                              Page

3    FORTESA QORROLLI

4    Direct By Mr. Holzberg . . . . . . . . . . . 167

5    Cross By Mr. Wims  . . . . . . . . . . . . . 211

6    Redirect By Mr. Holzberg . . . . . . . . . . 312

7    Recross By Mr. Wims  . . . . . . . . . . . . 318

8    Redirect By Mr. Holzberg . . . . . . . . . . 325

9    MARIO ORANTES

10   Direct By Mr. Holzberg . . . . . . . . . . . 327

11   Cross By Mr. Wims  . . . . . . . . . . . . . 340

12   Redirect By Mr. Holzberg . . . . . . . . . . 352

13    NEXHMIJE QORROLLI

14   Direct By Mr. Holzberg . . . . . . . . . . . 358

15   Cross By Mr. Wims  . . . . . . . . . . . . . 391

16   Redirect By Mr. Holzberg . . . . . . . . . . 414

17   Recross By Mr. Wims  . . . . . . . . . . . . 417

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    FORTESA QORROLLI,

4                     Plaintiff,              New York, N.Y.

5            v.                               18 Civ. 6836 (DLC)

6    METROPOLITAN DENTAL
     ASSOCIATES, D.D.S. – 225
7    BROADWAY, P.C., et al.

8                     Defendants.

9    ------------------------------x

10                                           February 8, 2023
                                             9:00 a.m.
11
     Before:
12
                           HON. DENISE COTE,
13
                                             U.S. District Judge
14

15                             APPEARANCES

16

17
     DEREK SMITH LAW GROUP, PLLC
18        Attorneys for Plaintiff
     BY:  ZACHARY I. HOLZBERG
19          DEREK SMITH
            CONSTANCE MOLLICK
20
     DAVID WIMS, LAW OFFICES
21        Attorneys for Defendants
     BY:  DAVID C. WIMS
22             and
     GILWITLAW
23        Attorneys for Defendants
     BY:  MARK D. GILWIT
24          (Trial resumed; jury not present)

25            THE COURT:  I am going to mark the draft jury charge

```
 1    as a court exhibit.

 2              THE DEPUTY CLERK:  Court Exhibit Number 2.

 3              THE COURT:  And the draft verdict sheet as an exhibit.

 4              THE DEPUTY CLERK:  Court Exhibit 3.

 5              THE COURT:  We will start with you, Mr. Holzberg.  Any

 6    objections or requests with respect to the draft jury charge?

 7              MR. HOLZBERG:  No, your Honor.

 8              THE COURT:  Thank you.

 9              Any requests or objections with respect to the special

10    verdict form, Mr. Holzberg?

11              MR. HOLZBERG:  No, your Honor.

12              THE COURT:  Thank you.

13              Mr. Wims, any objections or requests with respect to

14    the draft jury charge?

15              MR. WIMS:  No, your Honor.

16              THE COURT:  Any objections or requests with respect to

17    the special verdict form?

18              MR. WIMS:  No, your Honor.

19              THE COURT:  Thank you so much, counsel.

20              We will have a jury, I expect, they have been very

21    prompt, at around 9:30.

22              Mr. Holzberg, how long do you expect your summation to

23    be?

24              MR. HOLZBERG:  Maybe 15 minutes, your Honor.

25              THE COURT:  I'll give you a chance for a brief
```

1  rebuttal, but you can't withhold your summation arguments for a

2  rebuttal.  That wouldn't be fair.

3          MR. HOLZBERG:  Understood.

4          THE COURT:  Of course I'll give you a chance for a

5  very brief rebuttal if there is anything that needs to be said

6  after you hear Mr. Wims.

7          MR. HOLZBERG:  Thank you.

8          THE COURT:  Mr. Wims, you have heard that Mr. Holzberg

9  is planning on about a 15-minute summation.  How long do you

10  expect your summation to be?

11          MR. WIMS:  I expect it to be 15 to 20 minutes.

12          THE COURT:  Perfect.

13          MR. WIMS:  Your Honor, I'm sorry to interrupt you.  I

14  don't see in the charge.  Did the Court decide against

15  instructing the jury with respect to missing witnesses and

16  subpoena power?

17          THE COURT:  Yes.  I am going to leave that to counsel,

18  if necessary.  If there is anything said in summation that

19  suggests the parties don't have the power, subpoena power to

20  bring uncalled witnesses, I'll be alert to that and make it

21  clear to the jury that everybody has the power, subpoena power,

22  to bring witnesses to court or to obtain their testimony under

23  oath.

24          MR. WIMS:  Thank you, your Honor.

25          THE COURT:  Yes.

 1              When the jury comes in, I'll turn to you, Mr.

 2     Holzberg, and so you can rest formally in front of the jury,

 3     and then I'll turn to you, Mr. Wims, so you can rest formally

 4     in front of the jury.

 5              My deputy has kindly been able to obtain a podium

 6     since the official podium does not move, since it's so keyed to

 7     the electronics.  He obtained a free-standing podium that you

 8     could use.  It's sort of in the middle of the jury box, if

 9     you'd like.  You have your choice.  You can stand either place.

10              MR. HOLZBERG:  Thank you, your Honor.

11              THE COURT:  Good luck, counsel.  Thank you.

12              (Recess)

13              THE COURT:  We are missing defense counsel,

14     Mr. Whertvine.

15              We have defense counsel.

16              Bring in the jury.

17              We have all our jurors except one, so Mr. Whertvine is

18     going to look into that issue.  We will keep you advised.

19     Thanks so much, counsel.

20              (Recess)

21              THE COURT:  Our last juror has arrived.

22              Mr. Holzberg, you can move that wherever you want.

23              MR. HOLZBERG:  Thank you, your Honor.

24              THE COURT:  The podium, that is.

25              Bring in the jury.

1                    (Jury present)

2           THE COURT:  Good morning, ladies and gentlemen.  Thank

3     you again for being so diligent and making every effort to

4     arrive on time.  Of course we all thank the lawyers for

5     cooperating with each other to try this case efficiently.

6           Let me turn to you, Mr. Holzberg.

7           MR. HOLZBERG:  Thank you, your Honor.  The plaintiff

8     rests their case in chief.

9           THE COURT:  Thank you.

10          Mr. Wims.

11          MR. WIMS:  The defendants rest, your Honor.

12          THE COURT:  Thank you.

13          Ladies and gentlemen, the evidentiary portion of the

14    case is now complete.  You have heard all the evidence.

15          Now we come to the second time in this lawsuit when

16    the lawyers have an opportunity to address you directly.

17    Anything they say is not evidence, but of course what they say

18    is important to you.  It's their chance to tell you what they

19    think the evidence shows, to look at two or three or four

20    pieces of evidence, pull them together and ask for you to draw

21    certain inferences from that.  I know you will give them your

22    full attention.  But, remember, your recollection of the

23    evidence controls.

24          After the summations, I'll give you my charge as to

25    the law and you will begin your deliberations.

1          There will be three summations.  None of them will be

2     long.  But because the burden of proof rests on the plaintiff,

3     the plaintiff will start.  Defense counsel has a chance then to

4     give a summation argument.  And the plaintiff has a very brief

5     chance for a rebuttal.

6          Mr. Holzberg.

7          MR. HOLZBERG:  Thank you, your Honor.

8          Good morning, everyone.

9          First, I want to say thank you.  We made it.  We made

10    it after two long days of testimony and four witnesses.

11         You will recall, I said during my opening statement

12    that this is my last opportunity to speak with you until the

13    end.  Right now is my last opportunity to speak with you until

14    the case is fully over.  As the judge just said, I will have a

15    brief rebuttal.  But I have a lot to say right now because you

16    heard a lot.

17         And I understand how many times do we have to hear

18    this, how many times do we have to hear that.  I understand and

19    I just want to say thank you for your patience and for your

20    attention.  If I go talking a little bit long on the evidence,

21    I'm sorry.  I apologize in advance.  I only mention that

22    because maybe someone heard something that someone didn't, and

23    I want to make sure that you all understood everything that was

24    heard in this case.

25         Despite having four witnesses all testify in this

1   case, there is one undisputed fact that remains.  Nothing can

2   come out of this trial that disputes this fact, that Dr. Cohen

3   was put on notice of allegations that Mario Orantes was

4   sexually harassing female employees at MDA, undisputed.

5         My grandfather had some great expressions.  One of

6   them that I keep thinking on throughout the course of this

7   trial is, don't spit on my head and tell me that it's raining.

8   Don't tell us in this case that Tessa Qorrolli had trouble

9   taking constructive criticism from Mario and Dr. Cohen.  That's

10  not what happened here.  That's not what this case is about.

11  This is way beyond that.

12        Dr. Cohen is the owner of Metropolitan Dental

13  Associates and Ms. Qorrolli's supervisor.  And Mario, as the

14  office manager, is also her supervisor.  Mario complained to

15  Dr. Cohen about Tessa because she rejected his constant sexual

16  advances.  That's the trigger.  That is the trigger for Mario.

17  That's his modus operandi, how he acts.  If you reject his

18  sexual advances, he will complain about you to Dr. Cohen.  If

19  you reject his sexual advances, he treats you less well.

20        Now, the judge briefly mentioned our burden in this

21  case, and she is going to explain it to you further.  But it's

22  whether or not, by a preponderance of the evidence, meaning

23  more likely than not, we have put forth enough evidence to

24  establish that Ms. Qorrolli's claims tip the scales ever so

25  slightly in her favor.

1          Keep in mind, as we said, Mario was her boss.  She has

2    to do what her boss says.  It makes it so much worse when your

3    supervisor is making sexual comments to you, kissing your face,

4    grabbing your buttocks, putting his arms around you, saying,

5    Tessa, I love you, your body is so firm, nice butt.

6          Let's add this up.  You heard testimony that Mario

7    made unwelcomed sexual advances towards Tessa two to three

8    times per week.  You heard her testify to that.  Tessa worked

9    there for over six years.  That's over 312 weeks, meaning Mario

10   subjected Tessa to approximately 780 unwelcomed sexual advances

11   in her place of employment.

12          MR. WIMS:  Objection, your Honor.

13          THE COURT:  Overruled.

14          MR. HOLZBERG:  These were regular occurrences, ladies

15   and gentlemen.  You heard testimony that directly contradicts

16   Mr. Wims' assertion during his opening she is only touched

17   twice, just two times.

18          How did this happen?  Because Mario knew that he could

19   get away with it.  He could do whatever he wanted because

20   Dr. Cohen couldn't be bothered to do anything about it.

21   Dr. Cohen relied so heavily on Mario to run his practice that

22   to get rid of him would have been catastrophic.  You heard the

23   testimony.  I have ultimate trust in Mario.  Mario runs the

24   show.  He's my right-hand man.  This was calculated inaction on

25   behalf of Mr. Cohen.  Rather than get rid of Mario, he just let

it happen.  Mario was more valuable to him in his practice than

an hourly hygienist.  If they don't like it, they should leave.

I need him.  It's not my problem.  Except that it is.  Because

as the owner of a business, you are responsible to your

employees.  You have an obligation to protect your employees

from sexual harassment.

We heard testimony from both Dr. Cohen and Mario that

they know it's illegal to sexually harass someone.  The

advances that Mario made towards Tessa were based on her sex

because of the fact that she is a woman.

We also heard Tessa complain to Dr. Cohen numerous

times throughout the course of her employment.  She informed

him not only what she was experiencing herself, but that she

also personally observed Mario sexually harassing other women

in the office.  You heard her testify.  She told Dr. Cohen what

she observed Mario doing to Marina and Faten.  Tessa testified

herself.  She went to Dr. Cohen crying and said:  Dr. Cohen, I

don't want to have to be put in a situation where I have to be

sexually involved with Mario in order to be able to keep my job

here.  Do you remember what Dr. Cohen told Tessa in response?

You're fucking crazy.  Again, he just refused to acknowledge

what was going on because it was easier to ignore.  He

consciously dismissed and disregarded Tessa's complaints of

sexual harassment.

Now, we talked about that Tessa stayed there.  You

1   heard testimony that she needed the job.  Her mom as well.

2   They had a mortgage.  They came to this country with nothing

3   but a suitcase.  And for the first time in their life they were

4   able to purchase a home.

5          Keep in mind also, Tessa's mother testified that in

6   their home country she was a dentist.  She came here and took a

7   job as a dental assistant, as a dental hygienist, to be able to

8   provide for her family, to be able to put food on the table.

9   So why did Nexhmije stay at MDA?  To protect her daughter.

10         You also heard Mr. Orantes deny that he ever sexually

11  harassed Tessa or that he ever sexually harassed anyone at MDA.

12  However, you also heard Dr. Cohen testify that he has no reason

13  to doubt Tessa's honesty.

14         We all know that Dr. Cohen had notice of this letter

15  that was faxed to his office, this letter made allegations that

16  Mario was sexually harassing female employees at Metropolitan

17  Dental.  You heard testimony that Tessa and Mario spoke to

18  Dr. Cohen about this letter.  Dr. Cohen saw it and had notice.

19         Now, you also heard Mr. Orantes testify that defendant

20  Cohen conducted an investigation and recorded interviews in

21  connection with that investigation.  You know what struck me?

