```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
FORTESA QORROLLI,                      :
                                       :
                       Plaintiff,      :
                                       :        18cv6836 (DLC)
            -v-                        :
                                       :        OPINION AND ORDER
METROPOLITAN DENTAL ASSOCIATES, D.D.S. :
- 225 BROADWAY, P.C. et al.,           :
                                       :
                       Defendants.     :
                                       :
-------------------------------------- X
```

APPEARANCES:

For plaintiff:
Zachary Ian Holzberg
Alexander Gabriel Cabaceiras
Derek Smith Law Group, PLLC
One Penn Plaza
New York, NY 10119

Stephen Bergstein
Bergstein & Ullrich, LLP
5 Paradies Lane
New Paltz, NY 12561

For defendant Orantes:
David Christopher Wims
David Wims, Law Offices
1430 Pitkin Avenue
2nd Floor
Brooklyn, NY 11233

For defendants Cohen, Metropolitan Dental Associates, D.D.S. –
225 Broadway, P.C., Metropolitan Dental Associates, D.D.S. P.C.:
David Christopher Wims
(see above)

Mark David Gilwit
GilwitLaw
1200 N Federal Highway, Suite 200
Boca Raton, FL 33432

DENISE COTE, District Judge:

On February 9, 2023, at the end of a four-day trial, a jury found the defendants Mario Orantes, Dr. Paul I. Cohen, and Metropolitan Dental Associates, D.D.S. - 225 Broadway, P.C. liable for violating the New York City Human Rights Law ("NYCHRL"), and awarded plaintiff Fortesa Qorrolli $1 in nominal damages.  The plaintiff has moved for a new trial on damages only.  For the following reasons, the plaintiff's motion is denied.

## **Background**

I.   Procedural History

Qorrolli worked as a dental hygienist for the defendants for over six years, leaving their employ in May of 2016. Qorrolli filed this action on July 30, 2018, alleging that her supervisor Mario Orantes sexually harassed her at work, and that the proprietor of her workplace, Dr. Paul I. Cohen, did nothing to stop the harassment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the NYCHRL.  Familiarity with prior Opinions in this action is presumed.  See Qorrolli v. Metro. Dental Assocs., D.D.S – 225 Broadway, P.C., No. 18CV06836 (DLC), 2021 WL 6064520 (S.D.N.Y. Dec. 22, 2021) (granting in part the defendants' motion for summary judgment); Qorrolli v. Metro.

<u>Dental Assocs., D.D.S. - 225 Broadway, P.C.</u>, No. 18CV6836 (DLC),
2022 WL 17689836 (S.D.N.Y. Dec. 15, 2022) (granting the
defendants' request for a new trial).

This action was reassigned to this Court on September 9,
2021.  On December 22, the Court granted the defendants' motion
for summary judgment with respect to the plaintiff's retaliation
claims, but otherwise denied it.  2021 WL 6064520, at *5.  A
trial on the remaining claims was scheduled for April 2022, and
subsequently adjourned until October 2022.

The first trial in this action was held on October 24 to
27, 2022 (the "First Trial").  At the end of the First Trial,
the jury found all defendants liable under Title VII, the
NYSHRL, and the NYCHRL, and awarded the plaintiff $575,000 in
compensatory damages for her emotional distress.  The jury also
found the corporate defendants liable for punitive damages under
the NYCHRL.  After further deliberations, the jury returned a
punitive damages award of $2,000,000 against the corporate
defendants.

On November 18, 2022, the defendants moved for judgment as
a matter of law, a new trial, and remittitur, citing "multiple
irreversible and highly prejudicial events" at the First Trial.
On December 15, the Court granted the defendants' motion for a
new trial, without remittitur.  As detailed in the December 15

3

Opinion, the Court found that a significant portion of the plaintiff's case at the First Trial was based on inadmissible and prejudicial hearsay: "the jury's excessive damages award -- and particularly its award of punitive damages -- [could] only be explained by the unfair prejudice to the defendants from the hearsay offered by the plaintiff."  The jury's damages award was so disproportionate to an award of reasonable damages that a second trial was required.  2022 WL 17689836, at *11. Accordingly, a retrial was scheduled for February 6, 2023 (the "Retrial").

The parties filed their joint pretrial order on January 18, and the defendants filed a motion in limine on January 25, seeking to preclude plaintiff from offering much of the prejudicial hearsay that tainted the First Trial.  The final pretrial conference ("FPTC") was held on January 26.