22  Where are those records showing the results of that

23  investigation?  Where are the recordings of these interviews?

24  Why aren't they here?  Why didn't they show them to us?  You

25  know why, and we know why.  Because it doesn't show what they

1    were hoping it would show.  If those records or those

2    recordings showed that Mario did not sexually harass female

3    employees at MDA, you would have heard them.  Don't you think

4    so?  Also, where is the employee handbook containing policies

5    of sexual harassment?  I didn't see it.  Did you?

6          By failing to have a policy pertaining to sexual

7    harassment and antidiscrimination in the workplace, they are

8    allowing it.  They are saying, this is OK.  We don't prohibit

9    this from happening in our workplace.

10          Also, defendants talked a lot about Tessa's

11   performance, how she was written up countless times.  Where are

12   these writeups?  I didn't see any.  Did you?

13          Throughout the course of this trial we heard a lot of

14   denials from Dr. Cohen and Mario, a lot of denials.

15   Mr. Orantes, did you ever sexually harass Tessa?  No.

16   Mr. Orantes, did you ever sexually harass anyone at

17   Metropolitan Dental Associates?  No, no, no, no, no, no.

18          You know what you didn't hear throughout this entire

19   trial?  Testimony from a single witness on behalf of the

20   defendants.  You heard them testify that MDA at one point had

21   over 100 employees just at their primary location, employees

22   that are under their control.  You would think that if Mario

23   never sexually harassed Tessa that they would have called at

24   least one of those employees to come in and say what a perfect

25   gentleman Mr. Orantes is.  He would never do such a thing.  But

1   they didn't bring in a single person to speak on his behalf.

2           You heard testimony that Tessa saw Mario and Marina,

3   another hygienist, in the lunch room behind the door kissing.

4   You also heard testimony that Marina still works for the

5   defendants.  Marina is currently an employee of MDA and is

6   still under their control.  They didn't bring her in to say

7   that didn't happen.  Do you really think for one second that if

8   Marina's testimony would have helped them, they would have

9   called her?  Of course.  Do you think that if for one second

10  Marina's testimony would have contradicted anything that Tessa

11  Qorrolli said, would they have called her?  Absolutely.

12          Now, the same goes for Dr. Cohen.  They did not

13  produce a single witness to support their contention that

14  Dr. Cohen cares about his employees, that he took steps to

15  prohibit sexual harassment in the workplace.

16          You heard Tessa testify that she also gave a letter to

17  Dr. Cohen's sister, Bonnie Cohen.  She was crying when she

18  handed Bonnie the letter.  Where was Bonnie Cohen at this

19  trial, defendant Cohen's sister, his own flesh and blood who is

20  an employee of MDA, also under his control.  Wouldn't you think

21  that Bonnie Cohen would have come in to testify on behalf of

22  her brother?  I do.

23          THE COURT:  Excuse me, counsel.  No.

24          MR. HOLZBERG:  Thank you.

25          Now, before I discuss the verdict sheet that you are

1    going to receive, I would lastly like to talk to you about

2    damages.  You heard Tessa testify that she felt she was losing

3    herself because of everything that occurred and everything that

4    she experienced while at MDA.  The way that Mario treated her

5    had a substantial impact on her.  She was stressed, anxious,

6    and depressed, so much so that she wanted to end her life.  You

7    also heard and saw that Tessa suffered from crying spells.  She

8    cried in the office on numerous occasions as a result of

9    Mr. Orantes' unwelcomed sexual advances.

10          You also heard testimony that for the first time in

11   her life Tessa needed to seek treatment related to her mental

12   health, psychiatric treatment.  There was testimony never in

13   her life had she ever seen a psychiatrist before.  Never in her

14   life had she taken medication before for her mental health.

15   But, as a direct result of what Mario was doing to her, she

16   needed to seek help.  She needed to seek treatment.  And so

17   much so that she needed to take medication.  She needed to take

18   medication for PTSD, panic attacks, anxiety, and depression

19   that was caused by defendant Orantes.

20          You heard testimony that Tessa took these medications

21   and went to therapy.  Her medication was even increased.  Still

22   didn't help.  The work environment was so intolerable that she

23   had to resign.

24          You also heard evidence from Tessa's mother, Nexhmije,

25   who also worked at MDA, the person who has raised her since

1    birth.  You heard her talk about how Tessa's emotional

2    well-being was impacted so much that she didn't even recognize

3    her own child anymore.  Nexhmije testified that her daughter

4    will never be the same as a result of Mario's conduct.

5          I was thinking about this last night.  Trying to end

6    your own life.  Life is precious.  We wake up, we go to work

7    every single day.  Can you imagine how horrible someone must

8    have felt if they decided they were going to end their life?

9    In their opinion, it can't get any better than this black hole

10   that they are living in.  They feel powerless, hopeless.  Their

11   desire to continue ceased.  Can you imagine how this must feel?

12   The pain is so bad that you do not want to continue living your

13   life anymore.  I can't.  I can't imagine it.  Every time I

14   think about it, I start to get emotional.

15         THE COURT:  Counsel, again, I'm asking you, please,

16   not about yourself; about the evidence.

17         MR. HOLZBERG:  Thank you, your Honor.

18         Tessa testified that, as a result of Mario's

19   unwelcomed sexual advances, she was humiliated.

20         Now, the defense said, there is a distinction between

21   allegations of sexual harassment and the right to provide

22   verbal feedback regarding an employee's performance.  Are you

23   kidding me?  You can't break somebody and then complain that

24   they are broken.  Tessa's work performance had absolutely

25   nothing to do with whether or not Mario Orantes subjected her

1    to unwelcomed sexual advances.  Mario testified to that

2    himself, plain and simple.

3           Now also, the defendants had the right to have Tessa

4    examined by one of their own psychologists, but they never did.

5    They had the right to have Tessa examined by a psychologist who

6    would have given their own independent opinion of Tessa's

7    psychological damages, but they never did.  You know why they

8    never did?  Because they feared that the psychologist would

9    have come into court and confirmed everything that Tessa told

10   her psychiatrist, Dr. Lee.  There has been no testimony from a

11   psychiatrist to come in here and say, you know what, I examined

12   her and I don't think her depression is real.  You know what, I

13   examined her and I don't think she has PTSD.  I don't think

14   that wanting to end her life was caused by Mario Orantes.  Why

15   didn't they call a psychologist?

16          We all know how important work is in our lives.  Most

17   of us spend our waking hours not at home but at work.  We

18   should have the right to feel safe in our work environment,

19   safe where we don't have to put up with sexual harassment.  We

20   should feel safe in our workplace.  Everyone has the right to

21   be free from discrimination, whether it's because of your sex,

22   your race, your age, your national origin, your disability,

23   citizenship.

24          And in the case of sexual harassment, again, even

25   defendant Cohen and defendant Orantes admitted they are aware

1     it is illegal to sexually harass an employee and subject them

2     to a hostile work environment.  That was not the environment

3     that Dr. Cohen and Mario made Tessa Qorrolli work in.

4          Fortesa having to suck it up every day, going in there

5     knowing, I hope he doesn't make another sexual advance today,

6     living in that constant fear.  I hope he doesn't treat me as a

7     sexual play toy and degrade me, again, day after day.  One can

8     only imagine what that life must have been like.  Because of

9     all this, we ask that you find Tessa suffered emotional

10    distress as a direct result of being subject to a hostile work

11    environment during her six and a half years at MDA.

12         Now, you're also going to be asked about punitive

13    damages.  Punitive damages are a beautiful tool that we have in

14    the law.  Do you know what punitive damages are?  Punitive

15    damages are meant to do two things.  One, to punish the

16    defendants for their behavior and, at the same time, to deter

17    them and others from doing it again.  I love it.  Punish and

18    deter.  It's a wonderful concept.  And the judge will talk to

19    you about what is necessary to establish punitive damages.

20    Listen to see if she talks about conscious disregards to the

21    rights of Ms. Qorrolli, a reckless indifference.

22         We are seeking punitive damages for two reasons.  We

23    are seeking punitive damages because we want Metropolitan

24    Dental Associates to know that they can never do this again.

25    This has gone on long enough.  That's deterrence.  We want to

1    deter them from ever doing this again.  But they should also be

2    punished.  They should be punished for this type of conduct,

3    unlawful conduct.

4         So I respectfully submit to you that this is not just

5    a case about sexual harassment and a hostile work environment,

6    but that this case is also about punishing and deterring and

7    making sure that they can never do this again.  If this isn't a

8    case for punitive damages, I don't know what is.  We have a

9    manager who is abusing his position of power to sexually harass

10   the plaintiff, despite him knowing that it's illegal to

11   sexually harass someone.  He is fully aware of the law.  You

12   heard him testify to it.  Yet, he chose to disregard that law

13   time and time again.

14        You also have an owner who refused to take action in

15   response to numerous complaints, both verbally and in writing.

16   Even at the end of her employment, Tessa went to Dr. Cohen,

17   gave him this letter crying.  Dr. Cohen, please help me.  Here

18   is my letter.  Please call me.  You promise?  Promise me,

19   Dr. Cohen, you are going to call me.  You heard testimony that

20   Dr. Cohen never responded to Tessa, reckless indifference.  I

21   respectfully submit that there is no way to not find reckless

22   indifference when there was this opportunity, that opportunity,

23   that opportunity, another opportunity time and time again.

24        Now, I know you're tired.  I know you're ready to go

25   into the jury room and start your deliberation.  I am going to

do my best to speed this up but at the same time making sure I

cover all of the bases and I'm doing right by my client.

I want to talk a little bit about the verdict sheet.

While you're deliberating, or after you deliberate, you are

going to be given a verdict sheet.  This verdict sheet includes

all of the claims that Tessa Qorrolli have brought against the

defendants.  You are going to be asked this regarding different

types of law.  There are federal laws, state laws, and city

laws, and the judge will explain to you the different standard

under each of those laws.  You are going to hear the federal

law, Title VII.  You are going to hear the state law.  That's

New York Executive Law Section 296.  You are going to hear

about New York City law, the administrative code.  Also on that

verdict sheet you are going to see a question regarding

damages, if any, you will award to plaintiff for her emotional

distress.

By the way, I hate the word award.  This is

compensation.  How much do you compensate Tessa Qorrolli for

what happened?  This is something I've been thinking about for

a long time and, quite frankly, I don't know.  I don't know the

answer to that question.  You have the power.  You all have the

power to make that decision.  It's not for me to decide, it's

not for Mr. Wims to decide.  It is for all of you to decide.

I look forward to speaking with you briefly just one

more time after Mr. Wims speaks.  I thank you for your time,

1     each and every one of you.  Thank you.

2               MR. WIMS:  May I proceed, your Honor?

3               Good morning, ladies and gentlemen of the jury.  We

4     want to thank you as well for your service, your time, leaving

5     your lives, your work, your families.  We appreciate that.

6               Let's start off by talking about what you've seen and

7     heard over the last several days.  We stood up here a couple of

8     days ago, and you heard plaintiff's attorney make all these

9     fantastic representations about what you would see.

10              For example, he said, women, including the plaintiff,

11    were used as sex toys for the pleasure of Mr. Orantes and Dr.

12    Cohen at Metropolitan Dental.  And I want you to ask yourself,

13    did you see any evidence that that was the case?  No.

14              And that Mr. Orantes felt threatened, his power and

15    control over the office and all this sort of stuff with the

16    plaintiff.  Did you see that?  Was that proven to you?  No.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1           MR. WIMS:  He also said that you would see evidence

2    that plaintiff was subjected to sexual harassment several times

3    a week.  You heard him use the number in the 700s, right?  Did

4    you see that?  What part of the testimony was that?  The only

5    reference to anything close to that was plaintiff's testimony

6    that it happened all the time.  Didn't really say what it was.

7    Not defined.  Didn't say whether it was in 2009 or 2015.

8    That's simply not specific enough.  No dates, no times, no

9    locations to base a jury verdict on.

10          This is court.  The name of the game in court is

11   proof.  And what I want you to ask yourselves when you're in

12   there deciding this case is what did the plaintiff prove?

13   Because defendants have no burden here.  The only person in

14   this courtroom who is required to prove their case is the

15   plaintiff.

16          So, when Mr. Holzberg says to you they didn't produce

17   Marina, they didn't -- we had no obligation to do that.  They

18   have to prove or she has to prove her case.  And she said, for

19   example, Marina, former co-worker, you heard her say Marina

20   still works there.  I said why didn't you call her?  And she

21   said I don't have the phone number.  Certainly she has the

22   phone number to the workplace she used to be at every day for

23   six or seven years, and there is a thing called the internet if

24   the number had changed.

25          So ask yourself, does that make sense to you?  I think

1    the answer will clearly be no.

2           Now, in addition to not delivering what was promised

3    by plaintiff in plaintiff's counsel opening statement, I just

4    want to talk for a moment about what sexual harassment is and

5    is not.  Now, the judge is going to instruct you on what the

6    law is, and I am not going to interfere with that.  This is the

7    judge's courtroom; she's in charge.  However, I just want to be

8    clear.  The mere act of touching someone is not sexual

9    harassment.  If you touch someone's hand --

10          MR. HOLZBERG:  Objection your Honor.

11          THE COURT:  Okay.  Ladies and gentlemen, as Mr. Wims

12   indicated, I'll instruct you as to what the law is.  He's

13   making an argument to you about the evidence in this case, and

14   if you put it in those terms, Mr. Wims, you may continue.