II.  The Retrial

The Retrial began on February 6, 2023.  As her first witness, the plaintiff called Dr. Cohen.  The plaintiff testified next and then called Orantes.  The plaintiff's mother, Nexhmije Qorrolli, was her final witness.  The parties had agreed that each witness would testify only once during the trial, and therefore the "cross examination" of Dr. Cohen and Orantes was not restricted by the scope of their direct

examination.  The case was submitted to the jury on February 8.
This Opinion summarizes the facts adduced at trial that are
necessary to the disposition of the plaintiff's March 14 motion
for a third trial.  The facts are generally taken in the light
most favorable to the plaintiff, as the verdict winner, but
where indicated, the Court has made its own evaluation of the
evidence pursuant to Rule 59, Fed. R. Civ. P.

A.   The Plaintiff's Testimony

Qorrolli was born in Kosovo, and moved with her family to
the U.S. in 1996 at the age of six.  Immediately after she
obtained her associate degree in dental hygiene, Qorrolli began
her employment as a dental hygienist at Metropolitan Dental
Associates, D.D.S. – 225 Broadway, P.C. ("MDA").[1]  Qorrolli
worked at MDA's main office at 225 Broadway for over six years,
beginning in December of 2009.  She quit her job in May of 2016.
During Qorrolli's employment, Orantes worked as MDA's office
manager, supervising Qorrolli as well as most other MDA
employees regarding non-dentistry matters.  Dr. Cohen owned MDA,
which had four locations at the time of Qorrolli's employment.

---

[1] The plaintiff submitted no evidence as to the relationship
between the two corporate defendants.  Because the jury found
Metropolitan Dental Associates, D.D.S., P.C. not liable, this
Opinion refers only to Metropolitan Dental Associates, D.D.S. –
225 Broadway, P.C.

Three to four months after the start of her employment, Qorrolli received a raise in pay.  Qorrolli testified that around that time, Orantes's conduct toward her became hostile. Orantes began to assign her to an excessive number of patients. Orantes would also regularly take Qorrolli to Dr. Cohen's office and berate her about her job performance in front of Dr. Cohen. Although some of Orantes's criticism was related to her work, some was not -- for example, Orantes would sometimes complain about broken air conditioners or other office conditions.

Qorrolli also testified that Orantes sexually harassed her. In testimony laced with vulgarities and delivered with emotion, she described him as a vicious and manipulative man.  She cried repeatedly during her testimony but declined breaks when offered by the Court.  Qorrolli admitted that Orantes never explicitly propositioned her, but testified that he would frequently hug her, touch her, and make unwelcome comments about her appearance, her body, or how he loved her.  She was afraid that he was trying to have sex with her and that she might have to "give in" to keep her job or to lower her workload.  This pattern began shortly after she joined MDA, although it intensified in 2014.  She explained that she did not leave MDA sooner because she had encouraged her mother to join her in

working there, and both of them were working to pay a mortgage
on their family's home.

Qorrolli explained that she could not recall any specific
instance of sexual harassment that occurred before 2015, but
with the assistance of her diary was able to remember and
describe four instances in which Orantes touched her that
occurred between February and July of 2015.[2]  She described her
diary as notes she entered on her cellphone right after events
occurred.  Qorrolli's attorney showed her a document marked for
identification, and after reading that document to herself,
Qorrolli described the four specific incidents of touching.  In
one incident, Qorrolli joined Orantes in an elevator as she was
going to the gym.  He grabbed her butt, told her she had a "nice
butt" and asked, "[h]ow many squats do you do?"  In another
incident, she was consumed by tears as Dr. Cohen reprimanded
her.  Immediately afterwards Orantes hugged her, wiped her
tears, and kissed her cheek.  Orantes told her "I love you, ok.
Nothing is going to happen.  I promise you."  In the third
incident, after Dr. Cohen had reprimanded Qorrolli, called her
names and threatened to fire her, Orantes approached her, took

---

[2] At the First Trial, she described two of these incidents.  She
testified that once Orantes had touched her "thigh and butt
area" in the elevator as he commented "wow, that's very firm,"
and that in a second incident he had brushed away her tears and
kissed her cheek after she was reprimanded by Dr. Cohen.

her hand, and touched her on the cheek.  He said, "honey, you women are so vulnerable and full of hate."  The fourth incident was substantially similar.  After Dr. Cohen scolded and threatened Qorrolli over the telephone about patient wait times, Qorrolli began crying and Orantes pulled her hand close to him and said "[h]oney, please, I expect so much more from you as a woman."  The plaintiff's mother, who also worked at MDA, testified that she saw Orantes touching and grabbing the plaintiff.  Qorrolli testified that she explicitly told Orantes this conduct was unwelcome.

Qorrolli testified that she told Dr. Cohen multiple times that Orantes was sexually harassing her, but that Dr. Cohen refused to do anything about the harassment.  In April of 2016, roughly one month before she left MDA, Qorrolli gave Dr. Cohen a letter she had written complaining about her working conditions. The plaintiff acknowledged at trial that she did not mention any sexual harassment in the letter.  Qorrolli testified that Dr. Cohen took no action in response to this letter or in response to any of her other complaints.  At the time of Qorrolli's employment, MDA did not have any written sexual harassment policy or employee handbook.