15          MR. WIMS:  Thank you, your Honor.

16          Now, you ask yourself, you're all New Yorkers, you've

17   worked, you understand the real world and how things work.  If

18   I touch your hand, if I brush against your waist, if I touch

19   your shoulder or your hip, does that mean you were sexually

20   harassed?  That's for you to decide based on the judge's legal

21   instructions.

22          But, when you get rid of all the window dressing in

23   this case, and get right down to what it's about, what you have

24   is a swearing contest here.  Plaintiff says I was harassed.

25   Defendant Mr. Orantes says I did no such thing ever.  You heard

1     them both.  So this comes down to a swearing contest.  Why?

2     Because plaintiff clearly indicated there were no witnesses to

3     this alleged incident.  So it's her word against his.  If

4     they're equally believable, you have to return a defense

5     verdict, because plaintiff has the burden of proof.

6          Now, in deciding that swearing contest, what's going

7     to be crucial here is credibility.  Let me explain why you

8     can't believe plaintiff.  First of all, she made mention of

9     several people who had knowledge allegedly regarding this case

10    and the alleged facts.  None of them are here.  Plaintiff could

11    have subpoenaed them and forced them to appear to give

12    testimony under oath as to what they saw, they heard, they

13    experienced.  For whatever reason, that didn't happen.

14         Now, you have to ask yourself, given that so much is

15    at stake in this case, why would they not do that?  And ask

16    yourself why.  Because if you had a story to tell and there

17    were people who could shed light on that, you'd bring them to

18    the trial, correct?  She did not.

19         Now, she said she didn't have the number.  There is

20    this thing called the internet.  There are companies that will

21    help you locate someone.  I recently found somebody I went to

22    eighth grade with on Facebook.

23         Now, plaintiff's story changed too much.  She is the

24    sole firsthand witness in this case.  And let's talk about her

25    changing stories.  She contradicted herself by alleging at one

1   point that Mr. Orantes had grabbed her butt, but then

2   acknowledged in her sworn under penalty of perjury under oath

3   charge to the EEOC that she --

4           MR. HOLZBERG:  Objection, your Honor.  It's not in

5   evidence.

6           THE COURT:  Sustained.

7           Ladies and gentlemen, you'll remember what the record

8   shows.  Thank you.

9           MR. WIMS:  You heard it.  She swore that he pretended

10  to, then she got on the stand and said he did.  She had

11  previously testified that Mr. Orantes had grabbed her butt.

12  She got on the stand and said, well, it was the butt area.  Not

13  the butt.

14          Words matter.  Especially in a trial where there's

15  sworn testimony.  So you have to ask yourself whether that

16  speaks to or against plaintiff's credibility.

17          Now, she also didn't really specify as to what was

18  done.  She claims there were four incidents of touching.  Okay.

19  At a prior proceeding it had been two.  Now, she says the hand,

20  the shoulder, the hip, the arm, and the leg were touched.  Not

21  the genitalia, not the breasts, she said he didn't ask her to

22  date, he didn't ask her to have sex or make any explicit sexual

23  requests.

24          Now, she appeared to not be truthful about locks on

25  the doors at Metropolitan Dental.  She was not truthful when

1    she said her mother did not do therapy with her with the

2    psychiatrist.  And then her mother got on the stand and said we

3    did it together.  Right?  You remember.

4         Now, she alleged that she witnessed events with other

5    females at Metropolitan Dental, and them being, quote unquote,

6    harassed.  But under cross-examination when I questioned her,

7    she admitted she didn't see anything of a sexual nature and it

8    was behind closed doors.  So she didn't see that.

9         Now, perhaps plaintiff has a victim complex.  I don't

10   know.  But, you saw the crying, you saw the complaining, both

11   in her testimony here and in references to her tenure at

12   Metropolitan Dental.

13        Now, she said she wrote a letter of complaint and

14   handed it to Dr. Cohen in 2016 shortly before she resigned.

15   And you heard her, she said I put everything in there about

16   everything I had been through.  And I asked her, did it mention

17   anything about sexual harassment?  She said no.  And she said I

18   didn't put it in because I was worried about retaliation.  In a

19   prior proceeding, she said, well, my lawyers had told me not to

20   put it in.  Which one is it?  Does it really matter?  Once

21   someone has shifting explanations for the same event, you don't

22   believe them anymore.  So does it really matter?

23        Now, she acknowledged that she was never kissed on the

24   lips nor did Mr. Orantes ever make an attempt to do so.  There

25   was no explicit groping.  Okay.

1          Now, when we juxtapose Mr. Orantes compared to

2   plaintiff, Mr. Orantes is the all-American story.  Born in

3   Manhattan, begins working as a file clerk as a teenager, ends

4   up the office manager, and has been there for over 30 years.

5   Of course Dr. Cohen trusts Mr. Orantes.  Wouldn't you?  After

6   you had a faithful employee or manager for over 30 years?

7          Now, a lot of things don't make sense here.  They

8   would have you believe that plaintiff's mother came back to

9   work at Metropolitan Dental where Mr. Orantes and Dr. Cohen

10  were, she had worked there previously.  She subsequently, the

11  mother, subsequently brings her other daughter and her son to

12  work there.  They say she was subject to this alleged conduct

13  for the full six years.  So ask yourself why would plaintiff's

14  mother bring two of her other children there to work if what

15  they're saying is true.  And ask yourself, does that make

16  sense?

17         Now, supposedly, plaintiff says full six years plus

18  she was allegedly being harassed.  Now, she says she stayed

19  because they had a mortgage to pay.  Okay.

20         Now, plaintiff didn't like being told what to do.

21  That's clear from the evidence.  And you ask yourself, do I

22  have a basis to really believe that?  Of course you do.  How

23  many times did you see the judge instruct her to stop ad

24  libbing on the stand as opposed to just responding to

25  questions.  How many times did you see that?

1              MR. HOLZBERG:  Objection, your Honor.

2              THE COURT:  Overruled.

3              MR. WIMS:  So could you infer that she acted in a

4    similar capacity while at MDA when dealing with Dr. Cohen and

5    Mr. Orantes?  Of course.  Not only could you do so, it would be

6    logical and rational.

7              Now, this case really illustrates the difference

8    between illegal conduct like sexual harassment and an

9    employer's right to discipline, control, provide feedback, and

10   maintain its workforce and its employees.  Nobody likes to be

11   corrected, nobody likes to be chastised, no one likes to be

12   told that they did something wrong.  But that's something we

13   all deal with at work.  And Mr. Orantes doing that is not

14   sexual harassment.  Mr. Orantes touching her hand is not sexual

15   harassment.  Ask yourself what is.

16             Now, we believe, with respect to the damages that

17   plaintiff testified to, the alleged damages, that if in fact

18   she suffered from anxiety, depression, PTSD, or any other

19   emotional condition, that was caused by having to flee Kosovo

20   in the middle of the night with one suitcase.  The mother and

21   the daughter both had that experience.  You saw them both

22   crying here.  The mother began crying when Mr. Holzberg asked

23   her what her name was.

24             Now, also, the mother testified she never saw anything

25   sexual.  She saw him allegedly taking her into the room.

1    That's what employers do when they speak with somebody about

2    their performance.  You don't do that in front of all the other

3    coworkers.

4           You can't contradict yourself under oath and expect to

5    be believed or entitled to the benefit of the doubt.

6           Neither plaintiff nor her mother are physicians or

7    doctors, so what they say about the cause of any condition

8    would be like me saying that.  I'm a layperson medically, as

9    are they.

10          Now, plaintiff then goes further and alleges that,

11   essentially, both Mr. Orantes and Dr. Cohen were harassing her.

12   In fact, what she terms harassment is regulating their

13   workforce.  Okay.  And harassment is a legal term.  So it's

14   like discrimination.  Somebody says, hey, I was discriminated

15   against.  You need more information to figure out what it is

16   they're alleging.

17          Now, you notice not only did plaintiff fail to bring

18   any alleged witness, other than her mother, but you didn't see

19   her doctor here who could have come and said I diagnosed her

20   with this or that and it was caused by this or that.  That's

21   what medical professionals do, a doctor does.  Diagnose and

22   opine as to causation.  Not here though.  Ask yourself why.

23          Now, and to be clear, plaintiff's attorney's opening

24   and closing are not evidence, as the judge has told you.  We

25   believe that this lawsuit was filed after plaintiff asked

1    Mr. Orantes for a loan and it was denied by the defendants.

2            To win this case, plaintiff must have proven she was

3    sexually harassed during the time period covered by this

4    lawsuit.  There are just too many questions about her

5    credibility, about her mother's credibility, to be able to rule

6    in her favor.

7            There has to be specificity and certainty and concrete

8    proof for a jury to award monetary damages at law.  And you

9    haven't seen that.

10           Now, you must return a defense verdict.  Plaintiff

11   takes nothing, because she hasn't proven any violation of law.

12           Now, to be clear, proof requires more than just saying

13   something.  And that's what you had here.  Not a single witness

14   who saw anything that plaintiff claims.  Not a single document

15   that corroborates or even buttresses her allegations.  So, ask

16   yourself, what did she prove?  The answer, ladies and

17   gentlemen, is nothing.  And as a result, you must return a

18   verdict in favor of the defendants.

19           Thank you very much.

20           MR. HOLZBERG:  Thank you, your Honor.

21           All right.  So there is a lot to unpack here.  First

22   of all, Mr. Wims just said that Ms. Qorrolli did not provide

23   specific examples of when she was sexually harassed.  I guess

24   he forgot when she referred to Plaintiff's Exhibit 3, her

25   diary, and read specific examples of when she was sexually

1   harassed in 2015, in 2016, aside from her testimony that it

2   generally happened all the time.  But the specific year and

3   month when she said she was sexually harassed, I guess he

4   didn't hear that.

5         Now, also they mentioned they're not obligated to call

6   witnesses.  He's right.  They're not obligated to.  But again,

7   if it was going to help their case, they would.

8         Mr. Wims says, well, you know, there's something

9   called the internet.  She could have just gone online, looked

10  up the number for Metropolitan Dental Associates.  "This is

11  Tesa Qorrolli.  Is Marina here?  I would like her to testify on

12  my behalf at my sexual harassment trial."

13        This is another thing that Mr. Wims said that there

14  were no witnesses.  Tesa's mother took the stand and testified

15  under oath what she saw, what she observed herself.  It wasn't

16  as though Mario was just walking her into a room.  She said she

17  saw him take her hand and touch her, touch her hand, touch her

18  waist.  Okay.

19        There are a few other things that he raised that are

20  complete fabrications.  There is no evidence in the record that

21  they fled in the middle of the night from Kosovo.  I didn't

22  hear that, did you?  And I don't know what he was saying.  That

23  Tesa brought this lawsuit because she asked for some kind of

24  loan.  I don't know what he's talking about.  This has nothing

25  to do with this case.  That was not established in this case.

1          What was established in evidence was Mario grabbed

2     her.  He grabbed her butt.  Okay.  Mr. Wims wants to make a

3     stink about whether it was the butt or the butt area or your

4     thigh.  Either way, should your supervisor be touching you in

5     your butt, butt area, or your thigh?  The answer is no

6     regardless.

7          With respect to witnesses, Ms. Qorrolli testified that

8     she did reach out to co-workers of hers and one of them gave a

9     deposition on her behalf.  You didn't hear it.  It's neither

10    here nor there.  But that was in evidence.

11         MR. WIMS:  Objection, your Honor.

12         THE COURT:  So, ladies and gentlemen, counsel for the

13    plaintiff and for the defendants have submitted arguments to

14    you about how the other side didn't call certain witnesses.

15    Let me tell you what the law is.

16         The law is that a plaintiff and defendant in a lawsuit

17    have the right to subpoena witnesses to give their testimony

18    under oath.  It's for you to decide how to weigh the arguments

19    of the counsel for the plaintiff and the defendants with

20    respect to witnesses who weren't called.  Thank you.

21         MR. HOLZBERG:  Thank you.

22         So one other thing that Mr. Wims mentioned, you know,

23    he's in essence shaming Ms. Qorrolli and her mother for crying.

24    Saying you saw her on the stand crying so much.  Yeah, I wonder

25    why.  You heard what Mario did to her.  It would be either that

1    she cries too much, or she didn't even cry.  She's not even

2    affected by it.  She can't win one way or the other.  Either

3    she cries too much or it wouldn't be enough.

4          Ms. Qorrolli testified, and again, I think he

5    misunderstood her testimony, that she and her mother both saw

6    Dr. Lee in connection with what was going on at MDA.  The

7    diagnosis that they explained to you was not something that

8    they made up.  They were conveying the diagnosis that their

9    doctor made.

10          And Mr. Wims said that Tesa's word that doesn't mean

11   anything.  To the contrary, and as judge will instruct you,

12   testimony is evidence.  Her word does mean something.  She is

13   on the stand, she is sworn to take an oath to tell the truth,

14   and she did tell the truth.

15          Thank you.

16          THE COURT:  So, ladies and gentlemen, the next stage

17   is for me to give you my charge as to the law.