Qorrolli also witnessed events around the office that caused her to believe that Orantes was sexually harassing or

otherwise sexually involved with other female employees.
Qorrolli would often see Orantes pull one female employee into a
room and close the door behind them for 30 to 40 minutes at a
time, from which she inferred that Orantes was sexually
harassing or having sex with the employee.  Qorrolli once saw
Orantes rub himself against another employee with his groin and
make comments about her appearance.  And on another occasion,
Qorrolli walked in on Orantes and yet another employee holding
each other close, with the employee's jacket down around her
shoulders and lipstick smudged on her face.

Around October of 2015, Qorrolli saw an anonymous letter
which had been faxed to MDA and contained allegations of sexual
harassment against Orantes.  She testified that in March of 2016
she complained to Dr. Cohen about Orantes' sexual relationships
with other employees and told him that the fax "confirm[s]
everything that I've been telling you all these years is true."
As far as Qorrolli knew, Orantes was never disciplined in
connection with that letter.

B.   The Plaintiff's Emotional Distress

The plaintiff testified that her experience at MDA impacted
her mental health as well as her family and social life.
Qorrolli began seeing a psychiatrist, Dr. Lee, in June of 2015
due to the stress she was experiencing at work.  She testified

that she used to be consistently happy, but that she continues
to suffer from anxiety and depression that began during her job
at MDA.  She also testified that she became anxious and suffered
from panic attacks and PTSD.  Dr. Lee saw Qorrolli at first
twice a month and then every month.  He prescribed medication to
treat her anxiety, depression, and PTSD.  She listed the names
of the medications for the jury and the dosages she took.  She
stopped seeing Dr. Lee in 2021, five years after she left MDA
and after she had become pregnant.

The plaintiff's mother, Nexhmije Qorrolli, also testified
regarding the plaintiff's emotional distress.  Nexhmije had
previously worked at MDA and returned to work there shortly
after her daughter began her employment at MDA.  She testified
that the plaintiff's demeanor changed significantly after she
began working at MDA, that she would experience panic attacks,
and that she began rubbing her nose in distress so frequently
that it perforated the cartilage in her nose.

C.    Defendants' Testimony

Dr. Cohen had no recollection of the plaintiff ever
complaining about Orantes sexually harassing her, and testified
that the letter she gave him shortly before quitting complained
only of "being told what to do."  He was aware, however, of the
anonymous fax and stated that he "approached Mario directly any

10

time any accusation was made and spoke to him," but did not find
the accusations in the anonymous fax credible.  Dr. Cohen
further testified that he was aware that Orantes disciplined
Qorrolli on certain occasions, but that the market for dental
hygienists was tight following COVID and "you try to keep what
you have."

Orantes maintained that he never sexually harassed
the plaintiff.  He denied all of Qorrolli's allegations,
including that he had touched her, hugged her, and kissed her
cheek.  He testified that he "[has] not touched any part of Ms.
Qorrolli's body ever," and that he never wiped her tears,
although he may have handed her a tissue on occasion.  He
testified that the allegations of sexual misconduct in the
anonymous fax were "[s]candalous rumors that turned out not to
be true," and that he never sexually harassed anyone at MDA.

Orantes further testified that Qorrolli was difficult to
supervise, cried frequently, and took criticism poorly.  He
testified to specific incidents of discipline that he imposed on
the plaintiff and stated that in response she typically had "an
attitude," would cry, or say it was not her fault.

D.   The Verdict

The case was submitted to the jury on February 8.  The jury
returned a verdict for the plaintiff on February 9.  The jury

found that the plaintiff had not carried her burden to prove a
violation of either Title VII or the NYSHRL.  The jury found
defendants Mario Orantes, Paul I. Cohen, and Metropolitan Dental
Associates, D.D.S. - 225 Broadway, P.C. liable, however, for
violations of the NYCHRL, and awarded the plaintiff $1 in
nominal damages for her emotional distress.[3]  The jury found
defendant Metropolitan Dental Associates, D.D.S., P.C. not
liable, and lastly found that the plaintiff was not entitled to
any compensatory or punitive damages.

## Discussion

The plaintiff has moved for a new trial on damages alone,
under Fed. R. Civ. P 59(a)(1)(A), or in the alternative, an
amended judgment on damages under Fed. R. Civ. P. 59(e).  The
motion became fully submitted on April 21, 2023.  The
plaintiff's request to amend the damage award is unexplained,
and she has not provided any figure for an alternate award or
described a process through which a figure would be identified.
The request for an amended judgment will therefore be treated as
a further request for a new trial on damages.  For the reasons
given below, the plaintiff's motion is denied.