18          Would anyone like a break at this time?  Anyone need

19   to go to the jury room?  Okay.  Not seeing any indication you'd

20   like a break.  We're ready.

21          So, Mr. Whertvine, if you'd announce the jury charge,

22   please.

23          THE DEPUTY CLERK:  The Court is about to charge the

24   jury.  Any spectator who wishes to leave the courtroom will do

25   so now or remain seated through the completion of the Court's

1   charge.

2       THE COURT:  Mr. Whertvine will give each member of the

3   jury a copy of the jury charge, and, counsel, you each have a

4   copy of the jury charge, too.

5       Some people find it easier to listen if you can read

6   along.  You have to listen with care to what I'm about to read

7   to you.  But if you'd prefer just to listen to me, that's just

8   fine.  You can take this charge in the jury room with you, and

9   you can just put it under your chair right now.  But if you'd

10  like to read along, you can.

11      I will now instruct you as to the law.  It is your

12  duty to accept these instructions of the law and apply them to

13  the facts as you determine them.  If anyone has stated a legal

14  principle different from any that I state to you in my

15  instructions, it is my instructions that you must follow.  You

16  should not single out any instruction as alone stating the law,

17  but you should consider my instructions as a whole when you

18  retire to deliberate.

19      Your role is to decide the fact issues that are in the

20  case.  You are the sole and exclusive judges of the facts.  You

21  must determine the facts based solely on the evidence received

22  in this trial.  You must weigh and consider the evidence

23  without regard to sympathy, prejudice, or passion for or

24  against any party.

25      I remind you that nothing I've said during the trial

1   or will say during these instructions is evidence.  Similarly,

2   the rulings I have made during the trial are not any indication

3   of my views of what your decision should be.  What has been

4   said in the opening statements, closing arguments, objections

5   or questions, is not evidence.

6        The evidence before you consists of the answers given

7   by the witnesses and any exhibits that were received in

8   evidence.  You may not consider any testimony that I've told

9   you to disregard, or that was stricken from the record.

10        The plaintiff in this case is Fortesa Qorrolli.  The

11   defendants are the two corporate defendants -- Metropolitan

12   Dental Associates, D.D.S.-225 Broadway, P.C., and Metropolitan

13   Dental Associates D.D.S., P.C. -- Mario Orantes, and Dr. Paul

14   I. Cohen.

15        All litigants, including corporations, are equal under

16   the law, and are entitled to a just verdict.  It would be

17   improper for you to allow any personal feelings you might have

18   about the plaintiff, the defendants, or the nature of the claim

19   to influence you in any way.

20        In reaching a verdict, you must bear in mind that the

21   claims against each of the defendants are to be considered

22   separately.  Your verdict must be reached solely on the

23   evidence or the lack of evidence presented against each

24   defendant, without regard to the liability of the other

25   defendants.

1          Your verdict must be based solely upon the evidence,

2     or the lack of evidence, developed at trial and the

3     instructions I will give you as to the law.  It would be

4     improper for you to consider in reaching your decision any

5     personal feelings you may have about a party's gender, race, or

6     ethnicity.  Your verdict must reflect your decision on whether

7     the plaintiff has shown that the defendants violated the law.

8          Ms. Qorrolli bears the burden to prove each element of

9     the claims that she has brought in this case.  The standard

10    under which you will decide whether Ms. Qorrolli has met her

11    burden of proof is the preponderance of the evidence.

12         To establish by a preponderance of the evidence means

13    the evidence of the party having the burden of proof must be

14    more convincing and persuasive to you than the evidence opposed

15    to it.  The difference in persuasiveness need not be great.  It

16    requires only that you find that the scales tip, however

17    slightly, in favor of the party with the burden of proof that

18    what that party claims is more likely than not true.

19         What is important is the quality of the evidence and

20    not the number of witnesses or the number or variety of the

21    exhibits or the length of time spent on a subject.  In

22    determining whether any fact has been proved by a preponderance

23    of the evidence, you may consider the testimony of all the

24    witnesses and all of the exhibits.

25         Simply because I have permitted certain evidence to be

introduced does not mean that I've decided on its importance or

significance.  That is for you to decide.

Ms. Qorrolli claims that, during her employment, the
defendants created a hostile work environment based on her sex
in violation of federal, state, and city laws.  The federal law
is Title VII of the Civil Rights Act of 1964, which I will
simply call Title VII.  Ms. Qorrolli brings Title VII claims
against the corporate defendants only.

The state statute is the New York State Human Rights
Law, which I will call the NYSHRL.  The New York City ordinance
is the New York City Human Rights Law, which I will call the
NYCHRL.

Ms. Qorrolli brings claims under the NYSHRL and the
NYCHRL against all defendants, including Mr. Orantes and
Dr. Cohen individually.

Ms. Qorrolli claims that the defendants created a
hostile work environment on the basis of her sex.  She brings
this claim against all of the defendants under the New York
State Human Rights Law and the New York City Human Rights Law,
and against the corporate defendants alone under Title VII.

Title VII states that it is an unlawful employment
practice for an employer to discriminate against any individual
with respect to her terms, conditions, or privileges of
employment, because of such individual's sex.

The NYSHRL states that it shall be an unlawful

discriminatory practice for an employer, because of the sex of
any individual, to discriminate against such individual in
terms, conditions, or privileges of employment.

The NYCHRL makes it an unlawful discriminatory
practice for an employer or an employee or agent thereof,
because of the gender of any person, to discharge from
employment such person or to discriminate against such person
in terms, conditions, or privileges of employment.

In short, these laws prohibit harassment on the basis
of an employee's sex.

In order to prevail on her hostile work environment
claim under Title VII, or the NYSHRL, the plaintiff must prove
each of the following by a preponderance of the evidence:

That she was a member of a protected class.  That is
not disputed;

that she suffered harassment that was sufficiently
severe or pervasive to alter the conditions of her employment
and create an abusive working environment; and

that such an environment was created because of her
sex.

The NYCHRL requires the plaintiff to establish each of
the following by a preponderance of the evidence:

That she is a member of a protected class.  Again,
that is not disputed;

that she was treated less well than other employees;

1  and

2          that she suffered that differential treatment because

3  of her sex.

4          For harassment to create a hostile work environment

5  under Title VII or the New York State Human Rights Law,

6  plaintiff must prove that the workplace was permeated with

7  discriminatory intimidation, ridicule, and insult.  The conduct

8  must be severe or pervasive enough to alter the employee's

9  terms of employment.

10          In making this assessment, you should consider the

11  totality of the circumstances, including:  the frequency of the

12  discriminatory conduct; its severity; whether it is physically

13  threatening or humiliating, or a mere offensive utterance; and

14  whether it unreasonably interfered with the plaintiff's job

15  performance.  The plaintiff must prove that she was subjected

16  to harassment that transcended coarse, rude, or boorish

17  behavior.  Usually, the incidents must be more than episodic.

18  They must occur with enough regularity to affect the

19  plaintiff's workplace.  Even a single incident, however, if it

20  is extraordinarily severe, can make a workplace hostile.

21          Ms. Qorrolli must prove both that she perceived the

22  work environment to be hostile in the way I have described, and

23  that a reasonable person would have found her work environment

24  to be hostile.  The environment need not have been intolerable

25  in order to be hostile.  Put another way, Ms. Qorrolli need not

1    have been forced to quit her job by the offending behavior.

2            In deciding whether Ms. Qorrolli herself perceived the

3    environment as hostile, you may consider Ms. Qorrolli's

4    testimony about her state of mind that you find credible as

5    well as her conduct during her employment.  As it concerns

6    Ms. Qorrolli's contention that the workplace was hostile

7    because of her sex, you should bear in mind that sexual

8    harassment can take the form of sexual advances, requests for

9    sexual favors, or other verbal or physical conduct of a sexual

10   nature.  Sexual harassment need not, however consist of sexual

11   advances, have clear sexual overtones, or contain sexually

12   explicit content.  Rather, you may find that any harassment

13   directed at an employee because of that employee's sex is

14   sexual harassment.

15           In addition to her claims under Title VII and the

16   NYSHRL for harassment, Ms. Qorrolli brings a harassment claim

17   under the NYCHRL against each defendant.  Unlike the federal

18   and state laws I've just explained, under the NYCHRL,

19   Ms. Qorrolli does not have to prove that the harassment she

20   suffered was severe or pervasive.  She does have to show that a

21   defendant's conduct changed the terms of her employment.

22   Instead, she must show, by a preponderance of the evidence,

23   that she was treated less well than her colleagues because of

24   her sex.  In deciding whether Ms. Qorrolli was treated

25   differently because of her sex, you should consider the full

1    context of her employment.

2            If you find that Ms. Qorrolli was treated less well

3    because of her sex, the defendants can still avoid liability if

4    they prove that the conduct complained of consists of nothing

5    more than what a reasonable victim of discrimination would

6    consider petty slights and trivial inconveniences.  The burden

7    is on the defendants to show that any differential treatment

8    was truly insubstantial.

9            As was true with the Title VII and NYSHRL claims, in

10   order to find that the defendants are liable for discrimination

11   based on sex, you must find that the reasons for the action

12   taken by a defendant included, at least in part, unlawful

13   discrimination.  It is not enough for her to show that she had

14   an overbearing or obnoxious boss.  Ms. Qorrolli still bears the

15   burden of showing that a defendant's conduct, from the point of

16   view of a reasonable employee, was undertaken at least in part

17   because of her sex.

18           Under all three statutes, the third element that the

19   plaintiff must prove by a preponderance of the evidence is that

20   she was harassed because of her sex.  When I say "because of,"

21   I mean that you must decide whether Ms. Qorrolli has proven by

22   a preponderance of the evidence that her sex was a motivating

23   factor in the harassment, even if other factors also motivated

24   that conduct.  She does not have to establish that her sex was

25   the sole or principal reason for the harassment.  To prevail on

her claims of a hostile work environment, however, it is not enough for Ms. Qorrolli to show that the work environment was generally harsh, unfriendly, unpleasant, crude, or vulgar for all employees.

To prove that any adverse treatment was "because of" her sex, Ms. Qorrolli may point to sex-specific terms used by her harasser.  But, to prevail on her claim, Ms. Qorrolli must show more than simply the use of sex-specific terms.  She must demonstrate that the abuse of which she complains, including the use of those terms, occurred because of her sex.

Ms. Qorrolli may also rely on circumstantial evidence to prove that any harassment she experienced was because she was a woman.  I will explain the term "circumstantial evidence" in a moment.  Based on the circumstantial evidence, you may, but are not required, to infer that harassment that did not involve a reference to Ms. Qorrolli's sex was also motivated by that characteristic.

If you find Mr. Orantes liable under any of the three statutes under the law as I have just described it to you, you must also decide whether any of the other defendants are also liable.  If you do not find Mr. Orantes liable under any of the three statutes, your work is at an end.  You should indicate your verdict as to Mr. Orantes on the verdict sheet, sign your names to the verdict sheet, and advise me in a note that you have reached a verdict.  You need not consider the claims

1    against the remaining defendants.

2           Ms. Qorrolli must prove by a preponderance of the

3    evidence that the defendant you are considering was responsible

4    for the hostile work environment.  I will now explain the tests

5    for liability for the corporate defendants.  The tests for this

6    element is slightly different under Title VII on the one hand,

7    and the NYSHRL on the other.  The tests for this element is

8    broadest under the NYCHRL.

9           I'm now on page 17 if you're reading along.

10          Under Title VII, if you find that Mr. Orantes created

11   a hostile work environment, the corporate defendants, should

12   you find them to be Ms. Qorrolli's employers, are presumed to

13   be responsible if Mr. Orantes used his actual or apparent

14   authority to further the harassment, or if he was aided in

15   accomplishing the harassment by the authority entrusted to him

16   by the company.

17          Under the NYSHRL, the plaintiff must show that a

18   corporate defendant had knowledge of, acquiesced in, or

19   subsequently condoned the discriminatory conduct by her

20   supervisor, Mr. Orantes.  An employer is said to have knowledge

21   of the conduct if senior level management engaged in the

22   conduct, or if an employee complained of the conduct to senior

23   level management.  An employer may condone the conduct by

24   knowingly accepting or forgiving the offense.  An employer may

25   also condone the conduct by calculated inaction -- that is, by

choosing to do nothing in response to the conduct of which it

is aware.  An employer is not liable, however, if after

learning of the sexual harassment, it reasonably investigates

and takes corrective action.

Under the NYCHRL, a corporate defendant is liable for

Mr. Orantes' conduct if you find that Mr. Orantes exercised

managerial or supervisory responsibility.  The corporate

defendant does not have to have encouraged, condoned, or

approved of his behavior.  A corporate defendant also may be

liable if it knew of his behavior and failed to take immediate

corrective action, or if it should have known about his conduct

but did not exercise reasonable diligence to prevent it.  A

corporate defendant has knowledge of discriminatory conduct

where that conduct was known by another employee or agent who

exercised managerial or supervisory responsibility.