---

[3] The only form of compensatory damages that the plaintiff sought
was emotional distress damages.

Under Fed. R. Civ. P. 59(a)(1)(A), a district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Such a motion "ordinarily should be denied unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  ABKCO Music, Inc. v. Sagan, 50 F.4th 309, 324 (2d Cir. 2022) (citation omitted).  When considering a motion for a new trial under Rule 59(a) on the ground that the jury's verdict is against the weight of the evidence, the Second Circuit has instructed that a "high degree of deference is accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." ING Glob. v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 98 (2d Cir. 2014) (citation omitted).

Likewise, under Rule 59(e), "district courts may alter or amend judgment to correct a clear error of law or prevent manifest injustice."  4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202, 216 (2d Cir. 2019) (citation omitted).  A Rule 59(e) motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."  Id. (citation omitted).

Qorrolli argues that the Court should grant a new trial on damages for violation of the NYCHRL because: (1) the nominal damage award was against the weight of the evidence, and (2) the Court improperly excluded four exhibits.  Each contention is addressed in turn.

I.  Nominal Damage Award

The plaintiff has not shown that the award of nominal damages was erroneous, much less seriously so, or that it was a miscarriage of justice.  To place the damages award in context, it is important to note that the plaintiff failed to establish that Orantes subjected her to a hostile work environment on account of her sex in violation of either Title VII or the NYSHRL.  In other words, the jury rejected Qorrolli's claim that she suffered sexual harassment that, in the words of the jury charge, "was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment."  See Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015).  Instead, the jury found only that Orantes' actions violated the NYCHRL.  The jury was charged that such a violation required the plaintiff to establish that "she was treated less well than other employees" because of her sex.  See Emamian v. Rockefeller Univ., 971 F.3d 380, 389-90 (2d Cir. 2020).  As the charge explained, to prevail under the NYCHRL, she did not have

14

to prove that the harassment she suffered was severe or
pervasive or that it changed the terms of her employment.  If
the jury found that she was treated less well because of her
sex, then the defendants could avoid liability only if they
proved that the conduct complained of consisted of nothing more
than what a reasonable victim of discrimination would consider
petty slights and trivial inconveniences.  Thus, the verdict on
liability indicated that the jury rejected the most serious of
the plaintiff's claims but found that the discrimination she
experienced amounted to more than petty slights.

The standard for awarding damages was delivered to the jury
without objection by the parties.  The charge instructed the
jury that compensatory damages are those meant "to compensate [a
plaintiff] for the actual harm she suffered, if any, as a direct
result of the violation."  The damages "must be fair and
reasonable, neither inadequate nor excessive."  The jury was
told that it should not award damages for speculative injuries,
but only for those injuries that the plaintiff actually suffered
because of the violation, and that it was the plaintiff's burden
to prove the amount of damages.  The plaintiff bore the burden
of "present[ing] credible testimony with respect to the claimed
distress [damages]," and any award had to be fair in light of
the trial evidence.  The jury was told that it could award

damages for pain, suffering, humiliation, mental anguish or emotional distress.  The plaintiff did not have to prove her claim through expert medical testimony.

Where, however, the jury concludes that the "only injury that a plaintiff suffered was the deprivation of her rights without any actual damages" or is "unable to compute monetary damages except by engaging in pure speculation and guessing" it was told it should award nominal damages, as it did here.[4] "Either she experienced actual damages, in which case you must award compensatory damages, or else she did not, in which case you must award nominal damages."

The evidence at trial was consistent with an award of only nominal damages for the violation of the NYCHRL.  The trial evidence consisted exclusively of witness testimony.  Thus, whether Qorrolli was entitled to any compensatory damages for her emotional distress turned on the jury's evaluation of the credibility of the witnesses.  "[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."  Raedle v. Credit

---

[4] Plaintiff "submits that the Court's instruction regarding nominal damages may have caused confusion among the jury."  The same charge regarding compensatory and nominal damages was given without objection at the First Trial, and the plaintiff had no objection to the charge at the Retrial.

<u>Agricole Indosuez</u>, 670 F.3d 411, 418 (2d Cir. 2012) (citation omitted).

Qorrolli presented evidence of her emotional suffering and damages, and exhibited that distress throughout her testimony, as did her mother.  Qorrolli testified that her job caused her anxiety and depression, that she saw a psychiatrist for a period of time, took serious medications prescribed by that doctor in order to treat her condition, and that she experienced physical manifestations of the distress in the form of panic attacks, difficulty sleeping, a depressed mood, and damage to her nose. The jury was free, however, to reject or question the severity of her symptoms and the credibility of her testimony, or to find that the plaintiff failed to prove that her distress was due to a violation of her rights under the NYCHRL.