The plaintiff has brought claims against Dr. Cohen

under the NYSHRL and the NYCHRL.  You may find that Dr. Cohen

is liable under either of these two statutes, if you find that

he has an ownership interest in one of the corporate defendants

that employed her, or if he had the power to do more than carry

out personnel decisions made by others, or if he had knowledge

of, acquiesced in, or subsequently condoned Mr. Orantes'

discriminatory conduct.  In addition, under the NYCHRL,

Dr. Cohen may be held liable for Mr. Orantes' conduct if you

find that Dr. Cohen exercised managerial or supervisory

1   responsibility.

2            Dr. Cohen may also be liable for a violation of the

3   NYSHRL and the NYCHRL if he participated in the conduct giving

4   rise to the violation, that is, if he aided, abetted, incited,

5   compelled or coerced conduct by Mr. Orantes which you have

6   found violated the statutes, or if he attempted to do so.  You

7   may also find Dr. Cohen liable if he failed to take adequate

8   remedial measures in response to a complaint from Ms. Qorrolli

9   about Mr. Orantes' discriminatory conduct.

10           You should not infer that Ms. Qorrolli is entitled to

11  recover damages merely because I'm instructing you on the

12  elements of damages.  It is exclusively your function to decide

13  upon liability, and I am instructing you on damages only so

14  that you will have guidance should you decide that Ms. Qorrolli

15  is entitled to recovery.

16           If you find a violation of Ms. Qorrolli's rights, then

17  Ms. Qorrolli is entitled to collect damages for the injuries

18  she has proven by a preponderance of the evidence were caused

19  by that violation.  The damages must be fair and reasonable,

20  neither inadequate nor excessive.  You should not award damages

21  for speculative injuries, but only for those injuries that the

22  plaintiff has actually suffered because of the violation.  It

23  is the plaintiff's burden to prove the amount of damages and to

24  prove that the damages were caused by the sexual harassment.

25           The purpose of a damage award is to compensate

1    Ms. Qorrolli for the actual harm she suffered, if any, as a

2    direct result of the violation.  The purpose of such an award

3    of compensatory damages is not to punish the defendant.  Any

4    award you make should be fair in light of the evidence

5    presented at trial.

6           Next I will describe types of damages you may

7    consider.

8           Compensatory damages may include damages for pain,

9    suffering, humiliation, mental anguish, or emotional distress.

10   In order to recover damages for mental and emotional distress,

11   Ms. Qorrolli must present credible testimony with respect to

12   the claimed distress.  Psychiatric or other medical treatment

13   is not a precondition to recovery, nor is Ms. Qorrolli required

14   to prove her claim through expert medical testimony.  There's

15   no requirement that evidence of the monetary value of such

16   intangible things such as mental anguish be introduced into

17   evidence.

18          You have heard Nexhmije Qorrolli, the plaintiff's

19   mother, testify about her own emotional distress.  Nexhmije

20   Qorrolli is not a party to this lawsuit.  The plaintiff may

21   only recover compensatory damages for the emotional distress

22   that she herself experienced.

23          If you determine that the plaintiff has proven a

24   defendant is liable for a violation of the plaintiff's rights,

25   but the plaintiff suffered no injury as a result of this

violation, you must award the plaintiff nominal damages.

Nominal damages are awarded as recognition that the plaintiff's

rights have been violated.  You should award nominal damages of

one dollar if you conclude that the only injury that a

plaintiff suffered was the deprivation of her rights without

any actual damages.

You also may award nominal damages of one dollar if,

upon finding that some injury resulted from the deprivation of

the plaintiff's rights, you find that you are unable to compute

monetary damages except by engaging in pure speculation and

guessing.  You may not award both nominal and actual damages to

the plaintiff.  Either she experienced actual damages, in which

case you must award compensatory damages, or else she did not,

in which case you must award nominal damages.  Again, nominal

damages may not be awarded for more than a token sum.

If you find that a defendant violated the NYCHRL, you

may award punitive damages under that statute if you believe

the defendant engaged in discrimination with willful or wanton

negligence, or recklessness, or a conscious disregard of

Ms. Qorrolli's rights.

While you can impose punitive damages under the NYCHRL

without finding that the defendant intentionally or knowingly

discriminated against Ms. Qorrolli, punitive damages are not

automatic.  You must still believe that the defendant engaged

in conduct that was at least grossly negligent and therefore

1    deserving of punishment.

2           At this point, you are only to determine whether an

3    award of punitive damages is appropriate.  You should not

4    determine the amount of such an award.  If you decide that a

5    plaintiff is entitled to punitive damages, then there may be

6    some brief additional evidence presented to you to assist you

7    in determining the amount of punitive damages.

8           There are two types of evidence that you may properly

9    use in reaching your verdict.  One type of evidence is direct

10   evidence.  One kind of direct evidence is a witness's testimony

11   about something he or she knows by virtue of his or her own

12   senses -- something the witness has seen, felt, touched, or

13   heard.  Direct evidence may also be in the form of an exhibit.

14          The other type of evidence is circumstantial evidence.

15   Circumstantial evidence is evidence that tends to prove one

16   fact by proof of other facts.  There is a simple example of

17   circumstantial evidence that is often used in this courthouse.

18          Assume that when you came in to the courthouse this

19   morning the sun was shining and it was a nice day.  That's easy

20   to assume today.  Assume that the courtroom blinds are drawn,

21   and you cannot look outside.  As you are sitting here, someone

22   walks in with an umbrella that is dripping wet.  Somebody else

23   then walks in with a raincoat that is also dripping wet.

24          Now, under this hypothetical, you cannot look outside

25   the courtroom, and you cannot see whether or not it is raining,

1    so you have no direct evidence of that fact.  But on the

2    combination of the facts that I've asked you to assume, it

3    would be reasonable and logical for you to conclude that

4    between the time you arrived at the courthouse and the time

5    these people walked in, it had started to rain.

6            That's all there is to circumstantial evidence.  You

7    infer on the basis of reason and experience and common sense

8    from an established fact the existence or the non-existence of

9    some other fact.

10           Many facts, such as a person's state of mind, can only

11   rarely be proved by direct evidence.  Circumstantial evidence

12   is of no less value than direct evidence.  The law makes no

13   distinction between direct and circumstantial evidence, but

14   simply requires that you, the jury, decide the facts in

15   accordance with the preponderance of all the evidence, both

16   direct and circumstantial.

17           Now, for the important subject of evaluating

18   testimony.  How do you evaluate the credibility or

19   believability of the witnesses?  The answer is you use your

20   plain common sense.  Common sense is your greatest asset as a

21   juror.

22           If you find that a witness is intentionally telling a

23   falsehood, that is always a matter of importance that you

24   should weigh carefully.  If you find that any witness has lied

25   under oath at this trial, you should view the testimony of such

1   a witness cautiously and weigh it with great care.  It is,

2   however, for you to decide how much of a witness's testimony,

3   if any, you wish to believe.  Few people recall every detail of

4   every event precisely the same way.  A witness may be

5   inaccurate, contradictory, or even untruthful in some respects,

6   and yet entirely believable or truthful in other respects.  It

7   is for you to determine whether such inconsistencies are

8   significant or inconsequential, and whether to accept or reject

9   all or to accept some and reject the balance of the testimony

10  of any witness.

11          On some occasions during this trial, witnesses were

12  asked to explain an apparent inconsistency between testimony

13  offered at this trial and previous statements made by the

14  witness.  It is for you to determine whether a prior statement

15  was inconsistent, and if so, how much, if any, weight to give

16  to an inconsistent statement in assessing the witness's

17  credibility at trial.  You may consider evidence of a party's

18  prior inconsistent statement for whatever light you find it

19  sheds on the issues in this case.

20          You are not required to accept testimony, even though

21  the testimony is uncontradicted and the witness's testimony is

22  not challenged.  You may decide because of the witness's

23  bearing or demeanor, or because of the inherent improbability

24  of the testimony, or for other reasons sufficient to yourselves

25  that the testimony is not worthy of belief.  On the other hand,

1    you may find, because of the witness's bearing or demeanor, or

2    based on your consideration of all the other evidence in the

3    case, that the witness is truthful.

4            Thus, there is no magic formula by which you can

5    evaluate testimony.  Among the factors you may consider are the

6    witness's intelligence; the ability and opportunity the witness

7    had to see, hear, or know about the things that the witness

8    testified about; the witness's memory; any interest, bias, or

9    prejudice the witness may have; the manner of the witness while

10   testifying; and the reasonableness of the witness's testimony

11   in light of all the evidence in the case.

12           Your verdict will be organized according to a special

13   verdict form.  This form will assist you in reaching a verdict.

14   It lists the questions you must resolve based on the

15   instructions I've given you.  When the foreperson has completed

16   the form, each of you must sign your name, and the form will be

17   marked as a court exhibit.

18           Your verdict must be based solely on the evidence

19   admitted at trial.  You may not discuss this case with anyone

20   except the jurors with whom you are deliberating when all of

21   you are gathered together in the jury room.  You may not do any

22   independent research about any of the people, facts, or issues

23   in this case using the internet or any other research tool.

24           Do not communicate with each other by telephone or

25   computer during your deliberations.  Moreover, you should not

1    give anyone any information about your jury service on any

2    social networking platform.  You should not update your status

3    on any platform or tell anyone that you are a juror on a trial

4    or give any information about the trial at all during your

5    deliberations.

6          The most important part of the case, members of the

7    jury, is the part that you, as jurors, are now about to play as

8    you deliberate on the issues of fact.  I know you will try the

9    issues that have been presented to you according to the oath

10   that you have taken as jurors.  In that oath, you promised that

11   you would well and truly try the issues joined in this case and

12   a true verdict render.

13         As you deliberate, please listen to the opinions of

14   your fellow jurors, and ask for an opportunity to express your

15   own views.  Every juror should be heard.  No one juror should

16   hold the center stage in the jury room, and no one juror should

17   control or monopolize the deliberations.  If, after listening

18   to your fellow jurors and if, after stating your own view, you

19   become convinced that your view is wrong, do not hesitate

20   because of stubbornness or pride to change your view.  On the

21   other hand, do not surrender your honest convictions and

22   beliefs solely because of the opinions of your fellow jurors or

23   because you are outnumbered.  Your final vote must reflect your

24   conscientious belief as to how the issues should be decided.

25         Your decision must be unanimous.  You are not to

1   reveal the standing of the jurors, that is the split of the

2   vote, if any, to anyone, including the Court, at any time

3   during your deliberations.

4          Finally, I say this not because I think it's

5   necessary, but because it's the custom in this courthouse to

6   say this.  You should treat each other with courtesy and

7   respect during your deliberations.

8          During your deliberations, you will have the exhibits

9   available to you.  I'm going to discuss with counsel in a

10  moment whether any exhibits were received in evidence.  I'm not

11  quite sure that any were.  But if there were, you will receive

12  them.  You may also ask for portions of the testimony, but

13  please try to be as specific as you can in requesting

14  testimony.

15         If you have questions for the Court, just send me a

16  note.  As I said, you have a copy of the set of instructions to

17  take with you into the jury room.

18         Your first task will be to select a foreperson.  The

19  foreperson has no greater voice or authority than any other

20  juror, but is the person who will communicate with the Court

21  when questions arise.

22         Ladies and gentlemen, all litigants stand equal in

23  this room.  All litigants stand equal before the bar of

24  justice.  All litigants stand equal before you.  Your duty is

25  to decide between these parties fairly and impartially and to

1    see that justice is done.  Under your oath as jurors, you are

2    not to be swayed by sympathy.  You should be guided solely by

3    the evidence in the trial and the law as I gave it to you,

4    without regard to the consequences of your decision.

5           You have been chosen to try the issues of fact and

6    reach a verdict on the basis of the evidence or the lack of

7    evidence.  If you let sympathy interfere with your clear

8    thinking, there is a risk that you will not arrive at a just

9    verdict.  All parties to a civil lawsuit are entitled to a fair

10   trial.  You must make a fair and impartial decision so you will

11   arrive at a just verdict.

12          I ask for your patience for a few moments.  Please

13   remain patiently in the jury box without speaking to each other

14   as I see counsel at the sidebar.

15          (At the sidebar)

16          THE COURT:  Mr. Holzberg, I don't remember that the

17   plaintiff offered any exhibits that were received into

18   evidence.

19          MR. HOLZBERG:  Correct.

20          THE COURT:  And Mr. Wims, I don't believe the

21   defendant has offered any exhibits that were received into

22   evidence.

23          MR. WIMS:  That is correct.

24          THE COURT:  Mr. Holzberg, any objections to the jury

25   charge?

1          MR. HOLZBERG:  No, your Honor.

2          THE COURT:  Mr. Wims, any objections to the jury

3    charge?

4          MR. WIMS:  No.

5          THE COURT:  You may return to your seats.

6          (In open court)

7          THE COURT:  So, no exhibits were received into

8    evidence, so it is just the testimony.  I confirmed that with

9    counsel.  Thank you.

10          So, Mr. Whertvine, would you please swear in the

11   marshal.

12          (Court security officer sworn)

13          THE COURT:  So, ladies and gentlemen, you may take the

14   jury charge with you.  Mr. Whertvine, would you please give the

15   special verdict form to the Juror No. 1.

16          And sir, if you're chosen as the foreperson, that's

17   the verdict form you must complete.  If someone else is chosen

18   as the foreperson, please give that person the document for

19   completion.