In assessing the plaintiff's credibility, the jury was entitled to consider all of the evidence, including Qorrolli's demeanor and responsiveness on the stand.  Indeed, she may have undercut her own credibility.  Her attorney found it difficult to manage her as a witness -- she was strong willed and frequently unable to confine her answers to the questions that he asked even after being instructed to do so by the Court.  The jury was also entitled to find her testimony overwrought when compared to the conduct it found had actually occurred.  Several

17

times during the trial the plaintiff was impeached with prior inconsistent statements.

There was also circumstantial evidence that undermined Qorrolli's assertion that her suffering was due to discriminatory treatment.  For example, despite Qorrolli's assertion that Orantes sexually harassed her continuously for over six years, she failed to include any mention of sexual harassment in her letter of complaint to Dr. Cohen, which she testified contained "everything that [Orantes] was putting us through."  Qorrolli could only describe four instances of unwanted touching with any detail -- and even those were only described after her attorney refreshed her recollection of the events using her cellphone diary.  Despite the allegedly hostile work environment that she endured for over six years, Qorrolli testified that her mother also worked at MDA for all but the first months of that period and that she recruited both of her siblings to work there as well.

In sum, there is a clear path by which the jury could have arrived at an award of only nominal damages.  The jury could have credited Qorrolli's version of events when it found that the defendants' actions constituted a violation of the NYCHRL -- that Qorrolli was treated less well than others because of her sex -- and yet also concluded that any suffering they found she

18

experienced was due to a non-discriminatory unpleasant work environment and not to discriminatory treatment.  For example, the jury heard that she was continually criticized for the quality of her work and that she found her work schedule oppressive.  When paired with the whole verdict, which found that the plaintiff had not been subjected to sexual harassment as measured by the standards that apply to Title VII and the NYSHRL, the jury may have found that much of Qorrolli's highly emotional testimony was incredible or irrelevant to the charges of sexual harassment.  Alternatively, the jury could have reasonably concluded that any compensatory damages award would have been purely speculative.

Accordingly, the record in this case provides an insufficient basis on which to conclude that the jury's nominal damage award was "seriously erroneous," or a "miscarriage of justice."  ABKCO Music, 50 F.4th at 324.  This is especially so given that this verdict turned primarily on the credibility of the witnesses, determinations that courts are loathe to question.  There is thus no basis to upset the jury's award of $1 in nominal damages.

II.  Evidentiary Rulings

Qorrolli next argues that four exhibits were improperly excluded from the Retrial, and that their exclusion warrants a

new trial on the amount of damages to be awarded on the NYCHRL
claim.  She does not seek a new trial on the issue of liability
based on the exclusion of these documents.  The plaintiff has
not shown that the evidentiary rulings were made in error, or
that she is entitled to a new trial on damages because either
any one of or all four of the exhibits were excluded from the
trial evidence.  "[A]n erroneous evidentiary ruling warrants a
new trial only when a substantial right of a party is affected,
[such] as when a jury's judgment would be swayed in a material
fashion by the error."  Restivo v. Hessemann, 846 F.3d 547, 575
(2d Cir. 2017) (citation omitted).

A.   Plaintiff's Cellphone Diary

The plaintiff first argues that the Court erred in
excluding her cellphone diary as a trial exhibit.  She contends
it was admissible under Rules 803(1), (3), and (5), Fed. R.
Evid.  It was not.

The diary is a 21-page printout of an e-mail that the
plaintiff sent to her counsel in May of 2019.  The e-mail
purports to contain a copy of entries that the plaintiff made in
her cellphone shortly after certain events transpired at MDA.
The material appears to reflect entries made between December
23, 2014 and May 2, 2016.  Many of the entries in the diary have
a day or a month or a general topic heading associated with

20

them.  Some of the entries are lengthy paragraphs running
hundreds of words long.  Each entry describes a conversation or
interaction between the plaintiff and either a co-worker or the
defendants.  Many relate to the issue of overtime, and many of
the headings indicate as much.  In most of the entries the
plaintiff complains that she has been wrongfully accused by Dr.
Cohen of poor work performance and wrongfully threatened with
firing over that poor work.  She records abusive language used
by others.  There are a handful of entries that relate to her
accusations at trial against Orantes.

Relying on United States v. Jones, 299 F.3d 103 (2d Cir.
2002), the Court ruled on October 25, 2022 at the First Trial
that the diary was hearsay and that this calculated narration of
past conversations or events was not admissible as either a
present sense impression or an excited utterance under Rules
801(1) and (2), respectively.  At the First Trial, the plaintiff
used the diary to refresh her recollection as to one incident.