20          Now, ladies and gentlemen, I'm going to let counsel

21   and the parties have lunch.  Okay?  We're going to follow our

22   regular schedule.  So, we will not be available to respond to

23   any note that you might send between 12:45 and 2 o'clock.

24   We're going to take that same lunch break we've been taking

25   during the trial.

1          If you reach a verdict at some point today, other than

2     during that time, we'll be available to you.  If for any reason

3     you don't reach a verdict today, that's just fine.  Trial will

4     continue tomorrow.  Your deliberations will continue tomorrow.

5     But I will call you in shortly before 5 to give you

6     instructions for the evening.

7          Okay?  You may retire to the jury room to deliberate.

8          (Jury begin deliberations.  Time noted 11:03 a.m.)

9          THE COURT:  Mr. Whertvine, could you please mark the

10    jury charge I just rendered as a court exhibit.

11         THE DEPUTY CLERK:  Court Exhibit No. 4.

12         THE COURT:  Mr. Holzberg and Mr. Wims, I want you to

13    stay in the courtroom, except during our lunch break.  And if

14    you need to use the facilities on this floor, just make sure

15    someone knows where you are so we can promptly get you and

16    respond without delay to any note.

17         No trial is perfect.  But certainly this trial was a

18    vast improvement on the October trial.  There was still some

19    inadmissible hearsay, but it was minor in comparison, and I

20    think the jury got a fairer opportunity to resolve the claims

21    in this case than the jury was given in October.

22         So, we'll see what happens.  And Mr. Whertvine will

23    advise us all immediately if there is a note.  Thank you, all.

24         (Recess pending verdict)

25         (in open court; jury not present time noted 2:15 p.m.)

1           THE COURT:  We've received a note from the jury.

2    Copies have been given to counsel.  It will be marked as a

3    court exhibit.

4           THE DEPUTY CLERK:  Court Exhibit No. 5.

5           THE COURT:  So, counsel, let's talk about how to

6    proceed here.  You can identify the testimony you believe is

7    responsive to the note.  Do page and line lists so it's clear,

8    then discuss it with each other.  See if you have agreement or

9    disputes.  And once you have concluded your discussions with

10   each other, let Mr. Whertvine know.  I'll come down and we'll

11   make final decision about what the responsive passages are.

12           Anything that would be helpful to discuss?

13           MR. WIMS:  Judge, I'm not sure if you are going to go

14   through the entire list now but --

15           THE COURT:  Sure.

16           MR. WIMS:  Number two, there weren't any exhibits in

17   evidence so I'm not sure what texts they're referring to.

18           THE COURT:  Right.  So, number 2 reads:  Can we

19   receive texts surrounding the employment of Tesa's sibling.

20   How long were both working.

21           So I expect what I will tell the jury with respect to

22   the first question that there are no texts received into

23   evidence.

24           How long were both working?  So you'll find any

25   responsive testimony with respect to that issue.  Good.

 1              And don't worry, I'm not going to answer any of these

 2      questions or give further instructions to the jury without

 3      discussing it first with counsel.

 4              MR. HOLZBERG:  Thank you, your Honor.

 5              THE COURT:  Good.

 6              MR. WIMS:  Thank you, your Honor.

 7              (Recess)

 8              (In open court; jury not present)

 9              THE COURT:  So, counsel, let's work through these one

10      by one and see where you have agreement or where you have any

11      problems I can resolve.

12              The first one is can we please see the transcript from

13      Dr. Cohen's testimony mentioning Tesa's honesty.

14              Have the parties agreed with respect to a passage that

15      is responsive?

16              MR. HOLZBERG:  Yes, your Honor, we have.

17              THE COURT:  What are the page and line numbers?

18              MR. HOLZBERG:  Page 53, line 20, through page 56, line

19      18.

20              THE COURT:  Does defense counsel agree that's the

21      responsive passage?

22              MR. WIMS:  Yes, your Honor.

23              THE COURT:  Thank you.

24              Number 2.  Can we receive texts surrounding the

25      employment of Tesa's sibling?

```
1              I will instruct the jury, if counsel agrees, that
2      there are no texts that were received into evidence.
3              Next.  How long were both working?
4              Have counsel agreed as to the responsive passage
5      there?
6              MR. HOLZBERG:  Yes, your Honor, we have.  Page 236, I
7      apologize.  One second.  Lines 3 to 21.  As well as -- are you
8      ready?  Page 237, lines 4 through 6.  And also lines 10 through
9      13.  Same page.
10             THE COURT:  Mr. Wims, do the defendants agree those
11     are the responsive passages?
12             MR. WIMS:  We agree that's responsive to the second
13     question, number two, yes, your Honor.
14             THE COURT:  Thank you.
15             Going to number 3.  The question reads:  Can we see
16     the mother's testimony in regards to when she was fired from
17     the practice then returned.
18             MR. HOLZBERG:  Yes, your Honor.  Page 365, line 2,
19     through page 367, line 8.
20             THE COURT:  Mr. Wims, do you agree that that is the
21     responsive material?
22             MR. WIMS:  I do, your Honor.
23             THE COURT:  Thank you.
24             Let's go to question 4.  If reads:  Transcripts
25     regarding Mr. Wims and Tesa surrounding "touching."
```

1          MR. HOLZBERG:  Your Honor, with respect to question

2   four, counsel and I are still meeting and conferring regarding

3   relevant portions.  We've come to agreement on a few but we

4   haven't been able to discuss all of them yet.  We each were

5   looking on our own and now been exchanging relevant portions

6   going back and forth.  So I think we are in agreement with

7   respect to at least a couple as of right now, but there are

8   still I would say a couple more we need to discuss amongst

9   ourselves.

10          THE COURT:  Okay.  I'll let you continue working then.

11   But I think it will be helpful to get this back, for us to get

12   back to the jury as quickly as possible.

13          MR. HOLZBERG:  Sure.

14          THE COURT:  Thank you.

15          MR. HOLZBERG:  Your Honor, I have a question.  Is the

16   jury going to see the responsive passages for the first three

17   questions while we're figuring out the passage for the fourth

18   question?

19          THE COURT:  How close are you to getting the

20   responsive materials on the fourth question?

21          MR. HOLZBERG:  I think we can probably get it figured

22   out in maybe under 15 minutes.

23          THE COURT:  So we will wait.

24          (Recess)

25          (In open court; jury not present)

```
1                THE COURT:  Counsel.

2                MR. HOLZBERG:  Yes, your Honor.

3                THE COURT:  With respect to question 4, the question

4     reads:  Transcripts regarding Mr. Wims and Tesa surrounding

5     "touching."

6                MR. HOLZBERG:  Yes.

7                THE COURT:  Have counsel identified responsive

8     passages?

9                MR. HOLZBERG:  We have, your Honor.  There's quite a

10    few of them.  First is page 211, lines 5 through 23.

11               MR. WIMS:  Your Honor, I'm sorry to interrupt.  Would

12    it be easier for you and the jury if we just give you the

13    pages?  We had some dispute regarding some line numbers but I

14    think we have total agreement on the pages.  If there is not

15    going to be a redaction, they are going to see the whole page,

16    then we don't need to waste time.

17               THE COURT:  I expect I'm going to have the court

18    reporter read back.  I'm not sending colloquy and objections,

19    stricken testimony, back to the jury.  Okay.  So we are

20    proceeding in the correct way.

21               So Mr. Holzberg, page 211, lines 5 to 23.

22               MR. HOLZBERG:  Correct.  Your Honor, in some of these

23    portions we didn't account for any type of colloquy or

24    objections or anything like that.

25               THE COURT:  That's fine.
```

1              MR. HOLZBERG:  To the fact they exist within those

2     portions, those will be addressed by the court reporter?

3              THE COURT:  I have already taken the colloquy out of

4     the pages you identified with respect to the first three

5     questions.

6              MR. HOLZBERG:  Understood.

7              THE COURT:  So, just give me what you have and we'll

8     deal with it.

9              MR. HOLZBERG:  Understood.  We have page 231, lines 1

10    through 8.  Page 235, lines 4 through 15.

11             Is your Honor ready?

12             Page 253, line 20, through page 254, line 7.  Next is

13    page 281, line 21, to page 282, line 3.

14             Next is 283, line 15, we didn't reach a consensus on

15    the ending point of that segment.

16             THE COURT:  What's the plaintiff's position?

17             MR. HOLZBERG:  I had said until page 284, line 14.

18    And Mr. Wims just said generally to page 286.

19             MR. WIMS:  To 286, line 9.

20             MR. HOLZBERG:  Line 9?

21             MR. WIMS:  Yeah.

22             THE COURT:  Is that it, Mr. Holzberg?

23             MR. HOLZBERG:  No, your Honor.  There's more.

24             Page 306, line 19, to page 307, line 2.  Page 317,

25    lines 8 through 13.

```
 1              I apologize I missed one in chronological order.
 2   There was page 314, line 24, to page 316, line 15.  Should I
 3   repeat the page?  317.  Going in chronological order, just for
 4   clarity's sake I had 306, line 19, through 307, line 2.  Then,
 5   page 314, line 24, through page 316, to line 15.  Then, page
 6   317, lines 8 through 13.  Then page 318, line 13, I had until
 7   line 23.  And Mr. Wims requested page 320, line 6.
 8              Is that correct?
 9              MR. WIMS:  318 from line 13, to 320, line 6.
10              MR. HOLZBERG:  That's what you had.
11              MR. WIMS:  Yeah.
12              MR. HOLZBERG:  I think there may have been colloquy in
13   between.  I had it broken up but -- and then lastly, your
14   Honor, Mr. Wims just said -- what was it?
15              MR. WIMS:  321, 1 through 25.
16              MR. HOLZBERG:  So then page 321:1-322:19.
17              THE COURT:  Is that it?
18              MR. HOLZBERG:  Yes.  May I be seated?
19              THE COURT:  Oh, certainly.
20              So, my deputy informs me that the marshal conveyed the
21   jury's request orally to my deputy that the jury was inquiring
22   how much longer.  And my deputy told them, told the marshal to
23   tell the jury that it wouldn't be much longer.
24              The jury is going to be advised and the marshal as
25   well in the future all questions have to come to me in writing.
```

1    But I wanted to let you know that that question came orally.

2              So, counsel, what I'm inclined to do is, because I'm

3    just working through pulling out the colloquy on the pages

4    responsive to number 4., that I do what you suggested and give

5    them the response to the first three questions, and then they

6    can continue their deliberations.  What I'm going to do, I

7    think this is the most efficient thing, is I've marked up the

8    pages you have identified as responsive, and stricken out the

9    colloquy and the material on those pages that you didn't

10   identify.

11             I'm now going to have my deputy provide those pages to

12   you so you can look and make sure you have no problem with what

13   I struck.

14             I'm now handing you the few pages for question number

15   1.

16             Now number 2.

17             And now number 3.

18             Counsel, have you had a chance to review my redactions

19   from the passages you identified in response to questions 1, 2

20   and 3?

21             MR. HOLZBERG:  Yes, your Honor.  We have.

22             THE COURT:  Do you have any objections?

23             MR. HOLZBERG:  None from the plaintiff, your Honor.

24             MR. WIMS:  No objections from defendant, your Honor.

25             THE COURT:  Bring in the jury.

1                    (Jury present time.  Noted 4:10 p.m.)

2              THE COURT:  Ladies and gentlemen, we have received

3    your note.  It's been marked as a court exhibit.

4              Mr. Whertvine, what is the court exhibit number?

5              THE DEPUTY CLERK:  Number 5.

6              THE COURT:  Thank you.  Let me read it to you:

7              Questions for Judge Cote.

8              1.  Can we please see the transcript from Dr. Cohen's

9    testimony regarding Tesa's honesty.

10             2.  Can we receive texts surrounding the employment of

11   Tesa's sibling, how long were both working.

12             3.  Can we see the mother's testimony in regards to

13   when she was fired from the practice then return.

14             4.  Transcripts regarding Mr. Wims and Tesa

15   surrounding "touching."

16             Counsel have identified responsive passages from the

17   testimony, and in a moment, I'm going to have the court

18   reporter read the responsive passages.  But I have some

19   comments first.

20             One, we've only worked through the responsive passages

21   for the first three questions.  So counsel will need more time

22   for the last question, which is the one about transcripts

23   regarding Mr. Wims and Tesa surrounding touching.

24             In addition, there's one question you've asked that I

25   need to explain we can't respond to.  It is can we receive

 1   texts surrounding the employment of Tesa's sibling.  There are

 2   no texts received in evidence, so we have nothing to provide to

 3   you in response to that question.

 4          So I'm now going to have the court reporter read the

 5   passages that respond to the following questions:  Dr. Cohen's

 6   testimony mentioning Tesa's honesty.  How long Tesa's siblings

 7   were working.  And the mother's testimony in regards to when

 8   she was fired from the practice then returned.

 9          (The record was read)

10          THE COURT:  So, ladies and gentlemen, we're going to

11   continue working on the response to your fourth question, and

12   we'll let you know as soon as we have those passages ready for

13   you.

14          Thank you.  You may return to your deliberations.

15          (Jury continue deliberations.  Time noted 4:24 p.m.)