At the FPTC for the Retrial, held on January 26, 2023, the
plaintiff sought to admit the entire diary, now citing Rules
803(1) and 803(3).[5]  On that day, and again on February 6, the

---

[5] In the instant motion, the plaintiff raises for the first time
the argument that the diary should have been admissible under
Rule 803(5).  That request is untimely.  In any event, the
plaintiff never established a failure of recollection that would

Court denied the plaintiff's request.  The Court adopted its
ruling from the First Trial, and relied as well on United States
v. Lawal, 736 F.2d 5 (2d Cir. 1984), to observe that, to the
extent the entries reflected prior conversations, they did not
reflect the plaintiff's then-existing state of mind.  Finally,
the Court explained why any limited probative value of the diary
was substantially outweighed by Rule 403 concerns.

At the Retrial, the plaintiff explained her process for
making notes in her cellphone right after memorable events and
then her attorney used the diary to refresh her recollection.
Indeed, the only specific instances of physical contact with
Orantes that she was able to describe for the jury were
instances in which she explicitly used the diary to refresh her
recollection.  The jury was thereby left with the impression
that everything she was relating to them about these incidents
was confirmed by her diary entries.

In this motion for a new trial, the plaintiff has failed
to explain how the 21-page document, which contained largely
irrelevant material, was admissible or how its exclusion may
have affected the jury's verdict on damages.  In her reply

---

permit it to be used as recorded recollection.  Indeed, she used
it to refresh her recollection at the Retrial.

brief, she has abandoned any argument that its exclusion is a basis for a new trial on damages.

B.   Plaintiff's Psychiatric Records

The plaintiff next argues that she is entitled to a new trial on damages because the Court excluded the records from plaintiff's psychiatrist, Dr. Seung Ho Lee.  She argues that they are admissible as medical records pursuant to Rule 803(4), Fed. R. Evid.  There was no error in the exclusion, and no prejudice to the plaintiff from that exclusion.

The records are a 23-page printout.  The document reflects 11 meetings between plaintiff and her psychiatrist from June 10, 2015 through August 31, 2016.  The records contain Dr. Lee's general descriptions of the plaintiff's mental wellbeing -- including that she was having problems in the workplace, having trouble sleeping, and experiencing symptoms of depression.  Many of the later entries are "cut and paste" repetitions of prior entries.  Very few entries reflect any statements made by the plaintiff to the doctor.  There are limited references to Orantes, and none of those references describe the specific instances of sexual misconduct described by plaintiff at the Retrial.  He is described as "very manipulative" and "verbally abusive."  There is no description of a specific event and no use of the term sexual harassment.

The records include a diagnosis of panic disorder, PTSD, and major depressive disorder.  With regard to the PTSD diagnosis, the record from the first appointment reflects that plaintiff "experienced a traumatic event" and that she experiences flashbacks and distressing dreams about this event. It does not identify the event.  The PTSD diagnosis explains that it includes "PTSD for Children 6 yrs. and younger."  The records do not provide further context for the event which caused the PTSD diagnosis.  Finally, the records list prescribed medications and coping strategies.

At the FPTC, the Court reserved decision on the admissibility of the medical records.[6]  On February 6, the Court granted the defendants' motion to exclude the records.

Statements made by a medical professional to a patient are not admissible under Rule 803(4).  See Field v. Trigg Cnty. Hosp., Inc., 386 F.3d 729, 735-36 (6th Cir. 2004).  While statements made for the purpose of a medical diagnosis or treatment are admissible, there were few such statements in the proffered records.  Applying the balancing test under Rule 403, the Court excluded the records.  The parties were, however, allowed to elicit from the plaintiff the dates of her

---

[6] At the First Trial, the plaintiff withdrew her offer of the medical records.

appointments and the medications prescribed.  The Court ruled
that "the plaintiff may not tell the jury what she told the
psychiatrist, or the diagnosis she received."

The plaintiff has not shown that there was any error in the
exclusion of the psychiatric records, that she was prejudiced by
the exclusion, or that the exclusion entitles her to a new trial
on damages.  In her testimony at the Retrial, the plaintiff
described her decision to obtain psychiatric help because of her
experiences at work.  She testified that she began experiencing
anxiety and panic attacks, and eventually sought psychiatric
help because she "couldn't cope with the situation at work" and
"quitting wasn't an option."  Despite the Court's ruling, she
described the diagnoses provided by her treating physician,
including the diagnosis of PTSD.  She also listed the
medications she was prescribed.

C.   Deposition Testimony of Mercedes Vila

The plaintiff next contends that it was error to find that
the plaintiff had not carried her burden to show that Mercedes
Vila was unavailable to testify in person at the Retrial.  She
argues that the finding prevented the plaintiff from offering
Ms. Vila's deposition testimony as evidence, and that her
testimony was relevant to an award of punitive damages under the

NYCHRL.  The deposition was properly excluded under Rule
32(a)(4)(C), Fed. R. Civ. P.