16          THE COURT:  So, I think what I'll do is have

17   Mr. Whertvine mark as a court exhibit the pages, the marked-up

18   pages that the court reporter just read.  That will give us a

19   record of what was read back to them.

20          I'm going to go to the other room and as quickly as

21   possible markup the pages and send them out to you to look at

22   as I'm doing that, so we can turn this around as quickly as

23   possible.  Thank you, counsel.

24          (Recess)

25          (In open court; jury not present)

```
 1              THE COURT:  So, counsel, I've given you some of the
 2   pages you've identified and tried to quickly do the redactions.
 3   You have looked at those.  I have the remaining set of pages
 4   beginning at 314.  I note, though, that the passages at 314,
 5   pages 314-317 are not part of Mr. Wims' examination.  They're
 6   part of Mr. Holzberg's examination.  And therefore, not
 7   directly responsive to question 4.  And then, the last pages
 8   are Mr. Wims again and that's on recross.
 9              Now, it's fine with me if there is agreement of the
10   parties to send this material in.  I'm going to hand you the
11   last set of pages that I've marked up in response to what we've
12   identified.  And I'd ask you to review them together.
13              MR. HOLZBERG:  Thank you, your Honor.
14              (Pause)
15              MR. HOLZBERG:  Your Honor, I have a question.  Your
16   Honor, may I approach?  Or ask --
17              THE COURT:  So, we have to be clear about what's on
18   the record and what isn't.  So if counsel are speaking for the
19   record, you have to keep your voice up so the court reporter
20   can hear you.
21              MR. HOLZBERG:  Understood.
22              THE COURT:  If you are just having a quiet
23   conversation with my deputy, that's just fine.
24              MR. HOLZBERG:  Just for clarity's sake on page 318,
25   lines 18 to 23, are unmarked but then there is a line drawn
```

 1   across the page with the plaintiff's symbol and unclear whether

 2   you're including lines 4 and 25.  Just curious what that

 3   notation was.

 4          THE COURT:  That marking on page 318 is to be ignored.

 5   So, the material would just continue.

 6          MR. WIMS:  Through line 25, correct, your Honor?

 7          THE COURT:  Yes.

 8          MR. WIMS:  Thank you.

 9          MR. HOLZBERG:  Thank you for clarifying, your Honor.

10   I think I understand, actually.  I had asked, my request was

11   that it be stopped at line 23.  So that may have been why you

12   drew a line there and said plaintiff, because that's where we

13   had requested that the testimony end.  I think that --

14   clarifies that.

15          THE COURT:  So, counsel, having reviewed all these

16   pages, do you have any objections?

17          MR. WIMS:  No, we have --

18          THE COURT:  Based on my redactions or otherwise?

19          MR. HOLZBERG:  Your Honor, I didn't get to review the

20   last page yet.  321.  I'll do that right now.

21          (Pause)

22          MR. HOLZBERG:  We're in agreement, your Honor.

23          THE COURT:  Mr. Wims, are you in agreement as well?

24          MR. WIMS:  Yes, I am, your Honor.

25          THE COURT:  Thank you.  Bring in the jury, please.

1          (Jury present.  Time noted 4:53 p.m.)

2          THE COURT:  Thank you for your patience.  We have the

3    responsive materials for question 4.  The court reporter will

4    read the responsive materials, then I will dismiss you for the

5    evening, unless you jointly agree you want to stay longer, in

6    which case you can send us a note.

7          So here is question 4 again just so you can remember.

8    Number 4.  Transcripts regarding Mr. Wims and Tesa surrounding

9    "touching."

10          (The record was read)

11          THE COURT:  Those are the responsive passages to

12    question 4.  I noted where the responsive passages constitute

13    some of the redirect and then the recross.

14          Good.  So ladies and gentlemen, we're going to assume

15    that you are going home for the evening, and we'll return

16    tomorrow morning at 9:30 to continue your deliberations.  If

17    you want to stay longer, then just send us a note and tell us

18    that and we'll stay too.

19          But, on the assumption that you are leaving now, let

20    me tell you, do not discuss the case with anyone tonight.  And

21    tomorrow you can't discuss it with each other until all eight

22    of you have arrived.  When all eight of you have arrived, you

23    can begin your deliberations immediately.  I will not be

24    calling you in here.  So as soon as all eight are together

25    tomorrow morning, continue your deliberations.

```
 1              Have a good evening.

 2              (Jury excused time noted 5:12 p.m.)

 3              THE COURT:  I want to thank our reporter for doing a

 4    terrific job there with the readback.  Thank you.  Not always

 5    easy.

 6              Counsel, is there anything we need to discuss tonight,

 7    Mr. Holzberg?

 8              MR. HOLZBERG:  No, your Honor.

 9              THE COURT:  Mr. Wims?

10              MR. WIMS:  Your Honor, before the jury leaves, if you

11    could instruct, in addition to not discussing the case, there

12    were some new publications on the internet about this matter

13    yesterday.  Can you reiterate to the jury that they're not to

14    search any parties, attorneys, or anything related to this

15    case.  Because their views could be tainted by that, and it

16    could bleed into any decision they render.

17              THE COURT:  I've just dismissed them, Mr. Wims.  I'm

18    happy to give them that instruction first time I see them

19    again.  Okay.  We're going to mark --

20              MR. WIMS:  Your Honor, if they do it tonight, it would

21    defeat the purpose then.

22              THE COURT:  Mr. Wims, why are you raising this now?

23              MR. WIMS:  Because I didn't think it was appropriate

24    to ask you in front of the jury.

25              THE COURT:  No.  But we have been together all day.
```

1          MR. WIMS:  I understand.

2          THE COURT:  Did you just learn of this?

3          MR. WIMS:  No.  I just thought of it when I heard you

4    tell them not to --

5          THE COURT:  I am not going to call them back in.  I've

6    dismissed them for the night.  Thank you, Mr. Wims.

7          MR. WIMS:  Thank you, your Honor.

8          THE COURT:  We'll mark as a court exhibit the

9    collections of pages that reflect the readback.  They will be

10   exhibits.

11         THE DEPUTY CLERK:  6, 7, 8, and 9.

12         THE COURT:  Thanks so much.  Have a good evening,

13   counsel.

14         (Adjourned until February 9, 2023, at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

n293qorf

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

FORTESA QORROLLI,

                 Plaintiff,              New York, N.Y.

           v.                            18 Civ. 6836 (DLC)

METROPOLITAN DENTAL
ASSOCIATES, D.D.S. – 225
BROADWAY, P.C., et al.

                 Defendants.

------------------------------x

                                         February 9, 2023
                                         10:40 a.m.

Before:

                    HON. DENISE COTE,

                                         U.S. District Judge


                         APPEARANCES



DEREK SMITH LAW GROUP, PLLC
     Attorneys for Plaintiff
BY:  ZACHARY I. HOLZBERG
         DEREK SMITH
         CONSTANCE MOLLICK