Ms. Vila had worked with the plaintiff at MDA for about a
year, before Ms. Vila left MDA in December of 2010.  In her
deposition she testified that she went with the plaintiff a few
times to tell Dr. Cohen that Orantes was making inappropriate
comments, that she did not overhear any sexual comments that
Orantes made to the plaintiff, that on one occasion she saw
Orantes touch the plaintiff's waist, and she saw him bump into
the plaintiff in the hallway sometimes.  The plaintiff did not
take Ms. Vila's deposition during the period for fact discovery
but was permitted by the Court to take it on the eve of the
First Trial.

Shortly before the First Trial, plaintiff's counsel
requested that Ms. Vila be allowed to testify remotely because
he had "recently learned" that Ms. Vila was "suffering from
Stage 4 cancer and is unable to appear in person for health
reasons."  The Court denied the request but allowed the
plaintiff to take Ms. Vila's deposition, and noted that the
deposition could be offered at trial "[u]pon a showing that the
witness is unable to be present at the trial due to illness."
Ms. Vila's deposition was taken at her place of employment on
October 19.  At the FPTC ahead of the First Trial, on October

20, the defendants objected to receipt of the deposition and the
Court cautioned the plaintiff that she bore the burden of
proving the witness' unavailability.

The plaintiff subpoenaed Ms. Vila to testify at the First
Trial, but she refused to come, complaining that she had the flu
and was not going to testify.  On the second day of trial,
October 25, the plaintiff procured a doctor's note from Ms.
Vila's physician, which indicated that Ms. Vila should avoid
situations that might affect her anxiety and that she cannot
remain seated for prolonged periods.  The doctor's note made no
mention of the cancer diagnosis.  Without ruling on the issue of
availability, on October 25 the Court excluded the deposition
testimony at the First Trial on the ground that the specific
passages of the deposition described by plaintiff's counsel
during his proffer did not sufficiently support the reason given
for their admission, to wit, that Ms. Vila was present as the
plaintiff complained to Dr. Cohen that Orantes was sexually
harassing the plaintiff.

On the first day of the Retrial, February 6, 2023,
plaintiff's counsel advised the Court that he was "not sure" if
Ms. Vila would appear at trial to testify.  The plaintiff had
subpoenaed Ms. Vila to appear at the Retrial.  The Court

cautioned that, without a showing of witness unavailability, the deposition would be inadmissible.

Around 1:20 pm on February 6, the Court received, as an email attachment, a letter dated February 2 from Ms. Vila's physician (the "February 2 Letter").  The February 2 Letter recites Ms. Vila's serious medical conditions, including breast cancer.  The letter states that "[t]he patient cannot attend court, trial sessions due to her medical conditions.  Please afford her the appropriate accommodations."  The plaintiff then moved to admit -- first, in its entirety, and then passages he would designate --  Ms. Vila's deposition testimony under Fed. R. Civ. P. 32(a)(4)(C).  The plaintiff was given an opportunity to provide defense counsel with the deposition designations that night.

The next day, February 7, the Court explained why it is important to have live testimony for the jury, and relying on a totality of the circumstances test, gave its reasons for finding that the plaintiff had failed to establish that Ms. Vila was actually unavailable to testify in person.  The Court observed that it would ordinarily find a doctor's note to be determinative regarding unavailability, but Ms. Vila was still travelling to and attending work in Manhattan; plaintiff's counsel had been uncertain whether Ms. Vila would testify in

person; the physician's letters were vague and produced only at
the eleventh hour; and, it appeared the doctor had simply
"accommodated a witness's desire not to appear because of the
emotional stress" an appearance would entail.  The plaintiff has
failed to show that this ruling was in error or that the absence
of the proffered deposition testimony would have made any
difference to the outcome of the trial, much less to the jury's
determination about an award of punitive damages.

    D.   The Anonymous Fax

    Finally, the plaintiff contends that the Court erred in
excluding as an exhibit at trial an anonymous fax sent to fax
machines at MDA in 2015, several months before the plaintiff
left her employment at MDA.  The plaintiff admits that the fax
contains inadmissible hearsay, but argues that it should have
been admitted in any event as evidence that the defendants had
received notice of allegations of sexual harassment against
Orantes.  The document was properly excluded from the Retrial
under Rules 403 and 802, Fed. R. Evid.  Moreover, the plaintiff
was permitted to testify to pertinent facts about the fax.

    The document was an anonymous letter which was faxed to the
dental office in October of 2015 and addressed to Dr. Cohen.  It
accuses Orantes of engaging in sex with office staff both at the
office and elsewhere, threatening employees with cutting their

hours, and giving certain employees raises and free dental services in exchange for sex.  The fax states that Orantes was assisted by an older female employee in this behavior and that he sent inappropriate texts to female employees.  The fax does not discuss the plaintiff.