DAVID WIMS, LAW OFFICES
     Attorneys for Defendants
BY:  DAVID C. WIMS
             and
GILWITLAW
     Attorneys for Defendants
BY:  MARK D. GILWIT
```

1

2                    (In open court; jury not present)

3              THE COURT:  We have received a note from the jury.

4      Copies have been provided to counsel.  And it will be marked as

5      a court exhibit.

6              THE DEPUTY CLERK:  Court Exhibit No. 10.

7              THE COURT:  It reads:  What happens if we cannot make

8      a unanimous decision.

9              Excuse me just one second.

10             So, obviously this is early in their deliberations,

11     and as I instructed the jury in the charge, their verdict must

12     be unanimous.  And I'll remind them that they're not to tell us

13     the split of the vote at any time.  And I think I repeat that

14     portion of the charge -- for some reason the door is open.

15             THE DEPUTY CLERK:  The CSO.

16             THE COURT:  Thank you.

17             I repeat that portion of the charge on page 32, that

18     every juror should be heard, and don't be stubborn, but on the

19     other hand don't give up your conscientious beliefs because you

20     are outnumbered, and your final vote must reflect your

21     conscientious beliefs, etc.

22             So, I think what I should do is instruct the marshal

23     to have the jurors bring copies of their jury charge with them

24     back into the courtroom, and I will reread portions of page 32

25     to them and send them back to continue their deliberations.

1          Anyone have an objection or a suggestion for a

2     different way to approach this?

3          MR. HOLZBERG:  Your Honor, we would suggest the

4     majority.

5          THE COURT:  Certainly.  Why don't you consult with

6     defense counsel and see if you are willing to take less than a

7     unanimous verdict.

8          Excuse me.  If you could just consult with each other.

9          MR. HOLZBERG:  Thank you.

10         (Counsel conferring)

11         MR. HOLZBERG:  Your Honor, for now --

12         THE COURT:  Counsel, you've had an opportunity to

13    consult.  Is there agreement to take less than a unanimous

14    verdict from the jury?

15         MR. HOLZBERG:  I'm sorry.  Could you repeat the

16    question?

17         THE COURT:  Is there agreement between the parties to

18    take less than a unanimous verdict from the jury?

19         MR. HOLZBERG:  Not at this time, your Honor.  I spoke

20    with counsel.  He said at this point we would like for your

21    Honor to speak with the jury as you intended.  And if there's

22    still an issue later on, we'll revisit the idea if necessary.

23         THE COURT:  Great.

24         I haven't heard from you, Mr. Wims.  Do you agree that

25    I should instruct the jury as I proposed?

1           MR. WIMS:  Yes, your Honor.

2           THE COURT:  Thank you.  I'm going to ask the marshal

3    to bring in the jury, but ask them to bring with them their

4    copies of the jury charge.

5           Thank you, counsel.

6           MR. HOLZBERG:  Thank you.

7           (Jury present.  Time noted 10:45 a.m.)

8           THE COURT:  Good morning, ladies and gentlemen.  I

9    want to say again how much we all appreciate how seriously

10   you're taking your responsibilities as jurors, and we thank

11   you.

12          We've received a note.  It's been marked as Court

13   Exhibit 10.  It reads as follows:  What happens if we cannot

14   make a unanimous decision?

15          I've asked you each to bring a copy of the jury charge

16   with you, and I'm going to ask you to turn to page 32.

17          As you can see at the very bottom of the page, I

18   instruct you, two lines from the bottom, your decision must be

19   unanimous.  You are not to reveal the standing of the jurors,

20   that is, the split of the vote, to anyone, including the Court,

21   at any time during your deliberations.

22          Fine.  That's clear.  But let's go back to page 32,

23   and look at the lengthy paragraph in the middle of that page

24   that begins "as you deliberate."

25          This is the instruction I want to give you at this

1    moment.  So I'm going to read it to you again.

2              As you deliberate, please listen to the opinions of

3    your fellow jurors and ask for an opportunity to express your

4    own view.  Every juror should be heard.  No one juror should

5    hold the center stage in the jury room, and no one juror should

6    control or monopolize the deliberations.

7              If, after listening to your fellow jurors, and if,

8    after stating your own view, you become convinced that your

9    view is wrong, do not hesitate because of stubbornness or pride

10   to change your view.

11             On the other hand, do not surrender your honest

12   convictions and beliefs, solely because of the opinions of your

13   fellow jurors, or because you are outnumbered.

14             Your final vote must reflect your conscientious belief

15   as to how the issues should be decided.

16             Thank you so much.  I'm going to ask you to return to

17   the jury room and continue your deliberations.

18             (Jury continue deliberations.  Time noted 10:49 a.m.)

19             THE COURT:  So, I'll prepare an Allen charge, should

20   the jury send back another note to us indicating that they're

21   unable to reach a decision.  It will be a little stronger than

22   this instruction I just delivered.

23             But, in the meantime, counsel, would you please

24   discuss with each other, as you began to do, whether or not you

25   would accept a less than unanimous verdict.  Again, I'm not

1    going to take a less than unanimous verdict unless there is

2    agreement among the parties to do so.

3              Good.  Anything else we should discuss?

4              MR. HOLZBERG:  Nothing from the plaintiff, your Honor.

5    Thank you.

6              MR. WIMS:  No, your Honor.

7              THE COURT:  Thanks so much.

8              (Recess pending verdict)

9              (In open court; jury not present. Time noted

10   3:10 p.m.)

11             THE COURT:  We have a note from the jury.  It will be

12   marked as court exhibit.

13             THE DEPUTY CLERK:  Court Exhibit No. 11.

14             THE COURT:  It reads:  Can we hear transcripts from

15   the testimonies of Dr. Cohen and Mr. Orantes surrounding the

16   fax sent to the office.

17             Counsel were provided copies of the note, and as I

18   understand it have conferred with each other.  Counsel, have

19   you identified passages that you believe are responsive?

20             MR. HOLZBERG:  We have, your Honor.

21             THE COURT:  Could you please read those into the

22   record.

23             MR. HOLZBERG:  Yes.  So first with respect to

24   Dr. Cohen, we have agreed upon the following passages.  First

25   page 58, lines 7 through 13.

1          Also again, there may have been colloquy in between

2   some of these citations.

3          THE COURT:  That's fine.  We'll deal with that.

4          MR. HOLZBERG:  I wanted to make your Honor aware.

5          THE COURT:  Thank you.

6          MR. HOLZBERG:  So the next citation is page 60, lines

7   13 through 21.

8          Then page 69, line 1, through page 70, line 4.

9          Next is page 83, line 11, through page 85, line 23.

10          Next page 87, line 15, through page 89, line 4.

11          Next page 89, line 12, through page 91, line 8.

12          That is all of the relevant transcript excerpts we

13   found with respect to Dr. Cohen.

14          With respect to Mr. Orantes, page 334, line 5, through

15   page 335, line 13.

16          Next is page 335, lines 19 through 21.

17          Next is page 336, line 5 to 17.

18          And then page 338, lines 10 through 18.

19          And that's it for Mr. Orantes.

20          THE COURT:  I think I have already redacted the

21   Dr. Cohen pages.  I'll hand those to counsel so they can tell

22   me if they agree with the redactions.

23          MR. HOLZBERG:  Thank you, your Honor.

24          THE COURT:  I believe I have a markup of the pages

25   that you've identified as responsive to --

1          MR. HOLZBERG:  Your Honor?

2          THE COURT:  Excuse me.  I'm going to asking my deputy

3     to hand you these additional pages.

4          MR. HOLZBERG:  Thank you.

5          Your Honor?  There is an addition on this page.  I

6     wanted to confirm that's correct.  On the top of page 335, line

7     1.

8          THE COURT:  Excuse me.  Could I have the page, please.

9     Thank you, counsel.

10          So, counsel have identified page 335 as containing

11     material responsive to note number 11.  Could I have page 334,

12     please.  At the bottom of 334 is a question:

13     "Q.  Do you know the nature of that letter?"

14          This was a question posed to Mr. Orantes.  At the top

15     of page 35 is the answer.

16          As it is appears in the transcript, the answer reads:

17     "Scandalous rumors that turned out to be true."  I believe the

18     testimony was "Scandalous rumors that turned out not to be

19     true."

20          Counsel?

21          MR. WIMS:  We're in agreement.  We were going to point

22     that out.

23          MR. HOLZBERG:  I was saying we should check.

24          THE COURT:  Okay.  Well, we can absolutely ask the

25     court reporter to check what was taken down.  It's my

1    recollection that Mr. Orantes testified that the rumors were

2    not true.  I think if he had said they were true, fireworks

3    would have gone off in the courtroom, and we would have had a

4    different kind of examination and trial.  But, absolutely we'll

5    ask the court reporter if there is not agreement of counsel to

6    check.

7                MR. HOLZBERG:  Thank you.

8                THE COURT:  So I'm going to ask my deputy to provide

9    pages 334 to 335 to the court reporter for what assistance it

10   gives her in locating the right material.

11               The court reporter who is with us now is not the court

12   reporter who took this material.  As a result, there is nothing

13   that she can check right now.  She would have to leave the

14   courtroom, try to see if the court reporter who took that

15   testimony is available and can check his equipment.  It's

16   possible that he is in court on another matter and would be

17   unable to check his equipment.

18               Counsel, in these circumstances, do I have agreement

19   that the word "not" should be inserted into the transcript?

20               MR. HOLZBERG:  No, your Honor.

21               THE COURT:  Okay.  Fine.  I'll take those pages back.

22   And we won't read the material from pages 334 to 335 to the

23   jury at this time until we can resolve that.  We'll call the

24   jury back in and I'll have the reporter read the other material

25   to the jury.

1          Counsel, have you concluded reviewing the other pages?

2          MR. HOLZBERG:  No, your Honor.  And also, is it

3    possible that we would have the other questions and answers on

4    those pages read to the jury absent this question and answer

5    until that's resolved or no?

6          THE COURT:  No.

7          MR. HOLZBERG:  Okay.

8          THE COURT:  They need context.  Okay.  Counsel?

9          MR. HOLZBERG:  Can I have -- your Honor, on 336, it's

10   lines 5 to 17.  As it stands right now, lines 18 and 19 are

11   included.  That's a question with no answer.

12         THE COURT:  I'm going to ask Mr. Whertvine to hand me

13   the pages, please.  Thank you for catching that, counsel.  Much

14   appreciated.

15         Counsel do you have some of the pages still?

16         MR. HOLZBERG:  I don't have any, your Honor.

17         MR. WIMS:  No.

18         THE COURT:  Thank you.  Let me just check.

19         MR. HOLZBERG:  May I step out for just a moment?

20         THE COURT:  No.  We need to get back to the jury as

21   quickly as possible.

22         MR. HOLZBERG:  Understood.

23         MR. WIMS:  Judge, we have one additional cite for

24   Mr. Orantes that's responsive.

25         THE COURT:  What page?

1           MR. WIMS:  352, lines 1 through 6.  Counsel agree.

2           THE COURT:  Let me hand you page 352 as marked up.

3           MR. HOLZBERG:  Your Honor.

4           THE COURT:  Is there consent on pages 336, 338, and

5     352 as marked up?

6           MR. HOLZBERG:  Yes, your Honor.  Also, we'll consent

7     with respect to pages 334 and 335.  I still would at some

8     point, like, I mean, obviously the transcript to be updated

9     depending on whether it's correctly stated or not.  But in the

10    meantime --

11          THE COURT:  Counsel, this is an agreement that the

12    transcript should be changed at page 335, line 1, to insert the

13    word "not" N-O-T, so that the answer is "Scandalous rumors that

14    turned out not to be true."

15          MR. HOLZBERG:  Understood.

16          THE COURT:  Is there consent?

17          MR. HOLZBERG:  Sure.

18          THE COURT:  Okay.  Please have the jurors brought in.

19          (Jury present.  Time noted 3:26).

20          THE COURT:  Ladies and gentlemen, we've received a

21    note.  It's been marked as Court Exhibit 11.  Let me read it to

22    you.

23          Can we hear transcripts from the testimonies of

24    Dr. Cohen and Mr. Orantes surrounding the fax sent to the

25    office.

N293qor3                         Verdict

1          The parties have located responsive material, and the

2     court reporter will read those passages to you now.

3          (The record was read)

4          THE COURT:  So that completes the reading of the

5     responsive passages.  We're going to assume that you are going

6     to adjourn today at 5 o'clock, unless we get a note ahead of

7     time, or unless of course you return a verdict ahead of time,

8     in which case I'll call you back into the courtroom at about

9     five to 5 to give you instructions for the evening.

10         Thank you.  You may resume.

11         (Jury continues deliberations.  Time noted 3:43 p.m.)

12         THE COURT:  Thank you, counsel.

13         (Recess pending verdict)

14         (In open court; jury not present)

15         THE COURT:  By the way, the responsive pages for the

16    last readback to the jury were marked as a court exhibit.

17         THE DEPUTY CLERK:  Court Exhibit No. 12.

18         THE COURT:  And we have a note from the jury.  It's

19    been marked as a court exhibit.

20         THE DEPUTY CLERK:  Number 13.

21         THE COURT:  It reads:  The jury has come to a verdict.

22         Counsel have been given a copy.  Please bring in the

23    jury.

24         (Jury present.  Time noted 4:36 p.m.)

25         THE COURT:  Ladies and gentlemen, we've received a

N293qor3                    Verdict

note from you, it says the jury has come to a verdict.  It's
been marked as a court exhibit.

          I've also received the verdict form from you.  I will
now read your verdict to you, and after I have read it, I'm
going to ask each of you individually if what I have read
represents your verdict.

          Question 1.  Did the plaintiff establish by a
preponderance of the evidence that defendant Mario Orantes
subjected Fortesa Qorrolli to a hostile work environment on
account of her sex in violation of Title VII?

          No.

          Did the plaintiff establish by a preponderance of the
evidence that defendant Mario Orantes subjected Fortesa
Qorrolli to a hostile work environment on account of her sex in
violation of the NYSHRL?

          No.

          Did the plaintiff establish by a preponderance of the
evidence that defendant Mario Orantes subjected Fortesa
Qorrolli to a hostile work environment on account of her sex in
violation of the NYCHRL?

          Yes.

          Question 4.  Did the plaintiff establish by a
preponderance of the evidence that defendant Metropolitan
Dental Associates D.D.S. 225 Broadway P.C. is liable?

          Yes.

1              Question 5.  Did the plaintiff establish by a

2      preponderance of the evidence that defendant Metropolitan

3      Dental Associates D.D.S. P.C. is liable?

4              No.

5              6.  Did the plaintiff establish by a preponderance of

6      the evidence that Dr. Paul I. Cohen is liable?

7              Yes.

8              Question 7.  Did the plaintiff establish by a

9      preponderance of the evidence that she is entitled to

10     compensatory damages?

11             No.

12             Question 8.  If you answered "no" to question 7, did

13     the plaintiff establish by a preponderance of the evidence that

14     she is entitled to nominal damages in the amount of one dollar?

15             Yes.

16             Question 11.  Did the plaintiff establish by a

17     preponderance of the evidence that she is entitled to recover

18     punitive damages from Mario Orantes under the NYCHRL?

19             No.

20             Question 12.  Did the plaintiff establish by a

21     preponderance of the evidence that she is entitled to recover

22     punitive damages from Dr. Paul I. Cohen under the NYCHRL?

23             No.

24             Question 13.  Did the plaintiff establish by a

25     preponderance of the evidence that she is entitled to recover

1    punitive damages from Metropolitan Dental Associates D.D.S. 225

2    Broadway P.C. under the NYCHRL?

3              No.

4              Question 14.  Did the plaintiff establish by a

5    preponderance of the evidence that she is entitled to recover

6    punitive damages from the Metropolitan Dental Associates D.D.S.

7    P.C. under the NYCHRL?

8              No.

9              Mr. Luther, is that your verdict?

10             MR. LUTHER:  Yes.

11             THE COURT:  Ms. Delgado, is that your verdict?

12             MS. DELGADO:  Yes.

13             THE COURT:  Ms. Wright, is that your verdict?

14             MS. WRIGHT:  Yes.

15             THE COURT:  Ms. Coelho-Adams, is that your verdict?

16             MS. COELHO-ADAMS:  Yes.

17             THE COURT:  Mr. Vettom, is that your verdict?

18             MR. VETTOM:  Yes.

19             THE COURT:  Ms. Thorne, is that your verdict?

20             MS. THORNE:  Yes.

21             THE COURT:  Ms. Sewell, is that your verdict?

22             MS. SEWELL:  Yes.

23             THE COURT:  Ms. Sharp, is that your verdict?

24             MS. SHARP:  Yes.

25             THE COURT:  Counsel, is there any legal reason or any

1   reason at all that I cannot now dismiss this jury?

2          Mr. Holzberg?

3          MR. HOLZBERG:  No, your Honor.

4          THE COURT:  Mr. Wims?

5          MR. WIMS:  There is not, your Honor.

6          THE COURT:  So, ladies and gentlemen, I'm not going to

7   comment on your verdict.  But I do want to say a few things to

8   you.

9          First, you're released from your obligation not to

10   discuss the case.  You can now freely discuss the case with

11   whomever you would like to discuss it with.  But I have two

12   requests.  One, you can feel free to say no, you don't want to

13   discuss the case.  If you do choose to discuss the case, please

14   share your own views and respect the confidentiality of the

15   jury deliberation process and what went on in that jury room.

16   Okay?  Just share your own views.

17          The other thing I want to say is we were so conscious

18   of how dedicated you were to this process, how carefully you

19   listened to the testimony, how you arrived on time, you made

20   your breaks short.  You were always ready to have the trial

21   continue and be heard efficiently before you, and you have our

22   gratitude for that.

23          I hope you've seen how important jury service is.  We

24   all hope that you're never involved in any litigation, but if

25   you are, you'd like people just like you to be willing to serve

1   as jurors and take their responsibility seriously.  It's a

2   great privilege in America that we have a court system and a

3   jury system, and you are a big part of that now.

4           So, you have our thanks.  And with that, you are

5   excused.  Mr. Whertvine will meet with you and give you any

6   final instructions.  Thank you.  Have a good night.

7           (Jury excused)

8           THE COURT:  Excuse me, counsel.  Please come back.

9   Thank you, you may be seated.

10          So, counsel, I want to go off the record for a moment

11  here and just talk to you about mediation process going

12  forward.

13          (Discussion off the record)

14          THE COURT:  Back on the record.

15          I've had a discussion with counsel about mediation or

16  settlement discussions, and I'll send out the appropriate order

17  making a referral in light of the discussion that I've had.

18  Both the plaintiff and the defendant have expressed a

19  willingness to engage in good faith in those discussions, and I

20  thank them for that representation.  I certainly encourage it.

21          Mr. Holzberg, is there anything else we need to do?

22          MR. HOLZBERG:  No, your Honor.

23          THE COURT:  Mr. Wims, anything further we need to do?

24          MR. WIMS:  Not of which I am aware, your Honor.

25          THE COURT:  I must say, counsel, this trial is the

N293qor3                         Verdict

1    trial that we should have had in the first instance.  The

2    amount of hearsay that came in in the first trial was

3    extraordinary, and I've never seen anything like it.  And the

4    responsibility for that is shared, and I include myself in

5    that.  So, here we are.  The history is what the history is.

6    And I wish the parties very good luck in your negotiations.

7    Thank you, counsel.

8              Marking the verdict as a court exhibit.

9              THE DEPUTY CLERK:  Number 14.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25