At the First Trial the fax was admitted into evidence and published to the jury, with limiting instructions.  Despite the limiting instructions, plaintiff's counsel posed questions to the witnesses and made arguments in summation as if the document had been received for the truth of its contents.  2022 WL 17689836, at *4.

At the Retrial, the plaintiff again sought to admit the fax to show that Dr. Cohen had notice of allegations of sexual harassment against Orantes.  At the FPTC the Court excluded the fax as inadmissible hearsay and pursuant to Rule 403.  The Court permitted counsel to elicit that there was an anonymous fax received at the workplace, the date it was received, that it contained a complaint of sexual harassment against Orantes, that the plaintiff saw it, that the plaintiff discussed it with one or both of the defendants, and if she did discuss it with either of them, the entirety of those conversations.

At the Retrial, the plaintiff elicited that: in October of 2015 she saw the anonymous fax, it contained allegations of

sexual harassment against Orantes, and that she discussed the
fax with Dr. Cohen and told him the fax "confirm[s] everything
that I've been telling you [about Orantes' sexual relationships
with other employees] all these years is true."  Orantes
testified that he saw the fax when it was recieved, that he
believed Dr. Cohen had also seen it, and that Dr. Cohen "had an
investigation" but did not talk to him directly about the
accusations in the fax.  Orantes stated that the fax contained
scandalous false rumors.  For his part, Dr. Cohen testified that
he "was informed a long while ago about an anonymous fax," that
"it was vulgar," and that he "asked Mario what's going on with
this letter."  When asked if there was an investigation in
response to the fax, Dr. Cohen stated "I approached Mario
directly any time any accusation was made and spoke to him."
Dr. Cohen explained that he did not find the accusations in the
anonymous fax credible.

It was not error to exclude the fax.  Its serious
accusations of sexual misconduct are made anonymously and cannot
be received for the truth.  The risk of unfair prejudice to the
defendants is severe, and any probative value is far outweighed
by those risks.  The plaintiff sought to use the document to
show that Dr. Cohen was on notice that allegations of sexual
misconduct had been made against Orantes, and she was permitted

to refer to it for that purpose.  The plaintiff has failed to show that there was any error in these rulings, much less that she is entitled to a new trial on damages because it was not received in evidence.  Its receipt could only impact a damages award if the jury accepted its unsworn allegations as true, the very problem that infected the First Trial.

The plaintiff makes two arguments in support of her motion for a third trial.  First, she argues that the document should have been received in evidence at the Retrial since it had been received in evidence at the First Trial.  For the reasons explained in the December Opinion, it was error to receive the fax in evidence at the First Trial.  That error should not be repeated.

The plaintiff next argues that Orantes falsely testified at the Retrial that the letter did not directly accuse him of sexual harassment, and that that false testimony may have impacted the jury's decision not to award punitive damages. Orantes testified that the fax had "nonsense malicious things" in it and "[s]candalous rumors that turned out not to be true." When asked if he was aware that the fax contained allegations that he was "sexually harassing females employees" at MDA, Orantes replied: "[t]here was no specific names saying that I sexually harassed anyone.  It accused of many different things,

32

but nothing specific in nature."  Counsel continued, "Isn't it true that the letter directly accused you of sexual harassment?" and Oranted replied "No."

The fax does accuse Orantes of using his power "to sexually harass" females at MDA.  The plaintiff has failed to show that this denial entitled her to introduce the fax, and that she should now be given a new trial at which she would do so.  The fax is pure hearsay and is also inadmissible under the Rule 403 balancing test.  Notably, plaintiff's counsel did not renew his request to offer the fax as an exhibit at trial following Orantes' denial.  The testimony about the fax was sufficiently damaging to the defendants that plaintiff's counsel was able to argue in summation that

> We all know that Dr. Cohen had notice of this letter
> that was faxed to his office, this letter made
> allegations that [Orantes] was sexually harassing
> female employees at Metropolitan Dental.  You heard
> testimony that Tessa and [Orantes] spoke to Dr. Cohen
> about this letter.  Dr. Cohen saw it and had notice.

Counsel continued,

> Now, you also heard Mr. Orantes testify that defendant
> Cohen conducted an investigation and recorded
> interviews in connection with that investigation.  You
> know what struck me?  Where are those records showing
> the results of that investigation? . . . If those
> records or those recordings showed that [Orantes] did
> not sexually harass female employees at MDA, you would
> have heard them.

## Conclusion

The plaintiff's March 14, 2023 motion for a new trial or an amended judgment is denied.

Dated:    New York, New York
          May 25, 2023

                                    _____
                                         DENISE COTE
                                    United States District Judge

34